James E. Cecchi
**CARELLA, BYRNE, CECCHI,
  OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

*Liaison Counsel for Plaintiff Lehigh County
Employees' Retirement System*

Gerald H. Silk
Hannah Ross
Avi Josefson
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400

*Counsel for Plaintiff Lehigh County Employees'
Retirement System*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LEHIGH COUNTY EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NOVO NORDISK A/S, LARS REBIEN SØRENSEN, and JESPER BRANDGAARD,<br><br>Defendants. | Civil Action No.<br><br><br><br>**COMPLAINT and DEMAND FOR JURY TRIAL** |

Plaintiff Lehigh County Employees' Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by Novo Nordisk A/S ("Novo Nordisk" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Novo Nordisk; and (d) other public information regarding the Company.

**INTRODUCTION**

1.      This federal securities class action is brought on behalf of all those that purchased Novo Nordisk American Depositary Receipts ("ADRs") between April 30, 2015 and October 27, 2016, inclusive (the "Class Period").   The claims asserted herein are alleged against Novo Nordisk and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Novo Nordisk is a pharmaceutical company focused on producing insulin and other diabetes treatments.   Other than Novo Nordisk, only a few other companies manufacture insulin-based medicines, with the main players being Sanofi, Eli Lilly and Merck.   To capitalize on their dominant position in the market, the Company, together with Sanofi, Eli Lilly and Merck, entered into a collusive agreement to increase the prices of their insulin drugs.   Indeed, the prices of these firms' insulin products skyrocketed over the past decade in a suspiciously close and synchronized manner.

3.      Throughout the Class Period, Defendants reported impressive revenue, operating profit growth and sales growth.   In addition, Novo Nordisk told investors that the Company would achieve sales and operating profit growth of between 5% and 9% in 2016, as well as 10% operating profit growth over the long-term.   Further, while certain of Novo Nordisk's competitors acknowledged that revenue from their insulin franchises would dwindle given the increased pricing pressures from pharmacy benefit managers ("PBMs"), powerful middlemen that buy drugs on behalf of insureds and employers, Novo Nordisk assured investors otherwise.

4.      These statements, and similar statements issued throughout the Class Period, were materially false and misleading.   In truth, Novo Nordisk's reported earnings and forecasts were

materially misleading in that they were inflated through the collusive price fixing of the Company's insulin drugs. The inflated financial results reported to investors concealed the true extent of the pricing pressures the Company was experiencing in the U.S., which Novo Nordisk was only able to conceal by engaging in collusive activity.

5.      Investors began to learn the truth regarding Novo Nordisk's business through a series of corrective disclosures. On August 5, 2016, the Company announced disappointing earnings for the second quarter of 2016 because, despite its scheme, Novo Nordisk was finally unable to conceal the significant pricing pressures it was experiencing across its portfolio. Significantly, these pricing pressures forced the Company to lower its sales and operating growth targets for 2016. While CEO Lars Rebien Sørensen assured investors that the Company would still be able to increase prices in certain instances and reaffirmed Novo Nordisk's ability to grow its operating profit at a 10% rate, this news caused the price of the Company's ADRs to decline from $55.20 per ADR on August 4 to $49.87 per ADR on August 5, or approximately 10%.

6.      On August 8, 2016, Novo Nordisk held a Management Roundtable discussion in London to provide more details into the Company's business and pricing strategy. According to an analyst report issued by Kepler Cheuvreux on August 9 that summarized the Management Roundtable, the reality is that major net pricing upgrades in the U.S. will be the exception as opposed to the norm, and that there will be no quick rebound from the Company's stagnating growth. This news caused the price of Novo Nordisk ADRs to decline from $49.87 per ADR on August 5 to $47.13 per ADR on August 8, or nearly 6%.

7.      Then, on October 28, 2016, Novo Nordisk cut its long-term profit growth forecasts by 50%, specifically citing the increased pricing pressures on diabetes drugs in the U.S. In addition, the Company further cut its 2016 sales growth and operating profit growth targets.

Separate from the disappointing earnings, the Company also announced that it received a Civil Investigative Demand from the U.S. Attorney's Office for the Southern District of New York seeking information relating to Novo Nordisk's contracts and business relationships with PBMs concerning its insulin products named NovoLog, Novolin and Levemir.  On this news, the price of Novo Nordisk ADRs declined from $40.94 per ADR on October 27 to $35.66 per ADR on October 28, a decline of roughly 13%.  This is the largest decline in the price of Novo Nordisk ADRs in more than 14 years.

8.      Subsequent to the close of the Class Period, on November 3, 2016, Senator Bernie Sanders and Representative Elijah Cummings sent a letter to the U.S. Department of Justice calling on federal antitrust regulators to probe illegal collusion by Novo Nordisk and the three other major insulin producers—Sanofi, Eli Lilly, and Merck—to set the prices for insulin and other diabetes drugs.  In a tacit acknowledgement of its improper conduct, Novo Nordisk pledged on November 30, 2016 to limit all future drug list price increases to single-digit percentages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Novo Nordisk maintains its U.S. headquarters in Plainsboro, New Jersey, which is situated in this District, and the acts and conduct that constitute the violations of law complained of herein, including the preparation and/or dissemination to the public of materially

false and misleading information, occurred in this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

11.     Plaintiff Lehigh County Employees' Retirement System ("Plaintiff"), based in Pennsylvania, is a defined benefit plan governed under the Taft-Harley Act.  Plaintiff provides retirement, disability and death benefits to workers within the County of Lehigh, Pennsylvania. Currently, Plaintiff manages approximately $425 million in assets on behalf of approximately 3,600 participants.  Plaintiff purchased shares of Novo Nordisk ADRs on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

12.     Defendant Novo Nordisk is a global healthcare company focused on diabetes care and is one of the largest producers of insulin medications.  Based in Denmark, the Company was formed in 1989 by a merger of two Danish companies, Nordisk Gentofte A/S and Novo Industri A/S.  The Company maintains its U.S. headquarters at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.  Novo Nordisk ADRs trade on the New York Stock Exchange, which is an efficient market, under ticker symbol "NVO."  As of December 31, 2015, Novo Nordisk had over 240 million ADRs outstanding, owned by hundreds or thousands of investors.

13.     Defendant Lars Rebien Sørensen ("Sørensen") is, and was at all relevant times, President and Chief Executive Officer of Novo Nordisk.  On September 1, 2016, Novo Nordisk announced that Sørensen would resign from the Company by the end of 2016.

14.     Defendant Jesper Brandgaard ("Brandgaard") is, and was at all relevant times, Executive Vice President and Chief Financial Officer of Novo Nordisk.

15.     Defendants Sørensen and Brandgaard are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Novo Nordisk, possessed the power and authority to control the contents of Novo Nordisk's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## **BACKGROUND**

16.     Novo Nordisk is a global healthcare company and one of the most prolific producers of diabetes medications.  Diabetes is a metabolic condition in which a person's pancreas cannot produce insulin, a hormone that controls blood sugar levels.  Patients with diabetes—about 30 million in the U.S. and another 360 million worldwide—are primarily treated through daily injections of insulin.  Novo Nordisk derives roughly 80% of its revenues from selling insulin-based medications.  While there are millions of patients with the condition, the world market for insulin is dominated by just a handful of companies.  Those companies are Novo Nordisk, Sanofi, Eli Lilly and Merck.

17.     To capitalize on their oligopoly, Novo Nordisk and the three other major players in the insulin market colluded to increase the prices of their drugs.  Indeed, according to an analysis prepared by the *Washington Post*, over the past two decades, Novo Nordisk was able to raise the price of its insulin drugs 450% above the rate of inflation.  From 2010-2015, the Company raised the price of its signature diabetes drug (Levemir) by 169%.  In 2014-2015 alone the Company increased Levemir's price by 30%, and increased the price of its NovoLog product by nearly 21%.  As Novo Nordisk recently admitted, these price increases were so significant that "many patients simply can't afford the medicine they need."

18.     Critically, these price increases were closely synchronized with price increases by the Company's purported competitors.  For instance, on May 30, 2015, Sanofi increased the price of its diabetes medication Lantus by over 16%.  The very next day, Novo Nordisk increased the price of Levemir by the exact same amount.  The pattern repeated itself six months later when Sanofi again raised the price of Lantus—this time by almost 12%.  Novo Nordisk quickly increased Levemir's price to exactly match the price of Lantus.  In fact, in 13 instances since 2009, the prices of Levemir and Lantus have increased in tandem in the U.S.  As demonstrated by the chart below, the prices of several insulin drugs have exhibited a series of significant, and suspiciously timed price increases.  The magnitude and timing of the drug price increases indicate that Novo Nordisk and the few other companies that control the market for insulin colluded to fix the prices of their drugs.



JEFFERY DELVISCIO/STAT
Source: Truven Health Analytics

19.    Novo Nordisk's strategy was a success and its earnings soared as a result of its ability to increase prices and sell its products.  Indeed, between 2010 and 2015, Novo Nordisk delivered 12% annual sales growth, 20% growth in operating profit, and 22% growth in earnings. But after years of consistently raising prices for insulin, Novo Nordisk and the other major drugmakers began to experience significant pressure from PBMs to cut or flatten their prices and were unable to continue their scheme.

<u>**NOVO NORDISK DEFRAUDS INVESTORS**</u>

20.    The Class Period starts on April 30, 2015, the day that Novo Nordisk held its earnings conference call for the first quarter of 2015.  On that call, CEO Lars Rebien Sørensen announced that the Company achieved operating profit growth of 17% (to $2.1 billion) and sales growth of 9% (to $3.8 billion), primarily driven by success in its North America segment. Further, CEO Sørensen assured investors that the Company was "not anticipating any pricing impact in 2015," and with specific regard to the Company's Victoza drug, that the Company is in "a very strong position with a gold standard product, one should expect that we will hold our position firm on [] pricing."

21.    In fact, a Danske Bank analyst specifically asked Novo Nordisk on April 30 whether it could still "come back to double-digit growth in the insulin market" given that the

Company's competitors were reporting weak underlying growth of "between 1% and 2%" which was due in large part to "the pressure on prices in U.S." However, CEO Sørensen simply dismissed the analyst's concerns and told investors that despite the pricing pressures, the Company will still be able to "achieve 10% or more top-line growth in the diabetes market."

22. The statements and omissions set forth in ¶¶20-21 were materially false and misleading. In truth, Novo Nordisk's reported earnings and growth targets were based on the collusive price fixing of the Company's insulin drugs. The Company was also experiencing significant pricing pressures in the U.S. and was only able to conceal those pressures by engaging in collusive price fixing.

23. On August 6, 2015, the Company held its earnings conference call for the second quarter of 2015. During that call, CEO Sørensen reported growth of 16% in operating profit (to $3.9 billion) as well as growth of 9% in sales (to $7.8 billion) for the first six months of 2015. The growth was driven by strength in the Company's North America operations and, in particular, increased sales of Victoza and Levemir. With regard to the pricing of the Company's drugs, CEO Sørensen stated that the Company experienced "flat pricing" due to "the strong performance of Victoza, where we have pricing power because we are the gold standard in that market. When we look at insulins going forward, we are looking at full-year expectations from flat to slight positive pricing."

24. Further, CFO Brandgaard stated on August 6 that "there is a positive impact on our gross margin to the magnitude of 50 basis points . . . basically coming from an overall higher sales . . . [of] higher value products. And that trend is expected to continue into second half and potentially also 2016."

25.     The statements and omissions set forth in ¶¶23-24 were materially false and misleading.  In truth, Novo Nordisk was experiencing significant pricing pressure in the U.S. and was only able to report "flat pricing" for its drugs because the Company entered into collusive agreements with its purported competitors.   What's more, the Company's reported revenue, operating profit, sales growth, and margins were overstated in that they were based on collusive price fixing.

26.     The Company held its earnings conference call for the third quarter of 2015 on October 29, 2015.  On that call, CEO Sørensen touted that the Company achieved 9% sales growth (to $11.8 billion) and 16% operating profit growth (to $5.7 billion) in the first nine months of 2015 driven in part by strength in Novo Nordisk's North America business, with the "highest contribution coming from Victoza and Levemir."  CEO Sørensen also told investors that the Company expected to achieve mid-to-high single-digit sales growth in 2016, as well as a 3% increase in pricing.

27.     According to CFO Brandgaard, the Company expected to achieve sales growth for 2015 of 7% to 9%, along with operating profit growth of roughly 20%.  CFO Brandgaard also reiterated that the Company expected to achieve mid-to-high single-digit sales growth in 2016, and that Novo Nordisk expected operating profit growth to increase by the same amount. According to Brandgaard, this "reflect[s] expectations for continued robust performance of the portfolio of modern insulins, Tresiba and Victoza."

28.     The statements and omissions set forth in ¶¶26-27 were materially false and misleading.  In truth, Novo Nordisk's expected growth in sales and operating profit were not based on the "robust performance of the portfolio of modern insulins," but rather, the Company's assumption that it would continue to collude with its competitors.  Further, Novo Nordisk knew

that it would not be able to increase prices by 3% but-for such collusive activity. The Company's sales growth, operating profit growth, and revenue metrics were also materially false and misleading in that they were based on Novo Nordisk's collusive agreements to control the prices of insulin.

29.    Further, on February 3, 2016, the Company held its earnings conference call for the fourth quarter and full year of 2015, during which CEO Sørensen announced operating profit growth of 14% (to $7.4 billion) and sales growth of 8% (to $16 billion), again driven by strength in the Company's North America operations, "with the largest contributions coming from Victoza and Levemir." CEO Sørensen also told investors that the Company would achieve 10% operating profit growth over the long-term.

30.    According to CFO Brandgaard, sales and operating profit growth in 2016 would be between 5% and 9%, but would reach or exceed 10% over the long-term, "reflecting the current outlook for organic sales growth and the opportunities for operating margin leverage." CFO Brandgaard further stated that "if you look to 2015 and become very concrete, then you could say in 2015 we basically had no effect from prices on our average gross margin."

31.    The statements and omissions set forth in ¶¶29-30 were materially false and misleading. In truth, the Company's revenue and earnings metrics were inflated as a result of its collusive activity. Further, Novo Nordisk's operating profit and sales growth for 2016 and over the long-term would be unachievable but-for its scheme given the significant pricing pressures it was facing in the U.S.

32.    Novo Nordisk held its earnings conference call for the first quarter of 2016 on April 29, 2016. On that day, CEO Sørensen announced that the Company achieved sales growth of 9% (to $4 billion) and operating profit growth of 10% (after adjusting for a partial divestment

of a division) driven by strength in the Company's operations in the United States and particularly Victoza and Levemir.  CEO Sørensen also reiterated that the Company expected to achieve sales and operating profit growth of between 5% and 9% in 2016.  Further, according to Sørensen, the Company sees "still quite strong growth of Levemir in the U.S. . . . There is some volume, but there is also a price effect.  We took a price increase last year."

33.     Defendant Brandgaard reiterated that the Company expected to achieve 5%-9% in sales and operating profit growth in 2016 given "a continued robust performance for our modern insulins . . . Victoza and Tresiba."

34.     The statements and omissions set forth in ¶¶32-33 were materially false and misleading.  In truth, Novo Nordisk's reported earnings and forecasts were inflated in that they were based on the collusive price fixing of the Company's insulin drugs.  The Company was also experiencing significant pricing pressures in the U.S. and was only able to conceal those pressures by engaging in collusive activity.

## DISCLOSURES OF COMPANY'S MISCONDUCT CAUSE MASSIVE INVESTOR LOSSES

35.     On August 5, 2016, the Company announced disappointing earnings for the second quarter of 2016 because, despite its scheme, it was finally unable to withstand the intensifying pricing pressure from PBMs.  Indeed, the Company announced that the prices of its drugs—which have been perpetually increasing—would likely be "moderately lower" in 2017.  In fact, Novo Nordisk reported increasing pricing pressure across a broad swath of the Company's insulin portfolio.

36.     Novo Nordisk also narrowed its forecasts for sales growth to 5%-7% (from 5%-9%) and operating profit growth to 5%-8% (from 5%-9%) for the year.  Also weighing on Novo Nordisk's growth is the fact that it lost a significant contract with Express Scripts, the largest

PBM in the U.S., which refused to cover a number of the Company's diabetes medications, including Victoza, Novolin, and NovoLog.  Novo Nordisk also lost a contract with UnitedHealth, another large U.S. PBM, for the Company's NovoLog product, apparently because UnitedHealth would no longer pay exorbitant prices for the Company's drugs.

37.    According to an analyst report issued by Deutsche Bank on August 5, the fact that Novo Nordisk finally acknowledged the "elephant in the room" with regard to the intensifying pricing pressure "unnerved" investors and "created a stampede."  Similarly, an analyst report issued by SEB Equities on August 8, stated that "it is [] evident that Novo had to offer large discounts across its franchise in order to maintain market access" and it is an "ongoing challenge for Novo Nordisk to convince the largest PBM in the US market, Express Scripts, to include its products on their national drug lists."

38.    Nevertheless, CEO Sørensen attempted to assure investors by telling them that "we will see. . . more support for growth" coming from many of the Company's products.  "We see very strong script growth, we see relatively more stable pricing, even in some instances opportunities to raise net price slightly. . . I still think it is reasonable for us to have as an ambition, to grow our diabetes portfolio with 10%."  Despite the Company's assurances, the Company's disappointing earnings and slowing growth caused the price of the Company's ADRs to decline from $55.20 per ADR on August 4 to $49.87 per ADR on August 5, or approximately 10%.

39.    On August 8, 2016, the Company held a Management Roundtable discussion in London to attempt to provide more clarity into the Company's business and pricing strategy. According to an analyst report issued by Kepler Cheuvreux on August 9 that summarized the Management Roundtable, the reality is that major net pricing upgrades in the U.S. will be the

exception as opposed to the norm, and that there will be no quick rebound from the Company's stagnating growth.  On this news, the price of Novo Nordisk ADRs dropped from $49.87 per ADR on August 5 to $47.13 per ADR on August 8, or nearly 6%.

40.     Less than a month later, on September 1, 2016, Novo Nordisk announced that CEO Sørensen would resign from the Company by the end of 2016.  The announcement was particularly surprising given that the Board decided just a few months earlier that Sørensen should remain in the CEO role until his contract expires in 2019.  The Company also announced a number of other executive changes on September 1, including the resignation of Kesper Hoeiland, the head of the Company's North America Operations.  According to an analyst report issued by Morgan Stanley on September 1, given the Company's "very stable and conservative organization," the executive changes reflect Novo Nordisk's "unprecedented challenges such as US payer pressure and increased competition."

41.     Then, on October 28, 2016, Novo Nordisk announced its second consecutive quarter of disappointing earnings and cut its long-term profit-growth forecasts by 50%, specifically citing the increased pricing pressures on diabetes drugs in the U.S.  The Company reported that it expects its long-term profit to grow at a rate of 5% annually, down from the 10% that Novo Nordisk told investors to expect in February 2016.  In addition, the Company also cut for the second time in as many quarters its 2016 sales growth (from 5%-7% to 5%-6%) and operating profit growth targets (from 5%-8% to 5%-7%).  The Company also stated that it expects flat to low single-digit percentage growth in operating profit in 2017, and low single-digit percentage growth in sales for 2017.  Given the pricing pressures, Novo Nordisk was forced to significantly cut costs and reduce the amount that it is able to invest in researching and

developing new drugs.  According to an analyst report issued by Leerink, "NVO mgmt. finally owned up to the significant challenges it faces in the years ahead."

42.     Separate from the disappointing earnings, the Company also announced on October 28 that it received a Civil Investigative Demand from the U.S. Attorney's Office for the Southern District of New York seeking information relating to Novo Nordisk's contracts and business relationships with PBMs concerning its insulin products named NovoLog, Novolin and Levemir.  On this news, the price of Novo Nordisk ADRs declined from $40.94 per ADR on October 27 to $35.66 per ADR on October 28, a decline of roughly 13%.  This was the largest decline in the price of Novo Nordisk ADRs in more than 14 years.

43.     Subsequent to the close of the Class Period, on November 3, 2016, Senator Bernie Sanders and Representative Elijah Cummings sent a letter to the U.S. Department of Justice calling on federal antitrust regulators to probe whether Novo Nordisk and the three other major insulin producers—Sanofi, Eli Lilly, and Merck—colluded to set the prices for insulin and other diabetes drugs.  That letter specifically cited to the skyrocketing prices of insulin over the past 15 years, acknowledged that many of the price increases occurred at the same time, and questioned the true reasons for the price increases.  In a clean break from its anticompetitive scheme, Novo Nordisk committed on November 30, 2016 to limit all future drug list price increases to single digit percentages.

## LOSS CAUSATION

44.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Novo Nordisk ADRs and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed

to the market on August 5, 2016, August 8, 2016, and October 28, 2016, the price of Novo Nordisk ADRs fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Novo Nordisk ADRs during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the ADRs of Novo Nordisk during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Novo Nordisk and their families and affiliates.

46.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2015, Novo Nordisk had over 240 million ADRs outstanding, owned by hundreds or thousands of investors.

47.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether the price of Novo Nordisk ADRs was artificially inflated;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damage sustained by Class members and the appropriate measure of damages.

48.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

49.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

50.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

51.     Novo Nordisk's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

52.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Novo Nordisk who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic

17

performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

53.   At all relevant times, the market for Novo Nordisk's ADRs was an efficient market for the following reasons, among others:

(a)   Novo Nordisk ADRs met the requirements for listing, and were listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)   As a regulated issuer, Novo Nordisk filed periodic public reports with the SEC and the New York Stock Exchange;

(c)   Novo Nordisk regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Novo Nordisk was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

54.   As a result of the foregoing, the market for Novo Nordisk ADRs promptly digested current information regarding Novo Nordisk from all publicly available sources and reflected such information in the price of Novo Nordisk ADRs.  Under these circumstances, all purchasers of Novo Nordisk ADRs during the Class Period suffered similar injury through their

purchase of Novo Nordisk ADRs at artificially inflated prices and the presumption of reliance applies.

55.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Novo Nordisk's sales of insulin—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Novo Nordisk's insulin business, as set forth above, that requirement is satisfied here.

## <u>COUNT I</u>
**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Novo Nordisk ADRs at artificially inflated prices.

58.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADRs in an effort to

maintain artificially high market prices for Novo Nordisk ADRs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

60.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Novo Nordisk's true condition from the investing public and to support the artificially inflated prices of the Company's ADRs.

62.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Novo Nordisk ADRs.  Plaintiff and the Class would not have purchased the Company's ADRs at the prices they paid, or at all, had they been aware that the market prices for Novo Nordisk ADRs had been artificially inflated by Defendants' fraudulent course of conduct.

63.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's ADRs during the Class Period.

64.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

65.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of Novo Nordisk within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Novo Nordisk, the Individual Defendants had the power and ability to control the actions of Novo Nordisk and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 11, 2017

                        /s/ James E. Cecchi

                        **CARELLA, BYRNE, CECCHI, OLSTEIN,**
                          **BRODY & AGNELLO, P.C.**
                        James E. Cecchi
                        5 Becker Farm Road
                        Roseland, New Jersey 07068
                        Telephone: (973) 994-1700
                        Facsimile:  (973) 994-1744
                        jcecchi@carellabyrne.com

                        *Liaison Counsel for Plaintiff Lehigh County Employees' Retirement System*

                        **BERNSTEIN LITOWITZ BERGER**
                          **& GROSSMANN LLP**
                        Gerald H. Silk (*pro hac vice* forthcoming)
                        Hannah Ross (*pro hac vice* forthcoming)
                        Avi Josefson (*pro hac vice* forthcoming)
                        1251 Avenue of the Americas
                        New York, New York 10020
                        Telephone: (212) 554 1400
                        Facsimile: (212) 554 1444
                        jerry@blbglaw.com
                        hannah@blbglaw.com
                        avi@blbglaw.com

                        *Counsel for Plaintiff Lehigh County Employees' Retirement System*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Matthew R. Sorrentino, Esq., on behalf of Lehigh County Employees' Retirement System ("Lehigh County"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the County Solicitor of Lehigh County. I have reviewed the complaint and authorize its filing.

2. Lehigh County did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Lehigh County is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Lehigh County's transactions in the Novo Nordisk A/S securities that are the subject of this action are set forth in the chart attached hereto.

5. Lehigh County has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. Lehigh County will not accept any payment for serving as a representative party on behalf of the Class beyond Lehigh County's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of January, 2017.

Matthew R. Sorrentino, Esq.
County Solicitor
*Lehigh County Employees' Retirement System*

**Lehigh County Employees' Retirement System**
**Transactions in Novo Nordisk A/S**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 9/12/2016 | 3,720 | 45.9333 |
| Purchase | 9/13/2016 | 4,348 | 45.7054 |
| Purchase | 9/14/2016 | 3,495 | 46.1283 |
| Purchase | 9/15/2016 | 5,749 | 46.0254 |
| Purchase | 10/27/2016 | 1,510 | 41.1075 |