SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
JENNIFER R. SCULLION (admitted *pro hac vice*)
550 Broad Street, Suite 920
Newark, NJ 07102
Telephone: 973/639-9100
973/639-9393 (fax)

Local Counsel

ROBBINS GELLER RUDMAN
& DOWD LLP
DANIELLE S. MYERS (*pro hac vice* request pending)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

[Proposed] Lead Counsel for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LEHIGH COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> NOVO NORDISK A/S, et al., <br><br> Defendants. | No. 3:17-cv-00209-BRM-LHG <br><br> <u>CLASS ACTION</u> |

[Caption continued on following page.]

## DECLARATION OF JAMES P. CONDON

| | | |
|---|---|---|
| DON ZUK, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 3:17-cv-00358-BRM-LHG |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| NOVO NORDISK A/S, et al., | ) ) ) | |
| Defendants. | ) ) | |
| JOSEPH R. ZALESKI, JR., Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 3:17-cv-00506-BRM-LHG |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| NOVO NORDISK A/S, et al., | ) ) ) | |
| Defendants. | ) ) | |

1.     I, James P. Condon, am the Deputy Chief Legal Officer of Central States, Southeast and Southwest Areas Pension Fund ("Central States," the "Pension Fund" or the "Fund"), a multi-employer defined-benefit fund based in Illinois.  I make this Declaration in further support of the Fund's Motion for Appointment as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and in response to the assertions concerning Central States made by a competing applicant seeking lead plaintiff status.

2.     The Fund is one of the nation's largest Taft-Hartley Funds, with nearly 400,000 participants and approximately $15 billion in assets.  For more than a decade, United States District Courts across the country have recognized the Fund's ability to serve in a lead plaintiff capacity, appointed Central States as lead plaintiff on multiple occasions, and certified Central States as a class representative on multiple occasions. For example, the United States District Court for the Northern District of California found that the Fund was more than capable of adequately fulfilling the duties of lead plaintiff and, accordingly, appointed the Fund as lead plaintiff and later certified the Fund as a class representative in *In re Cisco Sys., Inc., Sec. Litig.*, No. C-01-20418-JW(PVT), 2004 WL 5326262 (N.D. Cal. May 27, 2004).   In *Cisco*, the court observed:

> The deposition testimony of Central States' Deputy General Counsel, James Condon, confirms that Central States is aware of the responsibilities of a class representative and has been meeting those responsibilities.

*Id.* at *4.  The Fund's efforts and documented ability as a court-appointed lead plaintiff in *Cisco*, where it obtained a recovery of nearly $100 million for the class,

conflicts with the assertion that the Fund is incapable of adequately serving as a lead plaintiff.

3.     The opposition memorandum filed in this case exclusively relies on two orders that are more than a decade old – a May 2004 Order issued by Judge Fogel in *Baker v. Arnold* and a February 2007 Order issued by Judge Crotty in *SafeNet* – that allude to a "Consent Decree."  The Consent Decree was entered in an action filed in 1978 and relates to allegations concerning loans made by the Fund to racketeers during the 1960's and 1970's.  *Donovan v. Fitzsimmons*, 78 C 342 (N.D. Ill.).[1]  The fact that the Consent Decree has remained in effect, despite the lack of any whiff of organized crime influence or other corruption after the passage of nearly forty years, is largely the result of the Fund's own choice.

4.     Pursuant to an Order entered on November 10, 1987, the Consent Decree was amended to provide:

> After September 22, 2002, the Pension Fund, after notice to the Secretary, may petition the Court to dissolve the Consent Decree for good cause shown.  After September 22, 2007, the Pension Fund, after notice to the Secretary, may petition the Court to dissolve the Consent Decree and, absent good cause shown by the Secretary establishing a need for continuing this Consent Decree, the Consent Decree shall be dissolved.

Agreed Order Amending Consent Decree (Nov. 10, 1987), Ex. A hereto, at 2.

5.     At the time Judges Fogel and Crotty handed down their Orders, the Fund could not so easily terminate the Consent Decree.  However, ***since September 22,***

---

[1]  The *Selbst* and *Navistar* appointments (described on page 4) are particularly notable because both cases were pending in the same District Court that the Consent Decree was filed in, the Northern District of Illinois.  And, the *Rubin, Kuriakose* and *City of Westland* orders were all issued by the same District Court ***after** SafeNet*.

*2007*, as the above-quoted Amendment indicates, the Fund can seek to terminate the Consent Decree simply by giving notice of its intent to do so to the Department of Labor.  At that point, the burden would shift to the Department of Labor to show cause why the Consent Decree should continue.  In my experience, the Fund has chosen not to seek to terminate the Consent Decree because it welcomes the opportunity the Decree provides for an exchange of information with the Department of Labor and with the Court.

6.     The competing movants also assert that the Fund is "violating that Consent Decree as well as federal law."  Dkt. No. 26 at 4.  They cite no evidence for this assertion and I am not aware of any.

7.     Moreover, since Judges Fogel and Crotty entered their rulings in *Baker* and *SafeNet*, the Consent Decree has been further amended to place a larger portion of the Fund's assets in accounts for which the Fund's Trustees have a more direct role without recourse to "named fiduciaries" selected by the Trustees and approved by the Court.  What is abundantly clear is that the Consent Decree has never detracted in any way from the ability of the Pension Fund and its Trustees to control litigation.

8.     As evidence of this fact, several courts have rejected the very attacks raised here against the Fund and appointed Central States as lead plaintiff, including the courts in *Rubin v. MF Global, Ltd.*, 08-cv-2233 (S.D.N.Y. June 23, 2008) – in which the Fund served alongside one of the Public Pension Fund Group members now challenging the Fund's adequacy, Boston Retirement System – and *Kuriakose v. Federal Home Loan Mortgage Co*, No. 08-cv-07281 (S.D.N.Y. Nov. 24, 2008).  In addition to *Cisco*, *MF Global*, and *Kuriakose*, Central States has also been appointed

as a lead plaintiff pursuant to the PSLRA in *Selbst v. McDonald's Corp.*, No. 04 C 2422 (N.D. Ill. July 21, 2004), *In re HealthSouth Stockholder Litig.*, No. CV-03-1501 (N.D. Ala. July 8, 2005), *Garden City Employees' Ret. Sys. v. Psychiatric Solutions, Inc.*, No. 09-cv-0882 (M.D. Tenn. Apr. 30, 2010), *City of Westland Police and Fire Ret. Sys. v. MetLife Inc.*, No. 12-cv-0256 (S.D.N.Y. Mar. 29, 2012), and *Construction Workers Pension Trust Fund v. Navistar*, No. 13 C 2111 (N.D. Ill. July 30, 2013). Notably, the Fund was certified as a class representative in PSLRA actions in *Cisco*, *HealthSouth*, *MF Global*, *Psychiatric Solutions* and *Navistar*. The Fund has never been denied class representative status in a PSLRA action. Combined, these cases recovered nearly $1 billion for the benefit of the classes the Fund dutifully and capably served. None of these cases were impacted by the Consent Decree, as at least the Boston Retirement System is well aware with respect to *MF Global*.

9.      The Fund's ability to conduct this litigation and pursue a resolution of the Fund's legal claims is entirely unaffected by the Consent Decree. To be sure, the Independent Special Counsel appointed under the Consent Decree occasionally reports to the Court concerning litigation, but there is no requirement under the Consent Decree that litigation decisions (or the commencement of litigation) be approved by the Court overseeing the Consent Decree. *See* Ex. B attached hereto. Indeed, "the Department of Labor has stated that an employee benefit plan has an affirmative duty [under ERISA] to consider serving as lead plaintiff or initiating [securities] litigation." Thomas P. Lemke and Gerald T. Liris, *Regulation of Investment Advisers* §2:34 (2008). Therefore, the Consent Decree, which was

intended to help ensure the Fund's continued compliance with ERISA, is not an obstacle to the Fund's service as a lead plaintiff pursuant to the PSLRA.

10. In short, the Fund is, and always has been, a free agent with respect to the conduct and resolution of securities fraud claims. The Consent Decree does involve limitations on the discretion of the Trustees with respect to investment decisions, but in recent years the Consent Decree has been amended to give more control in this area to the Fund Trustees (as opposed to the Fund's named fiduciaries) as well. Finally, the continued existence of the Consent Decree at this time is largely within the control of the Fund itself, and this too was a circumstance that did not exist at the time of the *Baker* or *SafeNet* decisions.

11. The competing movants also assert that the Fund's actuary certified the Fund to be in "Critical and Declining" status. The Fund has indeed been certified by its actuary to be in "Critical and Declining" status within the meaning of the Pension Protection Act of 2006 ("PPA"). The "Critical and Declining" status determination under the PPA is highly technical and is not in itself an indication that the Fund is insolvent or in danger of becoming so in the near term. In fact, the Fund has adopted a rehabilitation plan pursuant to the PPA and is in compliance with that plan. Moreover, the IRS approved a modification of Central States' amortization extension on April 28, 2016 that remains in effect and prevents the Fund from incurring a statutory funding deficiency subject to the condition that Central States continues to comply with its rehabilitation plan.

12. The competing movants also make much of the fact that a case was filed by some Kroger Co. employees based on their belief that the Fund acted imprudently

in considering (or failing to consider) a proposal Kroger made to the Fund concerning the timing of Kroger's planned withdrawal from the Fund.  Contrary to the Public Funds' assertions about these negotiations – which appear to simply accept the plaintiff's allegations as proven facts – the Independent Special Counsel, Retired United States District Judge Coar, reported on that case as follows:

(a)     Judge Zagel "denied" the preliminary injunction filed by the Kroger plaintiffs on June 30, 2016 – six months before the Public Pension Funds Group's opposition was filed here – because "(1) plaintiffs had not shown a probability of success on the merits (2) they had requested a form of final, irrevocable relief in their preliminary injunction motion, and (3) they had failed to show irreparable harm."  Ex. B at 5.

(b)     The Fund's Trustees "presented a counter-proposal to Kroger on July 15, 2016 and met with Kroger representatives on July 18 to discuss that proposal."  *Id.*  Thereafter, on October 1, 2016, Kroger submitted a counter-offer and the Fund submitted a further revised offer to Kroger on November 4, 2016, to which Kroger has yet to respond to.  *Id.*

These facts confirm the propriety of Judge Zagel's holding and suggest that it may have been a breach of fiduciary duty if the Fund had accepted Kroger's initial offer (which the Central States Trustees believed was not sufficiently beneficial to the Fund or its participants) or for the Fund to not continue negotiating, as it has, to obtain the best agreement possible with Kroger.

13.     The competing movants also contend that "the Treasury rejected a rescue plan designed to save Central States" which is another "risk[]" the Fund's

appointment would pose to the putative class and that Central States' application "violated federal regulations." Dkt. No. 26 at 4, 18.  The U.S. Treasury Department's May 6, 2016 denial of Central States' application in large measure relied upon regulations that were published only a few weeks before and became effective only the day before Treasury issued its ruling.  *See* 26 C.F.R. §1.432(e)(9)-1 (effective date: May 5, 2016).  Treasury's May 6, 2016 ruling interpreted these new regulations to require a showing that Central States had taken account of certain "relevant current economic data" in formulating its long term rate of investment return assumption.  *See* Ex. L at 3-5, attached to the Declaration of James E. Cecchi (Dkt. No. 26-1).  In contrast, the temporary regulations on which Central States was required to rely when it filed its application with Treasury six months before in September 2015 indicated that the projections made in the application could rely on Central States' then current investment return assumptions employed by its actuaries, subject to stochastic projections reflecting a 50% probability that over an "extended period" (50 years) the Fund will avoid insolvency.  80 Fed. Reg. 35262-01 at 35275 (June 19, 2015).  Thus, as a matter of basic logic, Central States had no real chance to comply with the regulation that the competing movants accuse the Fund of "violating."  The competing movants do not explain how Treasury's denial of Central States' application poses a "risk" to the putative class in this case.  That circumstance only leaves the Fund with more, and not less, motivation to vigorously pursue recovery of any losses it has sustained, including losses arising from the matters at issue in this case.

14.    Finally, with respect to the Government Accounting Office ("GAO") review, the Fund has already complied with all of the GAO's requests and is

continuing to dutifully respond to supplemental requests for information, as the Fund would do here in cooperating with defendants' discovery requests.

15.     I am familiar with the provisions of the PSLRA and understand that one of the reasons it was enacted was to encourage sophisticated investors, particularly institutional investors such as the Fund, to manage and oversee securities litigation matters.  If the Fund is appointed to serve as lead plaintiff, I would be one of the people who would ensure that the Fund actively and vigorously represents the Class and manages the prosecution of this action, through trial if necessary for the benefit of all class members, as I and the Fund have done successfully on several occasions previously.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury, that the foregoing is true and correct.  Executed this 10th day of April, 2017 in Rosemont Illinois.

_James P. Condon_

_____
JAMES P. CONDON
Deputy Chief Legal Officer
Central States, Southeast and Southwest
Areas Pension Fund

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS


HILDA SOLIS, Secretary of Labor, et al., v. FITZSIMMONS, et al.


Case No. 78 CV 342



CENTRAL STATES PENSION FUND CONSENT DECREE
ENTERED ON 9/22/82, PLUS ALL AMENDS THERETO
(through October 21, 2011)

F:338348 / AD092500 / 4/7/15

| **TAB:** | **DATE OF ENTRY:** | **DOCUMENT TITLE:** |
|---|---|---|
| A | September 22, 1982 | Consent Decree |
| B | November 10, 1987 | Agreed Order amending September 22, 1982 Consent Decree |
| C | June 16, 1998 | Order Approving and Authorizing Consent Decree Modifications |
| D | February 24, 1999 | Order Approving and Authorizing Consent Decree Modifications |
| E | May 27, 2003 | Order Approving and Authorizing Consent Decree Modifications and a Related Investment Policy Statement |
| F | September 25, 2003 | Order Approving and Authorizing Consent Decree Modification and a Related Named Fiduciary Appointment |
| G | May 10, 2005 | Order Approving the Appointment of a Named Fiduciary, an Asset Reallocation Plan and a Consent Decree Modification |
| H | November 20, 2007 | Order Approving and Authorizing Consent Decree Modifications |
| I | June 25, 2010 | Order Approving Asset Reallocation and a Consent Decree Modification |
| J | September 21, 2010 | Order Approving Transfer of Assets, the Appointment of an EAFE Index Account Manager, and Technical Amendments to Consent Decree Secs. II.E., F. and G. |

| K | October 21, 2011 | Order Approving Amendments to the Provisions of the Consent Decree Relating to the Appointment of a Successor Independent Special Counsel |
| L | November 2, 2011 | Order Appointing Independent Special Counsel |

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAYMOND J. DONOVAN, Secretary        )
of Labor,                            )
                                     )
                                     )
            Plaintiff,               )
                                     )
v.                                   ) Civil Action No.
                                     ) 78 C 342
                                     )
FRANK FITZSIMMONS, et al.,           )
                                     )
            Defendants.              )


<u>CONSENT DECREE</u>


Plaintiff Raymond J. Donovan, Secretary of Labor ("the
Secretary") has filed a complaint in this matter against the
named individual defendants, former trustees of the Central
States, Southeast and Southwest Areas Pension Fund ("the
individual defendants"), pursuant to the Employee Retirement
Income Security Act of 1974 as amended ("ERISA"), alleging,
<u>inter alia</u>, that the individual defendants violated section
404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1) (1976), and sec-
tion 405 of ERISA, 29 U.S.C. § 1105 (1976).  The Secretary
moved this Court for leave to amend the complaint, <u>inter
alia</u>, to include the Central States, Southeast and Southwest
Areas Pension Fund ("the Pension Fund") as a party to the
litigation and has filed with this Court an amended

complaint.  This motion was previously denied by the Court insofar as it sought to join the Pension Fund and is presently under advisement with the Court pursuant to the Secretary's motion for reconsideration.

The Pension Fund consents to the filing of the amended complaint insofar as it seeks to join the Pension Fund as a party defendant, acknowledges service of the amended complaint, and admits the jurisdiction of this Court.

The Pension Fund expressly waives Findings of Fact and Conclusions of Law and consents to the entry of this Consent Decree as a full and complete resolution of the issues raised in the amended complaint with respect to the Pension Fund.

Neither the Secretary nor the Pension Fund waives any claims against the individual defendants, and this Consent Decree in no way affects the liability of the individual defendants with respect to the allegations set forth in the complaint and the amended complaint. Nothing in this Consent Decree shall constitute or be deemed an admission of any fact alleged in the complaint or the amended complaint in this case.

The Court has jurisdiction over the Pension Fund and the subject matter of this action, and the Court is

-2-

empowered to provide the equitable and remedial relief following.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that the Secretary's motion for leave to file an amended complaint, insofar as it relates to the Pension Fund, is hereby granted and further that the Pension Fund shall perform the following undertakings:

## I.  COMPLIANCE

The Pension Fund shall operate in full compliance with ERISA and with any conditions contained in determination letters issued by the Internal Revenue Service as to the qualification of the Pension Fund under section 401 of the Internal Revenue Code and as to the exemption of the trust to which the Pension Fund relates under section 501 of the Internal Revenue Code ("the determination letters").

The Pension Fund shall require that its administrators, fiduciaries, officers, trustees, custodians, counsel, agents, employees, advisers, providers of goods or services, consultants, representatives in any capacity, and all persons who serve in any capacity that involves decisionmaking authority or custody or control of the moneys, funds, or assets of the Pension Fund, as

-3-

a condition of maintaining their respective relation-
ships with the Pension Fund, discharge their duties to
the Pension Fund in full compliance with ERISA and not
take any action in the discharge of such duties that is
inconsistent with the Pension Fund's full compliance
with ERISA or with the conditions of the determination
letters or with the Pension Fund's performance of the
undertakings in this Consent Decree.

The Pension Fund shall provide a copy of this Con-
sent Decree to the individuals and entities described
above within 30 days after its entry and to all such
new individuals and entities at the beginning of their
respective relationships with the Pension Fund, which-
ever is later.

## II.   ASSET MANAGEMENT

A.   <u>Appointment of a Named Fiduciary</u>

The Court understands that The Equitable Life Assur-
ance Society of the United States ("Equitable") is the
named fiduciary of the Pension Fund under contractual
arrangements which expire on October 3, 1982 ("the Equit-
able Contract").  At the expiration or termination of
the Equitable Contract, all assets of the Pension Fund,
except for those liquid assets held in reserve for pay-
ment of benefits and administrative expenses, which

liquid assets shall be defined and managed in
accordance with section III of this Consent Decree,
shall continue to be managed for the duration of this
Consent Decree by a named fiduciary, as defined in
section 402(a)(2) of ERISA, 29 U.S.C. § 1102(a)(2)
(1976), in accordance with section II of this Consent
Decree.  At least 60 days before the expiration of any
named fiduciary's appointment, the Pension Fund shall
request the Court's approval of a successor named
fiduciary and give the Secretary notice of the request
for approval.  The Secretary shall present any
objection to the appointment of the successor named
fiduciary within 30 days of the filing of the Pension
Fund's request for approval.  The succcessor named
fiduciary's appointment shall not become effective
until the Court expressly approves the appointment of
the successor named fiduciary.  To be eligible for
appointment, a successor named fiduciary must meet the
qualifications for the named fiduciary set forth in
section II.C. of this Consent Decree.

      B.    <u>Authority of the Named Fiduciary</u>

          1.   <u>Authority Over Fund Assets</u>

    The named fiduciary shall have exclusive responsibility
and authority to control and manage all assets of the

-5-

Pension Fund identified in section II.A. of this Consent
Decree.

     2.   <u>Authority Over Appointment of
Investment Managers</u>

The named fiduciary shall have exclusive authority
to appoint, replace, and remove such investment managers
and real estate investment managers as it shall in its
sole discretion determine are necessary to manage the
assets of the Pension Fund.  These appointments, replace-
ments, and removals need not be approved by the Court.

     3.   <u>Authority and Responsibility Over
Investment Managers</u>

The named fiduciary shall have exclusive responsibility
and authority to allocate available investment assets of the
Pension Fund among different types of investments and differ-
ent investment managers and to allocate available real estate
investment assets among different types of real estate invest-
ments and different real estate investment managers.  The
named fiduciary shall also have responsibility and authority
to monitor the performance of all investment managers and
real estate investment managers.  This monitoring function
of the named fiduciary shall not diminish the obligation of
the board of trustees of the Pension Fund under ERISA to
monitor such performance or relieve any trustee of any liabil-

ity under part 4 of title I of ERISA for any act of such trustee.

### 4.   Authority to Set Investment Objectives and Policies

The short-term and long-term investment objectives and policies of the Pension Fund shall be developed by the named fiduciary, after consultation with the board of trustees of the Pension Fund, with appropriate regard for the actuarial requirements of the Pension Fund. Attached hereto as an Exhibit is the investment policy statement setting forth the current short-term and long-term investment objectives and policies of the Pension Fund, including objectives and policies governing the acquisition of new securities-related assets and new real estate-related assets.  The board of trustees of the Pension Fund and Equitable have represented that this investment policy statement has been developed with appropriate regard for the actuarial requirements of the Pension Fund.  The attached investment policy may only be changed by the named fiduciary, after consultation with the board of trustees of the Pension Fund, and such change shall be reported immediately to the Independent Special Counsel

-7-

established by section V of this Consent Decree and to
the Secretary.  Any such change shall not remain in
effect more than 90 days except with leave of Court for
good cause shown after 60 days' notice to the
Independent Special Counsel and to the Secretary.
Neither the board of trustees of the Pension Fund nor
any administrator, officer, trustee, agent, or employee
of the Pension Fund shall authorize or recommend any
future acquisitions, investments, or dispositions of
Pension Fund assets on a direct or indirect basis.  All
present and future investments of Pension Fund assets
shall be managed solely by the named fiduciary or such
other independent investment managers or real estate
investment managers as defined in section II.C. of this
Consent Decree as the named fiduciary shall appoint.

    C.   <u>Qualifications of Named Fiduciary</u>
           <u>and Appointed Investment Managers</u>
           <u>and Real Estate Investment Managers</u>

    1.  <u>Named Fiduciary</u>

The named fiduciary must qualify as an investment mana-
ger under ERISA section 3(38), 29 U.S.C. § 1102(38) (1976),
and accept appointment as such in writing.  If the named
fiduciary is a bank, it shall be a bank as defined in
section 202(a)(2) of the Investment Advisors Act of 1940,

15 U.S.C. § 80a-2 (1976), and shall rank, on the basis of
its equity capital on the last day of its most recent fiscal
year, among the twenty-five largest banks in the United
States.  If the named fiduciary is an insurance company, it
shall be qualified to do business in and be subject to
regulation in at least six states and shall rank, on the
basis of assets on the last day of its most recent fiscal
year, among the twenty-five largest insurance companies in
the United States.  If the named fiduciary is an investment
adviser registered under section 202(a)(2) of the Investment
Advisers Act of 1940, 15 U.S.C. § 80a-2 (1976), it shall
rank, on the basis of total client assets under its
management and control at the close of its most recent
fiscal year, among the twenty-five largest investment
advisers in the United States that have either (1)
shareholders' or partners' equity in excess of $50,000,000
or (2) all of their obligations and liabilities assumed or
guaranteed by a bank or insurance company having the
characteristics described above, or by a broker or dealer
registered under section 15(a) of the Securities Exchange
Act of 1934, 15 U.S.C. § 78o(a) (1976), that has a net worth
in excess of $50,000,000 as of the last day of its most
recent fiscal year.  In addition, the named fiduciary must

meet the qualifications set forth below for appointed investment managers and real estate investment managers.

2.   Investment Managers

To be eligible for appointment as an investment manager by the named fiduciary under section II.B.2. of this Consent Decree, an investment manager must:

a.   Have at least 10 years of experience in operations as an investment management organization managing portfolios of, or providing investment advice with respect to, stock or other securities, and have demonstrated results of performance which are audited and a matter of public record;

b.   Excluding any Pension Fund assets, have at least $500 million of assets under management, with the Pension Fund's assets allocated to the investment manager constituting not more than 25% of the total of all assets under management;

c.   Have previously served or be serving as an investment manager to employee benefit plans or other tax-exempt trusts with assets exceeding $100 million subject to its control or advice;

d.   Charge a fee that shall be no more than is reasonable and shall not exceed the fees charged by the manager for comparable services to comparable clients;

-10-

e.   Not be affiliated with any administrator, officer,
     trustee, agent, or employee of the Pension Fund;
     and

f.   Review and agree to abide by the investment policy
     statement set forth in the Exhibit to this Consent
     Decree or such modification of it as may occur as
     provided in section II.B.4. of this Consent
     Decree.

### 3.   Real Estate Investment Managers

To be eligible for appointment as a real estate invest-
ment manager by the named fiduciary under section II.B.2. of
this Consent Decree, a real estate investment manager must:

a.   Have at least 10 years of experience in operations
     as a real estate investment management
     organization;

b.   Excluding any Pension Fund assets, have at least
     $100 million of real estate assets under
     management, with the Pension Fund's assets
     allocated to the real estate investment manager
     constituting not more than 25% of the total of all
     assets under management; and

c.   Meet all the qualifications set forth in sections
     II.C.2.d., e., & f. of this Consent Decree.

-11-

4.  <u>Current Investment Managers and Real
    Estate Investment Manager</u>

The qualifications set forth in sections II.C.2. and II.C.3. need not be met by any investment manager or real estate investment manager serving under the Equitable Contract.

D.  <u>Termination of the Named Fiduciary</u>

A named fiduciary appointed pursuant to this Consent Decree shall be subject to removal without cause shown on six months' written notice from the Pension Fund, a copy of which shall immediately be provided to the Secretary, and at any time by the Court for good cause shown after 60 days' notice to the named fiduciary and the Secretary.  Before the removal of a named fiduciary, there shall be appointed a successor named fiduciary under the procedure provided in section II.A. of this Consent Decree, which appointment shall become effective immediately upon the removal of the then current named fiduciary.

III. ASSETS HELD FOR BENEFITS AND
     ADMINISTRATIVE EXPENSES AND
     MAINTENANCE OF QUALIFIED INTERNAL
     AUDIT STAFF

A.   All assets received by the Pension Fund shall be transferred to the named fiduciary in accordance with section II of this Consent Decree, except as provided in sections III.B. through III.E. below.

B.   The Pension Fund may retain assets that it has determined are reasonably necessary for the payment of benefits and administrative expenses in a particular month.  The Pension Fund's determination shall take into account sums that could be made available to the Pension Fund by the named fiduciary and the investment managers and may include a reserve for benefits or administrative expenses that might become payable during the month.  Assets retained for the payment of benefits and administrative expenses must be used exclusively for those purposes.  The Pension Fund's determination for each month shall be made during the last 10 days of the preceding month and shall include a report setting forth the reasons for the determinations with supporting computations.  Copies of the report shall be made available to the Independent Special Counsel and on request to the Secretary and the Court.

C.   Notwithstanding the preceding section III.B., for each month the average daily balance of all assets retained by the Pension Fund, including assets held pending transfer to the named fiduciary (determined as of the close of business each day) shall not exceed 2 1/2 times the sum of the benefits and administrative expenses paid in the preceding month.  In no event will the disbursements for admin-

-13-

istrative expenses for any month exceed 2 1/2 times the administrative expenses in the previous month.

D.   Funds held for benefits and administrative expenses shall be managed and invested in accordance with the advice of a qualified independent investment adviser having the characteristics of the named fiduciary described in section II.C.1. of this Consent Decree, which investment adviser's appointment shall be subject to the approval of the Court after notice to the Secretary.

E.   The Pension Fund shall maintain a qualified Internal Audit Staff to monitor its affairs.  Responsibilities of the staff shall include the review of benefit administration, administrative expenditures, and the allocation of Pension Fund receipts as to investments and administration. The Internal Audit Staff, in cooperation with the Executive Director of the Pension Fund, shall prepare monthly reports setting forth its findings and recommendations, copies of which shall be made available to the Independent Special Counsel and on request to the Secretary and the Court.

## IV. REMOVAL OF CONVICTED PERSONS

Within 30 days after the entry of this Consent Decree, the trust agreement and other appropriate instruments under which the Pension Fund is maintained shall be amended to provide that:

-14-

A.  No person shall serve, or be permitted to serve, as an administrator, fiduciary, officer, trustee, custodian, counsel, agent, employee, adviser, provider of goods or services, consultant, representative in any capacity, or in any capacity that involves decisionmaking authority or custody or control of the moneys, funds, or assets of the Pension Fund if such person has been convicted of:

> robbery, bribery, extortion, embezzlement, fraud, grand larceny, burglary, arson, a felony violation of Federal or State law involving substances defined in section 802(6) of title 21, murder, rape, kidnaping, perjury, assault with intent to kill, any crime described in section 80a-9(a)(1) of title 15, a violation of any provision of ERISA, a violation of section 186 of title 29, a violation of chapter 63 of title 18, a violation of sections 874, 1027, 1503, 1505, 1506, 1510, 1951, or 1954 of title 18, a violation of the Labor-Management Reporting and Disclosure Act of 1959, or any felony involving abuse or misuse of such person's labor organization or employee benefit plan position or employment; or conspiracy to commit any such crimes; or attempt to commit any such crimes, or a crime in which any of the foregoing crimes is an element; or a misdemeanor involving a breach of fiduciary responsibility.

B.  Upon conviction for any of the crimes set forth in section IV.A. of this Consent Decree, such person shall immediately be removed from and disqualified from serving in

any capacity set forth in section IV.A. of this Consent De-
cree, provided that upon final reversal of such conviction,
such person, unless otherwise ineligible, shall thereafter
be eligible to serve; and provided further that this dis-
qualification shall cease to be operative ten years after
such conviction or after the end of imprisonment on such
conviction, whichever is the later, unless prior to the end
of such ten-year period, in the case of a person so
convicted or imprisoned, (a) his citizenship rights, having
been revoked as a result of such conviction, have been fully
restored, or (b) the United States Parole Commission,
pursuant to applicable law, determines that such person's
service would not be contrary to the best interests of the
Pension Fund.

## V.   INDEPENDENT SPECIAL COUNSEL

Due to the scope and complexity of this Consent Decree,
the parties agree that the Court should appoint an Independ-
ent Special Counsel to further the objectives of this
Consent Decree.  The parties believe that the appointment of
an Independent Special Counsel will serve the Court by
assisting in identifying and resolving any problems or
issues that may arise in connection with the Pension Fund's
performance of the undertakings in this Consent Decree.

-16-

The parties anticipate that the Independent Special Counsel will give special attention in the conduct of his office to compliance with the fiduciary responsibility provisions in part 4 of title I of ERISA and with conditions contained in determination letters issued by the Internal Revenue Service.  The parties further anticipate that the Independent Special Counsel ordinarily will not find it necessary or appropriate to examine, oversee, or report on matters relating to the establishment of contribution rates or benefit levels or to benefit determinations with respect to individual participants and beneficiaries of the Pension Fund, although the parties recognize that occasions may arise in which the Independent Special Counsel, in his discretion, will find it necessary or appropriate to exercise such powers, duties, and responsibilities.

Accordingly, within 30 days after the entry of this Consent Decree, the Court shall appoint an Independent Special Counsel from a list of three individuals recommended by the Pension Fund and agreeable to the Secretary.  Such Independent Special Counsel, in the conduct of his office as generally described above, shall have the following powers, duties, and responsibilities.

A.   The Independent Special Counsel shall have full authority to examine the future activities of the Pension Fund and to oversee and report on performance of the undertakings in this Consent Decree, giving special attention to compliance with the fiduciary responsibility provisions in part 4 of title I of ERISA and with conditions contained in determination letters issued by the Internal Revenue Service.

B.   The Independent Special Counsel may, with leave of Court for good cause shown, employ attorneys, accountants, investigators, and others reasonably necessary and appropriate to aid him in the exercise of his powers, duties, and responsibilities.

C.   The Independent Special Counsel shall have full access to all documents, books, records, personnel, files, and information of whatever type or description in the possession, custody, or control of the Pension Fund.  In addition, the administrators, fiduciaries, officers, trustees, custodians, counsel, agents, employees, advisers, providers of goods or services, consultants, representatives in any capacity, and all persons who serve in any capacity that involves decisionmaking authority or custody or control of the moneys, funds, or assets of the Pension Fund shall be required, as a condition of maintaining their respective

relationships with the Pension Fund, to cooperate fully with the Independent Special Counsel in the performance of his duties and responsibilities.  The Independent Special Counsel may attend meetings of the board of trustees of the Pension Fund, of any committees thereof (including closed or executive sessions), and any meetings of any attorneys' or review committees.  He shall receive notice in advance of and agenda of such meetings in the same manner and to the same extent as the other participants in the meetings.  In addition, the Independent Special Counsel may attend any other meetings of any type whatsoever at which Pension Fund related matters are discussed or considered including conferences with counsel to the Pension Fund and meetings attended by administrators, fiduciaries, officers, trustees, employees, custodians, counsel, agents, advisers, providers of goods or services, consultants, representatives in any capacity, and all persons who serve in any capacity that involves decisionmaking authority or custody or control of the moneys, funds, or assets of the Pension Fund.

D.  The Independent Special Counsel shall be free to consult with the Department of Labor, the Internal Revenue Service, and other federal, state, and local governmental agencies concerning any activities which he performs.

-19-

E.  The Independent Special Counsel shall provide access to the Department of Labor upon its request to any documents, books, interview notes, or records of any type reviewed, compiled, or prepared by the Independent Special Counsel in the exercise of his powers, duties, and responsibilities.

F.  After not less than 10 days notice to the board of trustees of the Pension Fund, to the affected individual or entity, and to the Secretary, the Independent Special Counsel may petition the Court for appropriate orders to compel co-operation by the Pension Fund and any administrator, fiduci-ary, officer, trustee, custodian, counsel, agent, employee, adviser, provider of goods or services, consultant, repre-sentative in any capacity, or person who serves in any capacity that involves decisionmaking authority or custody or control of the moneys, funds, or assets of the Pension Fund.

G.  The Independent Special Counsel shall file quarterly reports with the Court, with copies to the Secretary and the Pension Fund, and any other reports he deems necessary or appropriate.

H.  The Independent Special Counsel shall have such other powers, duties, and responsibilities as the Court may subsequently determine are appropriate.

The Independent Special Counsel shall not be discharged or terminated during the duration of this Consent Decree except by leave of Court.  Upon the termination, discharge, death, incapacity, or resignation of an Independent Special Counsel during the term of this Consent Decree, the Court shall appoint a successor Independent Special Counsel from a list of three individuals recommended by the Pension Fund and agreeable to the Secretary.  Recommendations for a successor Independent Special Counsel shall be made within such periods as the Court, by further order, may provide.

No attorney-client or other privilege shall be applicable to any communication between the Independent Special Counsel and the Pension Fund, or its administrators, fiduciaries, officers, trustees, custodians, counsel, agents, employees, advisers, providers of goods or services, consultants, representatives in any capacity, or persons who serve in any capacity that involves decisionmaking authority or custody or control of the moneys, funds, or assets of the Pension Fund.

On a monthly basis, the Pension Fund shall pay the Independent Special Counsel reasonable fees and expenses reasonably and actually incurred by the Independent Special Counsel in the exercise of his powers, duties, and responsibilities.

-21-

Nothing herein shall be construed (1) to limit the powers and responsibilities of any officer or employee of the United States under ERISA or any other law, (2) to relieve the Pension Fund or any of its administrators, fiduciaries, officers, trustees, custodians, counsel, agents, employees, advisers, providers of goods or services, consultants, representatives in any capacity, or persons who serve in any capacity that involves decisionmaking authority or custody or control of the moneys, funds, or assets of the Pension Fund of any duty or responsibility under ERISA or any other law, or (3) to confer on the Independent Special Counsel any fiduciary responsibility under part 4 of title I of ERISA or otherwise.

## VI.   COOPERATION WITH THE SECRETARY

In recognition of the terms and rationale of the Court's order herein on June 8, 1981, which determined that the attorney-client and work product privileges are not available with respect to certain Pension Fund documents, the Pension Fund shall cooperate fully with the Secretary, both in the prosecution of this action and in the exercise of his other enforcement responsibilities under ERISA, by promptly providing such documents, information, and persons under its control as the Secretary from time to time may request.

-22-

Nothing herein shall be construed to limit the rights the Secretary otherwise enjoys of access to documents, information, or persons; to preclude the Pension Fund from seeking appropriate orders from this Court protecting against the Secretary's unauthorized dissemination of documents or information; or to waive or restrict the exercise by any individual of his or her constitutional rights.

## VII.   RETENTION OF JURISDICTION

This Court shall retain jurisdiction over the parties and subject matter of this action for the purpose of enforcing the terms of this Consent Decree.  After a period of 10 years from the entry hereof, the Pension Fund, after notice to the Secretary, may petition the Court to dissolve the Consent Decree for good cause shown.  After a period of 15 years from the entry hereof, the Pension Fund, after notice to the Secretary, may petition the Court to dissolve the Consent Decree and, absent good cause shown by the Secretary establishing a need for continuing this Consent Decree, the Consent Decree shall be dissolved.

## VIII.   NOTICE

Provisions of this Consent Decree requiring notice to the board of trustees of the Pension Fund shall be satisfied by delivering it in writing to the Pension Fund in care of:

-23-

> Executive Director
> Central States, Southeast and Southwest
>   Areas Pension Fund
> 8550 W. Bryn Mawr Avenue
> Chicago, Illinois  60631.

Provisions of this Consent Decree requiring notice to the Secretary shall be satisfied by delivering it in writing to:

> The Administrator
> Pension and Welfare Benefit Programs
> U.S. Department of Labor
> 200 Constitution Avenue, N.W.
> Room S-4516
> Washington, D.C.  20210;

with a duplicate delivered to:

> The Solicitor of Labor
> U.S. Department of Labor
> 200 Constitution Avenue, N.W.
> Room S-2002
> Washington, D.C.  20210.

Provisions of this Consent Decree requiring notice to the Independent Special Counsel shall be satisfied by delivering it in writing to him at such address as he desig-nates with the Court.

The parties to this Consent Decree and the Independent Special Counsel may, as they deem necessary, change from time to time the designation of persons to receive notice on their behalf by filing with the Court notification of such change and serving a copy thereof on the other party or par-

ties to this Consent Decree and on the Independent Special Counsel, as the case may be.

### IX.   ENTRY OF JUDGMENT

There being no just reason for delay, the Clerk of the Court is hereby expressly directed to enter this Consent Decree forthwith in accordance with the provisions of Rule 54(b) of the Federal Rules of Civil Procedure.

Entered: _September 29, 1982_

_James B. Moran_
James B. Moran
United States District Judge

The undersigned consent to the
entry of the foregoing decree:


*Raymond J. Donovan*
RAYMOND J. DONOVAN,
SECRETARY OF LABOR, Plaintiff


*T. Timothy Ryan*
T. Timothy Ryan, Jr.
Solicitor of Labor


*David H. Feldman*
David H. Feldman
Associate Solicitor for
   Special Litigation

Office of the Solicitor
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, D.C.  20210

Attorneys for Plaintiff


CENTRAL STATES, SOUTHEAST AND SOUTHWEST
AREAS PENSION FUND, Defendant

By: *Loran W. Robbins*
   Loran W. Robbins


*Marion M. Winstead*
   Marion M. Winstead

Harold J. Yates

Earl L. Jennings, Jr.

**EMPLOYEE TRUSTEES**

Howard McDougall

Robert J. Baker

R. V. Pulliam, Sr.

**EMPLOYER TRUSTEES**

George W. Lehr

**EXECUTIVE DIRECTOR**

James G. Walsh, Jr.
8550 W. Bryn Mawr Avenue
Chicago, Illinois  60631

Attorney for Defendant,
Central States, Southeast and
Southwest Areas Pension Fund

- 27 -

EXHIBIT

Central States, Southeast and Southwest Areas

Pension Fund

Investment Policy Statement

Table of Contents

|  | Description | Page |
|---|---|---|
| I. | Introduction. . . . . . . . . . . . . . | 2 |
|  | • Investment Philosophy | |
|  | • Plan and Fund Characteristics and Considerations | |
| II. | Total Fund . . . . . . . . . . . . . | 6 |
| III. | Real Estate Related Assets . . . . . . | 9 |
| IV. | Securities Manager Objectives . . . . . | 14 |

\* \* \* \* \* \* \*

This Investment Policy Statement has been developed by The Equitable Life Assurance Society of the United States, after consultation with the board of trustees of the Central States, Southeast and Southwest Areas Pension Fund.

I.   INTRODUCTION

A.   The purpose of this Statement is to set forth the principal considerations and policies that will govern the investment management of the assets of the Central States, Southeast and Southwest Areas Pension Fund ("Fund").  The primary objectives and obligations of the board of trustees ("Trustees") of the Fund are, among other things, to ensure that:

(1)  The Fund is actuarially sound;

(2)  Benefits due or those expected to become due to participants and beneficiaries are paid; and

(3)  The investment earnings of the Fund are maximized considering acceptable and reasonable return/risk combinations.

Accordingly, the Named Fiduciary of the Fund, The Equitable Life Assurance Society of the United States ("Equitable"), after consultation with the Trustees, has adopted this Investment Policy Statement.

B.   This Investment Policy Statement has been formulated by Equitable, after consultation with the Trustees, and will be reviewed and modified by Equitable or any successor named fiduciary ("Named Fiduciary" or "Fiduciary") on a periodic basis, after consultation with the Trustees.  Any changes resulting from such re-

- 2 -

views will be communicated by the Named Fiduciary to the investment managers.

C.  The Named Fiduciary, shall be responsible for, among other things, the communication and monitoring of investment policy and its implementation.

D.  Each investment manager shall be responsible for investing and managing the Fund assets entrusted to it in a manner consistent with the intent and provisions of this Statement.

E.  This Statement supersedes the Statements dated December 1, 1979 and September 14, 1977 and the supplements thereto dated June 23, 1978, August 10, 1978 and January 11, 1979.

## Investment Philosophy

A.  Given the above factors, the overall investment philosophy shall be to manage Fund assets in a prudent, conservative, yet productive manner. The investment managers shall seek to increase the aggregate value of assets under management, while conscious of the need to preserve asset value, in order to enhance the ability of the Fund to meet its obligations to plan participants and beneficiaries.

B.  The Fund shall be investment-quality oriented.

- 3 -

C.  The Fund shall be invested in a manner which seeks to avoid excessive volatility in Fund asset values. <u>Control of such aggregate risk is the responsibility of the Fiduciary</u>.

D.  The Fund shall be broadly diversified among and within principal classes of investment.  <u>The Fiduciary retains the responsibility to assure that the Fund is adequately diversified</u>.  Accordingly, individual securities managers should remain aware that their portfolios are but portions of the total Fund's assets. The diversification of their specific portfolios is of secondary importance to the Fund since Fund diversification is achieved by aggregating the individual securities managers' portfolios.

E.  Fund assets shall be managed in order to achieve desired objectives over a longer-term time horizon.

F.  Investment managers shall not be concerned with maintaining a liquidity reserve in order to meet benefit payments unless advised otherwise by the Fiduciary.

G.  Fund assets shall not represent too substantial a portion of the investment management business of any securities investment manager.  Funds allocated to a securities investment manager shall not be greater than

- 4 -

20% of the total tax-exempt assets under management by the organization after such an allocation.

## Plan and Fund Characteristics and Considerations

Investment policy shall take into consideration the following factors:

A.   This is a jointly managed Taft-Hartley plan providing for collectively bargained contribution rates and defined benefits.

B.   The accrued liability and the value of benefits accrued to date exceed the assets of the Fund, as is typical with defined benefit pension plans.

C.   Net allocable cash flow will probably be declining over the next five years due to increasing benefit payments and administrative expenses.   Thus the Fund's future investment results will be more heavily influenced by the disposition of current Fund assets; new cash flow will probably play a less important role.

D.   In the Actuarial Report as of January 1, 1980, the Fund's actuary has assumed investment earnings rates scaled from 8.5% to 6.5% ten years hence.   To the extent that earnings are achieved consistently in excess of these assumed rates so does the Fund's asset/liability posture improve.   Accordingly, the re-

- 5 -

duction in investment return volatility is a key component of investment policy.

II.  TOTAL FUND

A.  Investment Objectives:

(1)  The minimum average annual rate of return over a five year period shall be at least 8.35%.

(2)  Other benchmark annual rates of return are:

   · 7 1/2% - the average "scaled" interest assumption over ten years.

   · 12% - a rate which could bring the asset/liability relationship of the Fund into a more positive condition and as a proxy for achieving a real rate of return of 3%.

(3)  The reduction of volatility and the control of risk are key facets of investment policy.

(4)  Asset combinations will be selected that are most likely to achieve these benchmark earnings rates. This likelihood will be expressed in terms of probability.  Success in achieving these objectives will be significantly affected by broad economic and capital market conditions.

(5)  Rate of return shall mean total rate of return, that is, investment income plus realized and un-

- 6 -

realized capital gains and losses, provided that, for purposes of calculating rate of return, investment values and changes therein shall be determined as provided in paragraph A (6) next following.   Rate of return shall be calculated on a time-weighted basis by linking dollar-weighted quarterly rates of return.

(6)   Investments shall be valued in the case of securities-related assets in accordance with the provisions set forth in the applicable Investment Management Agreement in the section titled "Compensation"; and, in the case of real estate-related assets and other assets, in accordance with the valuation procedures employed with respect to such assets since October 3, 1977.

(7)   Achievement of all benchmark objectives will be assessed over a five year measurement period.

B.   Guidelines:

(1)   The fiduciary shall be responsible for allocating Fund assets -- both new money and existing assets -- among investment managers in order to achieve the total Fund objectives.

(2)   (a)   The Fiduciary, guided by the investment philosophy described in Section I of this

- 7 -

Statement, shall seek to allocate the Fund assets among various major investment categories generally within the following ranges (percentage of total Pension Fund assets):

Mortgages/Owned Real Estate:  20-25%

Fixed Income Securities:   25-55%
 Publicly Traded Bonds
 Short Term Obligations
 Other Fixed Income Instruments

Common Stocks:     25-45%

(b) The asset distribution ranges may be modified by the Fiduciary if warranted by, among other things, the requirements of the Pension Fund or significant changes in the capital markets.

(c) At no time, however, will more than 35% of total Fund assets be invested in non-publicly traded (i.e., illiquid) assets exclusive of short term obligations.

C. <u>Volatility Reduction Programs</u>

(1) A new real estate investment program will be implemented to provide the Fund with a high and predictable cash flow serving to dampen aggregate portfolio volatility.

- 8 -

(2) The employment of fixed income vehicles that are relatively insulated from interest rate risk will be analyzed and, if appropriate, implemented. Immunized bond portfolios and the use of floating rate instruments, and other instruments are vehicles that could help preserve the value of the fixed-income asset base during periods of pro-longed rising interest rates.

(3) Income enhancement programs such as common stock option overwriting and securities lending may be adopted, if deemed advisable by the Fiduciary, in order to enhance the likelihood of increased income return to the Fund and decreased volatility in the market value of the Fund's securities port-folio.

## III. REAL ESTATE RELATED ASSETS

A. Investment Objectives

(1) With respect to new real estate-related assets (i.e., real estate-related assets acquired after June 1, 1981):

(a) To achieve a stable long term rate of return with the potential for capital appreciations and growth of rental income; and

(b) to the extent such assets represent equity interests in real estate, to achieve an average annual time-weighted rate of return (net of expenses) over a reasonable period of time which is:

- greater than the rate of inflation (GNP deflator);

- above average relative to other real estate equity funds with comparable objectives;

- greater than a portfolio of high quality publicly traded bonds; and

- greater than a portfolio of high quality mortgages.

(2) With respect to existing real estate-related assets (i.e., real estate-related assets acquired before June 1, 1981):

(a) continue to reduce the aggregate amount in an orderly and gradual manner;

(b) preserve and enhance the value of such assets; and

- 10 -

    (c)  optimize the income and rate of return on such assets.

**B.**  <u>Guidelines</u>:

(1)  <u>New</u> real estate-related assets:

    (a)  new real estate-related assets shall be acquired only by an investment manager specifically authorized by the Fiduciary to make such investments;

    (b)  new investments shall be made in order to diversify and enhance the quality of the existing portfolio of real estate-related assets; no investments shall be made in or secured by residential (including apartments) properties or resort related facilities;

    (c)  all new real estate-related investments shall incorporate explicit inflation protection features without, however, severely comprom- ising current returns, and shall be made with due regard to the quality of design and con- struction of existing structures and, where appropriate, to the adequacy of energy

- 11 -

conservation measures and functional flexibility;

(d) owned real estate shall be limited to existing income producing properties or properties with a specific plan development; emphasis shall be on properties with rent escalation clauses, shorter term leases and participation arrange-ments in retail property leases.

(e) leveraging of owned real estate properties shall be permitted only if such indebtedness is assumed as part of the acquisition of property and does not give rise to unrelated business income for tax purposes;

(f) investments may be made in development type projects, including joint venture arrangements;

(g) the aggregate amount invested in any one property shall not exceed $25 million without authorization of the Fiduciary; and

(h) no investments may be made in a pooled or commingled real estate-related investment account without the authorization of the Fiduciary.

- 12 -

(2)   <u>Existing</u> real estate-related assets:

    (a)   the reduction objective will generally be achieved over time through the amortization of mortgage loans, and the orderly disposition of involuntary equities with particular attention to reducing concentrations of asset type and/or location;

    (b)   additional investments may be made in existing real estate-related assets provided that any such additional investment:

        shall be deemed by the asset manager to be prudent and necessary to preserve or enhance the value of the existing assets;

        shall be on terms at least as favorable as the terms currently negotiated in comparable quality real estate investments, and to the greatest extent feasible, shall be consistent with the intent of this Investment Policy Statement;

shall be subject to the prior approval of the Fiduciary for any new investment in excess of $500,000 and to the appropriate procedures as defined in the applicable Investment Management Agreement;

(c)   sale of assets is encouraged only after comprehensive study of appropriate criteria including: evaluation reports and investigations, prospects for near and long term-appreciation, and the proposed terms of such sale and current market conditions;

(d)   no asset must be sold simply because the current return is low compared with current yields on comparable investments; and

(e)   the terms of the sale of any asset should be in the best interest of the Pension Fund.

## IV.   SECURITIES MANAGER OBJECTIVES

A.   All investment managers will be assigned specific investment guidelines issued in consonance with this Investment Policy Statement, and any exception to any guidelines applicable to an investment manager shall require the consent of the Fiduciary.

- 14 -

B.  Guidelines will have prescribed rate of return objec-
    tives, both absolute and relative, as well as quality,
    marketability, and operational directives.

C.  Each investment manager has full discretion within the
    context of the investment guidelines.

D.  Investment performance is monitored on a continuous
    basis by the Fiduciary.  Periodic investment meetings
    are conducted to assure conformance to the investment
    policies of the Fund as well as the guidelines assigned
    to the investment manager.

E.  The Fiduciary has the responsibility for retaining,
    monitoring, and, if necessary, terminating investment
    managers (other than itself as securities investment
    manager).

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DENNIS E. WHITFIELD,           )
Deputy Secretary of Labor,     )
U.S. Department of Labor,      )
                               )
              Plaintiff,       )
                               )        No. 78 C 342
        v.                     )
                               )        (Moran, J.)
FRANK E. FITZSIMMONS, et al.,  )
                               )
              Defendants.      )

## AGREED ORDER AMENDING
## SEPTEMBER 22, 1982, CONSENT DECREE

On September 22, 1982, Raymond J. Donovan, then-Secretary of
Labor and the plaintiff in this action, and the defendant Central
States, Southeast and Southwest Areas Pension Fund (the Pension
Fund), with the approval of the Court, entered into a consent
decree respecting the future management of the Pension Fund (the
1982 Consent Decree).  Due to a vacancy in the office of Secretary
of Labor, the duties of that office have been delegated to Dennis
E. Whitfield, Deputy Secretary of Labor (the Secretary).  The
parties now have agreed that amendments to the 1982 Consent Decree
would be appropriate.

The Court has retained jurisdiction over the Pension Fund and
the subject matter of this action, pursuant to section VII of the
1982 Consent Decree, and the Court is empowered for the good cause

that has been shown to provide the equitable and remedial relief that follows.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that the 1982 Consent Decree hereby is amended as follows:

1.  Section VII - All sentences following the first sentence are deleted and are replaced with the following:

> After September 22, 2002, the Pension Fund, after notice to the Secretary, may petition the Court to dissolve the Consent Decree for good cause shown.  After September 22, 2007, the Pension Fund, after notice to the Secretary, may petition the Court to dissolve the Consent Decree and, absent good cause shown by the Secretary establishing a need for continuing this Consent Decree, the Consent Decree shall be dissolved.

2.  Sections VIII and IX shall be renumbered as Sections IX and X, respectively.

3.  New Section VIII - A new section VIII, entitled "APPOINTMENT OF NEW TRUSTEES," shall be made a part of the Consent Decree and will provide as follows:

> At least 60 days before the proposed effective date of the appointment of any individual who currently is not a trustee of the Pension Fund to so serve as a trustee, the Pension Fund shall request the Court's approval of the appointment and give the Secretary notice of the request for approval.  The Secretary shall have the right to present any objection to or comment on the proposed appointment within 30 days of the filing of the Pension Fund's request for approval.  The individual's appointment shall not become effective until the Court expressly approves the appointment.

IT IS FURTHER ORDERED, there being no just reason for delay, that the Clerk of the Court is hereby directed to enter this Agreed Order Amending September 22, 1982, Consent Decree forth-

with, in accordance with the provisions of Rule 54(b) of the
Federal Rules of Civil Procedure.

Entered: _____November 10, 1987_____

James B. Moran
JAMES B. MORAN
United States District Judge

The undersigned consent to the
entry of the foregoing agreed
order amending September 22,
1982, consent decree, as is
shown by their signatures on
this page:

Plaintiff:

DENNIS E. WHITFIELD
Deputy Secretary of Labor
U.S. Department of Labor

By: _____
GEORGE R. SALEM
Solicitor of Labor

Defendant:

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND

FRED D. THOMPSON
Acting General Counsel

By: _____
GEORGE W. LEHR
Executive Director

3

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALEXIS M. HERMAN, Secretary of the United States Department of Labor, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 78 C 342 |
| ESTATE OF FRANK E. FITZSIMMONS, et al., | ) ) ) | (United States District Judge James B. Moran) |
| Defendants. | ) ) | |

## ORDER APPROVING AND AUTHORIZING
## CONSENT DECREE MODIFICATIONS

A consent decree ("Consent Decree") was entered by the Court in this action on September 22, 1982, upon the agreement of Raymond J. Donovan, then the Secretary of the United States Department of Labor, Central States, Southeast and Southwest Areas Pension Fund ("the Fund") and the Trustees of the Fund. Alexis M. Herman is the current Secretary of the United States Department of Labor ("the Secretary").

The trustees ("Trustees") of the Fund and the Fund have filed a motion ("Motion") for an order approving and authorizing modifications of the Consent Decree that would result in the revised Article II of the Consent Decree that is fully stated in attached EXHIBIT B, effective immediately. (The revisions largely relate to proposed arrangements and procedures for the appointment of a second Named Fiduciary of the Fund.) The Trustees and the Fund base this motion on related parts of the motion papers which they presented to the Court on May 7 and July 2, 1997, a motion

-2-

which they later withdrew in accordance with an order entered in this action on September 4, 1997.

The Secretary has filed a response to the Motion which states in part as follows:

> "For more than a year, representatives of the Pension Fund and of the Department of Labor have engaged in discussions with respect to the Movants' desire to modify the Consent Decree so as to permit the appointment of a second Named Fiduciary and to authorize the Trustees to allocate Pension Fund assets to the Named Fiduciaries for investment administration. The discussions addressed the Department's concerns that implementation of Movants' proposals, as earlier presented to the Court in their May 7 and July 2, 1997 submissions, might be violative of ERISA, would be inconsistent with the intent and purpose of the Consent Decree, and could significantly increase the cost of asset administration. The modifications, as delineated in Exhibit A of the motion and as proposed in Exhibit B for inclusion in the Consent Decree, represent a negotiated revision of Movants' earlier proposals that adequately resolves the Department's concerns.

> "Accordingly, the Secretary advises the Court that she has no objection to allowance of the subject motion and to the inclusion in the Consent Decree of the modifications as proposed therein."

It has been demonstrated to the satisfaction of the Court that the revised Article II of the Consent Decree that is fully stated in EXHIBIT B attached to this Order is an appropriate modification of the Consent Decree. The Court continues to have jurisdiction over the Fund and the subject matter of this action, and the Court is empowered to enter the following order.

-3-

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.   The Court approves and authorizes the revised Article II of the Consent Decree that is fully stated in EXHIBIT B attached to this Order as an appropriate modification of the Consent Decree.

2.   This approval by the Court is effective immediately. Entered:   June 16, 1998.

JAMES B. MORAN
United States District Judge

<u>EXHIBIT B</u>

<u>REVISED ARTICLE II OF THE 1982</u>
<u>CONSENT DECREE IN HERMAN v. ESTATE</u>
<u>OF FRANK E. FITZSIMMONS, ET AL., No.</u>
<u>78 C 342 (N.D.Ill.).</u>

## II.  ASSET MANAGEMENT

A.  <u>Named Fiduciary Appointments</u>

All assets of the Pension Fund, except for those liquid assets held in reserve for payment of benefits and administrative expenses, which liquid assets shall be defined and managed in accordance with section III of this Consent Decree, shall continue to be managed for the duration of this Consent Decree by one or two entities, each of which shall qualify as a named fiduciary as defined in section 402(a)(2) of ERISA, 29 U.S.C. § 1102(a)(2) (1976), in accordance with section II of this Consent Decree. Morgan Stanley Dean Witter & Co. ("Morgan Stanley") is as of June 1, 1998, the exclusive named fiduciary ("Named Fiduciary") of the Pension Fund for purposes of this Article II, pursuant to an appointment approved by the Court on May 20, 1997.  The Pension Fund has proposed and the Court hereby approves dual Named Fiduciary arrangements, effective on and after January 1, 1999, in accordance with the following procedures and time frames:

(1)  the Fund will develop and submit to the Court for approval, on or before October 1, 1998, a proposed plan for re-allocation of all assets managed by Morgan Stanley into two groups, A and B, to be effective (if approved) on and after January 1, 1999, provided that during and after 1999 Morgan Stanley as Named Fiduciary (or its successor) will remain responsible for group A (of which the value will equal or exceed, at the date of re-allocation, 85% of the combined value of groups A and B), and a new Named Fiduciary will become responsible for group B, and provided further that the Pension Fund will give the Secretary notice of the proposed plan pursuant to (4), *infra*;

(2)  on or before July 1, 1998, the Pension Fund will distribute requests for bid to as many qualified candidates for appointment as Named Fiduciary over group B as are likely to generate multiple competitive bids for that appointment, provided that Morgan Stanley will not be eligible to submit a bid for appointment as Named Fiduciary over group B;

−2−

(3) prior to October 1, 1998, after a reasonable evaluation of all bids received, the board of trustees of the Pension Fund shall appoint a Named Fiduciary over the assets in group B and shall approve a plan for re-allocation of assets into groups A and B, effective on and after January 1, 1999, contingent upon prior approval by the Court;

(4) on or before October 1, 1998, the Pension Fund shall request the Court's approval of the Named Fiduciary over the assets in group B and the plan for re-allocation of assets into groups A and B, and shall give the Secretary notice of the request for approval, allowing the Secretary to present any objection to the appointment and re-allocation plan within 30 days of the Pension Fund's request for approval;

(5) if the Pension Fund's request for the Court's approval of the Named Fiduciary over the assets in group B and the plan for re-allocation of assets into groups A and B is approved, there will be no further asset re-allocation between groups A and B for at least 36 months after the initial asset re-allocation effective date, and then only upon approval by the Court after notice to the Secretary;

(6) the Named Fiduciary over group B will develop and implement the investment policy statement for the assets in group B, for which it will be responsible on and after January 1, 1999, provided that such statement will be subject to the requirements of notice and approval under section II.B.4. of this Consent Decree;

(7) on or about January 1, 1999, Morgan Stanley and the appointed Named Fiduciary over group B will effect an orderly and cooperative transition of responsibility and authority for control and management of all assets in group B, from Morgan Stanley to the appointed Named Fiduciary over group B, including a transfer of all related records and documents, provided that it shall be the responsibility of Morgan Stanley and the appointed Named Fiduciary over group B to minimize the expenses to the Pension Fund that will be incurred during this transition;

(8) during the first three months of 1999, the Pension Fund will distribute requests for bid to as many

-3-

     candidates for appointment as Named Fiduciary over group A as are likely to generate multiple bids for that appointment, including a request for bid to Morgan Stanley, provided that the Named Fiduciary over group B will not be eligible to submit a bid for appointment as Named Fiduciary over group A;

  (9)  the above-specified time frames may be modified by the Court at any time; and

 (10)  in and for each calendar year after 1998, the board of trustees and each Named Fiduciary of the Pension Fund, while maintaining their independence consistent with this Consent Decree, will cooperate together to achieve the objective that the proportion of the management fees of each Named Fiduciary, investment manager and custodian of the Pension Fund for each calendar year (calculated in the aggregate and on an accrual basis) to the aggregate value of the net assets of the Pension Fund at yearend will not exceed the proportion of such fees to such assets for calendar year 1998, to the extent such cooperative action and objective are consistent with the fiduciary responsibilities of the trustees and each Named Fiduciary.

At least 60 days before the termination of any Named Fiduciary's appointment, the Pension Fund shall request the Court's approval of a successor Named Fiduciary and give the Secretary notice of the request for approval. The Secretary shall present any objection to the appointment of the successor Named Fiduciary within 30 days of the filing of the Pension Fund's request for approval. No successor Named Fiduciary's appointment shall become effective until the Court expressly approves the appointment of the successor Named Fiduciary. The Pension Fund shall rebid the Named Fiduciary position currently held by Morgan Stanley during 1999, and shall also rebid each Named Fiduciary position at least once within every six-year period after 1999, provided that the time limit for any such required rebidding after 1999 may be extended for one calendar year. To be eligible for appointment, each Named Fiduciary must meet the qualifications for the Named Fiduciary set forth in section II.C. of this Consent Decree. The board of trustees of the Pension Fund shall have responsibility and authority to monitor the performance of each Named Fiduciary.

    B.   <u>Authority of Each Named Fiduciary</u>

       1.   <u>Authority Over Fund Assets</u>

     Each Named Fiduciary shall have exclusive responsibility and authority to control and manage all assets of the Pension Fund

-4-

identified in section II.A. of this Consent Decree and allocated to the entity as such Named Fiduciary.  All future requests by the Pension Fund for approval by the Court of the appointment of a Named Fiduciary (after June, 1998) shall also specify both the quantity of assets of the Fund that, contingent upon approval by the Court, is to be allocated to the Named Fiduciary and the method by which such initial asset allocation will be achieved, provided that, after any such Named Fiduciary appointment is approved and becomes effective, the board of trustees will reserve no authority or responsibility to change any such asset allocation while the appointment continues to be effective unless that change is approved by the Court.

2.    Authority Over Appointment of Investment Managers and Custodians

Each Named Fiduciary shall have exclusive authority to appoint, replace, and remove such  investment managers and real estate investment managers as it shall in its sole discretion determine are necessary to manage the assets of the Pension Fund allocated to the Named Fiduciary.  Each Named Fiduciary of the Fund shall have exclusive authority to appoint, replace and remove the custodian or custodians for all assets of the Pension Fund allocated to the Named Fiduciary.   These appointments, replacements, and removals need not be approved by the Court.

3.    Authority and Responsibility Over Investment Managers

Each Named Fiduciary shall have exclusive responsibility and authority to allocate available investment assets of the Pension Fund for which it is responsible as Named Fiduciary among different types of investments and different investment managers and to allocate available real estate investment assets among different types of real estate investments and different real estate investment managers.  Each Named Fiduciary shall also have responsibility and authority to monitor the performance of all investment managers and real estate investment managers it has appointed.  This monitoring function of each Named Fiduciary shall not diminish the obligation of the board of trustees of the Pension Fund under ERISA to monitor such performance or relieve any trustee of any liability under part 4 of title I of ERISA for any act of such trustee.

4.    Authority to Set Investment Objectives and Policies

The current investment policy statement setting forth the short-term and long-term investment objectives and policies of the Pension Fund, including objectives and policies governing the acquisition of new securities-related assets and new real estate-

-5-

related assets, is attached to an order entered by the Court in this action on January 18, 1994.  The investment policy statement may be changed by a Named Fiduciary, relative to all assets of the Pension Fund for which it is responsible as Named Fiduciary, after consultation with the board of trustees of the Pension Fund, and such change shall be reported immediately to the Independent Special Counsel established by section V of this Consent Decree and to the Secretary.  Any such change shall not remain in effect more than 90 days except with leave of Court for good cause shown after 60 days' notice to the Independent Special Counsel and to the Secretary.  Neither the board of trustees of the Pension Fund nor any administrator, officer, trustee, agent, or employee of the Pension Fund shall authorize or recommend any future acquisitions, investments, or dispositions of Pension Fund assets on a direct or indirect basis.  All present and future investments of Pension Fund assets shall be managed solely by the Named Fiduciary or such other independent investment managers or real estate investment managers as defined in section II.C. of this Consent Decree as the Named Fiduciary shall appoint.

C. __Qualifications of Each Named Fiduciary and Appointed Investment Managers and Real Estate Investment Managers__

1. __Named Fiduciary__

Each Named Fiduciary must qualify as an investment manager under ERISA section 3(38), 29 U.S.C. § 1102(38) (1976), and accept appointment as such in writing.  If any Named Fiduciary is a bank, it shall be a bank as defined in section 202(a)(2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80a-2 (1976), and shall rank, on the basis of its equity capital on the last day of its most recent fiscal year, among the twenty-five largest banks in the United States.  If any Named Fiduciary is an insurance company, it shall be qualified to do business in and be subject to regulation in at least six states and shall rank, on the basis of assets on the last day of its most recent fiscal year, among the twenty-five largest insurance companies in the United States.  If any Named Fiduciary is an investment adviser registered under section 202(a)(2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80a-2 (1976), it shall rank, on the basis of total client assets under its management and control at the close of its most recent fiscal year, among the twenty-five largest investment advisers in the United States that have either (1) shareholders' or partners' equity in excess of $50,000,000 or (2) all of their obligations and liabilities assumed or guaranteed by a bank or insurance company having the characteristics described above, or by a broker or dealer registered under section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a) (1976), that has a net worth in excess of $50,000,000 as of the last day of its most recent fiscal year.  In addition, each Named Fiduciary must meet the

-6-

qualifications set forth below for appointed investment managers and real estate investment managers.

2.    Investment Managers

To be eligible for appointment as an investment manager by a Named Fiduciary under section II.B.2. of this Consent Decree, an investment manager must:

a.    Have at least 10 years of experience in operations as an investment management organization managing portfolios of, or providing investment advice with respect to, stock or other securities, and have demonstrated results of performance which are audited and a matter of public record;

b.    Excluding any Pension Fund assets, have at least $500 million of assets under management, with the Pension Fund's assets allocated to the investment manager constituting not more than 25% of the total of all assets under management;

c.    Have previously served or be serving as an investment manager to employee benefit plans or other tax-exempt trusts with assets exceeding $100 million subject to its control or advice;

d.    Charge a fee that shall be no more than is reasonable and shall not exceed the fees charged by the manager for comparable services to comparable clients;

e.    Not be affiliated with any administrator, officer, trustee, agent, or employee of the Pension Fund; and

f.    Review and agree to abide by the investment policy statement which is attached to an order entered by the Court in this action on January 18, 1994, or such modification of it as may occur as provided in section II.B.4. of this Consent Decree.

3.    Real Estate Investment Managers

To be eligible for appointment as a real estate investment manager by a Named Fiduciary under section II.B.2. of this Consent Decree, a real estate investment manager must:

a.    Have at least 10 years of experience in operations as a real estate investment management organization;

−7−

b. Excluding any Pension Fund assets, have at least $100 million of real estate assets under management, with the Pension Fund's assets allocated to the real estate investment manager constituting not more than 25% of the total of all assets under management; and

c. Meet all the qualifications set forth in sections II.C.2.d., e., & f. of this Consent Decree.

D. <u>Termination of the Named Fiduciary</u>

A Named Fiduciary appointed pursuant to this Consent Decree shall be subject to removal without cause shown on six months' written notice from the Pension Fund, a copy of which shall immediately be provided to the Secretary, and at any time by the Court for good cause shown after 60 days' notice to the Named Fiduciary and the Secretary. Before the removal of a Named Fiduciary, there shall be appointed a successor Named Fiduciary under the procedure provided in section II.A. of this Consent Decree, which appointment shall become effective immediately upon the removal of a then current Named Fiduciary.

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALEXIS M. HERMAN, Secretary of )
the United States Department )
of Labor, )
       )
           Plaintiff, )
       )
v. )
       )
ESTATE OF FRANK E. FITZSIMMONS, )
et al., )
       )
           Defendants. )

RECEIVED
FEB 2 4 1999
SENIOR JUDGE JAMES B. MORAN
U.S. DISTRICT COURT

No. 78 C 342

(United States
District Judge
James B. Moran)

## ORDER APPROVING AND AUTHORIZING
## CONSENT DECREE MODIFICATIONS

A consent decree ("Consent Decree") was entered by the Court in this action on September 22, 1982, upon the agreement of Raymond J. Donovan, then the Secretary of the United States Department of Labor, Central States, Southeast and Southwest Areas Pension Fund ("the Fund") and the Trustees of the Fund ("Trustees"). Alexis M. Herman is the current Secretary of the United States Department of Labor ("the Secretary").

The Trustees and the Fund have filed a motion ("Motion") for an order approving and authorizing modifications of the Consent Decree (as amended to date) that would result in the partial revisions of Article II of the Consent Decree that are incorporated in attached EXHIBIT B, effective immediately. It has been represented to the Court that the Secretary has no objection to the allowance of this motion.

-2-

It has been demonstrated to the satisfaction of the Court that the partial revisions of Article II of the Consent Decree that are incorporated in EXHIBIT B attached to this Order are appropriate modifications of the Consent Decree.   The Court continues to have jurisdiction over the Fund and the subject matter of this action, and the Court is empowered to enter the following order.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.   The Court approves and authorizes the partial revisions of Article II of the Consent Decree that are incorporated in EXHIBIT B attached to this Order as appropriate modifications of the Consent Decree.

2.   This approval by the Court is effective immediately. Entered:  February 24th, 1999.

_____
JAMES B. MORAN
United States District Judge

## EXHIBIT B

**REVISIONS TO PARTS OF CURRENT ARTICLE II OF THE 1982 CONSENT DECREE IN HERMAN v. ESTATE OF FRANK E. FITZSIMMONS, ET AL., No. 78 C 342 (N.D.Ill.).**

## II.   ASSET MANAGEMENT

A.   Named Fiduciary Appointments

All assets of the Pension Fund, except for those liquid assets held in reserve for payment of benefits and administrative expenses, which liquid assets shall be defined and managed in accordance with section III of this Consent Decree, shall continue to be managed for the duration of this Consent Decree by two entities, each of which shall qualify as a named fiduciary as defined in section 402(a)(2) of ERISA, 29 U.S.C. § 1102(a)(2) (1976), in accordance with section II of this Consent Decree. Morgan Stanley Dean Witter & Co. ("Morgan Stanley") is as of February 24, 1999, the exclusive named fiduciary ("Named Fiduciary") of the Pension Fund for purposes of this Article II, pursuant to an appointment approved by the Court on May 20, 1997. On June 16, 1998, the Court entered an order, on motion by the Pension Fund, authorizing and approving modifications of section II of this Consent Decree as specified in an exhibit attached to that order, providing for dual Named Fiduciary arrangements effective on and after January 1, 1999. In accordance with that order, all assets managed by Morgan Stanley as Named Fiduciary of the Pension Fund were to be allocated into two groups, A and B, on and after January 1, 1999, with Morgan Stanley (or its successor) to be responsible for the Group A assets and a new Named Fiduciary to be responsible for the Group B assets. On October 21, 1998, after an evaluation of bids submitted by applicants, the board of trustees of the Pension Fund appointed Bankers Trust Company ("Bankers Trust") as the new Named Fiduciary to be responsible for the Group B assets, on and after January 1, 1999, and on November 12, 1998, the Court approved that appointment. On January 29, 1999, Bankers Trust submitted its resignation as the Named Fiduciary responsible for the Group B assets, that resignation became effective as of 2:00 p.m. E.S.T. on February 3, 1999, and, as a result, Morgan Stanley became, and continues to be, the exclusive Named Fiduciary of the Pension Fund with responsibility for both the Group A assets and the Group B assets, in the aggregate and without any distinction related to the prior allocation into Group A assets and Group B assets.

The Pension Fund has proposed and the Court hereby approves the resumption of dual Named Fiduciary arrangements, effective on and after July 1, 1999, in accordance with the following procedures and time frames:

-2-

(1)   effective on or shortly after July 1, 1999, both the assets managed by Morgan Stanley as Named Fiduciary will again be allocated into Group A assets and Group B assets and the Group B assets will be transferred to a new Named Fiduciary (to be appointed and approved as hereinafter explained) so that, upon such re-allocation, Morgan Stanley and the new Named Fiduciary will each be then responsible for 50% of the combined value of the Group A assets and the Group B assets (determined as of June 30, 1999), and Morgan Stanley will remain responsible for the Group A assets and the new Named Fiduciary will become responsible for the Group B assets;

(2)   on or about March 1, 1999, the Pension Fund will distribute requests for bid:

   (a)   to qualified candidates for appointment, effective July 1, 1999, as the new Named Fiduciary responsible for the Group B assets, provided that Morgan Stanley will not be eligible to submit a bid for appointment as the Named Fiduciary responsible for the Group B assets; and

   (b)   to qualified candidates for appointment, effective February 1, 2000, as the Named Fiduciary responsible for the Group A assets managed by Morgan Stanley before and after July 1, 1999;

(3)   on or before May 19, 1999, after a reasonable evaluation of all bids received, the board of trustees of the Pension Fund will appoint both (a) the new Named Fiduciary responsible for the Group B assets, effective on and after July 1, 1999, and (b) the Named Fiduciary responsible for the Group A assets, effective on and after February 1, 2000, provided that both appointments will be contingent upon prior approval by the Court after notice to the Secretary;

(4)   effective on or shortly after July 1, 1999, Morgan Stanley and the new Named Fiduciary responsible for the Group B assets will effect an orderly and cooperative transition of responsibility and authority for control and management of the Group B assets being transferred pursuant to (1), *supra*, including a transfer of all related records and documents, pursuant to an asset re-allocation plan

-3-

adopted by the board of trustees of the Pension Fund and approved by the Court, provided that it shall be the responsibility of Morgan Stanley and the new Named Fiduciary responsible for the Group B assets, each acting independently, to minimize the expenses to the Pension Fund that will be incurred during this transition;

(5)   effective on or shortly after February 1, 2000, if an entity other than Morgan Stanley is appointed pursuant to (3), *supra*, to be the Named Fiduciary responsible for the Group A assets, Morgan Stanley and that new Named Fiduciary will effect an orderly and cooperative transition of responsibility and authority for control and management of the Group A assets, including a transfer of all related records and documents, provided that it shall be the responsibility of Morgan Stanley and the new Named Fiduciary responsible for the Group A assets to minimize the expenses to the Pension Fund that will be incurred during this transition;

(6)   each appointed Named Fiduciary approved by the Court, acting independently, will develop and implement the investment policy statement for the assets for which it is responsible, without any need to consider the investment policy statement of the other Named Fiduciary, provided that such statement will be subject to the requirements of notice and approval under section II.B.4. of this Consent Decree;

(7)   after the asset re-allocation pursuant to (1), *supra*, is completed, there will be no further asset re-allocation between the Group A assets and the Group B assets prior to January 1, 2003, and any such further re-allocation, if requested, will be contingent upon prior approval by the Court after notice to the Secretary;

(8)   the above-specified time frames may be modified by the Court at any time; and

(9)   in and for each calendar year after 1998, the board of trustees and each Named Fiduciary of the Pension Fund, while maintaining their independence consistent with this Consent Decree, will cooperate together to achieve the objective that the proportion of the management fees of each Named Fiduciary, investment manager and custodian of the Pension Fund for each calendar year (calculated in

–4–

the aggregate and on an accrual basis) to the aggregate value of the net assets of the Pension Fund at yearend will not exceed the proportion of such fees to such assets for calendar year 1998, to the extent such cooperative action and objective are consistent with the fiduciary responsibilities of the Trustees and each Named Fiduciary.

At least 60 days before the termination of any Named Fiduciary's appointment, the Pension Fund shall request the Court's approval of a successor Named Fiduciary and give the Secretary notice of the request for approval.  The Secretary shall present any objection to the appointment of the successor Named Fiduciary within 30 days of the filing of the Pension Fund's request for approval. No successor Named Fiduciary's appointment shall become effective until the Court expressly approves the appointment of the successor Named Fiduciary.  The Pension Fund shall rebid each named Fiduciary position at least once within every six-year period after 1999, provided that the time limit for any such required rebidding after 1999 may be extended for one calendar year.  To be eligible for appointment, each named Fiduciary must meet the qualifications for the Named Fiduciary set forth in section II.C. of this Consent Decree.  The board of trustees of the Pension Fund shall have responsibility and authority to monitor the performance of each Named Fiduciary.

     B.  Authority of Each Named Fiduciary

       1.  Authority Over Fund Assets

Each Named Fiduciary shall have exclusive responsibility and authority to control and manage all assets of the Pension Fund identified in section II.A. of this Consent Decree and allocated to the entity as such Named Fiduciary.  All requests by the Pension Fund for approval by the Court of the appointment of a Named Fiduciary after February 24, 1999, shall also specify both the quantity of assets of the Fund that, contingent upon approval by the Court, is to be allocated to the Named Fiduciary and the method by which such initial asset allocation will be achieved, provided that, after any such Named Fiduciary appointment is approved and becomes effective, the board of trustees will reserve no authority or responsibility to change any such asset allocation while the appointment continues to be effective unless that change is approved by the Court.

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELAINE L. CHAO, Secretary of the United States Department of Labor, | ) ) ) ) | COPY OF ORDER ENTERED BY U.S. DISTRICT JUDGE JAMES B. MORAN ON MAY 27, 2003 |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 78 C 342 |
| ESTATE OF FRANK E. FITZSIMMONS, et al., | ) ) ) | (United States District Judge James B. Moran) |
| Defendants. | ) ) | |

ORDER APPROVING AND AUTHORIZING
CONSENT DECREE MODIFICATIONS AND A
RELATED INVESTMENT POLICY STATEMENT

A consent decree ("Consent Decree") was entered by the Court in this action on September 22, 1982, upon the agreement of Raymond J. Donovan, then the Secretary of the United States Department of Labor, and Central States, Southeast and Southwest Areas Pension Fund ("Fund"), and has been amended several times. Elaine L. Chao is the current Secretary of the United States Department of Labor ("the Secretary").

The current trustees of the Fund and the Fund have filed a motion ("Motion") for an order both (a) authorizing and approving proposed modifications ("Proposed Modifications") of Section II of the Consent Decree as amended to date (the proposed full restatement of Section II is attached to the Motion and this Order as EXHIBIT A) and (b) authorizing and approving a proposed investment policy statement ("Investment Policy Statement") applicable to the Passive Fixed-Income Index Account which would be authorized, established and maintained pursuant to the Proposed Modifications if they are approved by the Court (the proposed

-2-

Investment Policy Statement is attached to the Motion and this Order as EXHIBIT B). The text of the Motion includes this representation (emphasis in Motion):

> "William Zuckerman, counsel for the Secretary of Labor ("Secretary") has authorized the undersigned Thomas C. Nyhan and William J. Nellis to represent to the Court that the Secretary has no objection to the allowance of this motion."

It has been demonstrated to the satisfaction of the Court that the revised Section II of the Consent Decree that is EXHIBIT A attached to this Order is a reasonable and appropriate modification of the Consent Decree. It has further been demonstrated to the satisfaction of the Court that the proposed Investment Policy Statement that is EXHIBIT B attached to this Order is reasonable and appropriate. The Court continues to have jurisdiction over the Fund and the subject matter of this action, and the Court is empowered to enter the following Order.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The Court approves and authorizes the revised Section II of the Consent Decree that is EXHIBIT A attached to this Order, and that revised Section II is effective immediately.

2. The Court approves the INVESTMENT POLICY STATEMENT FOR THE PASSIVE FIXED-INCOME INDEX ACCOUNT that is EXHIBIT B attached to this Order.

-3-

3. These approvals by the Court are effective immediately.

Entered: May 27, 2003.

```
                              JAMES B. MORAN (S)
                              JAMES B. MORAN
                              United States District Judge
```

## II.   ASSET MANAGEMENT

### A.   Named Fiduciary Appointments

All assets of the Pension Fund shall be managed for the duration of this Consent Decree by two entities, each of which shall qualify as a named fiduciary as defined in section 402(a)(2) of ERISA, 29 U.S.C. 1102(a)(2), in accordance with this section II, except for assets allocated to and managed in the Passive Fixed-Income Index Account maintained in accordance with section II.E. of this Consent Decree.  As of June 30, 1999, Morgan Stanley Dean Witter & Co. ("Morgan Stanley") was the exclusive named fiduciary ("Named Fiduciary") of the Pension Fund for purposes of this section II pursuant to appointment approval orders entered by the Court during and after 1983.  On June 16, 1998, the Court entered an order authorizing and approving modifications of this section II providing for dual Named Fiduciary arrangements effective on and after January 1, 1999.  In accordance with that order, all assets managed by Morgan Stanley as Named Fiduciary of the Pension Fund were to be allocated into two groups, A and B, on and after January 1, 1999, with Morgan Stanley to be responsible for the Group A assets and a new Named Fiduciary to be responsible for the Group B assets. On October 21, 1998, the board of trustees of the Pension Fund ("Board of Trustees") appointed Bankers Trust Company as the new Named Fiduciary to be responsible for the Group B assets, on and after January 1, 1999, and on November 12, 1998, the Court approved that appointment.  On January 29, 1999, Bankers Trust Company submitted its resignation as the Named Fiduciary responsible for the Group B assets, that resignation became effective on February 3, 1999, and, as a result, Morgan Stanley once again became the exclusive Named Fiduciary of the Pension Fund with responsibility for both the Group A assets and the Group B assets.  On February 24, 1999, the Court entered an order authorizing and approving the resumption of dual Named Fiduciary arrangements, effective on and after July 1, 1999, and related modifications of this section II.  In accordance with that order, all assets managed by Morgan Stanley as Named Fiduciary of the Pension Fund were once again to be allocated into two groups, A and B, on and after July 1, 1999.  On April 21-22, 1999, the Board cf Trustees appointed Goldman, Sachs & Co. ("Goldman Sachs") as the new Named Fiduciary to be responsible for the Group B assets, effective on or shortly after July 1, 1999, and on May 27, 1999, the Court approved that appointment.  On August 18, 1999, the Board of Trustees appointed J.P. Morgan Investment Management Inc. ("J.P. Morgan") as the new Named Fiduciary (replacing Morgan Stanley) to be responsible for the Group A assets, effective on or shortly after February 1, 2000, and on September 28, 1999, the Court approved that appointment.  Since on or about February 1, 2000,

**EXHIBIT A**

-2-

responsibility for management of the assets of the Pension Fund has been divided between Goldman Sachs (as Named Fiduciary for Group B assets) and J.P. Morgan (as Named Fiduciary for Group A assets).

Each appointed Named Fiduciary approved by the Court, acting independently, is required to develop and implement the investment policy statement for the assets for which it is responsible, without any need to consider the investment policy statement of the other Named Fiduciary.  In and for each calendar year after 1998, the Board of Trustees and each Named Fiduciary of the Pension Fund, while maintaining their independence consistent with this Consent Decree, will cooperate together to achieve the objective that the proportion of the management fees of each Named Fiduciary, investment manager and custodian of the Pension Fund for each calendar year (calculated in the aggregate and on an accrual basis) to the aggregate value of the net assets of the Pension Fund at yearend will not exceed the proportion of such fees to such assets for calendar year 1998, to the extent such cooperative action and objective are consistent with the fiduciary responsibilities of the Trustees and each Named Fiduciary.

At least 60 days before the termination of any Named Fiduciary's appointment, the Pension Fund shall request the Court's approval of a successor Named Fiduciary and give the Secretary notice of the request for approval.  The Secretary shall present any objection to the appointment of the successor Named Fiduciary within 30 days of the filing of the Pension Fund's request for approval.  No successor Named Fiduciary's appointment shall become effective until the Court approves the appointment of the successor Named Fiduciary.  The Pension Fund shall rebid each Named Fiduciary position at least once within every six-year period after 1999, provided that the time limit for any such required rebidding after 1999 may be extended for one calendar year.  To be eligible for appointment, each Named Fiduciary must meet the qualifications for the Named Fiduciary set forth in section II.C. of this Consent Decree.  The Board of Trustees shall have responsibility and authority to monitor the performance of each Named Fiduciary.

**B.  Authority of Each Named Fiduciary**

  1.  Authority Over Fund Assets

Each Named Fiduciary shall have exclusive responsibility and authority to control and manage all assets of the Pension Fund allocated to the entity as such Named Fiduciary.  All requests by the Pension Fund for approval by the Court of the appointment of a Named Fiduciary shall also specify both the amount of assets of the

-3-

Pension Fund that is to be allocated to the Named Fiduciary and the method by which such initial asset allocation will be achieved, provided that, after any such Named Fiduciary appointment is approved, the Board of Trustees will have no authority or responsibility to change any such asset allocation without prior approval by the Court.

The Board of Trustees shall retain responsibility for the payment of benefits and administering the Pension Fund, and each Named Fiduciary shall release such sums as the Pension Fund may determine are required for the exclusive purpose of providing current benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan.

2.   <u>Appointment of Investment Managers and Custodians</u>

Each Named Fiduciary shall have exclusive authority to appoint, replace and remove such investment managers and real estate investment managers as it shall in its sole discretion determine are necessary to manage the assets of the Pension Fund allocated to the Named Fiduciary. Each Named Fiduciary of the Fund shall have exclusive authority to appoint, replace and remove the custodian or custodians for all assets of the Pension Fund allocated to the Named Fiduciary. These appointments, replacements and removals need not be approved by the Court.

3.   <u>Responsibility and Authority Over Investment Managers</u>

Each Named Fiduciary shall have exclusive responsibility and authority to allocate available investment assets of the Pension Fund for which it is responsible as Named Fiduciary among different types of investments and different investment managers and to allocate available real estate investment assets among different types of real estate investments and different real estate investment managers. Each Named Fiduciary shall also have responsibility and authority to monitor the performance of all investment managers and real estate investment managers it has appointed. This monitoring function of each Named Fiduciary shall not diminish the obligation of the Board of Trustees under ERISA to monitor such performance or relieve any Trustee of any liability under part 4 of title I of ERISA for any act of such Trustee.

-4-

4.    <u>Investment Objectives and Policies</u>

The current investment policy statements setting forth the short-term and long-term investment objectives and policies of the Pension Fund, including objectives and policies governing the acquisition of new securities-related assets and new real estate-related assets, are attached to orders previously entered by the Court in this action.   An investment policy statement may be changed by a Named Fiduciary, relative to all assets of the Pension Fund for which it is responsible as Named Fiduciary, after consultation with the board of trustees of the Pension Fund. Effective on and after July 1, 2003, changes to investment policy statements by any Named Fiduciary need not be approved by the Court, provided that notice of any change to an investment policy statement by any Named Fiduciary shall be reported to the Court, the Independent Special Counsel, the Secretary and the Pension Fund no later than 90 days after the change becomes effective.  Neither the Board of Trustees nor any administrator, officer, trustee, agent or employee of the Pension Fund shall authorize or recommend any future acquisitions, investments or dispositions of Pension Fund assets on a direct or indirect basis, except as otherwise provided in section II.E. of this Consent Decree.  All present and future investments of Pension Fund assets shall be managed solely by a Named Fiduciary or such other independent investment managers or real estate investment managers, qualified in accordance with section II.C. of this Consent Decree, as a Named Fiduciary shall appoint, except as otherwise provided in Section II.E. of this Consent Decree.

C.    <u>Qualifications of Each Named Fiduciary and of Appointed Investment Managers and Real Estate Investment Managers</u>

1.    <u>Named Fiduciary</u>

Each Named Fiduciary must qualify as an investment manager under ERISA Section 3(38), 29 U.S.C. § 1102(38) (1976), and accept appointment as such in writing.  If any Named Fiduciary is a bank, it shall be a bank, as defined in section 202(a)(2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80a-2 (1976), and shall rank, on the basis of its equity capital on the last day of its most recent fiscal year, amount the twenty-five largest banks in the United States.  If any Named Fiduciary is an insurance company, it shall be qualified to do business in and be subject to regulation in at least six states and shall rank, on the basis of assets on the last day of its most recent fiscal year, among the twenty-five largest insurance companies in the United States.  If

-5-

any Named Fiduciary is an investment adviser registered under section 202(a)(2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80a-2 (1976), it shall rank, on the basis of total client assets under its management and control at the close of its most recent fiscal year, among the twenty-five largest investment advisers in the United States that have either (1) shareholders' or partners' equity in excess of $50,000,000 or (2) all of their obligations and liabilities assumed or guaranteed by a bank or insurance company having the characteristics described above, or by a broker or dealer registered under section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 780(a) (1976), that has a net worth in excess of $50,000,000 as of the last day of its most recent fiscal year. In addition, each Named Fiduciary must meet the qualifications set forth below for appointed investment managers and real estate investment managers.

## 2.   Investment Managers

To be eligible for appointment as an investment manager by a Named Fiduciary under section II.B.2. of this Consent Decree, an investment manager must:

a.   Have significant experience in operations as an investment management organization managing portfolios of, or providing investments advice with respect to, stock or other securities, and have demonstrated results of performance which are audited and a matter of public record;

b.   Excluding any Pension Fund assets, have at least $500 million of assets under management, with the Pension Fund's assets allocated to the investment manager constituting not more than 25% of the total of all assets under management;

c.   Have previously served or be serving as an investment manager to employee benefit plans or other tax-exempt trusts with assets exceeding $100 million subject to its control or advice;

d.   Charge a fee that shall be no more than is reasonable and shall not exceed the fees charged by the manager for comparable services to comparable clients;

-6-

e.   Not be affiliated with any administrator, officer, trustee, agent, or employee of the Pension Fund; and

f.   Review and agree to abide by the investment policy statement which is attached to an applicable order previously entered by the Court in this action, or such modification of it as may occur as provided in section II.B.4. of this Consent Decree.

3.   **Real Estate Investment Managers**

To be eligible for appointment as a real estate investment manager by a Named Fiduciary under section II.B.2. of this Consent Decree, a real estate investment manager must:

a.   Have significant experience in operations as a real estate investment management organization;

b.   Excluding any Pension Fund assets, have at least $100 million of real estate assets under management, with the Pension Fund's assets allocated to the real estate investment manager constituting not more than 25% of the total of all assets under management; and

c.   Meet all the qualifications set forth in sections II.C.2.d., e. and f. of this Consent Decree.

D.   **Termination of the Named Fiduciary**

A Named Fiduciary appointed pursuant to this Consent Decree shall be subject to removal without cause shown on six months' written notice from the Pension Fund, a copy of which shall immediately be provided to the Secretary, and at any time by the Court for good cause shown after 60 days' notice to the Named Fiduciary and the Secretary.  Before the removal of a Named Fiduciary, there shall be appointed a successor Named Fiduciary under the procedure provided in section II.A. of this Consent Decree, which appointment shall become effective immediately upon the removal of a then current Named Fiduciary.

E.   **Passive Fixed-Income Index Account**

A passively managed fixed-income account ("the Passive Fixed-Income Index Account") will be maintained by the Pension Fund outside the authority, responsibility and control of the Named

-7-

Fiduciary appointees and the provisions of sections II.A., II.B., II.C. and II.D. of this Consent Decree, initially effective July 1, 2003.   The Passive Fixed-Income Index Account will initially consist of 20% of the combined value as of May 31, 2003, of all assets of the Pension Fund managed by Goldman Sachs and J.P. Morgan as the Named Fiduciary appointees, and those two appointees will re-allocate those assets on or shortly after July 1, 2003, in accordance with an asset re-allocation plan adopted by the Board of Trustees and approved by the Court, to an investment manager appointed by the  Trustees and approved by the Court.

It is an objective of this section II.E. that the assets of the Pension Fund in the Passive Fixed-Income Index Account will continuously constitute 20% (or around 20%) of the combined value of all investment assets of the Pension Fund and, to achieve that objective, there will be quarterly adjustments in the following manner:

(1)   the Pension Fund will ascertain the amount needed, by transfers between that account and each Named Fiduciary, to maintain the Passive Fixed-Income Index Account at a 20% share of all investment assets, as of the first day of each calendar quarter on and after October 1, 2003, within 20 days after the end of the prior quarter;

(2)   the Pension Fund and each Named Fiduciary will together cause transfers to and from the Passive Fixed-Income Index Account, to complete the adjustment to that account's 20% share, within 35 days after the end of the prior quarter (for example, the adjustment to 20% as of October 1, 2003, will be completed on or before November 4, 2003);

(3)   the amounts of all transfers from and to each Named Fiduciary, to complete each such quarterly adjustment of the Passive Fixed-Income Index Account, will be equal; and

(4)   notice of the details of each quarterly adjustment of the Passive Fixed-Income Index Account will be provided by the Pension Fund to the Independent Special Counsel and the Secretary within 10 days after the adjustment has been completed.

-8-

All assets of the Pension Fund in the Passive Fixed-Income Index Account shall be managed by one or more investment managers as defined in section 3(38) of ERISA, 29 U.S.C. § 1002(38), each of which shall be appointed by the Trustees with the approval of the Court after notice to the Secretary. At least 30 days before the effective date of any investment manager's appointment, the Pension Fund shall request the Court's approval of the appointment and give the Secretary notice of the request for approval. The Secretary shall present any objection to the appointment of any such investment manager within 20 days of the filing of the Pension Fund's request for approval. The appointment of any such investment manager shall not become effective until the Court expressly approves the appointment of the investment manager. To be eligible for appointment, an investment manager for all or part of the Passive Fixed-Income Index Account must meet the qualifications set forth in section II.C.2. of this Consent Decree.

Each investment manager appointed to manage all or any part of the Passive Fixed-Income Index Account shall have exclusive authority to control and manage all assets of the Pension Fund for which it is responsible, in accordance with its investment policy statement, except that the Board of Trustees shall retain responsibility for the payment of benefits and administering the Fund, and each investment manager shall release such sums as the Pension Fund may determine are required for the exclusive purpose of providing current benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. The investment policy statement governing the Passive Fixed-Income Index Account will be established by the Board of Trustees, but will not be effective until it is approved by the Court after notice to the Independent Special Counsel and the Secretary, and any subsequent change to that investment policy statement will require the same prior notice and the same approval by the Court. The Board of Trustees shall have responsibility and authority to monitor the performance of, and whenever appropriate to remove and replace, each investment manager appointed pursuant to this section II.E.

# INVESTMENT POLICY STATEMENT
## FOR THE
## PASSIVE FIXED-INCOME INDEX ACCOUNT
### OF
## CENTRAL STATES, SOUTHEAST AND
## SOUTHWEST AREAS PENSION FUND
## AS OF JULY 1, 2003

## I.   INTRODUCTION

### A.   General

1.   The purpose of this Investment Policy Statement is to record the investment policies that govern the management of the Passive Fixed-Income Index Account ("Index Account") of Central States, Southeast and Southwest Areas Pension Fund ("Fund"), an account which is established and maintained in accordance with the consent decree ("Consent Decree") governing the Fund, as entered by U.S. District Judge James B. Moran in civil action No. 78 C 342 in the United States District Court for the Northern District of Illinois, Eastern Division ("Court"), as heretofore and hereafter amended.

2.   This Investment Policy Statement has been adopted by the board of trustees ("Trustees") of the Fund.

3.   The Trustees are authorized and responsible to develop this Investment Policy Statement and to implement it by one or more investment managers appointed by the Trustees and approved by the Court.

4.   The Trustees are authorized and responsible to appoint and monitor one or more investment managers which will manage the Index Account and, if and when appropriate, to remove and replace any such appointed manager.

### B.   Plan and Fund Characteristics and Considerations

The investment policy applicable to the Index Account shall take into consideration the following factors:

1.   The Fund is a multiemployer defined benefit pension plan and trust, and is a qualified plan and a tax-exempt organization in accordance with Sections 401(a) and 501(a) of the Internal Revenue Code.

**EXHIBIT B**

-2-

    2.   Participating employers remit periodic contributions to the Fund, on behalf of employee participants of the Fund, at rates specified in collective bargaining agreements. Active participants may, in specified conditions during temporary absences from employment, remit self-contributions to the Fund in order to increase benefit accruals. The Trustees are empowered to establish and amend the terms, provisions and limitations of plan benefits. Collective bargaining agreements are generally negotiated for multi-year periods and include specific expiration dates, provisions and employer contribution rates. The Fund is not a party to such negotiations or to such agreements.

**C.   Investment Philosophy**

    1.   The investment philosophy shall be to manage the Index Account in a prudent and conservative yet productive manner consistent with the Consent Decree and the Employee Retirement Income Security Act ("ERISA"), as heretofore and hereafter amended. Each appointed investment manager responsible to manage all or part of the Index Account shall seek to increase the aggregate purchasing power of the assets under management over the long-term, while conscious of the need to preserve asset value, in order to enhance the ability of the Fund to meet its obligations.

    2.   The Index Account will be diversified in accordance with the investment objectives stated in Section II.A., *infra*.

## II.  INVESTMENT POLICY

**A.   Investment Objectives**

The investment objectives of the Index Account shall include the following:

    1.   To replicate the price return, income return and risk level of the Lehman Brothers Aggregate Bond Index.

    2.   To limit the Fund's investments in the Index Account to domestic fixed-income securities within the scope of the Specific Investment Guidelines in Section II.B., *infra*.

-3-

3.  To maximize investment returns in the Index Account to the extent consistent with the requirements of sufficient liquidity and minimum risk.

4.  To minimize investment expenses.

B.  **Specific Investment Guidelines**

1.  Each investment manager appointed to manage all or part of the Index Account shall seek to replicate the characteristics of the Lehman Brothers Aggregate Bond Index ("LBAB Index") with respect to duration, asset class distribution, sector distribution, quality distribution, coupon, maturity and yield by investing in a representative sample of the securities in the LBAB Index, selecting issues to represent an entire class or type of securities of the LBAB Index.

2.  The LBAB Index consists of all publicly issued U.S. investment-grade fixed-rate debt with a maturity greater than one year and at least $150 million par outstanding. The U.S. investment-grade fixed-rate bond market includes government and corporate securities, agency mortgage pass-through securities, commercial mortgage-backed securities and asset-backed securities. Investment grade means the security is rated Baa3 or better by Moody's Investor Services (Standard & Poor's rating is used in the absence of a rating by Moody's Investor Services). Because of the large number of issues included in the LBAB Index, the Index Fund cannot and will not invest in all such issues. The Index Fund will be invested in a representative sample of the securities in the LBAB Index, selecting issues to represent an entire class or type of securities in the LBAB Index.

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELAINE L. CHAO, Secretary of the United States Department of Labor, | ) ) ) ) | **COPY OF ORDER ENTERED BY U.S. DISTRICT JUDGE JAMES B. MORAN ON SEPTEMBER 25, 2003** |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 78 C 342 |
| ESTATE OF FRANK E. FITZSIMMONS, et al., | ) ) ) | (United States District Judge James B. Moran) |
| Defendants. | ) ) | |

<u>ORDER APPROVING AND AUTHORIZING
CONSENT DECREE MODIFICATION AND A
RELATED NAMED FIDUCIARY APPOINTMENT</u>

A consent decree ("Consent Decree") was entered by the Court in this action on September 22, 1982, upon the agreement of Raymond J. Donovan, then the Secretary of the United States Department of Labor, and Central States, Southeast and Southwest Areas Pension Fund ("Fund"), and has been amended several times. Elaine L. Chao is the current Secretary of the United States Department of Labor ("the Secretary").

On September 18, 2003, the current trustees ("Trustees") of the Fund and the Fund delivered to the Court, for filing, a motion ("Motion") for an order both (1) authorizing and approving a proposed modification of Section II ("Section II") of the 1982 consent decree ("Consent Decree") in this action as amended to date to reflect an assignment, effective October 1, 2003, of all authority, rights, duties, obligations and responsibilities of Goldman Sachs & Co. ("GS&Co."), a New York limited partnership, as

-2-

one of the two named fiduciary ("Named Fiduciary") appointees of the Fund appointed and approved in compliance with Section II, to an affiliated entity, Goldman Sachs Asset Management, L.P. ("GSAM LP"), a Delaware limited partnership, and (2) approving the appointment by the Trustees of GSAM LP to replace GS&Co. in that Named Fiduciary position, effective October 1, 2003, contingent upon prior approval by the Court.  Section II currently states in part:

> "... On April 21-22, 1999, the Board of Trustees [of the Fund] appointed Goldman, Sachs & Co. ('Goldman Sachs') as the new Named Fiduciary to be responsible for the Group B assets, effective on or shortly after July 1, 1999, and on May 27, 1999, the Court approved that appointment...."

The text of the Motion includes:

> "3.  GS&Co. has requested, and GSAM LP has joined in the request, that the Trustees consent to the assignment ('Requested Assignment') of all authority, rights, duties, obligations and responsibilities of GS&Co. pursuant to the GS&Co. Agreement to GSAM LP, effective October 1, 2003.  In support of that request, GS&Co. and GSAM LP have represented to the Trustees and the Fund:

>> (a)   that GSAM LP is a limited partnership duly organized, existing and in good standing under the laws of the State of Delaware; and

>> (b)   that all of the equity interests in GS&Co. and GSAM LP are currently owned and, after the Requested Assignment (if authorized and finalized), will continue to be owned, directly or indirectly, by The Goldman Sachs Group, Inc.; and

>> (c)   that GSAM LP is an 'investment adviser' as defined in the

-3-

Investment Advisers Act of 1940 and is currently registered as an investment adviser with the U.S. Securities and Exchange Commission; and

(d)  that GSAM LP satisfies all conditions, qualifications and requirements established by the Consent Decree for its appointment as a named fiduciary of the Fund (within the meaning of Section II), including all conditions, qualifications and requirements established by Sections II.C.1 and II.C.2. of the Consent Decree; and

(e)  that GSAM LP is entirely ready, willing and able to assume all authority, rights, duties, obligations and responsibilities of GS&Co. pursuant to the GS&Co. Agreement, effective October 1, 2003; and

(f)  that the change from GS&Co. to GSAM LP will have no effect on the quality or nature of investment management and client relationship services for the Fund and the same management personnel will continue to be assigned to the Fund after as before October 1, 2003.

"4.  At a board meeting on September 16, 2003, after being informed of relevant circumstances including the representations by GS&Co. and GSAM LP stated in paragraph 3, *supra*, the Trustees appointed GSAM LP as a named fiduciary of the Fund (within the meaning of Section II), replacing GS&Co., effective October 1, 2003, contingent upon prior approval of this appointment by the Court in accordance with the Consent Decree, and the Trustees at the same board meeting authorized the Requested Assignment to be approved and executed on their behalf...."

On September 23, 2003, the Secretary delivered to the Court, for filing, her response to the Motion, including:

-4-

"In support of the motion, it has been represented to counsel for the Secretary that the management personnel who have been responsible for performing GS&Co.'s services as the Named Fiduciary of the Pension Fund's Group B assets will continue to perform those same services on behalf of GSAM LP.  It has been further represented to counsel for the Secretary that GSAM LP meets all of the conditions, qualifications, and requirements established under Sections II.C.1. and 2. of the Consent Decree for appointment as Named Fiduciary.

"In reliance upon these representations, the Secretary advises the Court that she does not object to the relief requested in the subject motion."

It has been demonstrated to the satisfaction of the Court that Goldman Sachs Asset Management, L.P. is qualified to serve as a Named Fiduciary of the Fund in accordance with Section II of the Consent Decree.  The Court continues to have jurisdiction over the Fund and the subject matter of this action, and the Court is empowered to enter the following order.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.    The Court approves the appointment of Goldman Sachs Asset Management, L.P. as the Named Fiduciary of the Fund responsible for the Group B assets, replacing Goldman, Sachs & Co., effective October 1, 2003, in accordance with Section II of the Consent Decree.

2.    The last five sentences of the first paragraph of Section II.A. of the Consent Decree are deleted, effective October 1, 2003, and replaced by the following:

-5-

"... On February 24, 1999, the Court entered an order authorizing and approving the resumption of dual Named Fiduciary arrangements, effective on and after July 1, 1999, and related modifications of this section II.  In accordance with that order, all assets managed by Morgan Stanley as Named Fiduciary of the Pension Fund were once again to be allocated into two groups, A and B, on and after July 1, 1999.  On April 21-22, 1999, the Board of Trustees appointed Goldman, Sachs & Co. ('Goldman Sachs') as the new Named Fiduciary to be responsible for the Group B assets, effective on or shortly after July 1, 1999, and on May 27, 1999, the Court approved that appointment.  On August 18, 1999, the Board of Trustees appointed J.P. Morgan Investment Management Inc. ('J.P. Morgan') as the new Named Fiduciary (replacing Morgan Stanley) to be responsible for the Group A assets, effective on or shortly after February 1, 2000, and on September 28, 1999, the Court approved that appointment.  From on or about February 1, 2000, through September 30, 2003, responsibility for management of assets of the Pension Fund has been divided between Goldman Sachs (as Named Fiduciary for the Group B assets) and J.P. Morgan (as Named Fiduciary for the Group A assets).  On September 16, 2003, the Board of Trustees appointed Goldman Sachs Asset Management, L.P. as the new Named Fiduciary (replacing Goldman Sachs) to be responsible for the Group B Assets, effective October 1, 2003, and on September 24, 2003, the Court approved that appointment.  Since October 1, 2003, responsibility for management of assets of the Pension Fund.has been divided between Goldman Sachs Asset Management, L.P. (as Named Fiduciary for the Group B assets) and J.P. Morgan (as Named Fiduciary for the Group A assets)."

3.    This Order is effective immediately.

Entered:  September 25, 2003.


                              JAMES B. MORAN (S)
                         JAMES B. MORAN
                         United States District Judge

Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELAINE L. CHAO, Secretary of the United States Department of Labor, | ) ) ) ) | **COPY OF ORDER ENTERED BY U.S. DISTRICT JUDGE JAMES B. MORAN ON MAY 10, 2005** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| ESTATE OF FRANK E. FITZSIMMONS, <u>et al.</u>, | ) ) ) | No. 78 C 342 (United States District Judge James B. Moran) |
| Defendants. | ) ) | |

<u>**ORDER APPROVING THE APPOINTMENT OF A NAMED FIDUCIARY, AN ASSET REALLOCATION PLAN AND A CONSENT DECREE MODIFICATION**</u>

A consent decree ("Consent Decree") was entered by the Court in this action on September 22, 1982, upon the agreement of Raymond J. Donovan, then the Secretary of the United States Department of Labor, Central States, Southeast and Southwest Areas Pension Fund ("Fund") and the trustees ("Trustees") of the Fund. Elaine L. Chao is the current Secretary of the United States Department of Labor ("the Secretary").

On April 6, 2005, upon a motion filed by the Fund and the Trustees, the Court signed an order ("April 6 Order") (1) approving the Trustees' appointment of Northern Trust Corporation, effective June 1, 2005, as a successor Named Fiduciary of the Fund pursuant to the Consent Decree; (2) authorizing the reallocation of the assets of the Fund currently managed by J.P. Morgan Investment Management Inc. as Named Fiduciary into two equal (or approximately equal) segments valued as of the close of business on March 31, 2005, and the transfer of the two segments to Northern Trust

-2-

Corporation and Goldman Sachs Asset Management, L.P. pursuant to a specific asset reallocation plan to be finalized and approved; and (3) amending the Consent Decree, effective June 1, 2005, to reflect these changes.

On April 28, 2005, the Fund delivered to the Court, for filing in this action, a motion entitled Trustees' and Fund's Motion for Order Approving the Appointment of a Named Fiduciary, an Asset Reallocation Plan and a Consent Decree Modification ("Fund Motion"), with proof of service upon the Secretary, Independent Special Counsel Frank J. McGarr and others.  The Fund Motion among other things recites the following:

> **"Northern Trust Global Advisors, Inc.**
>
> "2.  After the April 6 Order was signed and entered, it was determined that Northern Trust Global Advisors, Inc. ('NTGA'), a wholly owned-subsidiary of Northern Trust Corporation, will be a more appropriate successor Named Fiduciary (replacing J.P. Morgan Investment Management Inc.) than its parent, Northern Trust Corporation, and that appointment of NTGA will be beneficial to the Fund and protective of its interests.  NTGA is the 'manager-of-managers' subsidiary of Northern Trust Corporation....
>
> "3.  At a board meeting of the Trustees on April 19, 2005, the Trustees ... rescinded their previous appointment of Northern Trust Corporation as successor Named Fiduciary and instead appointed NTGA as successor Named Fiduciary (replacing J.P. Morgan), effective June 1, 2005, contingent upon prior approval by the Court.
>
> "4.  In combination with Northern Trust Corporation itself and it subsidiaries, NTGA satisfies the requisite qualifications of a Named Fiduciary stated in the Consent Decree, including 'among the twenty-five largest'

-3-

financial institutions in one of three categories. The application of the Consent Decree's Named Fiduciary qualifications to the appointee's entire corporate structure was established during proceedings on January 17, 1984, at which the Court approved the appointment of Morgan Stanley Inc. as Named Fiduciary.... Approval by the Court of the appointment of Northern Trust Global Advisors, Inc. as successor Named Fiduciary is requested.

### "Asset Reallocation Plan

"5. ... At a board meeting of the Trustees on April 19, 2005, the Trustees ... adopted a Resolution which constitutes ... [the] 'specific asset reallocation plan.' Attached EXHIBIT A is a copy of that adopted Resolution and its approval by the Court is requested.

### "Consent Decree Amendment

"6. ... [T]he Court is requested to amend the Consent Decree by replacing 'Northern Trust Corporation' with 'Northern Trust Global Advisors, Inc.' in the new terms added to Section II.A by the April 6 Order...."

On May 3, 2005, the Secretary delivered to the Court, for filing, her comments in response to the Fund Motion, including the following:

"In their motion, the trustees and Pension Fund represent that, based upon evidence submitted to them, NTGA meets all of the qualifications required of appointees to the position of Named Fiduciary, as provided in Article II.C of the Consent Decree entered herein on September 22, 1982, as amended. The trustees and Pension Fund implicitly and/or explicitly represent by their motion that (a) NTGA, a wholly-owned subsidiary of Northen Trust, will be a more appropriate successor Named Fiduciary than Northern Trust and that appointment of NTGA will be beneficial to the Pension Fund and protective of its interests; (b) NTGA possesses the requisite expertise and

-4-

ability to perform its duties and responsibilities as a Named Fiduciary of the Pension Fund as to that part of the Group A assets assigned to it; and (c) the asset reallocation plan attached to the Motion as Exhibit A is consistent with the provisions of the April 6, 2005 Order authorizing the reallocation of the 'Group A' assets.

"Based on those representations, the Secretary advises the Court that she has no objection to an order (1) approving the appointment of Northern Trust Global Advisors, Inc. instead of Northern Trust Corporation, as a successor Named Fiduciary of the Pension Fund pursuant to Article II of the Consent Decree entered in this action as amended to date; (2) approving a specific reallocation plan (attached to the Motion as Exhibit A) for the reallocation of the assets of the Fund currently managed by J.P. Morgan Investment Management Inc. as Named Fiduciary into two segments and for the transfer of authority and responsibility for those assets to NTGA and Goldman Sachs Asset Management, L.P.; and (3) amending the Consent Decree, effective June 1, 2005, to reflect these changes."

It has been demonstrated to the satisfaction of the Court that Northern Trust Global Advisors, Inc. is qualified to serve as a Named Fiduciary of the Fund in accordance with the Consent Decree. The Court continues to have jurisdiction over the Fund and the subject matter of this action, and the Court is empowered to enter the following Order.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.   The Court approves the appointment of Northern Trust Global Advisors, Inc. as a Named Fiduciary of the Fund in accordance with the Consent Decree, effective June 1, 2005.  (That part of the April 6 Order which approved the previous appointment

-5-

of Northern Trust Corporation is vacated for the reason that that appointment has been rescinded by the Trustees.)

2.    The Court hereby authorizes the reallocation of the Group A assets (currently managed by J.P. Morgan Investment Management Inc. as Named Fiduciary), and the transfer of authority and responsibility for those assets, to Northern Trust Global Advisors, Inc. as Named Fiduciary and to Goldman Sachs Asset Management, L.P. as Named Fiduciary, in accordance with the asset reallocation plan which is EXHIBIT A attached to this order, and that plan is hereby approved by the Court.

3.    Section II.A. of the Consent Decree, as most recently amended by the April 6 Order, is amended by replacing "Northern Trust Corporation" with "Northern Trust Global Advisors, Inc.", and by the revision of the first paragraph of Section II.A. of the Consent Decree to read as follows:

> "All assets of the Pension Fund shall be managed for the duration of this Consent Decree by two entities, each of which shall qualify as a named fiduciary as defined in section 402(a)(2) of ERISA, 29 U.S.C. 1102(a)(2), in accordance with this section II, except for assets allocated to and managed in the Passive Fixed-Income Index Account maintained in accordance with section II.E. of this Consent Decree. As of June 30, 1999, Morgan Stanley Dean Witter & Co. ('Morgan Stanley') was the exclusive named fiduciary ('Named Fiduciary') of the Pension Fund for purposes of this section II pursuant to appointment approval orders entered by the Court during and after 1984. On June 16, 1998, the Court entered an order authorizing and approving modifications of this section II providing for dual Named Fiduciary arrangements effective on and after January 1, 1999. In accordance with that order, all

-6-

assets managed by Morgan Stanley as Named Fiduciary of the Pension Fund were to be allocated into two groups, A and B, on and after January 1, 1999, with Morgan Stanley to be responsible for the Group A assets and a new Named Fiduciary to be responsible for the Group B assets. On October 21, 1998, the board of trustees of the Pension Fund ('Board of Trustees') appointed Bankers Trust Company as the new Named Fiduciary to be responsible for the Group B assets on and after January 1, 1999, and on November 12, 1998, the Court approved that appointment. On January 29, 1999, Bankers Trust Company submitted its resignation as the Named Fiduciary responsible for the Group B assets, that resignation became effective on February 3, 1999, and, as a result, Morgan Stanley once again became the exclusive Named Fiduciary of the Pension Fund with responsibility for both the Group A assets and the Group B assets. On February 24, 1999, the Court entered an order authorizing and approving the resumption of dual Named Fiduciary arrangements, effective on and after July 1, 1999, and related modifications of this section II. In accordance with that order, all assets managed by Morgan Stanley as Named Fiduciary of the Pension Fund were once again to be allocated into two groups, A and B, on and after July 1, 1999. On April 21-22, 1999, the Board of Trustees appointed Goldman, Sachs & Co. ('Goldman Sachs') as the new Named Fiduciary to be responsible for the Group B assets, effective on or shortly after July 1, 1999, and on May 27, 1999, the Court approved that appointment. On August 18, 1999, the Board of Trustees appointed J.P. Morgan Investment Management Inc. ('J.P. Morgan') as the new Named Fiduciary (replacing Morgan Stanley) to be responsible for the Group A assets, effective on or shortly after February 1, 2000, and on September 28, 1999, the Court approved that appointment. From on or about February 1, 2000, through September 30, 2003, responsibility for management of assets of the Pension Fund was divided between Goldman Sachs (as Named Fiduciary for the Group B assets) and J.P. Morgan (as Named Fiduciary for the Group A assets). On September 16, 2003, the Board of Trustees appointed Goldman Sachs

-7-

Asset Management, L.P. as the new Named
Fiduciary (replacing Goldman Sachs) to be
responsible for the Group B Assets, effective
October 1, 2003, and on September 24, 2003,
the Court approved that appointment. From
October 1, 2003, until June 1, 2005,
responsibility for management of assets of the
Pension Fund was divided between Goldman Sachs
Asset Management, L.P. (as Named Fiduciary for
the Group B assets) and J.P. Morgan (as Named
Fiduciary for the Group A assets). On April
19, 2005, the Board of Trustees appointed
Northern Trust Global Advisors, Inc.
('Northern Trust') as the new Named Fiduciary
(replacing J.P. Morgan, which resigned
effective June 1, 2005) to be responsible for
a reallocated portion of the Group A assets,
effective June 1, 2005, and on May 10, 2005,
the Court approved that appointment. During
May, 2005, and on June 1, 2005, responsibility
for management of the Group A assets
previously managed by J.P. Morgan was
reallocated and transferred to Northern Trust
and Goldman Sachs Asset Management, L.P.
pursuant to an asset reallocation plan
approved by the Court. Since June 1, 2005,
responsibility for management of assets of the
Pension Fund has been divided between Goldman
Sachs Asset Management, L.P. as Named
Fiduciary and Northern Trust as Named
Fiduciary."

4.    This Order is effective immediately, except that the

Consent Decree modification described in paragraph 3 of this Order

is effective on June 1, 2005.

Entered:  May 10, 2005.

\_\_\_\_\_JAMES B. MORAN (S)\_\_\_\_\_
JAMES B. MORAN
United States District Judge

April 19, 2005

### RESOLUTION

WHEREAS, J.P. Morgan Investment Management Inc. ("J.P. Morgan") has served since February 1, 2000, and continues to serve, as the appointed (and Court-approved) Named Fiduciary of the Pension Fund ("Fund") authorized and responsible to manage what the Fund's Consent Decree designates as the Group A assets ("Group A assets"); and

WHEREAS, in a letter to the Trustees received by the Fund on October 1, 2004, J.P. Morgan served notice of its resignation as such Named Fiduciary, that letter stating in part:

> "We refer to the Agreement dated as of September 1, 1999, by and between the Trustees of the Central States, Southeast and Southwest Areas Pension Fund (the 'Fund') and J.P. Morgan Investment Management Inc. ('JPMIM'). As we recently discussed with Mr. Mark Angerame, we hereby resign as 'named fiduciary' of the Fund effective as of the close of business on April 1, 2005. We look forward to working with you to ensure a smooth transition of our responsibilities with respect to the assets of the Fund"; and

WHEREAS, J.P. Morgan has agreed to postpone the effective date of its resignation, and to continue its service as the Named Fiduciary responsible for the Group A assets, until the close of business on Wednesday, June 1, 2005; and

WHEREAS, at a board meeting on March 23, 2005, upon recommendation of Staff, the Trustees unanimously voted to authorize and approve the following (Minute Item No. 31):

> "(a) the appointment of Northern Trust [Corporation] as a successor Named Fiduciary responsible for a reallocated portion (50% or approximately 50%) of the Group A assets, effective June 1, 2005, contingent upon prior approval by the Court (U.S. District Judge James B. Moran);

> "(b) reallocation of the Group A assets (currently managed by J.P. Morgan as Named Fiduciary) into two equal (or approximately equal) segments valued as of the close of business on March 31, 2005, one segment to be transferred to

### EXHIBIT A

-2-

Northern Trust as Named Fiduciary and the other segment to be transferred to Goldman Sachs Asset Management, L.P., as Named Fiduciary in accordance with an asset reallocation plan ('Asset Reallocation Plan'), contingent upon prior approval by the Court;

"(c)  a directive that Staff finalize and present to the Trustees at the board meeting scheduled to occur on April 19, 2005, a recommended Asset Reallocation Plan which, if and when it is adopted by the Trustees, is to be promptly submitted to the Court with a request for approval by the Court, provided that implementation of the adopted Asset Reallocation Plan is contingent upon prior approval by the Court;

"(d)  the filing with the Court of a motion for approval of the appointment of Northern Trust as successor Named Fiduciary, approval of the above-described reallocation of the Group A assets (contingent upon future approval by the Court of the Asset Reallocation Plan after it is adopted), and modification of the Consent Decree to reflect these changes; and

"(e)  the execution by Executive Director Thomas C. Nyhan (on behalf of the Trustees) of a Named Fiduciary Agreement between the Trustees and Northern Trust in a form acceptable to the Fund (and the acceptance, in this agreement, of the Northern Trust Fee Proposal)"; and

WHEREAS, on April 6, 2005, acting upon a motion filed March 23 by the Fund and the Trustees, and upon a response filed April 1 by the Secretary of Labor that she had no objection to the motion, U.S. District Judge James B. Moran entered an order (1) approving the appointment of Northern Trust Corporation effective June 1, 2005, as a successor Named Fiduciary of the Fund pursuant to the Consent Decree; (2) authorizing the reallocation of the Group A assets of the Fund currently managed by J.P. Morgan as Named Fiduciary into two equal (or approximately equal) segments valued as of the close of business on March 31, 2005, and division of responsibility for the segments between Northern Trust Corporation and Goldman Sachs Asset Management, L.P., <u>pursuant to</u>

-3-

<u>a specific asset reallocation plan to be finalized and submitted to Judge Moran (after adoption by the Trustees), with a request for his approval, during April, 2005</u>; and (3) amending the Consent Decree, effective June 1, 2005, to reflect these changes; and

WHEREAS, the purpose of this Resolution is to establish the specific asset reallocation plan contemplated by the above-referenced April 6 order entered by Judge Moran, contingent upon his subsequent approval of the plan prior to its implementation, provided that Northern Trust Global Advisors, Inc. is substituted, for Northern Trust Corporation, as the actual successor Named Fiduciary being appointed by the Trustees;

NOW, THEREFORE, IT IS HEREBY RESOLVED BY THE BOARD OF TRUSTEES OF THE FUND, IN LAWFUL MEETING ASSEMBLED, A QUORUM BEING PRESENT, AS FOLLOWS:

1. Goldman Sachs Asset Management, L.P., will, exercising its independence as a Named Fiduciary of the Fund, appoint as its own investment managers for the Fund, effective as of one or more dates on or prior to June 1, 2005, the following investment managers currently serving the Fund as appointees of J.P. Morgan Investment Management Inc. ("J.P. Morgan"):

| Investment Manager by Asset Class | Market Value as of March 31, 2005 |
|---|---|
| <u>US Equity</u> | |
| Barclays Global Investors, N.A. | $273 million |
| State Street Global Advisors | $813 million |
| Brandywine Asset Management, LLC | $338 million |
| Harris Associates L.P. | $129 million |
| State Street Global Advisors | $307 million |
| Earnest Partners, LLC | $ 92 million |
| Donald Smith & Co., Inc. | $241 million |
| <u>International Equity</u> | |
| Artisan Partners Limited Partnership | $483 million |
| State Street Global Advisors | $267 million |
| The Boston Company Asset Management, LLC | $136 million |
| Grantham, Mayo, Van Otterloo & Co., LLC | $ 45 million |
| The Boston Company Asset Management, LLC | $126 million |

-4-

<u>Real Estate</u>
   AEW Capital Management, L.P.                  $ 50 million

<u>Other Assets</u>
   Pareto Partners                              $  2 million
   Record Treasury Management Limited          -$  6 million
   JP Morgan Asset Management*                  $ 51 million
   Mellon Bank, N.A.                            $116 million

<u>Cash</u>
   Mellon Bank, N.A.                            $183 million

     2.   Northern   Trust   Global   Advisors,   Inc.,   will,
exercising its independence as a Named Fiduciary of the Fund,
appoint as its own investment managers for the Fund, as of June 1,
2005,  the  following  investment  managers  currently  serving  the
Pension Fund as appointees of J.P. Morgan:

| Investment Manager by Asset Class | Market Value as of March 31, 2005 |
|---|---|
| **US Equity** | |
| Barclays Global Investors, N.A. | $273 million |
| Victory Capital Management, Inc. | $161 million |
| Pzena Asset Management, LLC | $136 million |
| Pacific Financial Research, Inc. | $401 million |
| State Street Global Advisors | $131 million |
| Columbus Circle Investors | $198 million |
| Transamerica Investment Management, LLC | $196 million |
| Putnam Advisory Company | $334 million |
| Next Century Growth Investors, LLC | $173 million |
| Turner Investment Partners, Inc. | $209 million |
| **International Equity** | |
| Julius Baer Investment Management, Inc. | $111 million |
| The Boston Company Asset Management, LLC | $407 million |
| Genesis Asset Managers Limited | $134 million |
| Grantham, Mayo, Van Otterloo & Co., LLC | $ 88 million |
| **Fixed Income** | |
| Mellon Bank, N.A. | $106 million |
| W.R. Huff Asset Management Co. | $169 million |

_____

* Assets actually held by Mellon Bank, N.A.

-5-

### Real Estate
    Cohen & Steers Capital
      Management, Inc.                      $356 million
    LaSalle Investment Management, Inc.    $ 69 million

### Other Assets
    TCW Asset Management Company           $ 13 million
    Pareto Partners                        $  2 million
    Record Treasury Management Limited    -$  6 million
    JP Morgan Asset Management Inc.**      $ 13 million
    Mellon Bank, N.A.                      $ 29 million

### Cash
    Mellon Bank, N.A.                      $ 46 million

    3.   This Resolution is effective immediately, as of
April 19, 2005, contingent upon its approval by U.S. District Judge
James B. Moran prior to its actual implementation.

_____

**    Assets actually held by Mellon Bank, N.A.

# Exhibit H



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ELAINE L. CHAO, Secretary of        )
the United States Department        )
of Labor,                           )
                                    )
            Plaintiff,              )
                                    )
v.                                  )
                                    )    No. 78 C 342
ESTATE OF FRANK E. FITZSIMMONS,     )
et al.,                             )    (United States District
                                    )     Judge James B. Moran)
            Defendants.             )

## ORDER APPROVING AND AUTHORIZING
## CONSENT DECREE MODIFICATIONS

A consent decree ("Consent Decree") was entered by the Court in this action on September 22, 1982, upon the agreement of Raymond J. Donovan, then the Secretary of the United States Department of Labor, and Central States, Southeast and Southwest Areas Pension Fund ("Fund"), and has been amended several times. Elaine L. Chao is the current Secretary of the United States Department of Labor ("the Secretary").

On November 9, 2007, the current trustees ("Trustees") of the Fund and the Fund delivered to the Court, for filing, a motion ("Motion") for an order approving and authorizing proposed modifications of the Consent Decree as amended to date. The text of the Motion includes:

"1.   The seven proposed modifications of Section II of the Consent Decree (which is entitled 'ASSET MANAGEMENT') are specified in paragraphs 3 through 9 of this motion and may be summarized as follows:

"(a) the first modification (¶ 3, *infra*) would expressly authorize the Court at any future time '... to change

all allocations of all assets of the Pension Fund, including the authority to order the transfer of assets from one appointed Named Fiduciary to the other appointed Named Fiduciary to such extent and on such date (or dates) as the Court shall determine and specify' (this first modification would authorize a Court-approved partial asset transfer from one Named Fiduciary appointee to the other, while the seventh modification requested in this motion would authorize a future transition to a single Named Fiduciary appointee);

"(b) the second modification (¶ 4, *infra*) would delegate to the Trustees '... the authority to appoint, replace and remove the custodian or custodians for all assets of the Pension Fund .... [, provided that at] least 60 days before the effective date of the appointment of any custodian of assets of the Pension Fund, the Pension Fund shall request the Court's approval of the custodian and give the Secretary notice of the request for approval. The Secretary shall present any objection to the appointment of the custodian within 30 days of the filing of the Pension Fund's request for approval. No custodian's appointment shall become effective until the Court approves the appointment of the custodian';

"(c) the third modification (¶ 5, *infra*) would prospectively require that each Named Fiduciary appointee's exclusive authority to adopt and amend its investment policy statement, 'after consultation with the Board of Trustees', is contingent upon approval by Court order within 90 days, provided that any 'such order shall be entered without any prejudice to the enforcement of all legal rights and

-2-

authority by the Secretary and all other interested parties';

"(d) the fourth modification (¶ 6, *infra*) would expressly authorize the Court at any future time to order the transfer of assets from each appointed Named Fiduciary to a future Passive Equity Index Account, managed by one or more Court-approved investment managers, according to a Court-approved asset re-allocation plan, upon motion by the Fund explaining the proposed justification for and specifics of this future transfer and plan (this current modification would establish a framework of the possible future Passive Equity Index Account that would parallel the framework of the existing Passive Fixed-Income Index Account which the Court authorized and approved on May 27, 2003, and which is now managed in accordance with Section II.E. of the Consent Decree);

"(e) the fifth modification (¶ 7, *infra*) would enlarge the lead sentence of Section II to acknowledge the possibility of a future Court-authorized Passive Equity Index Account;

"(f) the sixth modification (¶ 8, *infra*) would require any needed quarterly adjustments to the existing Passive Fixed-Income Index Account (Section II.E.) to consist of transfers from and to each Named Fiduciary in amounts 'approximately proportionate' to their then-current assets management responsibilities (instead of in equal amounts) (this change would conform to the possible future Passive Equity Index Account); and

"(g) the seventh modification (§ 9, *infra*) would expressly authorize the Court at any future time to approve a transition from the current '...

-3-

> arrangements for assets management by two Court-approved Named Fiduciary appointees ... to asset management by a single Court-approved Named Fiduciary ....'"

On November 16, 2007, the Secretary delivered to the Court, for filing, her response to the Motion, including:

> "During the past year, representatives of the Pension Fund and of the Department of Labor have engaged in discussions with respect to the Movants' desire to modify the Consent Decree so as to (a) permit the establishment of an equity index fund, (b) streamline procedures for the appointment of multiple named fiduciaries (or a single named fiduciary) and for the transfer of assets between them, (c) provide for Court approval of the Named Fiduciaries' Investment Policy Statements and (d) transfer authority to appoint the Pension Fund's custodian from the Named Fiduciaries to the Trustees.

> "The modifications, as delineated in the proposed Order Approving and Authorizing Consent Decree Modifications, represent a negotiated revision of Movants' earlier proposals that adequately resolve the Department's concerns.

> "Accordingly, the Secretary advises the Court that she has no objection to allowance of the subject motion and to the inclusion in the Consent Decree of the modifications as proposed in the Order Approving and Authorizing Consent Decree Modifications."

It has been demonstrated to the satisfaction of the Court that the modifications of the Consent Decree proposed in the Motion are reasonable, protective of the interests of the Fund and consistent with the purposes of the Consent Decree. The Court continues to have jurisdiction over the Fund and the subject matter of this action, and the Court is empowered to enter the following order.

-4-

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.     Section II.B.1. of the Consent is amended, effective immediately, by the addition of the following sentence to its first paragraph:

> "At all times the Court shall retain full authority to change all allocations of all assets of the Pension Fund, including the authority to order the transfer of assets from one appointed Named Fiduciary to the other appointed Named Fiduciary to such extent and on such date (or dates) as the Court shall determine and specify."

2.     Section II.B.2. of the Consent Decree is amended, effective January 1, 2008, to read as follows:

> "2.   Appointment of Investment Managers and Custodians

> "Each Named Fiduciary shall have exclusive authority to appoint, replace and remove such investment managers and real estate investment managers as it shall in its sole discretion determine are necessary to manage the assets of the Pension Fund allocated to the Named Fiduciary. These appointments, replacements and approvals by a Named Fiduciary need not be approved by the Court.   The Board of Trustees shall have exclusive authority to appoint, replace and remove the custodian or custodians for all assets of the Pension Fund, including assets allocated to each Named Fiduciary.  At least 60 days before the effective date of the appointment of any custodian of assets of the Pension Fund, the Pension Fund shall request the Court's approval of the custodian and give the Secretary notice of the request for approval.   The Secretary shall present any objection to the appointment of the custodian within 30 days of the filing of the Pension Fund's request for approval.  No custodian's appointment shall become effective until the Court approves the appointment of the custodian."

3.    Section II.B.4. of the Consent Decree is amended, effective immediately, to read as follows:

"4.   Investment Objectives and Policies

"Each Named Fiduciary is required to develop and implement the investment policy statement for the assets for which it is responsible, without any need to consider the investment policy  statement of the other Named Fiduciary, after consultation with the Board of Trustees, with appropriate regard for the actuarial requirements of the Pension Fund.     Each investment policy statement adopted by each Named Fiduciary will include appropriate volatility bands determined and provided by the Board of Trustees.   Investment policy statements setting forth the short-term and long-term investment objectives and policies of the Pension Fund were attached to orders previously entered by the Court in this action.   An investment policy statement may be changed by a Named Fiduciary, relative to all assets of the Pension Fund for which it is responsible as Named Fiduciary, after consultation with the Board of Trustees, after Notice of any change to an investment policy statement by any Named Fiduciary shall be reported to the Court, the Independent Special Counsel, the Secretary and the Pension Fund no later than 30 days after the change becomes effective. Effective on and after December 1, 2007, any adoption of or change to an investment policy statement by a Named Fiduciary shall not remain in effect for more than 90 days unless previously approved by order of the Court, provided that such order shall be entered without any prejudice to the enforcement of all legal rights and authority by the Secretary and all other interested parties.   Neither the Board of Trustees nor any administrator, officer, trustee, agent or employee of the Pension Fund shall authorize or recommend any future acquisitions, investments or dispositions of Pension Fund assets on a direct or indirect basis, except as otherwise provided in section II.E. and section II.F. of this Consent Decree.   All present and future investments of Pension Fund assets shall be managed solely by a Named Fiduciary or such other independent investment

-6-

managers or real estate investment managers, qualified in accordance with section II.C. of this Consent Decree, as a Named Fiduciary shall appoint, except as otherwise provided in section II.E. and section II.F. of this Consent Decree."

4.   Section II of the Consent Decree is amended, effective immediately, by the addition of a new Section II.F. to read as follows:

"F.   Passive Equity Index Account

"A passively managed broad-based equity account ('the Passive Equity Index Account') may be maintained by the Pension Fund, if authorized by the Court, outside the authority, responsibility and control of the Named Fiduciary appointees and the provisions of sections II.A., II.B., II.C. and II.D. of this Consent Decree.  If so authorized, the Passive Equity Index Account will initially consist of such part of the combined value as of a specified date of all assets of the Pension Fund then managed by the two Named Fiduciary appointees as the Court shall determine and specify ('the Court-authorized Allocation'), and the two Named Fiduciary appointees will re-allocate those assets on such date or dates as the Court shall determine and specify, in accordance with an asset re-allocation plan adopted by the Board of Trustees and approved by the Court, to one or more investment managers appointed by the Board of Trustees and approved by the Court.

"It is an objective of this section II.F. that the assets of the Pension Fund in the Passive Equity Index Account will continuously be substantially equal to the Court-authorized Allocation (provided that the Court may eliminate or change that allocation at any time) and, to achieve that objective, there will be quarterly adjustments in the following manner:

"(1) the Pension Fund will ascertain the amount needed, by transfers between the account and each Named Fiduciary, to maintain the Passive

-7-

Equity Index Account within the Court-authorized Allocation as of the first day of each calendar quarter while the account is funded, within 20 days after the end of the prior quarter;

"(2) the Pension Fund and each Named Fiduciary will together cause transfers to and from the Passive Equity Index Account, to complete any adjustment needed to maintain the Passive Equity Index Account within the Court-authorized Allocation, within 35 days after the end of the prior quarter;

"(3) the amounts of all transfers from and to each Named Fiduciary, to complete each such quarterly adjustment of the Passive Equity Index Account, will be approximately proportionate to the aggregate values of all assets of the Pension Fund for which they are then responsible; and

"(4) notice of the details of each quarterly adjustment of the Passive Equity Index Account will be provided by the Pension Fund to the Independent Special Counsel and the Secretary within 10 days after the adjustment has been completed.

"All assets of the Pension Fund in the Passive Equity Index Account shall be managed by one or more investment managers as defined in section 3(38) of ERISA, 29 U.S.C. § 1002(38), each of which shall be appointed by the Board of Trustees with the approval of the Court after notice to the Secretary. At least 30 days before the effective date of any investment manager's appointment, the Pension Fund shall request the Court's approval of the appointment and give the Secretary notice of the request for approval. The Secretary shall present any objection to the appointment of any such investment manager within 20 days of the filing of the Pension Fund's request for approval. The appointment of any such investment manager shall not become effective

-8-

until the Court expressly approves the appointment of the investment manager. To be eligible for appointment, an investment manager for all or part of the Passive Equity Index Account must meet the qualifications set forth in section II.C.2. of this Consent Decree.

"Each investment manager appointed to manage all or any part of the Passive Equity Index Account shall have exclusive authority to control and manage all assets of the Pension Fund for which it is responsible, in accordance with its investment policy statement, except that the Board of Trustees shall retain responsibility for the payment of benefits and administering the Pension Fund, and each investment manager shall release such sums as the Pension Fund may determine are required for the exclusive purpose of providing current benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. The investment policy statement governing the Passive Equity Index Account will be established by the Board of Trustees, but will not be effective until it is approved by the Court after notice to the Independent Special Counsel and the Secretary, and any subsequent change to that investment policy statement will require the same prior notice and the same approval by the Court. The Board of Trustees shall have responsibility and authority to monitor the performance of, and whenever appropriate to remove and replace, each investment manager appointed pursuant to this section II.F."

5.    Section II.A. of the Consent Decree is amended, effective immediately, by the expansion of the first sentence of Section II.A. to read as follows:

"All assets of the Pension Fund shall be managed for the duration of this Consent Decree by two entities, each of which shall qualify as a named fiduciary as defined in section 402(a)(2) of ERISA, 29 U.S.C. 1102(a)(2), in accordance with this section II, except for assets allocated to and managed in the Passive Fixed-Income Index Account

-9-

maintained in accordance with section II.E. of this Consent Decree, and except for assets allocated to and managed in the Passive Equity Index Account maintained in accordance with section II.F. of this Consent Decree."

6.   Section II.E. of the Consent Decree is amended, effective immediately, by the amendment of sub-part (3) of the first sentence in the second paragraph of Section II.E. to read as follows:

"(3) the amounts of all transfers from and to each Named Fiduciary, to complete each such quarterly adjustment of the Passive Fixed-Income Index Account, will be approximately proportionate to the aggregate values of all assets of the Pension Fund for which they are then responsible; ...".

7.   Section II of the Consent Decree is amended, effective immediately, by the addition of a new Section II.G. to read as follows:

"G.   Alternative   Asset   Management Arrangements

"Instead of the arrangements for assets management by two Court-approved Named Fiduciary appointees provided by sections II.A. and II.B. of this Consent Decree, the Court may at any time enter an order or orders approving a transition as of a specified date (or dates) to asset management by a single Court-approved Named Fiduciary of the Pension Fund, in which event all assets of the Pension Fund shall be allocated by the Court, for management, among the single Named Fiduciary, the Passive Fixed-Income Index Account and (if authorized by the Court) the Passive Equity Index Account, in such specific asset amounts and combinations and on such initially effective date (or dates) as the Court shall determine and specify.   All other terms of section II of this Consent Decree shall be applicable to these Court-approved asset management arrangements."

-10-

5.   This Order is effective immediately.

Entered:   November 20, 2007.

_____

JAMES B. MORAN
United States District Judge

# Exhibit I

*MHN*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HILDA L. SOLIS, Secretary of        )
the United States Department        )
of Labor,                           )
                                    )
            Plaintiff,              )
                                    )
v.                                  )     No. 78 C 342
                                    )
ESTATE OF FRANK E. FITZSIMMONS,     )     (United States
et al.,                             )      District Judge
                                    )      Milton I. Shadur)
            Defendants.             )

ORDER APPROVING (1) ASSET REALLOCATION FROM NAMED FIDUCIARY
GOLDMAN SACHS TO NAMED FIDUCIARY NORTHERN TRUST
AND (2) A CONSENT DECREE MODIFICATION

1.   A Consent Decree ("Consent Decree") was entered by the
Court in this action on September 22, 1982, upon the agreement of
Raymond J. Donovan, then the Secretary of the United States
Department of Labor, Central States, Southeast and Southwest Areas
Pension Fund ("Fund") and the Trustees of the Fund.  Hilda L. Solis
is the current Secretary of the United States Department of Labor
("the Secretary").

2.   On June 14, 2010, the Fund delivered to the Court, for
filing, a motion in this action entitled Fund's Motion for an Order
Approving an Asset Reallocation and a Consent Decree Modification
("Motion").  The Motion, among other things, recites that:

     In a letter to the Trustees received by the Fund on
     February 10, 2010, Goldman Sachs [Asset Management, L.P.
     ("Goldman Sachs")] served formal notice of its

F:338127 / AD092500 / 6/25/10                -1-

resignation as Named Fiduciary. Goldman Sachs has agreed to postpone the effective date of its resignation, for a reasonable period to allow the orderly reallocation of the Fund assets for which it is responsible.

As noted, Northern Trust [Global Advisors, Inc. ("Northern Trust")] was appointed to and approved by the Court to serve as a named fiduciary in 2005. At a board meeting of the Trustees on February 9, 2010, there was an oral and written presentation by a group of executives of Northern Trust. The presentation demonstrated a firm commitment by Northern Trust to take responsibility, as the Fund's sole Named Fiduciary, for all or part of the assets for which Goldman Sachs is presently responsible.

At a board meeting of the Trustees on April 20, 2010, the Trustees reviewed presentations by the Fund's staff and an outside financial consultant (Dr. John Heaton of the University of Chicago) concerning the Fund's experience with the dual named fiduciary arrangement that had been in place since 1999. On the basis of these presentations, the Trustees concluded that it was now in the Fund's interest to have a single Named Fiduciary and to increase the amount of the Fund's assets allocated to the passive, indexed investments. Accordingly, at the April 20, 2010 Meeting of the Board of Trustees, the Board approved, based on advice from Northern Trust as Named Fiduciary and subject to approval by this Court, a reallocation of all assets for which the Goldman Sachs is responsible to Northern Trust as Named Fiduciary, with the understanding that Northern Trust will subsequently make further a reallocation from the assets under its control as Named Fiduciary as follows –

> (a)  5% of the Fund's total assets are to be transferred to and invested in the Passive Equity Index Account established under Sec. II.F of the Consent Decree in this case; and

> (b)  5% of the Fund's total assets are to be transferred to and invested in a new EAFE [Europe Australia Far East] Index Account to be established under the Consent Decree.

The additional proposed allocation to indexed accounts described above has been recommended by Northern Trust in its capacity as Named Fiduciary. In addition, Northern Trust, in its capacity as Named Fiduciary, also recommended that, in order to complete this asset reallocation in the most cost effective manner, as an initial, transitional step in this asset transfer and reallocation, all the assets for which Goldman Sachs is currently responsible be transferred to Northern Trust – as described above.

(Motion, ¶¶ 8-11.)

Subsequent to the filing of this Motion, the Secretary delivered to the Court, for filing, her comments in response to the Motion, indicating that she had no objection to the Motion.

It has been demonstrated to the satisfaction of the Court that the Fund is entitled to the relief requested in its Motion.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.    The Court approves and authorizes a transfer, to take place on or before August 1, 2010, from Goldman to Northern Trust of all of the Fund assets for which Goldman is responsible as a Named Fiduciary for the Fund to Northern Trust as Named Fiduciary.

2.    Subject to the separate submission and approval by the Court of a specific asset reallocation plan (including the approval by the Court of an investment manager and investment policy for a Passive Europe Australia Far East ("EAFE") Index Account to be established under the Consent Decree modification described below), within 60 days of receipt of the above-referenced assets from

Goldman Sachs, Northern Trust is authorized to make a further reallocation of Fund assets as follows:

(a)   assets under the control of Northern Trust as Named Fiduciary comprising 5% of the Fund's total assets are to be transferred to the Passive Equity Account established under Sec. II.F. of the Consent Decree; and

(b)   assets under the control of Northern Trust as Named Fiduciary comprising 5% of the total value of the Fund's assets are to be transferred to a new Passive EAFE Index Account to be established under the Consent Decree (*see* proposed Consent Decree amendments discussed below).

After this asset reallocation process described above is complete, it is contemplated under this Order that the Fund's assets will be allocated as follows:

50%  -  Northern Trust

25%  -  Passive Equity Account

20%  -  Passive Fixed Income Account

5%  -  Passive EAFE Account

3.  The Court further orders, that the Consent Decree is amended effective immediately, as follows:

(a)  The first sentence of Sec. II.A. is deleted and replaced with the following sentence:

All assets of the Pension Fund shall be managed for the duration of this Consent Decree by a single entity (or such number of entities as the Court may subsequently direct), which (or each of which)

shall qualify as a named fiduciary as defined in section 402(a)(2) of ERISA, 29 U.S.C. 1102(a)(2), in accordance with this section II, except for assets allocated to and managed in the Passive Fixed-Income Index Account maintained in accordance with Section II.E. of this Consent Decree, except for assets allocated to and managed in the Passive Equity Index Account maintained in accordance with section II.F. of this Consent Decree, and except for assets allocated to and managed in the Passive EAFE Index Account maintained in accordance with section II.G. of this Consent Decree.

(b)   The following sentence is added at the end of the first paragraph of Section II.A.:

On February 10, 2010, Goldman Sachs gave notice of its intent to resign as Named Fiduciary, and subsequently, pursuant to a Motion filed by the Fund on June 14, 2010, the Court approved the transfer of all assets for which Goldman Sachs is responsible to Northern Trust as Named Fiduciary, with the direction that within 60 days of Northern Trust's receipt of assets from Goldman Sachs, and subject to the Court's approval of a specific plan of reallocation, Northern Trust will transfer assets under its control as Named Fiduciary as follows - -

(a)   assets totaling 5% of the total assets of the Fund to the Passive Equity Index Account; and

      (b)    assets totaling 5% of the
total assets of the Fund
to the Passive Index
EAFE Account.

(c)   Section II.G. is redesignated "II.H." and reads as follows:

       H.   <u>Alternative Asset Management Arrangements</u>

      Instead of the arrangements for assets management by two court-approved Named Fiduciary appointees permitted under sections II.A. and II.B. of this Consent Decree, the Court may at any time enter an order or orders approving a transition as of a specified date (or dates) to asset management by a single Court-approved Named Fiduciary of the Pension Fund, in which event all assets of the Pension Fund shall be allocated by the Court, for management, among the single Named Fiduciary, the Passive Fixed-Income Index Account (if authorized by the Court) the Passive Equity Index Account, and the Passive EAFE Index Account in such specific asset amounts and combinations and on such initially effective date (or dates) as the Court shall determine and specify. All other terms of section II of this Consent Decree shall be applicable to these Court-approved asset management arrangements.

(d)   the following new Section II.G. is added:

       G.   <u>Passive EAFE Index Account</u>

      A passively managed Europe Australia Far East Index ("EAFE") account ('the Passive EAFE Index

Account) may be maintained by the Pension Fund, if authorized by the Court, outside the authority, responsibility and control of the Named Fiduciary appointees and the provisions of sections II.A., II.B., II.C. and 11.D. of this Consent Decree. If so authorized, the Passive EAFE Index Account will initially consist of such part of the combined value as of a specified date of all assets of the Pension Fund then managed by the Named Fiduciary appointee as the Court shall determine and specify ('the Court-authorized Allocation'), and the Named Fiduciary appointee will re-allocate those assets on such date or dates as the Court shall determine and specify, in accordance with an asset re-allocation plan adopted by the Board of Trustees and approved by the Court, to one or more investment managers appointed by the Board of Trustees and approved by the Court.

It is an objective of this section II.G. that the assets of the Pension Fund in the Passive EAFE Index Account will continuously be substantially equal to the Court-authorized Allocation (provided that the Court may eliminate or change that allocation at any time) and, to achieve that objective, there will be quarterly adjustments in the following manner:

(1) the Pension Fund will ascertain the amount needed, by transfers between the account and each Named Fiduciary, to maintain the Passive EAFE Index Account within the Court-authorized Allocation as of the first day of each calendar quarter while the account is funded, within

20 days after the end of the prior quarter;

(2)    the Pension Fund and each Named Fiduciary will together cause transfers to and from the Passive EAFE Index Account, to complete any adjustment needed to maintain the Passive EAFE Index Account within the Court-authorized Allocation, within 35 days after the end of the prior quarter;

(3)    the amounts of all transfers from and to each Named Fiduciary, to complete each such quarterly adjustment of the Passive EAFE Index Account, will be approximately proportionate to the aggregate values of all assets of the Pension Fund for which they are then responsible; and

(4)    notice of the details of each quarterly adjustment of the Passive EAFE Index Account will be provided by the Pension Fund to the Independent Special Counsel and the Secretary within 10 days after the adjustment has been completed.

All assets of the Pension Fund in the Passive EAFE Index Account shall be managed by one or more investment managers as defined in section 3(38) of ERISA, 29 U.S.C. § 1002(38), each of which shall be appointed by the Board of Trustees with the approval of the Court after notice to the Secretary. At least 30 days before the effective date of any investment manager's appointment, the Pension Fund shall

request the Court's approval of the appointment and give the Secretary notice of the request for approval. The Secretary shall present any objection to the appointment of any such investment manager within 20 days of the filing of the Pension Fund's request for approval. The appointment of any such investment manager shall not become effective until the Court expressly approves the appointment of the investment manager. To be eligible for appointment, an investment manager for all or part of the Passive EAFE Index Account must meet the qualifications set forth in section II.C.2. of this Consent Decree.

Each investment manager appointed to manage all or any part of the Passive EAFE Index Account shall have exclusive authority to control and manage all assets of the Pension Fund for which it is responsible, in accordance with its investment policy statement, except that the Board of Trustees shall retain responsibility for the payment of benefits and administering the Pension Fund, and each investment manager shall release such sums as the Pension Fund may determine are required for the exclusive purpose of providing current benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. The investment policy statement governing the Passive EAFE Index Account will be established by the Board of Trustees, but will not be effective until it is approved by the Court after notice to the Independent Special Counsel and the Secretary, and any subsequent change to that investment policy statement

will require the same prior notice and the same approval by the Court. The Board of Trustees shall have responsibility and authority to monitor the performance of, and whenever appropriate to remove and replace, each investment manager appointed pursuant to this section II.G.

4.   This Order is effective immediately.


Entered: June 25 2010

6-25-2010

_____
Milton I. Shadur
United States District Judge

# Exhibit J

*MHN*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| HILDA L. SOLIS, Secretary,<br>United States Department of Labor, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 78 C 342 |
| v. | ) | |
| | ) | (United States District |
| | ) | Judge Milton I. Shadur) |
| ESTATE OF FRANK FITZSIMMONS, | ) | |
| *et al,* | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER APPROVING  (1) THE TRANSFER OF CERTAIN ASSETS FROM NORTHERN TRUST TO THE PASSIVE EQUITY INDEX ACCOUNT AND TO THE PASSIVE EAFE INDEX ACCOUNT IN ACCORDANCE WITH A REVISED COURT-AUTHORIZED ALLOCATION, (2) THE TRUSTEES' APPOINTMENT OF AN INVESTMENT MANAGER WITH RESPONSIBILITY FOR THE EAFE INDEX ACCOUNT, AND (3) TECHNICAL AMENDMENTS TO SECTIONS II.E., F. & G. OF THE CONSENT DECREE

1.      A Consent Decree ("Consent Decree") was entered by the Court in this action on September 22, 1982, upon the agreement of Raymond J. Donovan, then the Secretary of the United States Department of Labor, Central States, Southeast and Southwest Areas Pension Fund ("Fund") and the Trustees of the Fund.  Hilda L. Solis is the current Secretary of the United States Department of Labor ("the Secretary").

2.      On September 20, 2010, the Fund delivered to the Court, for filing, a motion in this action entitled Fund's Motion for an Order Approving (1) the Transfer of Certain Assets from Northern Trust to the Passive Equity Index Account and to the Passive EAFE Index Account in Accordance with a Revised Court-authorized Allocation, (2) the Trustees' Appointment of an Investment Manager with Responsibility for the EAFE Index Account,

and (3) Technical Amendments to Sections II.E., F. & G. of the Consent Decree ("Motion").

The Motion, among other things, recites that:

On June 25, 2010, the Court entered an Order authorizing the transfer of all assets of the Fund held by Goldman Sachs Asset Management L.P. ("Goldman Sachs," as Named Fiduciary) to Northern Trust Global Advisors, Inc. ("Northern Trust," as Named Fiduciary).  On August 2, 2010, this asset transfer was accomplished, and $5,537,429,371.72 in Fund assets were transferred from Goldman Sachs to Northern Trust.

Following this transfer of assets, under the June 25 Order, Northern Trust now acts as the Fund's only Named Fiduciary.

The June 25 Order also contemplates that following the transfer of assets from Goldman Sachs to Northern Trust, there would be further reallocations and transfers from Northern Trust to the Fund's Passive Equity Index Account and Passive EAFE Account, so as ultimately to achieve a Court-authorized Allocation of the Fund's assets whereby (1) 50% of the assets would be allocated to Northern Trust as Named Fiduciary, (2) 25% would be allocated to the Passive Index Equity Account, (3) 20% to the Passive Fixed-Income Index Account and (4) 5% to the Passive EAFE Index Account.  *See* 6/25/2010 Order, p. 4.

\* \* \*

The Court's June 25 Order approved and authorized modifications of Section II of the Consent Decree in this action as amended to date ("Consent Decree").  One modification provided that a Passive EAFE Index Account –

...may be maintained by the Pension Fund, if authorized by the Court, outside the authority, responsibility and control of the Named Fiduciary appointees ....

6/25/2010 Order, pp. 6-7 (amending Consent Decree § II.G.).

This provision of the Consent Decree approved under the Court's June 25, 2010 Order mirrors the November 20, 2007 Consent Decree modification which authorized that  the Fund's Passive Equity Index Account –

may be maintained by the Pension Fund, ... outside the authority, responsibility and control of the Named Fiduciary appointees ....

11/20/2007 Order, p. 7 (amending Consent Decree § II.F.) [footnote omitted].

* * *

The Court holds full authority for the allocation of all investment assets of the Fund under Section II of the Consent Decree among the Named Fiduciary(ies), the Passive Fixed-Income Index Account, the Passive Equity Index Account and the Passive EAFE Index Account :

> At all times the Court shall retain full authority to change all allocations of all assets of the Pension Fund....

Consent Decree, Sec. II.B.

As noted in the Fund's Motion for an Order Approving an Asset Allocation and Consent Decree Modification (filed 6/14/2010, pp. 9-10), at the April 20, 2010 Meeting of the Fund's Board of Trustees, upon the recommendation of Northern Trust, the Board authorized (subject to court approval) asset transfers from Northern Trust (following Northern Trust's receipt of the assets from Goldman Sachs), so that the following allocation of the Fund's investment assets could ultimately be achieved:

| Named Fiduciary or Passive Index Account | Percent of Total Assets |
|---|---|
| Northern Trust | 50% |
| Passive Equity Index Account | 25% |
| Passive Fixed-Income Index Account | 20% |
| Passive EAFE Index Account | 5% |

See also 6/25/2010 Order, p. 4 (approving the above-described asset allocation, subject to approval of a specific reallocation plan).

As of July 31, 2010 (the most recent date for which final certified investment reports are available), the Funds had investment assets with a total value of $18,524,456,917.08, which were allocated as follows:

| Named Fiduciary or Passive Index Account | Percent of Total Assets |
|---|---|
| Named Fiduciaries [footnote omitted] | 61.6% |
| Passive Equity Index Account | 21.1% |
| Passive Fixed-Income Index Account | 17.3% [footnote omitted] |

In order to achieve the Court-authorized Allocation of the Fund's assets contemplated under the Court's June 25 Order (*see* para. 10 above), the Fund requests that the Court authorize and approve the following specific reallocations and transfers of assets on or before October 1, 2010 from Northern Trust to the Passive Equity Index Account and to the Passive EAFE Index Account:

      (a)     transfer of $715,784,150.93 (comprising 4% of the Fund's investment assets as of 7/31/2010) to the Passive Equity Income Index Account of the Fund; and

      (b)     transfer of $926,222,845.85 (comprising 5% of the Fund's investment assets as of 7/31/2010) to the Passive EAFE Index Account of the Fund.

The Pension Fund requests that a revised Court-authorized Allocation of the Fund's investment assets under Sec. II of the Consent Decree be approved as follows, effective upon consummation of the asset transfers requested in Paragraph 12 above:

| Named Fiduciary or Passive Index Account | Percent of Total Fund Assets |
|---|---|
| Northern Trust | 50% |
| Passive Equity Index Account | 25% |
| Passive Fixed-Income Index Account | 20% |
| Passive EAFE Index Account | 5% [footnote omitted] |

Section II.G. of the Consent Decree also provides that "[a]ll assets of the Pension Fund in the Passive EAFE Index Account shall be managed by one or more investment managers as defined in section 3(38) of ERISA, 29 U.S.C. § 1002(38), each of which shall be appointed by the Board of Trustees with the approval of the Court after notice to the Secretary." 6/25/2010 Order, p. 8. Section II.G. also requires that the manager of the Passive EAFE Index Account "meet the qualifications [for an investment manager] under Section II.C.2. of this Consent Decree." *Id.*, p. 9 [footnote omitted].

* * *

    .... Subject to Court approval, Mellon Capital Management Corporation, a subsidiary of Bank of New York Mellon Corporation (collectively "Mellon"), was appointed by the Fund's Trustees at their August 10, 2010 Board meeting as the investment manager of the Fund with

exclusive authority and responsibility to control and manage the assets of the Fund in the Passive EAFE Index Account.

Mellon meets the investment manager qualifications specified under Sec. II.C.2. of the Consent Decree .... In fact, Mellon first served as an investment manager of the Fund beginning in September 1978, and has served as the custodian of assets of the Fund since October 1, 1986. Mellon also has administered benefit disbursement accounts of both the Fund and Central States, Southeast and Southwest Areas Health and Welfare Fund ("Welfare Fund") since August 1, 1990.

\* \* \*

It is respectfully requested that the Court now enter an order approving the appointment by the Trustees of Mellon to serve as an investment manager of the Fund, with authority and responsibility for the Passive EAFE Index Account of the Fund, effective immediately. It is further respectfully requested that the Court enter an order approving the Investment Policy Statement for the Passive EAFE Index Account, of which a copy is attached.

The Consent Decree contains certain references to "two Named Fiduciary appointees." *See, e.g.,* Consent Decree Sec. II.F., 11/20/2007 Order (quoted in Para. 7 above; emphasis added.) These references to "two Named Fiduciaries" became obsolete on August 2, 2010, when, pursuant to the Court's June 25, 2010 Order, Goldman Sachs transferred all the Fund assets it held as a Named Fiduciary to Northern Trust.

Therefore, for the sake of clarity and the avoidance of doubt, the Pension Fund requests that the pertinent provisions of Sec. II. of the Consent Decree be amended to eliminate the references to "two Named Fiduciaries," and to clarify and harmonize the phrasing of certain provisions of Sec. II. The technical amendments requested relate to Sections II.E., F. and G of the Consent Decree, and set forth below in parts (a), (b) and (c) of this Para. 24 are the proposed amendments (with requested deletions from the existing language of the Consent Decree shown with cross-throughs, and requested additions shown with underlining):

(a)     The first two paragraphs of Sec. II.E. of the Consent Decree (*see* 5/27/03 Order, Ex. A, at pp. 6-7) should be amended as follows:

E.     Passive Fixed-Income Index Account

A passively managed fixed-income account ("the Passive Fixed-Income Index Account") will be maintained by the Pension Fund outside the authority, responsibility and control of the Named Fiduciary appointee(s) and

the provisions of sections II.A., II.B., II.C. and II.D. of this Consent Decree, initially effective July 1, 2003. The Passive Fixed-Income Index Account will initially consist of 20% of the combined value as of May 31, 2003, of all assets of the Pension Fund managed by ~~Goldman Sachs and J.P. Morgan as the~~ Named Fiduciary appointee(s), and ~~those two~~ the appointee(s) will re-allocate those assets ~~on or shortly after July 1, 2003,~~ in accordance with an asset re-allocation plan adopted by the Board of Trustees and approved by the Court, to ~~an~~ <u>one or more</u> investment manager<u>s</u> appointed by the <u>Board of</u> Trustees and approved by the Court.

It is an objective of this section II.E. that the assets of the Pension Fund in the Passive Fixed-Income Index Account will continuously constitute 20% (or around 20%) of the combined value of all investment assets of the Pension Fund and, to achieve that objective, there will be quarterly adjustments in the following manner:

    (1)    the Pension Fund will ascertain the amount needed, by transfers between that account and each Named Fiduciary, to maintain the Passive Fixed-Income Index Account at a 20% share of all investment assets, as of the first day of each calendar quarter on and after October 1, 2003, within 20 days after the end of the prior quarter;

    (2)    the Pension Fund and each Named Fiduciary will together cause transfers to and from the Passive Fixed-Income Index Account, to complete the adjustment to that account's 20% share, within 35 days after the end of the prior quarter (for example, the adjustment to 20% as of October 1, 2003, will be completed on or before November 4, 2003);

    (3)    the amounts of all transfers from and to each Named Fiduciary, to complete each such quarterly adjustment of the Passive Fixed-Income Index Account, will be approximately proportionate to the aggregate values of all assets of the Pension Fund for which ~~they are~~ <u>each such Named Fiduciary is</u> then responsible; and

    (4)    notice of the details of each quarterly adjustment of the Passive Fixed-Income Index Account will be provided by the Pension Fund to the Independent Special Counsel and the Secretary within 10 days after the adjustment has been completed.

    (b)    The first paragraph of Sec. II.F. of the Consent Decree (*see* 11/20/07 Order, pp. 7-8) should be amended as follows:

F.      Passive Equity Index Account

A passively managed broad-based equity account ('the Passive Equity Index Account') ~~may~~ will be maintained by the Pension Fund, ~~if authorized by the Court,~~ outside the authority, responsibility and control of the Named Fiduciary appointee(s) and the provisions of sections II.A., II.B., II.C. and II.D. of this Consent Decree. ~~If so authorized,~~ The Passive Equity Index Account will initially consist of such part of the combined value as of a specified date of all assets of the Pension Fund then managed by the ~~two~~ Named Fiduciary appointee(s) as the Court shall determine and specify ('the Court-authorized Allocation'), and the ~~two~~ Named Fiduciary appointee(s) will re-allocate those assets on such date or dates as the Court shall determine and specify, in accordance with an asset re-allocation plan adopted by the Board of Trustees and approved by the Court, to one or more investment managers appointed by the Board of Trustees and approved by the Court.

        (c)     The first paragraph of Sec. II.G. of the Consent Decree (*see* 6/25/2010 Order, pp. 6-7) should be amended as follows:

G.      Passive EAFE Index Account

A passively managed Europe Australia Far East Index ("EAFE") account ('the Passive EAFE Index Account) ~~may~~ will be maintained by the Pension Fund, ~~if authorized by the Court,~~ outside the authority, responsibility and control of the Named Fiduciary appointee(s) and the provisions of sections II.A., II.B., II.C. and II.D. of this Consent Decree. ~~If so authorized,~~ [T]he Passive EAFE Index Account will initially consist of such part of the combined value as of a specified date of all assets of the Pension Fund then managed by the Named Fiduciary appointee(s) as the Court shall determine and specify ('the Court-authorized Allocation'), and the Named Fiduciary appointee(s) will re-allocate those assets on such date or dates as the Court shall determine and specify, in accordance with an asset re-allocation plan adopted by the Board of Trustees and approved by the Court, to one or more investment managers appointed by the Board of Trustees and approved by the Court.

Motion, Paras. 1-3, 6-7, 9-14, 16-17 and 22-24.

        3.      It has been demonstrated to the satisfaction of the Court that the Fund is entitled to the relief requested in its Motion.

        IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

(a)     The Court authorizes and approves the transfer on or before October 1, 2010 of (a) $715,784,150.93 from Northern Trust to the Passive Equity Index Account, and (b) $926,222,845.85 from Northern Trust to the Passive EAFE Index Account;

(b)     The Court approves the following as the Court-authorized Allocation of the Fund's investment assets  under Sec. II of the Consent Decree, effective upon completion of the asset transfers described in Para. (a) above:

| Percent of Total Assets | Named Fiduciary or Passive  Index Account |
|---|---|
| 50% | Northern Trust |
| 25% | Passive Equity Index Account |
| 20% | Passive Fixed-Income Index Account |
| 5% | Passive EAFE Index Account |

(c)     The Court approves Mellon Capital Management Corporation as the investment manager for the Passive EAFE Index Account under Sec. II.G. of the Consent Decree and approves the attached Statement of Investment Policy for that Account; and

(d)     The Court approves the amendments to Sections II.E., F. and G. of the Consent Decree requested and described in the Fund's Motion, so that effective immediately, Sections II.E., F. and G. of the Consent Decree are amended to state in their entirety as follows –

First, Section II.E. shall state:

E.     Passive Fixed-Income Index Account

A passively managed fixed-income account ("the Passive Fixed-Income Index Account") will be maintained by the Pension Fund outside the authority, responsibility and control of the Named Fiduciary appointee(s) and the provisions of sections II.A., II.B., II.C. and II.D. of this Consent Decree, initially effective July 1, 2003.  The Passive Fixed-Income Index Account will initially consist of 20% of the combined value as of May 31, 2003, of all assets of the Pension Fund

managed by the Named Fiduciary appointee(s), and the appointee(s) will re-allocate those assets in accordance with an asset re-allocation plan adopted by the Board of Trustees and approved by the Court, to one or more investment managers appointed by the Board of Trustees and approved by the Court.

It is an objective of this section II.E. that the assets of the Pension Fund in the Passive Fixed-Income Index Account will continuously constitute 20% (or around 20%) of the combined value of all investment assets of the Pension Fund and, to achieve that objective, there will be quarterly adjustments in the following manner:

(1)     the Pension Fund will ascertain the amount needed, by transfers between that account and each Named Fiduciary, to maintain the Passive Fixed-Income Index Account at a 20% share of all investment assets, as of the first day of each calendar quarter on and after October 1, 2003, within 20 days after the end of the prior quarter;

(2)     the Pension Fund and each Named Fiduciary will together cause transfers to and from the Passive Fixed-Income Index Account, to complete the adjustment to that account's 20% share, within 35 days after the end of the prior quarter (for example, the adjustment to 20% as of October 1, 2003, will be completed on or before November 4, 2003);

(3)     the amounts of all transfers from and to each Named Fiduciary, to complete each such quarterly adjustment of the Passive Fixed-Income Index Account, will be approximately proportionate to the aggregate values of all assets of the Pension Fund for which each such Named Fiduciary is then responsible; and

(4)     notice of the details of each quarterly adjustment of the Passive Fixed-Income Index Account will be provided by the Pension Fund to the Independent Special Counsel and the Secretary within 10 days after the adjustment has been completed.

All assets of the Pension Fund in the Passive Fixed-Income Index Account shall be managed by one or more investment managers as defined in section 3(38) of ERISA, 29 U.S.C. § 1002(38), each of which shall be appointed by the Trustees with the approval of the Court after notice to the Secretary. At

least 30 days before the effective date of any investment manager's appointment, the Pension Fund shall request the Court's approval of the appointment and give the Secretary notice of the request for approval. The Secretary shall present any objection to the appointment of any such investment manager within 20 days of the filing of the Pension Fund's request for approval. The appointment of any such investment manager shall not become effective until the Court expressly approves the appointment of the investment manager. To be eligible for appointment, an investment manager for all or part of the Passive Fixed-Income Index Account must meet the qualifications set forth in section II.C.2. of this Consent Decree.

Each investment manager appointed to manage all or any part of the Passive Fixed-Income Index Account shall have exclusive authority to control and manage all assets of the Pension Fund for which it is responsible, in accordance with its investment policy statement, except that the Board of Trustees shall retain responsibility for the payment of benefits and administering the Fund, and each investment manager shall release such sums as the Pension Fund may determine are required for the exclusive purpose of providing current benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. The investment policy statement governing the Passive Fixed-Income Index Account will be established by the Board of Trustees, but will not be effective until it is approved by the Court after notice to the Independent Special Counsel and the Secretary, and any subsequent change to that investment policy statement will require the same prior notice and the same approval by the Court. The Board of Trustees shall have responsibility and authority to monitor the performance of, and whenever appropriate to remove and replace, each investment manager appointed pursuant to this section II.E.

Second, Section II.F. shall state:

F.      Passive Equity Index Account

A passively managed broad-based equity account ('the Passive Equity Index Account') will be maintained by the Pension Fund outside the authority, responsibility and control of the Named Fiduciary appointee(s) and the provisions of sections II.A., II.B., II.C. and II.D. of this Consent Decree. The Passive Equity Index Account will initially consist of such part of the combined value as of a specified date of all assets of the

Pension Fund then managed by the Named Fiduciary appointee(s) as the Court shall determine and specify ('the Court-authorized Allocation'), and the Named Fiduciary appointee(s) will re-allocate those assets on such date or dates as the Court shall determine and specify, in accordance with an asset re-allocation plan adopted by the Board of Trustees and approved by the Court, to one or more investment managers appointed by the Board of Trustees and approved by the Court.

It is an objective of this section II.F. that the assets of the Pension Fund in the Passive Equity Index Account will continuously be substantially equal to the Court-authorized Allocation (provided that the Court may eliminate or change that allocation at any time) and, to achieve that objective, there will be quarterly adjustments in the following manner:

(1)   the Pension Fund will ascertain the amount needed, by transfers between the account and each Named Fiduciary, to maintain the Passive Equity Index Account within the Court-authorized Allocation as of the first day of each calendar quarter while the account is funded, within 20 days after the end of the prior quarter;

(2)   the Pension Fund and each Named Fiduciary will together cause transfers to and from the Passive Equity Index Account, to complete any adjustment needed to maintain the Passive Equity Index Account within the Court-authorized Allocation, within 35 days after the end of the prior quarter;

(3)   the amounts of all transfers from and to each Named Fiduciary, to complete each such quarterly adjustment of the Passive Equity Index Account, will be approximately proportionate to the aggregate values of all assets of the Pension Fund for which they are then responsible; and

(4)   notice of the details of each quarterly adjustment of the Passive Equity Index Account will be provided by the Pension Fund to the Independent Special Counsel and the Secretary within 10 days after the adjustment has been completed.

All assets of the Pension Fund in the Passive Equity Index Account shall be managed by one or more investment managers as defined in section 3(38) of ERISA, 29 U.S.C. § 1002(38), each of which shall be appointed by the Board of Trustees with the approval of the Court after notice to the

Secretary.  At least 30 days before the effective date of any investment manager's appointment, the Pension Fund shall request the Court's approval of the appointment and give the Secretary notice of the request for approval.  The Secretary shall present any objection to the appointment of any such investment manager within 20 days of the filing of the Pension Fund's request for approval.  The appointment of any such investment manager shall not become effective until the Court expressly approves the appointment of the investment manager.  To be eligible for appointment, an investment manager for all or part of the Passive Equity Index Account must meet the qualifications set forth in section II.C.2. of this Consent Decree.

Each investment manager appointed to manage all or any part of the Passive Equity Index Account shall have exclusive authority to control and manage all assets of the Pension Fund for which it is responsible, in accordance with its investment policy statement, except that the Board of Trustees shall retain responsibility for the payment of benefits and administering the Pension Fund, and each investment manager shall release such sums as the Pension Fund may determine are required for the exclusive purpose of providing current benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan.  The investment policy statement governing the Passive Equity Index Account will be established by the Board of Trustees, but will not be effective until it is approved by the Court after notice to the Independent Special Counsel and the Secretary, and any subsequent change to that investment policy statement will require the same prior notice and the same approval by the Court.  The Board of Trustees shall have responsibility and authority to monitor the performance of, and whenever appropriate to remove and replace, each investment manager appointed pursuant to this section II.F.

Third, Section II.G. shall state:

G.     Passive EAFE Index Account

A passively managed Europe Australia Far East Index ("EAFE") account ("the Passive EAFE Index Account) will be maintained by the Pension Fund outside the authority, responsibility and control of the Named Fiduciary appointee(s) and the provisions of sections II.A., II.B., II.C. and II.D. of this Consent Decree. [T]he Passive EAFE Index Account will

initially consist of such part of the combined value as of a specified date of all assets of the Pension Fund then managed by the Named Fiduciary appointee(s) as the Court shall determine and specify ('the Court-authorized Allocation'), and the Named Fiduciary appointee(s) will re-allocate those assets on such date or dates as the Court shall determine and specify, in accordance with an asset re-allocation plan adopted by the Board of Trustees and approved by the Court, to one or more investment managers appointed by the Board of Trustees and approved by the Court.

It is an objective of this section II.G. that the assets of the Pension Fund in the Passive EAFE Index Account will continuously be substantially equal to the Court-authorized Allocation (provided that the Court may eliminate or change that allocation at any time) and, to achieve that objective, there will be quarterly adjustments in the following manner:

(1)     the Pension Fund will ascertain the amount needed, by transfers between the account and each Named Fiduciary, to maintain the Passive EAFE Index Account within the Court-authorized Allocation as of the first day of each calendar quarter while the account is funded, within 20 days after the end of the prior quarter;

(2)     the Pension Fund and each Named Fiduciary will together cause transfers to and from the Passive EAFE Index Account, to complete any adjustment needed to maintain the Passive EAFE Index Account within the Court-authorized Allocation, within 35 days after the end of the prior quarter;

(3)     the amounts of all transfers from and to each Named Fiduciary, to complete each such quarterly adjustment of the Passive EAFE Index Account, will be approximately proportionate to the aggregate values of all assets of the Pension Fund for which they are then responsible; and

(4)     notice of the details of each quarterly adjustment of the Passive EAFE Index Account will be provided by the Pension Fund to the Independent Special Counsel and the Secretary within 10 days after the adjustment has been completed.

All assets of the Pension Fund in the Passive EAFE Index Account shall be managed by one or more investment managers as defined in section 3(38) of ERISA, 29 U.S.C. § 1002(38), each of which shall be appointed by the Board of

Trustees with the approval of the Court after notice to the Secretary. At least 30 days before the effective date of any investment manager's appointment, the Pension Fund shall request the Court's approval of the appointment and give the Secretary notice of the request for approval. The Secretary shall present any objection to the appointment of any such investment manager within 20 days of the filing of the Pension Fund's request for approval. The appointment of any such investment manager shall not become effective until the Court expressly approves the appointment of the investment manager. To be eligible for appointment, an investment manager for all or part of the Passive EAFE Index Account must meet the qualifications set forth in section II.C.2. of this Consent Decree.

Each investment manager appointed to manage all or any part of the Passive EAFE Index Account shall have exclusive authority to control and manage all assets of the Pension Fund for which it is responsible, in accordance with its investment policy statement, except that the Board of Trustees shall retain responsibility for the payment of benefits and administering the Pension Fund, and each investment manager shall release such sums as the Pension Fund may determine are required for the exclusive purpose of providing current benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. The investment policy statement governing the Passive EAFE Index Account will be established by the Board of Trustees, but will not be effective until it is approved by the Court after notice to the Independent Special Counsel and the Secretary, and any subsequent change to that investment policy statement will require the same prior notice and the same approval by the Court. The Board of Trustees shall have responsibility and authority to monitor the performance of, and whenever appropriate to remove and replace, each investment manager appointed pursuant to this section II.G.

(e)     This Order is effective immediately.

Entered: September 21, 2010

_____
Milton I. Shadur
United States District Judge

F:344304 / 04000011 / 9/21/10                    **-14-**

**INVESTMENT POLICY STATEMENT**
**FOR THE**
**PASSIVE EAFE INDEX ACCOUNT**
**OF**
**CENTRAL STATES, SOUTHEAST AND**
**SOUTHWEST AREAS PENSION FUND**
**AS OF SEPTEMBER 1, 2010**

## I.   INTRODUCTION

### A. General

1. The purpose of this Investment Policy Statement is to record the investment policies that govern the management of the Passive EAFE Index Account ("Index Account") of Central States, southeast and Southwest Areas Pension Fund ("Fund"), an account which is established and maintained in accordance with the consent decree ("Consent Decree") governing the Fund, as entered by U.S. District Judge James B. Moran in civil action No. 78 C 342 in the United States District Court for the Northern District of Illinois, Eastern Division ("Court"), as heretofore and hereafter amended.

2. This Investment Policy Statement has been adopted by the board of trustees ("Trustees") of the Fund.

3. The Trustees are authorized and responsible to develop this Investment Policy Statement and to implement it by one or more investment managers appointed by the Trustees and approved by the Court.

4. The Trustees are authorized and responsible to appoint and monitor one or more investment managers which will manage the Index Account and, if and when appropriate, to remove and replace any such appointed manager.

### B. Plan and Fund Characteristics and Considerations

The investment policy applicable to the Index Account shall take into consideration the following factors:

1. The Fund is a multiemployer defined benefit pension plan and trust, and is a qualified plan and a tax-exempt organization in accordance with Sections 401(a) and 501(a) of the Internal Revenue Code.

2. Participating employers remit periodic contributions to the Fund, on behalf of employee participants of the Fund, at rates specified in collective

bargaining agreements. Active participants may, in specified conditions during temporary absences from employment, remit self-contributions to the Fund in order to increase benefit accruals. The Trustees are empowered to establish and amend the terms, provisions and limitations of plan benefits. Collective bargaining agreements are generally negotiated for multi-year periods and include specific expiration dates, provisions and employer contribution rates. The Fund is not a party to such negotiations or to such agreements.

### C. Investment Philosophy

1. The investment philosophy shall be to manage the Index Account in a prudent and conservative yet productive manner consistent with the Consent Decree and the Employee Retirement Income Security Act ("ERISA"), as heretofore and hereafter amended. Each appointed investment manager responsible to manage all or part of the Index Account shall seek to increase the aggregate purchasing power of the assets under management over the long-term, while conscious of the need to preserve asset value, in order to enhance the ability of the Fund to meet its obligations.

2. The Index Account will be diversified in accordance with the investment objectives stated in Section II.A., infra.

## II.   INVESTMENT POLICY

### A. Investment Objectives

The investment objectives of the Index Account shall include the following:

1. To provide income and capital appreciation by diversified investment in the developed international equity markets (excluding the United States and Canada) matching the total return of the Morgan Stanley Capital International Europe, Australasia, Far East Index ("MSCI EAFE Index").

2. To maximize investment returns and minimize tracking error in the Index Account to the extent consistent with the requirements of sufficient liquidity and minimum risk.

3. To minimize investment expenses.

**B.  Specific Investment Guidelines**

1.  Each investment manager appointed to manage all or part of the Index
    Account shall seek to replicate the characteristics of the MSCI EAFE Index.
    Each investment manager shall remain fully invested in the equity market at
    all times and shall hold each security of the MSCI EAFE Index in the same
    index weight.

2.  The MSCI EAFE Index is a free float-adjusted market capitalization index
    that is designed to measure the equity market performance of developed
    markets excluding the United States and Canada.  The companies that
    comprise the MSCI EAFE Index are weighted according to their respective
    shares outstanding.   This market-value-weighted index makes each
    company's influence on the Index's performance proportional to that
    company's market value.

F:344609 / AD092500 / 9/21/10                                    -3-

# Exhibit K



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HILDA L. SOLIS, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 78 C 342 |
| ESTATE OF FRANK E. FITZSIMMONS, et al., | ) | Judge Milton Shadur |
| Defendants. | ) | |

| | | |
|---|---|---|
| HILDA L. SOLIS, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 78 C 4075 |
| LORAN W. ROBBINS, et al., | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| HILDA L. SOLIS, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 82 C 7951 |
| ALLEN M. DORFMAN, et al., | ) | |
| Defendants. | ) | |

**ORDER APPROVING AMENDMENTS TO THE PROVISIONS
OF THE CONSENT DECREE RELATING TO THE APPOINTMENT
OF A SUCCESSOR INDEPENDENT SPECIAL COUNSEL**

1.     A Consent Decree was entered in the *Fitzsimmons* case by the Court on

September 22, 1982, upon the agreement of the Secretary of the United States

Department of Labor (the "Secretary"), the Central States, Southeast and Southwest Areas

Pension Fund ("Pension Fund") and the Trustees of the Pension Fund.  (The "Pension

Fund Consent Decree.")

      2.      An Amended Consent Decree was entered in the *Robbins* and *Dorfman*

cases, upon agreement of the Secretary, the Central States, Southeast and Southwest

Areas Health and Welfare Fund (the "Health and Welfare Fund") and the Trustees of the

Health and Welfare Fund.  (The "Health and Welfare Fund Consent Decree.")

      3.      On October 14, 2011, the Fund delivered to the Court, for filing, a motion in

this action entitled Central States Funds' Agreed Motion for an Order Approving Consent

Decree Amendments Relating to the Appointment of the Independent Special Counsel

("Motion"). The Motion, among other things, recites that:

> [T]he Consent Decree provisions relating to the appointment of a
> successor Independent Special Counsel [Sec. V. H. of each Consent
> Decree] should be amended to eliminate the reference to the
> submission of a list of "*three individuals*" as ISC candidates.  This
> amendment will serve to better conform the language of the Consent
> Decree to the actual practice of the Court and the parties.  This
> amendment will also provide the parties with appropriate flexibility to
> accommodate circumstances in which for practical reasons fewer
> than three ISC candidates can be recommended to the Court by the
> parties.

Motion, ¶ 8.

      4.      The Secretary of Labor does not object to the relief requested in the Motion.

      5.      It has been demonstrated to the satisfaction of the Court that the Fund is

entitled to the relief requested in its Motion.

      IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

      1.      The provisions of the Pension Fund and Health and Welfare Fund Consent

Decrees relating to the appointment of a successor Independent Special Counsel by

submitting to the Court a list of three individuals recommended by the Funds and

agreeable to the Secretary are amended, so that the second paragraph of Sec. V. H. of

each Consent Decree shall state:

> The Independent Special Counsel shall not be discharged or terminated during the duration of this Consent Decree except by leave of Court. Upon the termination, discharge, death, incapacity, or resignation of an Independent Special Counsel during the term of this Consent Decree, the Court shall appoint a successor Independent Special Counsel from a list consisting of one to three individuals recommended by both the Pension Fund and the Health and Welfare Fund and agreeable to the Secretary. Recommendations for a successor Independent Special Counsel shall be made within such periods as the Court, by further order, may provide.

2.    This Order is effective immediately.

Entered: October 21, 2011

Milton I. Shadur
United States District Judge

# Exhibit L



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HILDA L. SOLIS, et al.,                )
                                       )
            Plaintiffs,                )
                                       )
v.                                     )          No. 78 C 342
                                       )          Judge Milton Shadur
ESTATE OF FRANK E. FITZSIMMONS,)
et al.,                                )
                                       )
            Defendants.                )
_____)
HILDA L. SOLIS,                        )
                                       )
            Plaintiff,                 )
                                       )
     v.                                )          No. 78 C 4075
                                       )
LORAN W. ROBBINS, et al.,              )
                                       )
            Defendants.                )
_____)
HILDA L. SOLIS,                        )
                                       )
            Plaintiff,                 )
                                       )
     v.                                )          No. 82 C 7951
                                       )
ALLEN M. DORFMAN, et al.,              )
                                       )
            Defendants.                )

## ORDER APPOINTING INDEPENDENT SPECIAL COUNSEL

This Order relates to the appointment of an Independent Special Counsel under the

1982 Consent Decree concerning the Central States, Southeast and Southwest Areas

Pension Fund ("Pension Fund") in the above-referenced *Fitzsimmons* action, and under

the 1993 Amended Consent Decree concerning the Central States, Southeast and

Southwest Areas Health and Welfare Fund ("Health and Welfare Fund") in the above-referenced *Robbins* and *Dorfman* actions.

Pursuant to an Order entered on September 19, 2011 and pursuant to his request, this Court relieved Frank J. McGarr, a retired Chief Judge in this District, from his position as Independent Special Counsel, a position to which he was appointed by this Court on February 27, 2003.

In a Motion submitted on October 28, 2011, the Pension Fund and the Health and Welfare Fund notified the Court that David H. Coar, another retired Judge in this District, is recommended by the Funds for appointment by the Court as the successor Independent Special Counsel. Counsel for the Secretary of Labor has informed the Court that David H. Coar is "agreeable to the Secretary" in the words of Sec. V.H. of each Consent Decree.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.      The Court hereby appoints David H. Coar, a retired United States District Judge in this District, as the Independent Special Counsel of the Funds, replacing Frank J. McGarr (who has resigned), with all authority and responsibilities of that appointed position as specified in the Consent Decrees.

2.      This appointment and Order are effective immediately.

Entered: November 2, 2011

Milton I. Shadur
United States District Judge

EXHIBIT B

## DAVID H. COAR, ESQ.
**Arbitration and Mediation**

January 17, 2017

**Via UPS Next Day**

The Honorable Milton I. Shadur
United States District Judge
United States District Court
Northern District of Illinois
Eastern Division
219 South Dearborn Street
Chicago, Illinois 60604

Re:     Quarterly Report of Independent Special Counsel, *Perez v. Estate of Frank E. Fitzsimmons, et al.*, No. 78 C 342 (N.D. Ill., E.D.); *Perez v. Robbins, et al.*, No. 78 C 4075 (N.D. Ill., E.D.); and *Perez v. Dorman, et al.*, No. 82 C 7951 (N.D. Ill., E.D.)

Dear Judge Shadur:

This is to report on my activities during the third quarter of 2016 as Independent Special Counsel appointed pursuant to the *Fitzsimmons* (Pension Fund) and *Robbins* and *Dorfman* (Health and Welfare Fund) consent decrees.

### Central Trustee Selection Board

The Central Trustee Selection Board ("CTSB") consists of 11 members elected by the principal officers of Teamster Local Unions in 11 Midwestern states. The CTSB has responsibility to elect and monitor 3 of the 4 Employee Trustees of Central States Funds. The Funds' Statement of Procedure for the Selection and Monitoring of Trustees (the "Procedures") provides that a CTSB member must vacate his or her position if he or she is appointed an Employee Trustee of the Funds.

Gary Dunham, who was appointed as an Employee Trustee on June 7, 2016, had previously been serving as the CTSB member for the State of Iowa. Accordingly ballots were sent to all eligible Iowa Local Unions in September of this year and all ballots were returned and counted on October 7, 2016. The results of this election -- which were reviewed and approved by the Employee Trustees on October 11, 2016, pursuant to the Procedures -- is that Ms. Claudia Pettit, the principal officer of Local Union 90 in Des Moines, Iowa, has been elected to the CTSB member for Iowa. She will serve the remainder of Mr. Dunham's term, which will expire on December 31, 2018.

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 2

## Audit

At the September 13, 2016 Meeting of the Board of Trustees and the Meeting of the Audit Subcommittee held on that same date, the Trustees heard the report of the Funds' outside auditors -- Lindquist LLP -- concerning their audit of the Funds' Annual Reports (Form 5500s) for the plan/calendar year ending on December 31, 2015. Lindquist LLP submitted unqualified opinions concerning the 2015 Annual Reports of both the Pension Fund and the Health and Welfare Fund. At the September 2016 Meetings the Trustees also reviewed and approved the filing of the 2015 Annual Reports of both Funds.

At the September 2016 Board Meetings the Internal Audit Department presented its report on the audit "V-3" employer contract system. ("V-3" refers to a software system used to track contributing employer accounts and other key information used in the Funds' operations.) The overall conclusion of the audit was that the administrative and internal accounting controls surrounding contracts processing are operating in accordance with the Funds' policies, and provide a basis for reliance on the propriety of the transactions processed.

## Pension Fund

### PPA-Related Issues

As explained in previous reports, the multiemployer plan funding rules of the Pension Protection Act of 2006 ("PPA") became effective on January 1, 2008. On March 24, 2008, the Fund's actuary certified the Fund to be in "critical status" under the PPA for the 2008 plan year; the actuary has made the same certification with respect to subsequent plan years, except that in March 2015, the actuary certified the Fund to be in the new category of "critical and declining" created by the Multiemployer Pension Reform Act of 2014 (discussed below). As a result of the initial critical status certification, the Trustees adopted a "rehabilitation plan" as the PPA requires for critical status plans. In broad outline, the Rehabilitation Plan approved by the Trustees contains a "Primary Schedule," which requires each contributing employer to agree to five years of 8% annual contribution increases (7% if the increases began in 2006) in order to maintain current benefit levels for the affected bargaining unit. The PPA also requires that a rehabilitation plan contain a "Default Schedule" which must provide for the reduction in what the PPA terms "adjustable benefits"; the Fund's Rehabilitation Plan mandates 4% annual contribution rate increases with respect to the Default Schedule. ("Adjustable benefits" under the PPA generally include all benefits other than a contribution-based retirement benefits payable at age 65.) The PPA also provides that if the bargaining parties have not chosen any of the schedules established by a rehabilitation plan (i.e., the Primary or Default Schedule) within 180 days following the expiration of the parties' last labor agreement, the Default Schedule will be imposed as a matter of law. In addition, the Rehabilitation Plan provides that that the members of bargaining units who agree to a withdrawal from the Pension Fund, or otherwise acquiesce or participate in a withdrawal -- an event termed a "Rehabilitation Plan Withdrawal" -- also incur a loss of their adjustable benefits.

As also explained in my previous reports, the PPA requires the Trustees to engage in an annual process of considering whether it is appropriate to update the Rehabilitation Plan in any fashion. Last December during the 2015 Rehabilitation Plan update process the Trustees

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 3

noted that because the Fund was facing an insolvency (projected to occur in 2025), the PPA required that they take "reasonable measures" to forestall the insolvency. ERISA §305(e)(3)(A)(ii). The Trustees also concluded that the application that the Trustees approved for filing with the U.S. Department of Treasury on September 25, 2015 pursuant to the Multiemployer Pension Reform Act (MPRA) was a reasonable measure designed to forestall the projected insolvency (see pp. 3 - 4 below), and therefore one that the Trustees were required to take under the PPA. However, during the 2015 Rehabilitation Plan update process the Trustees also concluded that any further or additional benefit reductions or the imposition of additional requirements for increased contributions (i.e., beyond filing the 2015 MPRA application and those measures previously implemented and set forth in Rehabilitation Plan) would entail too great a risk of irreparable harm to a large number of contributing employers, or would otherwise risk prompting an undue and harmful number of withdrawals from the Fund.

However, in the 2015 Rehabilitation Plan update process, the Trustees approved continued implementation of (i) the Distressed Employer Schedule (which the Trustees believe accommodated the special circumstances presented by YRC, Inc. in a manner that was actuarially favorable to the Fund; see pp. 12 - 13 below), (ii) the hybrid withdrawal liability method (pp. 10 - 11 below), and (iii) the benefit modifications, contribution rate increases and other features of the Rehabilitation Plan that have been previously adopted (e.g., the Trustees raised the minimum retirement age to 57, effective as of June 1, 2011).

Although it appears the Pension Fund has reported some progress in securing increased employer contributions and in adjusting benefits as required of "critical and declining status" plans under the PPA, the Fund suffered serious investment losses in the general stock market and economic downturn that commenced in 2008 (and before that, in the 2002 – 2003 market decline). In more recent years, the Fund has enjoyed significant investment gains. For example, the Fund enjoyed a composite rate of return of 19.04% for calendar year 2013, and a rate of return of 6.86% for calendar year 2014. However, 2015 and 2016 (through the end of the third quarter) have been marked by volatility in the markets. The asset level as of September 30, 2016 of approximately $15.7 billion is approximately $10 billion below the value of assets held by the Fund shortly before the commencement of the world wide stock market collapse in 2008. But the Fund's Staff reports that the continuing downward pressure on the Fund's assets is largely due to the Fund's current annual operating deficit of more than $2 billion per year -- meaning that in recent years the Fund has paid out more than $2 billion each year more in benefits than it has collected in contributions from employers.

In addition, as indicated in my prior reports, the Pension Fund's Staff has reported that due to the global downturn in investment markets during 2008, as of January 1, 2009, the Pension Fund was unable to satisfy the funding improvement targets that are a condition of the amortization extension granted to the Fund by the IRS in 2005. The consequence of an unexcused failure to satisfy the funding target conditions of the amortization extension (as it was originally formulated) could have been the imposition of potentially crippling excise taxes upon the Fund's contributing employers. However, Staff has also reported that in early 2009 the Pension Fund filed an application with the IRS requesting a waiver of the funding targets.

As is also indicated in my prior reports, Staff now advises that on April 28, 2016, the IRS approved a modification of the amortization extension. Staff advises that under this

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 4

modification there will be no retroactive funding deficiency for years prior to 2009 as a result of any failure of the Fund to satisfy the funding target conditions for 2009 and subsequent years. Staff also advises that under the modified extension the Fund's employers will not be exposed to excise taxes as long as the Fund has a PPA rehabilitation plan in place and is complying with it.

Funding Issues Confronting Multiemployer Plans

According to the Pension Benefit Guarantee Corporation's ("PBGC") fiscal year 2015 Projections Report (published on June 17, 2016), it is more likely than not that the PBGC multiemployer guaranteed program will run out of money by the end of 2025. This means that the PBGC will have no financial resources to pay benefits to the Pension Fund participants if, as projected, the Fund also becomes insolvent at approximately the same time as the PBGC.

And according to an August 2016 report issued by the Congressional Budget Office ("CBO"), multiemployer pension plans in the United States have in the aggregate approximately $850 billion in pension obligations, but have only about $400 billion in assets. U.S. Congressional Budget Office, *Options to Improve the Financial Condition of the PBGC's Multiemployer Program* (August 2016).This CBO report also indicates that the present value of the combined projected claims of all multiemployer plans for financial assistance from the PBGC during the 2017-2036 period totals $101 billion. But the CBO also reports that since the PBGC is projected to become insolvent in 2025, that agency will only be able to satisfy a small portion of these claims.

Multiemployer Pension Reform Act of 2014

As was also explained in my prior reports, it appears that in response to the funding issues impacting the PBGC and a number of multiemployer plans throughout the United States, in December 2014 the Multiemployer Pension Reform Act of 2014 ("MPRA" or the "Act") was enacted. MPRA provides "critical and declining" multiemployer plans -- such as the Pension Fund -- with the option of requesting approval for a plan of benefit suspensions from the U.S. Department of Treasury. Any such benefit suspension plan (a) would be required to avoid the Fund's projected insolvency, but (b) may not contain benefit suspensions that are materially greater than those required to avoid the insolvency.

In addition, my prior reports noted that on September 25, 2015, the Pension Fund filed an application under MPRA with the U.S. Department of the Treasury requesting approval of a plan of benefit suspensions.

And as also indicated in my prior reports:

1.   On May 6, 2016 the Department of Treasury denied the Fund's MPRA application.

2.   Due to the passage of time (and the accompanying decline in the Fund's assets), and due to the new requirements of the recently published Treasury regulations governing MPRA applications, the Pension Fund Trustees have concluded that it

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 5

> is not possible for the Fund to submit a new or revised application or proposed
> suspension plan.

3.     The Trustees have also resolved to continue to cooperate with Congress,
       regulatory agencies, unions, employers and private parties and organizations to
       search for a solution to the multiemployer pension funding problem.

Campbell Litigation

As the Court is aware, on April 25, 2016 Doris Campbell and several other participants
in the Pension Fund filed an action alleging breach of fiduciary duty against the Fund and its
Trustees. Campbell v. Whobrey, No. 16-CV-04631 (U.S. Dist. N.D. Ill.). The Campbell plaintiffs
are all present or former employees of The Kroger Co. ("Kroger"), a significant contributing
employer to the Fund. The Campbell complaint alleges that the Pension Fund defendants
acted imprudently in considering (or failing to consider) a proposal that Kroger had made to the
Pension Fund concerning the timing of Kroger's planned withdrawal from the Pension Fund
and the resolution of the company's resulting withdrawal liability.

The Campbell case was assigned to Judge James Zagel, but on May 3, 2016, the
Pension Fund defendants filed a motion with this Court requesting reassignment of Campbell
as a case related to the Pension Fund consent decree case (No. 78 C 342). On May 6, 2016,
this Court denied the reassignment motion for the reasons stated in open court.

The Campbell plaintiffs filed a motion for a preliminary injunction requesting, along with
other relief, the appointment of an independent fiduciary to consider the Kroger proposal
relating to that company's planned withdrawal from the Pension Fund, and presumably to
negotiate with Kroger on behalf of the Fund concerning the terms of Kroger's planned
withdrawal. That motion was briefed and argued before Judge Zagel, who denied the motion
on June 30, 2016 on the grounds that (1) the plaintiffs had not shown a probability of success
on the merits (2) they had requested a form of final, irrevocable relief in their preliminary
injunction motion, and (3) they had failed to show irreparable harm.

The Pension Fund contends that the Campbell complaint is baseless. The Pension
Fund's Staff also reports that the action is being controlled and funded by Kroger pursuant to
an agreement with the International Brotherhood of Teamsters (or its affiliates) in an effort to
gain leverage in negotiations with the Fund. In any event, the Fund's Staff reports that it has
provided the actuarial data requested by Kroger in order to permit the company to analyze
various settlement alternatives. In addition, Staff reports that it presented a counter - proposal
to Kroger on July 15, 2016 and met with Kroger representatives on July 18 to discuss that
proposal. Staff also reports that Kroger rejected the Fund's proposal at the July 18th meeting,
and did not offer a counter - proposal at the time of the meeting. However, Staff reports that on
October 21, 2016 Kroger did submit a counter-offer to the Fund's July 15, 2016 proposal, and
that on November 4, 2016 the Fund submitted a further revised offer to Kroger. As of this date,
Kroger has not responded to the Fund's November 4th proposal.

On October 27, 2016 the Campbell case was reassigned from Judge Zagel to Judge
Edmond Chang. The Pension Fund has filed, and fully briefed, a motion for a protective order

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 6

before Judge Chang to limit the discovery to the administrative record before the Trustees concerning their consideration of Kroger's proposals. The parties are awaiting a ruling on that motion by Judge Chang.

## Government Accounting Office Review

In response to a February 1, 2016 request by Senator Charles Grassley (R-Iowa), the Government Accounting Office (GAO) has commenced a review of the Department of Labor's (DOL) oversight of the Pension Fund under the consent decree. On June 20, 2016 a number of members of Congress also requested that the GAO review the Pension Fund's investment activities, and the GOA has acknowledged that it will undertake that review as well.

As I previously reported, the Fund's Staff advises that on June 15, 2016, Staff met with representatives of the GAO in order to review the history and the background of the consent decree, including the various amendments to the consent decree that have been entered since that order was originally entered on September 22, 1984. The GAO also made inquiries during this meeting concerning the appointments of named fiduciaries and independent special counsels under the consent decree. Subsequently, the representatives of the GAO requested additional documentation from the Fund relating to the administration of the consent decree, investment procedures and investment performance and fees. Staff advises that all documents referenced in the GAO's original requests have been produced, and that the Fund is in the process of collecting materials responsive to supplemental requests more recently submitted by the GAO.

On October 19, 2016, the GAO conducted a telephone interview with key Pension Fund Staff Members as a follow-up to the initial June 2016 meeting with Staff. The Pension Fund's Staff advises that the October 19th telephonic interview focused on the reasons for (and consequences of) the Pension Fund's decline in active participation, the responses of the IRS and the DOL to the Fund's financial difficulties and efforts taken by the Fund (including the named fiduciaries and the Trustees) to improve or stabilize the Funds financial condition.

The GAO has also requested additional data and records from the Pension Fund which Staff reports are being assembled.

It is anticipated that these reviews by the GAO will result in the issuance of one or more written reports, but it is not known when these reports will be completed.

## Financial Information - Investment Returns

The Pension Fund's investment return for the third quarter of 2016 was 4.00%.

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 7

A comparison of the Pension Fund's performance to the TUCS[1] universe results published for the third quarter of 2016 (showing percent returns on investment) is summarized in the following tables:[2]

### Pension Fund's Composite (Percent) Return

| | 3rd Quarter Ended September 30, 2016 | One Year Period Ended September 30, 2016 | Three Year Period Ended September 30, 2016 |
|---|---|---|---|
| TUCS 1st Quartile | 3.97 | 10.84 | 7.44 |
| TUCS Median | 3.51 | 9.64 | 6.64 |
| TUCS 3rd Quartile | 3.09 | 8.03 | 5.82 |
| Fund's Composite Return | 4.00 | 11.30 | 6.64 |

---

[1] "TUCS" is the Trust Universe Comparison Service. Its Custom Large Funds Universe is composed of plans with assets exceeding $3 billion.

[2] As required under the consent decree, 50% of the Pension Fund's investments are held in passive or indexed accounts and 50% of the investments are subject to active management under the control of Northern Trust Investments, Inc. ("Northern Trust") as the Fund's court-appointed Named Fiduciary. However, the Named Fiduciary is also responsible for setting the Pension Fund's overall asset allocation, and in doing so it must take account of the mandatory allocation of 50% of the Fund's assets to passive or indexed accounts as directed under the consent decree – an allocation that includes, for example, an indexed or passive bond / fixed income account that comprises 20% of the Fund's total assets. Therefore, the Pension Fund's Composite Returns presented below reflect the combined returns of the passive / indexed portion of the Fund's total investment portfolio and the portion under active management controlled by the Named Fiduciary. On the other hand, Northern Trust's returns, as presented below, reflect only the performance of the assets under the control of Northern Trust as Named Fiduciary. However, Northern Trust's separately stated returns can be influenced at times by the asset allocations that it feels constrained to make within its own actively managed portfolio in light of the allocations required under consent decree in the passive / indexed portion of the Fund's portfolio.

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 8

## Pension Fund's Total Equity (Percent) Return

|  | 3rd Quarter Ended<br>September 30, 2016 | One Year Period Ended<br>September 30, 2016 | Three Year Period Ended<br>September 30, 2016 |
|---|---|---|---|
| TUCS 1st<br>Quartile | 6.19 | 13.53 | 8.69 |
| TUCS Median | 5.60 | 12.63 | 7.96 |
| TUCS 3rd<br>Quartile | 5.09 | 9.55 | 5.71 |
| Fund's<br>Total Equity<br>Return | 5.29 | 12.63 | 7.65 |

## Pension Fund's Fixed Income (Percent) Return

|  | 3rd Quarter Ended<br>September 30, 2016 | One Year Period Ended<br>September 30, 2016 | Three Year Period Ended<br>September 30, 2016 |
|---|---|---|---|
| TUCS 1st<br>Quartile | 2.37 | 13.83 | 8.56 |
| TUCS Median | 1.59 | 8.25 | 5.32 |
| TUCS 3rd<br>Quartile | 1.04 | 6.13 | 4.12 |
| Fund's<br>Fixed Income<br>Return | 2.33 | 8.14 | 3.89 |

The Fund's Named Fiduciary, Northern Trust Investments, Inc. ("Northern Trust")[3], which has been allocated 50% of the Fund's investment assets, submits monthly investment reports to the Trustees, summarized below (showing percent returns on investment):

---

[3] Formerly known as Northern Trust Company of Connecticut, which was in turn formerly known as Northern Trust Global Advisors, Inc.

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 9

## Northern Trust

|  | Year-to-Date as of September 30, 2016 | July 2016 | August 2016 | September 2016 |
|---|---|---|---|---|
| Northern Trust's Composite Return | 9.11 | 3.74 | 0.72 | 0.81 |
| Benchmark Composite Return | 9.96 | 3.73 | 0.48 | 0.60 |
| Northern Trust's Total Fixed Income Return | 13.69 | 2.31 | 1.64 | 0.66 |
| Benchmark Fixed Income Return | 12.90 | 1.81 | 1.39 | 0.56 |

Northern Trust's third quarter 2016 composite return included a 5.52% return on U.S. equities (5.57% on large cap, 4.63% on mid cap and 7.20% on small cap U.S. equities), 7.52% on international equities, 1.09% on real estate and 1.91% on global listed infrastructure.

The Fund's financial group reported the following asset allocation of the Pension Fund as a whole as of September 30, 2016 as follows: 61% equity, 33% fixed income, 5% other and 1% cash.

The financial group also reported that for the third quarter of 2016 the returns on the Fund's passive indexed accounts were as follows (showing percent returns on investment):

| Account | Rate of Return for 3rd Quarter 2016 |
|---|---|
| Passive Indexed Equity (S&P 500) (25% of investment assets) | 3.86 |
| Passive Indexed Fixed Income (20% of investment assets) | 0.44 |
| Passive EAFE Indexed (5% of investment assets) | 6.43 |

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 10

Financial Information - Net Assets
(Dollars shown in thousands)

The financial reports prepared by Pension Fund Staff for the nine months ended September 30, 2016 (enclosed) show net assets as of that date of $15,701,983, compared to $16,126,208 at December 31, 2015, a decrease of $424,225 compared to a decrease of $1,940,426 for the same period in 2015. The $1,516,201 difference is due to $1,782,054 more net investment income offset by $265,853 more net operating loss.

The enclosed Fund's Staff report further notes that for the nine months ended September 30, 2016, the Fund's net asset decrease from operations (before investment income) was $1,570,324 compared to a decrease of $1,304,471 for the same period in 2015, or a $265,853 unfavorable change. This change in net assets from operations (before investment income) was attributable to:

a)      ($271,866) less contributions primarily due to recognition of withdrawal liability previously classified as potentially refundable in 2015,

b)      $3,521 less benefits and

c)      $2,492 less general and administrative expenses.

During the nine months ended September 2016 and 2015, the Fund withdrew $1,749,044 and $1,427,054, respectively, from investment assets to fund the cash operating deficit.

Financial Information - Participant Population

The enclosed September 30, 2016 report prepared by Fund Staff further notes that the eight month average number of Full-Time Equivalent ("FTE") memberships decreased 1.58% from August 2015 to August 2016 (from 60,132 to 59,179). During that period, the average number of retirees decreased 1.20% (from 206,891 to 204,404).

Named Fiduciary

Officers of the Named Fiduciary, Northern Trust, met with the Board of Trustees to discuss portfolio matters including asset allocation.

## Hybrid Withdrawal Liability Method

As indicated in my prior reports, in July 2011 the Trustees adopted -- subject to approval by the Pension Benefit Guaranty Corporation ("PBGC") — an alternative withdrawal

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 11

liability method.[4] Under this method, new employers joining the Pension Fund will have their withdrawal liability measured based upon the "direct attribution" method; employers who already participate in the Fund can also be treated as new employers for withdrawal liability purposes on a prospective basis (and become eligible for the "direct attribution" method) by satisfying their existing withdrawal liability under the method historically employed by the Pension Fund (i.e., the "modified presumptive method"), and then agreeing to continue to contribute to the Fund. This formula is referred to as a "hybrid" withdrawal liability method.

Staff reports that it believes the hybrid method offers a means for employers who are concerned about the potential for future growth in their exposure to withdrawal liability to cap their liability at its present level while continuing to participate in the Fund with little or no risk of withdrawal liability in the future.

Further, as explained in my prior reports, in November 2012, the Trustees restructured the Primary Schedule of the Rehabilitation Plan so that employers who satisfy their withdrawal liability qualify as New Employers under the hybrid method and continue to contribute to the Pension Fund will not be subject to the rate increase rate requirements to which other Primary Schedule Employers are subject. The Trustees have also approved an amendment intended to help ensure that New Employers who satisfy their existing withdrawal liability and continue to contribute to the Fund under the hybrid method will not face increased risks in the event of a mass withdrawal, as compared to employers who have simply withdrawn from the Fund and completely discontinued pension contributions.

Staff reports that to date approximately 90 old employers have satisfied their existing liability and qualified as new employers under the hybrid plan, or have made commitments in principle to do so. This has resulted in the payment of (or commitments to pay, subject to the execution of formal settlement documents) approximately $281 million in withdrawal liability to the Pension Fund while the employers in question also continue to contribute to the Fund pursuant to their collective bargaining agreements at guaranteed participation levels.

## Bankruptcies and Litigation

The Fund's Staff also reports that Allied Systems Holdings, Inc. and its affiliates ("Allied") — an automobile transporter with several hundred participants in the Funds — filed for Chapter 11 bankruptcy protection in mid-2012. However, Allied continued to operate in bankruptcy and to pay contributions to the Funds on behalf of its drivers. Staff reports that in December 2013 Jack Cooper, Inc., another unionized automobile transporter, purchased the assets of Allied in the bankruptcy and will continue to contribute to the Funds with respect to the purchased assets and operations, but without an assumption or Jack Coopers' withdrawal liability. Allied's withdrawal liability (in the amount of $976 million) was triggered by the sale and Staff advises that the Allied bankrupt estate is not likely to have assets sufficient to satisfy this assessment. However, as noted, Jack Cooper should be able to continue the income stream to the Funds represented by the contributions historically paid by Allied.

---

[4] The Pension Fund's Staff advises that on October 14, 2011, the PBGC approved the Pension Fund's use of the hybrid method.

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 12

## YRC

As also previously reported, in May 2009 the Funds entered a Contribution Deferral Agreement ("CDA" or "Deferral Agreement") with YRC, Inc. and its affiliates ("YRC") — one of the largest contributing employers to the Fund. Under the Deferral Agreement, the Pension Fund ultimately agreed to defer approximately $109 million in pension contributions. The Fund's financial consultant indicated that absent deferral of these contribution obligations, YRC would be in default of loan covenants with its banks; Staff reported that such a default would risk triggering an insolvency and liquidation of YRC, which would destroy any chance of rehabilitating the employer as a healthy contributor to the Funds.

Some 25 other multiemployer pension plans in which YRC participates joined in the Deferral Agreement, but the Pension Fund is owed approximately 64% of the contributions deferred under the Agreement.

Following a temporary termination of YRC's participation in the Pension Fund (due to its chronic delinquencies), on September 24, 2010, the Teamsters National Freight Negotiating Committee and YRC executed an Agreement for the restructuring of the YRC Worldwide, Inc. Operating Companies ("Restructuring Agreement"), which further revised YRC's pension contribution obligations. Under this Agreement YRC was scheduled to resume contributions to the Pension Fund in June 2011 at a rate constituting a 75% reduction from its pre-termination (pre-July 2009) rate.

In March 2011 the Trustees then approved an arrangement under which the CDA repayment obligations are to be deferred until March 31, 2015 (when a lump sum payment of the entire CDA balance was scheduled to be made), with the exception of monthly interest payments to commence in June 2011.

At the March 9, 2011 Board Meeting, the Fund's Trustees also determined, in light of the company's continuing financial distress, that it was appropriate to accept contributions at the new contribution rate proposed under the YRC/TNFNC September 24, 2010 Restructuring Agreement (25% of the rate required prior to the July 2009 termination).

At the same time, the Trustees decided that the YRC employee unit should receive reduced benefits equivalent in most respects to the Default Schedule under the Fund's Rehabilitation Plan. (This is termed the "Distressed Employer" schedule of benefits.)

In January 2014, after consultation with financial, actuarial and legal advisors, the Trustees voted to approve a revised CDA extending the balloon payment under the CDA from 2015 to 2019. The other Teamster Pension Funds who participated in the CDA also agreed to these terms and an amended CDA was executed on January 31, 2014.

Staff also reports that since July 2011, YRC has remained current in its pension contribution payments ($3-$4 million per month), and in the monthly interest payments (beginning in August 2011) of approximately $500,000. In addition, on November 12, 2013 the interest rate under the CDA escalated from 7.5% per year to 7.75%.

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 13

In addition, Staff has reported that to date the Pension Fund has received approximately $49.4 million as its share of the net proceeds from sales of collateralized assets as a pre-payment under the CDA. Staff reports that after accounting for all principal and interest payments made to date, the unpaid balance owed to the Pension Fund under the CDA by YRC is approximately $69.2 million. Staff also notes that in May 2012 the Fund received a payment of approximately $110,000 under the CDA which is expressly denominated as a fee calculated under that Agreement as a match of a portion of a refinancing charge paid by YRC to its commercial lenders (and not applicable to reduce YRC's principal or interest balance); on November 12, 2013 the Fund received approximately $419,000 as another such refinancing fee match.

### Hostess Brands, Inc.

In August 2011, Hostess Brands, Inc. ("Hostess") — an employer that had regularly contributed to the Pension Fund on behalf of approximately 2,800 participants — failed to make the monthly pension contribution payment of approximately $1.9 million that was due on August 15, 2011.

Hostess's pension contribution delinquency persisted and at the November 2011 Board Meeting the Trustees voted to terminate the participation of Hostess in the Pension Fund and to generally reduce the benefits of the Hostess participants to the Default Schedule levels specified under the Rehabilitation Plan (see pp. 5 - 6 above).

On January 11, 2012, Hostess filed a petition under Chapter 11 of the Bankruptcy Code in the Southern District of New York. The Pension Fund has delinquent contribution claims in the amount of approximately $8 million against the bankrupt estate, as well as withdrawal liability claim in the amount of approximately $583 million.

As previously reported, Staff has indicated the efforts to reorganize Hostess were unsuccessful. Further, Staff has reported that it now is clear that proceeds from the Hostess liquidation are not sufficient to satisfy the company's secured debt, and that the Pension Fund and other general unsecured creditors will make no further recoveries from the Hostess Bankruptcy. As a result, because Staff reports that the Pension Fund has no priority or administrative claims in the Hostess bankruptcy, the Trustees have now approved a write-off of all claims against Hostess.

### Health and Welfare Fund

Department of Labor Review

As indicated in my report on the second quarter of this year, on February 2, 2016 the Chicago office of the U.S. Department of Labor (the "Department") commenced an onsite review of various Health and Welfare Fund documents that the Department requested pursuant to its general authority under ERISA § 504, 29 U.S.C. §1134. The Health and Welfare Fund's Staff advises that this is a fairly standard review, and has apparently not been prompted by any specific concerns by the Department of Labor about the Fund's compliance with ERISA and other legal requirements.

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 14

The Department of Labor's review has focused on the operations of the Active Health and Welfare Plan, and the documents requested by the Department include Trust Agreements, Plan Documents, Summary Plan Descriptions, Evidence of Coverage, Enrollment Packages, Summaries of Benefits and Coverage, contracts with service providers and Form 5500 Annual Reports.

Following their onsite inspection of documents at the Fund's offices during the week of February 2, 2016, the Department of Labor personnel involved in this review asked the Fund to provide various data and files relating to claims processing. The Fund's Staff reports that all requested files and data have been provided to the Department of Labor, and that these materials are currently being reviewed by the Department.

Financial Information
(Dollars shown in thousands)

The Health and Welfare Fund's financial summary for the nine months ended September 30, 2016 are compared below with financial information for the same period of 2015:

|  | Nine Months Ended September 30, | |
|---|---|---|
|  | 2016 | 2015 |
| **Contributions** | $  2,365,050 | 2,187,059 |
| **Recognized portion of UPS lump sum** | 64,359 | 73,584 |
| **Benefits** | 1,998,501 | 1,760,917 |
| **TeamCare administrative expenses** | 58,283 | 54,773 |
| **General and administrative expenses** | 53,459 | 48,889 |
| **Net operating income** | 319,166 | 396,064 |
| **Investment income (loss)** | 192,001 | (39,372) |
| **Increase in net assets** | 511,167 | 356,692 |
| **Net assets, end of period** | 4,827,235 | 4,176,433 |
| **Eight-month average Participants (FTEs)** | 191,096 | 183,102 |

For the nine months ended September 30, 2016, the Health and Welfare Fund's net asset increase from operations (before investment income) was $319,166 compared to an increase of $396,064 for the same period in 2015, or a $76,898 unfavorable change:

    (a)   $168,766 more contributions due to increases in FTEs (UPS and American Red Cross),

The Honorable Milton I. Shadur, 2017
January 17, 2017
Page 15

      (b)     ($237,584) more benefits, primarily due to UPS and American Red Cross,

      (c)     ($3,510) more TeamCare administrative fees and

      (d)     ($4,570) more general and administrative expenses.

During the nine months ended September 2016 and 2015, the Fund transferred $299,063 and $303,132, respectively, to investments (BNY Mellon) as the operations generated positive cash flows for those periods.

The enclosed report also notes that the eight month average number of Full-Time Equivalent (FTE) memberships increased by 4.37% from August 2015 to August 2016 (from 183,102 to 191,096). During that period, the average number of retirees covered by the Health and Welfare Fund increased by 5.46% (from 8,421 to 8,881).

Article V (H)

As required by Article V (H) of the Health and Welfare Fund Consent Decree, the Health and Welfare Fund has paid during the third quarter of 2016 the following for professional services and expenses for the Independent Special Counsel:

| July | $0.00 |
| August | $5,559.05 |
| September | $0.00 |

I will be glad to provide additional details regarding any aspect of my activities as Independent Special Counsel. Should you have any questions or comments, please do not hesitate to contact me.

Sincerely,

David H. Coar

Enclosure

cc: Ms. M. Patricia Smith (w/encl.) **Via UPS Next Day**
    Mr. Wayne Berry (w/encl.) **Via UPS Next Day**
    Mr. Thomas C. Nyhan