SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
550 Broad Street, Suite 920
Newark, NJ 07102
Telephone: 973/639-9100
973/639-9393 (fax)

CARELLA, BYRNE, CECCHI, OLSTEIN,
   BRODY & AGNELLO, P.C.
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ 07068
Telephone: 973/994-1700
973/994-1744 (fax)

Co-Liaison Counsel and Executive Committee Members for the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re NOVO NORDISK SECURITIES LITIGATION | ) ) ) | Master File No. 3:17-cv-00209-BRM-LHG |
| | ) ) | CLASS ACTION |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**Page**

I.      NATURE AND SUMMARY OF THE ACTION ..........................................1

II.     JURISDICTION AND VENUE....................................................................15

III.    PARTIES ....................................................................................................16

        A.     Plaintiffs .........................................................................................16

        B.     Defendants......................................................................................18

               1.     Corporate Defendant ............................................................18

               2.     Individual Defendants ..........................................................18

IV.     FACTUAL ALLEGATIONS .......................................................................19

        A.     Novo Is One of Three Manufacturers in the U.S. Insulin-Drug
               Market..............................................................................................19

        B.     Novo's Insulin Products .................................................................20

        C.     The Rise of the PBMs in the Insulin Supply Chain ..........................21

        D.     The Kickback Scheme......................................................................23

               1.     The Secretive Relationships Between Novo and the
                      PBMs....................................................................................28

               2.     The *Quid Pro Quo* Between Novo and the PBMs Led to
                      Anticompetitive Behavior .......................................................33

               3.     The Structure of the U.S. Insulin Market Facilitated
                      Novo's Rebate Scheme ...........................................................37

        E.     Defendants Misled Investors About the Reasons for and
               Sustainability of Novo's Growth.......................................................40

        F.     Prior to and Throughout the Class Period, Defendants Denied
               Novo Was Subject to the Pricing Pressures that Finally Came to
               Bear on the U.S. Insulin Market........................................................45

**Page**

G.    Novo Falsely Represented that Tresiba Would Insulate the Company from Pricing Pressures ......................................................56

H.    Public Outrage about Prohibitive List Prices Severely Impacted the U.S. Insulin Market ...................................................62

I.     Government Investigations and Legislative Action Related to the U.S. Insulin Market and Rebates to PBMs....................................68

V.     WITNESS ACCOUNTS .................................................................75

A.    A Former Novo Employee Confirms that Sørensen's and Høiland's Departures Were Related to Misconduct at the Company ...................................................................................75

B.    Other Former Novo Employees Detail Defendants' Misconduct .......76

VI.    POST-CLASS PERIOD DEVELOPMENTS ...............................................79

A.    Novo Has Admitted Misleading Investors Concerning the Unlawful Rebate Scheme ..................................................................79

B.    Novo Faces Additional Governmental Pressure and Investigations.................................................................................80

VII.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD ............................83

A.    Novo's Earnings Release for the Fourth Quarter and Full-Year 2014 ......................................................................................83

B.    Novo's Earnings Release for the First Quarter 2015 .........................86

C.    Novo's Earnings Release for the Second Quarter 2015......................91

D.    Novo's September 28, 2015 Announcement of the FDA's Approval of Tresiba...............................................................................96

E.    Novo's Earnings Release for the Third Quarter 2015........................97

F.    Novo's November 19, 2015 Capital Markets Day............................103

**Page**

G.    Novo's Earnings Release for the Fourth Quarter and Full-Year 2015 .................................................................................107

H.    Novo's Earnings Release for the First Quarter 2016 .......................116

I.    Novo's Earnings Release for the Second Quarter 2016...................120

J.    Novo's Earnings Release for the Third Quarter 2016......................125

VIII.  NOVO'S FAILURE TO MAKE REQUIRED SEC DISCLOSURES WHICH RENDERED ITS REVENUE AND OPERATING PROFIT STATEMENTS MISLEADING .................................................................129

A.    Novo's U.S. Sales Were Contingent on Complying with the Ever-Growing Demands of the PBMs .............................................130

B.    The Rebate Scheme was Unsustainable ...........................................132

C.    The Rebate Scheme Involved a New Distribution Channel with High Rebates and Low Margins .......................................................133

IX.  ADDITIONAL EVIDENCE OF SCIENTER .............................................136

A.    The Fraud Infected Novo's Core Operations, Which Defendants Closely Monitored................................................................................136

B.    Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised Novo's Controls and Procedures........137

C.    Defendants' Compensation Structure Incentivized Fraud ...............139

D.    Sørensen and Høiland Abruptly Leave .............................................141

X.  LOSS CAUSATION ..................................................................................142

XI.  NO SAFE HARBOR ................................................................................148

XII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET .......................................................................149

XIII.  PLAINTIFFS' CLASS ACTION ALLEGATIONS ...................................152

**Page**

COUNT I ......................................................................................................154

COUNT II ....................................................................................................156

PRAYER FOR RELIEF ...............................................................................156

DEMAND FOR TRIAL BY JURY ..............................................................157

1.     Co-Lead Plaintiffs Central States, Southeast and Southwest Areas Pension Fund ("Central States"), Lehigh County Employees' Retirement System ("Lehigh"), Oklahoma Firefighters Pension and Retirement System ("Oklahoma"), Boston Retirement System ("Boston"), and Employees' Pension Plan of the City of Clearwater ("Clearwater"), individually and on behalf of all other persons similarly situated (collectively "Plaintiffs"), by their undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Novo Nordisk A/S ("Novo" or the "Company"), analysts' reports and advisories about Novo, information obtainable on the Internet, drug pricing and market share information from proprietary databases, interviews with former Novo employees and consultation with industry experts.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE AND SUMMARY OF THE ACTION

2.     This is a federal securities investor class action brought by Plaintiffs individually and on behalf of a proposed class of all persons and entities who

purchased or otherwise acquired Novo American Depositary Receipts ("ADRs") between February 3, 2015 and February 2, 2017, inclusive (the "Class Period").

3.     Novo is a global healthcare company and one of the most prolific producers of diabetes medications in the world.  Patients with diabetes – about 30 million in the U.S. and another 360 million worldwide – are primarily treated through daily injections of insulin.  Novo derives roughly 80% of its revenues from selling insulin-based medications and approximately 54% of its revenues from the U.S. insulin market.  While there are millions of patients with diabetes, the world market for insulin is dominated by just a handful of companies – Novo being one of them.

4.     This action involves a series of material misstatements and omissions about Novo's sales of its core insulin drugs in the United States.  Repeatedly, Novo falsely attributed its impressive revenue, operating profit growth, and actual and forecasted sales growth in the U.S. insulin market to its innovation and product-specific qualities, when in fact they were the result of a scheme whereby Novo paid increasingly large kickbacks to pharmacy benefit managers ("PBMs"), the middlemen between the manufacturers and the health insurers who controlled market access, in exchange for placement on their formularies (*i.e.*, the lists of covered drugs recommended to providers).  Novo was able to pay these kickbacks, which Novo misleadingly referred to as "rebates," and still grow its profits, by raising the list

prices for its insulin drugs in lockstep with its competitors in the insulin market, Sanofi S.A. ("Sanofi") and Eli Lilly and Company ("Eli Lilly").  However, these list-price increases were not sustainable, due to increasing political pressure and regulatory scrutiny regarding insulin prices – a fact that Novo's competitors openly acknowledged.  Specifically, during the Class Period, Novo's competitors Sanofi and Eli Lilly publicly disclosed that increased pricing pressures in the U.S. market would cause their earnings to decline significantly.  Novo, however, did not.

5.      Instead, Novo falsely asserted that its innovation and product-specific attributes warranted "premium pricing" even in the challenging market, thus protecting the Company's insulin products from the negative consequences of the pricing pressures its competitors were experiencing.  Novo expressly told investors that, as a result, Novo would maintain stable sales growth, unlike Sanofi and Eli Lilly.  However, in reality, Novo's products were not sufficiently differentiated from insulin products that had already been on the market for decades to justify any "premium pricing" – a fact of which the PBMs, which continued to demand ever increasing "rebates" (*i.e.*, kickbacks), were well aware.

6.      Thus, contrary to what it told the market, Novo's ability to achieve its guidance in sales growth and market share depended not on the quality of its products, but on the size of the kickbacks it could pay to the PBMs in exchange for formulary access.  However, having lost its ability to raise its list prices, the larger and larger

- 3 -

kickbacks Novo had to pay to the PBMs for market access inevitably and increasingly cut into Novo's sales growth and profits.  In other words, despite Novo's false statements to the contrary about its "premium" drug portfolio, Novo was in the exact same boat as its competitors, and could not maintain the sales and market share growth, as it claimed to investors.

7.     The U.S. pharmaceutical industry is increasingly dominated by three PBMs:  Express Scripts Holding Company ("Express Scripts"), CVS Health ("CVS"), and UnitedHealth Group/OptumRx ("UnitedHealth").   PBMs do not themselves purchase or sell pharmaceuticals, but instead contract with insurance companies and pharmacies, and negotiate the pricing and other terms at which prescription drugs are sold in the market.  As the American Pharmacists Association explains, "PBMs are primarily responsible for developing and maintaining the formulary, contracting with pharmacies, negotiating discounts and rebates with drug manufacturers, and processing and paying prescription drug claims."  A substantial portion of PBMs' revenues comes from rebates and discounts to list pricing that the PBMs negotiate, some of which is passed on and some of which the PBMs keep themselves.  As of 2016, PBMs managed pharmacy benefits for approximately 266 million Americans.

8.     Two key functions of PBMs are particularly pertinent here:  (1) they negotiate rebates and discounts to list pricing on behalf of pharmacies and insurance companies, and (2) they control formulary access.  Whether and how a drug is placed

- 4 -

on the formularies that the PBMs maintain is a key factor in the cost that a consumer ultimately pays for the drug, how much of the drug's cost insurance will cover, and indeed whether as a practical matter the drug is available to the consumer at all. Because the PBMs represent so many "covered lives," a drug company that does not secure an advantageous placement on a PBM's formulary will lose access to as many as tens of millions of potential customers. The PBMs accordingly have massive leverage to demand ever-increasing rebates from pharmaceutical companies.

9.     The PBMs provide access to their formularies (and the corresponding millions of diabetes patients in covered health plans). In return, manufacturers such as Novo provide substantial kickbacks to the PBMs, which constitute a significant portion of what the manufacturers misleadingly call "rebates." The actual price of the insulin drug – what is known as the "net price" – is the list price (*i.e.*, the price published to consumers) minus the "rebates" (the discount the PBM negotiated on behalf of the insurance company plus the "kickback," or the percentage of the negotiated discount the PBM pockets for itself). To offset these "rebates," the manufacturers, in response, may either raise their list prices so that their "net prices" increase or remain constant, or keep their list prices constant – meaning a lower net price, and thus decreased revenues for the manufacturers. In the U.S. insulin market, Novo and the other insulin manufacturers implemented continuous, lockstep increases to the list prices of their drugs, in an effort to offset larger and larger kickbacks paid to

- 5 -

the PBMs for formulary access.  As Novo recently admitted, the price increases were so significant that "many patients simply can't afford the medicine they need."

10.     The lockstep price increases occurred while market share remained steady.  The price increases were not due to a raw material shortage, spike in production costs or restrictive regulations, which are often associated with a rise in prices.  The insulin treatments are clinically unchanged since just a few years ago when they cost a fraction of what they do today.  Furthermore, although the profits were astronomical, no new competitors entered the market.  Such arbitrary price hikes should not exist in a purely competitive market, but can be explained by the *quid pro quo* between the manufacturers and the PBMs.

11.     The increase of Novo's average insulin list price directly correlated with the increase in Novo's stock price between January 2012 and June 2016.

Average Novo Insulin WAC[1] price vs. Novo Stock Price



12.     The contracts between Novo and the PBMs that established the payments

Novo must make to get formulary placement were nonpublic, and their terms were

closely-guarded secrets.  Media reports are conflicted on the amount of the rebate the

PBMs pocketed and the amount they passed on to the health plans they represent.  But

by all accounts, an increase to the list price of drugs resulted in an increase of the

amount of money kicked back to the PBM.  And in many instances, the health plans

the PBMs represented were not even aware of the amounts of the kickbacks the PBMs

received from Novo.

13.     Insulin manufacturers were uniquely positioned to execute this scheme

because, although they sold name-brand drugs, insulin is a commodity.  For instance,

---

[1]     Wholesale  Acquisition  Cost  ("WAC")  is  the  cost  that  Novo  invoices  the
wholesaler for the insulin product.

during the Class Period and at all relevant times, each of Novo, Sanofi, and Eli Lilly manufactured and sold at least one rapid-acting ("bolus") analog insulin drug and at least one long-acting ("basal") analog insulin drug in the U.S. market:  for Novo, rapid-acting Novolog and long-acting Levemir (and, beginning in September 2015, Tresiba); for Sanofi, rapid-acting Apidra and long-acting Lantus (and, beginning in 2015, Toujeo); and for Eli Lilly, rapid-acting Humalog and long-acting Basalgar (introduced in late 2016).  Within each category, the different company's drugs are substantially similar.  Indeed, in certain instances, patients may switch from one to another (*i.e.*, from Levemir to Lantus) with only a pharmacist's approval and no need for a doctor's prescription.  As such, a PBM can easily exclude one manufacturer's insulin from its formularies and replace it with the same insulin from a different manufacturer that agreed to play the kickback game.

14.     As list prices increased, so too did the rebates kicked back to the PBMs, and for many years the PBMs and the manufacturers profited handsomely together.  In total, Novo derived more than $7.8 billion from rising list prices as rebates to PBMs grew from 2012 to 2016.  During the same period, net sales for Novo's modern insulin increased by 74%.  However, this growth was not sustainable.  Novo's competitors acknowledged throughout the Class Period that earnings from their insulin franchises would dwindle given the increased pricing pressures from PBMs and increased scrutiny from government authorities and market participants (which constrained

manufacturers' ability to increase list prices, and limited the benefits of the rebate scheme). Moreover, given those intense pricing pressures and the stakes involved, investors and analysts were closely focused on how each of Novo, Sanofi, and Eli Lilly responded to the pricing pressures. Throughout the Class Period, however, in both their regulatory filings and in response to questions on conference calls and otherwise, Novo misrepresented, concealed, and denied that its earnings would suffer due to the same pricing pressures that its competitors faced, claiming that the innovation and quality of its insulin products, and specifically its new long-acting insulin drug Tresiba (which was to be launched in January 2016), would allow it to continue to experience growth in profits and market share despite the challenging market. Defendants' false statements, buttressed by the opaque pay-to-play scheme, misled investors about the increased toll the growing rebates were having on Novo's profits.

15.    Indeed, defendants repeatedly told investors that Novo's drugs would allow the Company to avoid the negative consequences of market-based pricing pressures, falsely representing that Novo was better positioned due to "*a very strong position with a gold standard product*," that the Company's new drug Tresiba would "*allow us to achieve 10% or more top-line growth in the diabetes market*," and that defendants were "*quite certain*" that Novo would realize its forecasted growth. Analysts were acutely focused on Novo's purported ability to weather the storm of

Case 3:17-cv-00209-BRM-LHG   Document 71   Filed 08/04/17   Page 15 of 167 PageID: 1560

pricing pressures affecting Sanofi and Eli Lilly, directly asking Novo questions such as, "*[s]ince your competitors are so pessimistic, in particular Sanofi, how can you be so optimistic, considering . . . the increased competition in the U.S. market?*"  Novo consistently, and falsely, responded that its drugs were better than the competitors', and would allow Novo to compete without lowering prices and forecasts as Sanofi and Eli Lilly had done.

16.     Nearly every quarter throughout the Class Period, the same pattern emerged.  Sanofi and/or Eli Lilly would issue a negative earnings report, attributing lower U.S. insulin revenues to the ever-growing rebates that the PBMs demanded.  At the same time, Novo would project flat or moderately growing earnings.  Analysts repeatedly questioned how, in such a fiercely competitive environment, Novo could outperform Sanofi and Eli Lilly.  In response to analysts' questions, defendants would explain that Novo's insulin-drug portfolio was simply stronger than its competitors', which would enable Novo to avoid the earnings misses that Sanofi and Eli Lilly suffered.  Analysts then credited and parroted those explanations, maintaining positive forecasts for Novo and writing reports reflecting their belief in the strength of Novo's drugs – and especially Tresiba (approved by the FDA in September 2015 and launched in January 2016), which Novo repeatedly touted as a superior drug for which it could obtain "premium pricing."

- 10 -

1292912_1

17.     However, defendants knew that the quality of Novo's products did not differentiate Novo from its competitors.  Indeed, PBMs granted Novo formulary access not because of product quality, but instead based on its willingness to pay increasingly high rebates, as the PBMs knew that the insulin drugs on the market – including the newly launched Tresiba – were substantially similar and thus interchangeable, despite Novo's claims to the contrary.

18.     Thus, although defendants told investors that in the U.S. market Novo's "[p]roduct success is largely based on competition on efficacy, safety, quality and price," Novo's drugs actually were selected for managed care formularies based on the size of the kickbacks Novo paid the PBMs, and not on its drugs' efficacy, safety, or quality.  Likewise, defendants represented that Novo had leverage when it came to pricing because of the strength of its products, claiming its superior and innovative products, and specifically Tresiba, warranted "premium pricing" in spite of the challenging market:  Novo claimed that "the pricing is made between the company and the payers.  And we do compete, ***but we make our own decisions***."  But after the Class Period, defendants admitted that they had no such leverage, conceding that as part of "negotiat[ions] with the companies that actually pay for the medicine [payers]," Novo provided "rebates, fees and other price concessions . . . to the payer," which was "necessary in order for our medicines to stay on their preferred drug list or formulary."  In other words, defendants knew that Novo's Class Period market share

- 11 -

was based on the ability to pay ever-increasing kickbacks through ever-increasing list prices, not the quality of Novo's drugs.

19.     Defendants were able to misrepresent and conceal Novo's exposure to pricing pressures for only so long.   Ultimately, through a series of corrective disclosures, the investing public learned the truth:  that Novo's earnings would decline significantly as a result of pricing pressures, and that it was not spared the same fate as its competitors because of its supposedly "superior" drug portfolio.  Beginning on August 5, 2016, when Novo announced disappointing earnings and lowered guidance based on "*a challenging pricing* environment" in the wake of finalizing the majority of its U.S. formulary negotiations for 2017, investors learned that pricing pressures – both from PBMs demanding ever-larger rebates, and from the public outcry and governmental scrutiny concerning rising insulin prices – were severely cutting into Novo's financial results and prospects.  Novo also disclosed that, rather than obtaining "premium pricing" for the newly launched Tresiba, Novo in fact had to "be more aggressive to get Tresiba onto the market," offering deep rebates that resulted in a net price on par with Levemir – its long-acting insulin drug that had already been on the market for over a decade, since 2005.  Further, not long after this earnings release, UnitedHealth, one of the three largest PBMs, announced it would not cover Tresiba at all – because it was not sufficiently differentiated from the drugs already on the market.

- 12 -

20.     On October 28, 2016, Novo announced its second consecutive quarter of disappointing earnings, cutting its guidance yet again.  As one analyst concluded, after Novo's repeated denials and misrepresentations, "***NVO mgmt finally owned up to the significant challenges it faces in the years ahead***."  The market learned more about the truth of Novo's exposure to pricing pressures on February 2, 2017, when the Company again reported disappointing earnings and slashed its guidance dramatically, admitting to a "***transformation of how we conduct business in the US***."  Since that time, Novo has further admitted that high rebates to PBMs in exchange for formulary access, and increased public scrutiny, severely harmed Novo.

21.     Moreover, during October 2016, Novo investor Brian Lundstrom ("Lundstrom") exchanged several e-mails with Novo chairman, Goran Ando ("Chairman"), who indicated to Lundstrom that Novo was faced with issues well beyond that of poor corporate communications.  On October 20, 2016 Lundstrom explicitly encouraged the Chairman and the outgoing and incoming CEOs to provide the financial markets with timely information of material company matters as to prevent a major correction.  Management did not heed that advice, and on October 28, 2016 when Novo announced its Q3 2016 results, the company lost over $10 billion in market cap.  Lundstrom discussed these events verbally with the SEC in late December 2016 and they recommended that he file a detailed whistleblower complaint with them, which he did on January 2, 2017.  Lundstrom followed that up

- 13 -

with a parallel filing with the Danish Financial Supervisory Authority ("FSA") on January 4, 2017.

22.     On January 12, 2017, Lundstrom had detailed conversations with Novo's former head of North America Operations Jesper Høiland ("Høiland"), in which Høiland described repeated warnings during the Class Period to Novo's senior management that Novo would not be able to meet the Company's long-term growth targets due to pricing pressure in the United States (including from PBMs) or drive sufficient profits through new products with marginal value relative to already highly cost-efficient diabetes products.  In response, senior management told Høiland that he had to meet the corporate targets or they would "find someone else who would." After the Company was forced to revise its guidance downwards on October 28, 2016, Høiland was indeed terminated effective December 1, 2016.

23.     A former Vice President of Diabetes Marketing in the U.S. at Novo (the "Diabetes Marketing VP") echoed Lundstrom's account.  The Diabetes Marketing VP sat on Novo's Pre-Pricing Committee ("PPC"), which assessed market forces in the U.S. and issued reports to Novo executives to help make pricing decisions.  The Diabetes Marketing VP recalls that the PPC warned Novo executives "all the time" that the Company could not meet their expectations for U.S. sales.  In response, executives in Denmark including defendant Sørensen would demand they meet the number anyway.  The Diabetes Marketing VP also described Tresiba as a "big puff of

- 14 -

hot air" that was not meaningfully clinically differentiated from existing diabetes drugs.

24.     Novo's fraudulent scheme and misrepresentations concerning earnings severely harmed investors.  On each of the partial corrective disclosures, Novo ADRs suffered significant price declines.  On the day prior to the first disclosure, August 4, 2016, Novo ADRs closed at a price of $55.20 per ADR, falling to close at $49.87 on August 5, 2016.  Novo ADRs would never again close that high, and fell to $33.48 per ADR at the close of the Class Period, causing substantial damages to the Class.

## II.     JURISDICTION AND VENUE

25.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Novo maintains its U.S. headquarters in Plainsboro, New Jersey, which is situated in this District, and a substantial part of the acts and conduct that constitute the violations of law complained of herein, including the preparation and/or dissemination to the public of materially false and misleading information, occurred in this District.

- 15 -

28.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

### A.     Plaintiffs

29.     Co-Lead Plaintiff Central States is one of the nation's largest multi-employer defined benefit pension plans with approximately $15 billion in assets and more than 400,000 participants across the country. Central States purchased Novo ADRs on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

30.     Co-Lead Plaintiff Lehigh, based in Pennsylvania, is a defined benefit plan governed under the Taft-Harley Act.  Lehigh provides retirement, disability and death benefits to workers within the County of Lehigh, Pennsylvania. Currently, Lehigh manages approximately $425 million in assets on behalf of approximately 3,600 participants.  Lehigh purchased Novo ADRs on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

31.     Co-Lead Plaintiff Oklahoma is a public pension fund that provides retirement allowances and other benefits to firefighters in Oklahoma.  Currently,

- 16 -

Oklahoma manages approximately $2.3 billion in assets on behalf of approximately 25,000 participants.  Oklahoma purchased Novo ADRs on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

32.     Co-Lead Plaintiff Boston is a public pension fund that manages approximately $5.4 billion in assets maintained for the benefit of employees of the City of Boston.  Currently, Boston manages assets on behalf of approximately 34,000 participants.  Boston purchased Novo ADRs on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

33.     Co-Lead Plaintiff Clearwater is a defined benefit plan headquartered in Clearwater, Florida which is self-administered by the City of Clearwater as the employer and sponsor of the plan.  As of January 1, 2016, Clearwater managed over $860 million in assets on behalf of 1,500 members and beneficiaries.  Clearwater purchased Novo ADRs on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.   Defendants

#### 1.   Corporate Defendant

34.     Defendant Novo is a global healthcare company focused on diabetes care and is one of the largest producers of insulin medications. Based in Denmark, the Company was formed in 1989 by a merger of two Danish companies, Nordisk Gentofte A/S and Novo Industri A/S.  The Company maintains its U.S. headquarters at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.  Novo ADRs trade on the New York Stock Exchange, which is an efficient market, under ticker symbol "NVO."

#### 2.   Individual Defendants

35.     Defendant Lars Rebien Sørensen ("Sørensen") was Novo's President and Chief Executive Officer at all times during the Class Period until December 31, 2016.

36.     Defendant Jesper Brandgaard ("Brandgaard") is, and was at all relevant times, Novo's Executive Vice President and Chief Financial Officer.

37.     Defendant Jakob Riis ("Riis") was Novo's Executive Vice President for North America and President of Novo Nordisk Inc., the Company's U.S. subsidiary, from September 2016 through March 2017.  From January 2013 to September 2016, Riis was Novo's Executive Vice President for China, Pacific & Marketing, and from January 2006 through September 2016, Riis was Novo's Senior Vice President for Global Marketing.

38.     Defendants Sørensen, Brandgaard, and Riis are collectively referred to hereinafter as the "Individual Defendants."

- 18 -

39.    The Individual Defendants, because of their positions with Novo, possessed the power and authority to control the contents of Novo's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.   Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## IV.    FACTUAL ALLEGATIONS

### A.    Novo Is One of Three Manufacturers in the U.S. Insulin-Drug Market

40.    The United States is the largest insulin market in the world, with sales revenues reaching close to $31 billion in 2016, and sales of more than $113 billion between 2011 and 2016.   The market is split among Novo, Sanofi, and Eli Lilly. During 2016, for example, Novo and Sanofi each held 37% market share, and Eli Lilly held the remaining 26%.   As illustrated in the charts below, between 2011 and

- 19 -

2016, insulin sales revenues grew dramatically, with Novo's insulin revenues growing by 200%, Sanofi's by 177%, and Eli Lilly's by 163%.



| Manufacturer | 2011 ($m) | 2012 ($m) | 2013 ($m) | 2014 ($m) | 2015 ($m) | 2016 ($m) | | Sales Change (2011 to 2016) |
|---|---|---|---|---|---|---|---|---|
| Sanofi-Aventis | 4,124 | 5,241 | 6,913 | 9,515 | 11,100 | 11,413 | | 177% |
| Eli Lilly | 3,037 | 3,413 | 4,065 | 5,468 | 6,509 | 7,981 | | 163% |
| Novo Nordisk | 3,788 | 4,948 | 6,564 | 8,327 | 10,669 | 11,484 | | 200% |
| | | | | | | | | |
| Total | 10,950 | 13,601 | 17,542 | 23,310 | 28,278 | 30,878 | | 284% |

## B.    Novo's Insulin Products

41.    Novo manufactures modern "analog" insulins, as well as less widely used human insulins.   Novo's modern insulins include NovoLog (also known as NovoRapid outside of the United States), NovoLog Mix (NovoMix outside of the United States), Levemir, and beginning in January 2016, Tresiba.  NovoLog, approved by the U.S. Food and Drug Administration ("FDA") in 2000, is the most widely used fast-acting insulin taken during mealtime and comes in vial, cartridge, and pen forms. Levemir, approved by the FDA in 2005, is a once-daily, long-acting insulin and is produced in vial and pen forms.  Tresiba, approved by the FDA in 2015, is also a

once-daily, long-acting insulin produced in pen form.  NovoLog Mix 70/30 covers both meal-time and long-acting requirements and comes in vial, cartridge, and pen forms.  Novo's human insulins include Novolin R, Novolin N, and Novolin 70-30. Novo's human insulins are all produced in vial, cartridge and pen forms.

42.    Novo's U.S. insulin sales amounted to over $41 billion between 2012 and 2016, representing 37% of total U.S. insulin sales.

### C.    The Rise of the PBMs in the Insulin Supply Chain

43.    Historically, drugs such as insulin have had a straightforward chain of distribution between the drug manufacturer and the ultimate patient-consumer:  (i) the drug manufacturer sells to a wholesaler; (ii) the wholesaler sells the drug to a pharmacy or other drug dispenser; and (iii) the pharmacy (or other dispenser) dispenses the drug to the patient-consumer.

44.    By the late 1980s, PBMs became a significant participant in the industry, as health care and prescription costs were escalating, with the ostensible purpose of negotiating on behalf of patients to keep drug prices low.  Throughout the 1990s and 2000s, widespread consolidation occurred in the PBM field, including PBMs acquiring and developing strategic relationships with pharmacies.  This dynamic has created an inherent conflict in the market: PBMs are supposed to negotiate lower drug pricing, but PBMs are interested in higher pricing combined with higher rebates to boost their own revenues which come from a portion of the rebates they demand.  As

a result, PBMs now wield significant power in controlling access to pharmacies and ultimately patients who buy prescription drugs, but with the primary focus of extracting profits for the PBMs themselves rather than keeping drug prices low.

45.     PBMs make outsized profits by exploiting the United States' complex prescription distribution system.  In practice, drug makers set list prices for their drugs.  PBMs then negotiate with the drug makers for discounts and rebates off of that list pricing, some of which is distributed to insurers or other players in the market and a significant portion of which accrues as revenues to the PBMs.  The net amount to the manufacturer for the drug, after accounting for rebates and discounts to the list price, is the "net price."  Because PBMs' profits largely derive from those rebates, it is preferable for a PBM to negotiate a large rebate to a high list price, rather than a small (or no) rebate to a low list price, regardless of which option leads to a lower net price for the drug and/or lower prices for patients.  And for drug companies like Novo, maintaining access to PBMs' formularies is paramount, as is maintaining or growing net prices – even if doing so requires raising list pricing simply in order to pay PBMs a larger rebate without cutting into net pricing.  "Overall, nearly one-third of the total expenditures on branded pharmaceuticals were, in some way, rebated back to PBMs and [other] payers in 2015."[2]

---

[2]   Wayne Winegarden, *The Economic Costs of Pharmacy Benefit Managers: A Review of the Literature*, Pacific Research Institute, at 5 (May 2017).

46.     While the role of PBMs in the supply chain is well known, the size of the rebates and other fees they extract from companies for formulary placement, and the portion of these payments they pocket, are carefully guarded secrets.[3]   Drug manufacturers and PBMs depend on the lack of transparency to conduct their business.  They have vigorously resisted disclosing the details of their agreements – including the levels of discounts and rebates the drug makers pay to the PBMs – as well as PBMs' agreements with insurers and pharmacies.  CVS President and CEO Larry J. Merlo summed up the PBMs' position on transparency during a December 16, 2014 analyst day:  "We're not going to get into any specifics on contract structure because we think that is, quite frankly, a little bit of our secret sauce."

**D.     The Kickback Scheme**

47.     In light of the factors discussed above, the U.S. insulin market allows for PBMs to demand ever-larger rebates, meaning that insulin makers must raise list prices to stay profitable, and patients pay more as a result.  Private parties and government entities have initiated multiple lawsuits and investigations into the U.S. insulin market (including the drug makers and the PBMs), and whether market participants engaged in illegal anti-competitive misconduct.

---

[3]     *See, e.g.*, Lydia Ramsey, *One of the largest middlemen in the drug industry just released a video showing why it should be able to remain secretive*, Business Insider (Feb. 9, 2017), http://www.businessinsider.com/what-pharmacy-benefit-managers-aredoing-about-trump-and-drug-pricing-2017-2.

48.     Wherever the lawsuits and investigations ultimately lead, the evidence shows that (as Plaintiffs allege here): (1) formulary access was granted based upon the size of the kickbacks offered to PBMs, as the PBMs viewed the insulin drugs on the market, including the newly launched Tresiba, as interchangeable; and (2) rebates to PBMs and drug makers' list pricing rose dramatically and unsustainably, ultimately leading to undisclosed net pricing pressures as Novo and its competitors were forced either to lose market share or accept lower net pricing in order to maintain formulary access when they could no longer keep raising list prices as they had in the past.

49.     As CVS admitted during the JPMorgan Health Conference on January 15, 2013, exclusionary formularies were developed to control drug manufacturers' pricing by "prevent[ing] manufacturer subversion of a formulary strategy."  While PBMs could use their market power to drive down the prices for insulin by forcing the drug manufacturers to compete on price for formulary placement, instead they and the insulin manufacturers – including Novo – figured out a way to game the system for their mutual benefit.  To gain formulary access, Novo inflated its list prices and then kicked back a significant portion of the list price to PBMs, calling it a "rebate."  The rebates are provided under a variety of labels, including "discounts," "credits," and "concession fees."  Regardless of the term used to describe them, they are a *quid pro quo* for formulary inclusion or preferential placement.

- 24 -

50. Initially, this rebate scheme mutually benefited both Novo and the PBMs, at the expense of consumers. The PBMs obtained large rebates in exchange for granting access to the exclusionary formularies. The PBMs received the payments, which typically were determined as a percentage of the insulin list price, directly from the drug manufacturers, and kept the entire rebate or passed a portion on to their health insurer clients – some of which are owned by or affiliated with them. The higher the rebate, the more the PBMs would pocket. In return, Novo paid the high rebates without diminishing its net profits, because it simply increased list prices. As Novo and other drug manufacturers increased their list prices, the PBMs' rebate payments grew as did the manufacturers' net profits. Novo also increased its market share because it was ensured sales through formulary placement.

51. At first, Novo and the other drug manufacturers controlled the list prices, and in effect, the PBMs' rebates. As discussed above, however, consolidation of the PBMs and their resulting control over access to millions of patients on formularies led them to exert more control over the scheme and demand higher and higher rebates.

52. Prior to the Class Period, Novo learned a hard lesson about the consequences of refusing to provide PBMs with increasingly large rebates. In October 2013, Express Scripts set its 2014 formulary, and completely excluded Novo's GLP-1 diabetes drug Victoza and its rapid-acting insulin Novolog, which contributed to Novo's "negatively impacted" sales growth of "around 4 percentage

- 25 -

points." This marked the change in the PBMs' use of formulary exclusions. Prior to this exclusion, formularies were open and included most drugs arranged in various tiers. If a manufacturer's drug was not on the cheapest tier for consumers, it could simply provide patients with coupons to cover what their health plans covered for the competitor's drug. But being completely excluded from Express Scripts's formulary provided Novo with no alternatives and reduced its market by millions of patients.

53.     The total amount and nature of the rebates, the amount that the PBMs pocket, and the amounts that pass through to payers, are all nonpublic. The companies' list prices, however, are public and show that prior to and during the Class Period, insulin-drug list prices rose dramatically. For Novo, through persistent list-price increases, the average list price per unit of insulin sold in the U.S. grew 97% between 2011 and 2015 from $14.32 to $28.21.

54.     Even assuming that PBMs passed 90% of the rebates received from drug manufacturers through to insurers, pharmacies, patients, and/or others, PBMs still profited handsomely from rising insulin-drug prices and rebate levels. Novo likely paid billions of dollars to PBMs from 2012 to 2016 in the form of rebates. By keeping even 10% of the rebates, PBMs likely garnered hundreds of millions of dollars in profit from Novo alone. Throughout 2015, the PBMs reported billions in revenue each quarter, citing higher rebates as a material factor. For example, in 2015, CVS's PBM segment reported more than $100 billion in revenues, and credited

- 26 -

"favorable . . . rebate economics" as a primary reason for the 20.5% year-over-year increase in gross profit.  Novo also profited due to escalating net sales of insulin. Between 2012 and 2016, the Company generated $20.3 billion in net sales of insulin in the U.S. through the combination of higher net prices and steady market shares as the overall size of the U.S. insulin market grew.  From 2011 to 2016, Novo's net U.S. insulin sales increased by 61%.  These sales increases were not because Novo had a better product or offered better prices, but rather were due to rising prices and access to formularies purchased from the PBMs.

55.     Far from promoting an open market where quality products rose to the top, numerous government officials and commentators have asserted and/or are presently investigating whether manufacturers' rebates to PBMs have involved egregious, deceptive and illegal conduct:

- In January 2017, New York Governor Andrew M. Cuomo, announced a proposal to "protect consumers from unfair business practices by [PBMs]," stating that PBMs engage in "unfair business practices."

- In March 2017, Congressman Doug Collins (Georgia), introducing H.R. 1316, the Prescription Drug Price Transparency Act, stated: "PBMs engage in predatory practices designed to boost their own profit margins at the expense of insurers, contracting pharmacies, [and] patients . . . ."

- In his March 20, 2017 testimony before the California Senate Committee on Business, Profession and Economic Development, a former Assistant Deputy Director of Policy and Evaluation of the FTC's Competition Bureau testified that PBMs "engage in anticompetitive, deceptive and fraudulent conduct," described how the PBMs have entered into *"sweetheart deals . . . with drug manufacturers* to force consumers to use higher cost, less efficacious drugs, in order to maximize rebates and

*secure kickbacks*," and confirmed that "the dominant PBMs have been characterized by opaque business practices, limited market competition, and widespread allegations of fraud."

- A March 28, 2017 article entitled, "The Hidden Monopolies That Raise Drug Prices; How pharmacy benefit managers morphed from processors to predators" likewise observed: "The PBM industry is rife with conflicts of interest and *kickbacks*."

### 1. The Secretive Relationships Between Novo and the PBMs

56.  During the Class Period, information surrounding the relationships between Novo and the PBMs was closely guarded, and the details of those relationships – including the amount of rebates to the PBMs – was not publicly known.  Even subsequent to the announcement of government investigations into their collusive activities, both the manufacturers and the PBMs have made every attempt to conceal the details of their relationships.  Moreover, and directly contrary to how they actually developed their formularies, the PBMs' publicly stated policies strictly prohibited the PBMs from making formulary selections based on the PBMs' financial considerations.

57.  While still lacking full clarity, more information concerning the nature of the relationship between the drug manufacturers and PBMs is now emerging.  A February 9, 2017 *Business Insider* article described the relationship as follows: "PBMs negotiate rebates with the different drugmakers.  The terms of these rebate contracts are variable and secret.  The more lives a PBM covers, the more leverage it

tends to have in negotiating steeper rebates, which is why some PBMs may walk away with rebates twice as big as those of their competitors."

58.    A September 2016 *Business Insider* article explained that, "[i]f the price of the drug has increased, the PBM can be paid a rebate for the excess, which it pockets.  The insurer, which is paying for the drug, won't know."  Thus, when a drug manufacturer raises the price, the PBM gets a kickback that its clients do not know about.  The article points out that the collusive nature of the rebate scheme caused an AllianceBernstein analyst to downgrade Express Scripts because the rebate scheme provided a material undisclosed risk to Express Scripts shareholders that would eventually be uncovered.  A June 9, 2017 *Los Angeles Times* article similarly wrote that "no one can be sure [drug costs are really being reduced], because the size of the rebates and the degree to which they're passed along is guarded by the PBMs as trade secrets."

59.    The PBMs also have circled the wagons and refused to reveal details about the rebates they pocketed.  In a statement that is now heavily quoted as a symbol of the PBMs' defiance, Express Scripts' Chief Medical Officer Steve Miller conceded, "what we don't want is transparency."  Miller claims the reason for the lack of transparency is to keep trade secrets from Express Scripts' competitors, but his statement acknowledges that even Express Scripts's clients – the insurance companies – lack insight into the rebates to PBMs.  Tellingly, Miller stated that Express Scripts' clients can "audit their

contracts" and "know exactly what they're going to be required to pay." Thus, the insurance companies and other payors can learn what they will be required to pay for particular drugs, but they do not know the amount of money the PBMs pocket. As a PBM consultant testified to the 2014 ERISA Advisory Council, even the payers had trouble accessing that information:

> Some PBMs will not disclose the contracts with the retail pharmacies and manufacturers which set the prices being paid by the PBM to the pharmacy or the manufacturer. When rebate contracts are disclosed, a review of the contract can take 4 to 5 hours of auditor time per contract. The auditor is not given a separate copy of the contract, but is required to take notes from the contract.

60.     Ultimately, PBM contracts required the execution of a confidentiality agreement, and some contracts "restrict communications between the auditor and the plan sponsor on the basis of confidentiality." In 2017, as the rebate scheme unraveled, Novo's new CEO Lars Jørgensen acknowledged that "[w]e need to transition to a model where it's more transparent who sells at which price and who makes how much profit."

61.     The collusive nature of the rebate scheme and the rising list prices that are a result of the rebate scheme have caused patients, consumers, government entities, and other interested parties such as employee benefits organizations to take action. That public outcry is part of pricing pressures that have made it increasingly difficult, if not impossible, for Novo and its competitors to continue regularly and significantly raising list prices. For example, the California Public Employees'

- 30 -

Retirement System (CalPERS), which administers health benefits for more than 1.4 million members and their families, required transparency in its most recent contract with PBM OptumRX. According to a May 18, 2016 CalPERS news release, CalPERS' contract with OptumRX "requires transparency and full disclosure of the financial relationships between the PBM and drug manufacturers."

62.     The secretive nature of the rebate scheme also kept Novo shareholders in the dark, causing a lack of transparency into the true nature and sustainability of their drug sales and risk of Novo meeting its financial forecasts. Without knowing the true amount of rebates provided to the PBMs and the nature of the relationship, investors were not able to determine the likelihood that Novo would maintain its growth. Due to the unlawful nature of the rebate scheme, investors were not able to determine the trends that were occurring. As such, investors were not aware that the revelation of the true nature of the rebate scheme would force Novo to adjust its business models and miss its forecasts. Instead, because formulary access was granted based upon the size of the kickbacks paid, and not as Novo and the PBMs publicly represented the "safety and efficacy" of manufacturers' products, investors were misled into believing Novo's product quality set the Company apart from its competitors and allowed it to withstand pricing pressures that were impacting Novo's competitors.

63.    Novo, and numerous others, have recently repeatedly stressed the need for greater transparency, evidencing the lack of transparency surrounding the PBM scheme that existed during the Class Period.

- In late 2016, Novo announced its intention to "transform[] the drug pricing system, which is incredibly complex and has resulted in a lot of confusion around what patients pay for medicines . . . we . . . need to . . . improve the system and create more transparency."

- In January 2017, New York Governor Andrew M. Cuomo announced a new proposal requiring PBMs to disclose financial incentives or benefits for promoting the use of certain drugs.

- In February 2017, Novo stated in its 2016 Annual Report: "The pricing system needs to be simplified, which includes making it more transparent."

- In March 2017, Congressman Doug Collins (Georgia) introduced H.R. 1316, the Prescription Drug Price Transparency Act, to "protect taxpayers and the community pharmacists who serve them by requiring greater transparency from [PBMs]." Collins stated: "The lack of transparency in their operations has allowed them to control the market unjustly, with the result that these companies withhold savings that they have promised to pass on . . . ."

- In March 2017, U.S. Senator Ron Wyden (Oregon) introduced legislation to the Senate Finance Committee geared at improving transparency between PBMs and drug makers. The legislation ("Creating Transparency to Have Drug Rebates Unlocked (C-THRU) Act") would require public disclosure of the total amount of rebates provided by manufacturers to PBMs and the proportion of those rebates that are passed on to health plans.

- In April 2017, the California Assembly Committee on Business and Professions advanced a PBM "transparency" law (AB 315). The legislation would require PBMs to disclose to their purchaser clients data regarding drug costs, rebates, and fees earned.

- 32 -

### 2. The *Quid Pro Quo* Between Novo and the PBMs Led to Anticompetitive Behavior

64. Because Novo, Sanofi, Eli Lilly and the PBMs had aligned interests to keep supracompetitive insulin profits to themselves, their scheme kept new entrants out of the market and enabled the manufacturers to maintain over 99% market share. Between 2012 and 2016, the three manufacturers' U.S. insulin market shares remained constant, with Novo and Eli Lilly each gaining 1% share while Sanofi lost 2%.



| Average Yearly Market Share | 2012 | 2013 | 2014 | 2015 | 2016 | Change (2012 -2016) |
|---|---|---|---|---|---|---|
| Lilly | 25% | 23% | 23% | 23% | 26% | -1% |
| Novo Nordisk | 36% | 37% | 36% | 38% | 37% | –1% |
| Sanofi-Aventis | 39% | 39% | 41% | 39% | 37% | 2% |

65.   Likewise, Novo and Eli Lilly split the fast-acting market evenly:



| St.Dev (mrkt shre) | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Novo Nordisk (Novolog: Vials Injectable) | 2.64% | 3.05% | 3.34% | 2.62% | 2.98% |
| Sanofi-Aventis Pharma (Apidra:Vials Injectable) | 0.40% | 0.34% | 0.46% | 0.48% | 0.31% |
| Lilly (Humalog:Vials Injectable) | 3.32% | 2.84% | 3.05% | 3.22% | 2.55% |

66.   Such market share stability is uncharacteristic of a competitive market, where manufacturers would compete by lowering price to gain market share.  Due to the scheme, however, the converse was true in the insulin market where higher prices led to higher rebates.  The steady market share allocation despite increasing prices evidences the lack of competition.  Likewise, the lockstep pricing evidences an understanding by the manufacturers that by keeping the same prices, they can restrict new entrants and maintain constant market share at supracompetitive prices.

67.   For example, Novo and Eli Lilly opted to raise list prices of NovoLog and Humalog in lockstep fashion and kept market share unchanged.

- 34 -



68.     Novo and Eli Lilly implemented the list price increases for NovoLog vial and Humalog vial in an identical manner.  Between 2012 to 2016, the correlation of the two manufacturers' price moves registered at 99.9% with a statistically significant relationship that indicated the probability of obtaining such high correlation by chance is less than 1%.  The percentage difference from the average of the NovoLog and Humalog prices per unit was 1.2% or less for each of the five years.



| Year | 2012 | 2013 | 2014 | 2015 | 2016 |
|------|------|------|------|------|------|
| % Change from Avg. Price | 1.2% | 0.7% | 1.0% | 1.0% | 1.2% |

69.     The unusual pricing pattern was manifested in the majority of insulin forms, including Novo's Levemir pen and Sanofi's Lantus pen.  The correlation of Novo and Sanofi's price moves during 2012 to 2016 was 98.7%.



70.     Other than the perverse incentives arising from the PBM scheme, which provided outsized and growing profits to the PBMs and manufacturers alike, there are

no external factors that explain the lockstep price increases. Insulin treatments had been clinically unchanged for a number of years. As such, costs associated with Novo's insulin production remained relatively constant and did not increase at nearly the same rate as prices and sales.

71. As Novo acknowledged in its 2015 Form 20-F ("2015 20-F"), raw material prices and availability were not issues of concern for the Company:

> The impact on the overall profitability of Novo Nordisk from variations in raw material prices is unlikely to be significant. There is no raw material supply shortage that is expected to significantly impact the Company's ability to supply any significant market. The Company's production is largely based on common and readily available raw materials with relatively low price volatility. Certain specific raw materials are, however, less available. For these raw materials, it is the policy of Novo Nordisk to develop close and long-term relationships with key suppliers as well as to secure at least dual sourcing whenever possible and when relevant operate with a predefined minimum safety level of raw material inventories.

### 3. The Structure of the U.S. Insulin Market Facilitated Novo's Rebate Scheme

72. The U.S. insulin market was highly conducive to a rebate scheme between Novo and the PBMs. Characteristics that facilitated the scheme include: (a) a high level of market concentration, (b) highly inelastic demand, (c) the commoditized nature of insulin, and (d) the significant barriers to entry.

73. First, the highly concentrated insulin market was vulnerable to coordinated activities because fewer firms were involved in the negotiation and collusive revenues were high for each firm.

- 37 -

74.     Second, as a result of the rebate scheme, the U.S. insulin market was so inelastic that price increases had no negative effect on sales whatsoever, as quantities sold actually increased – evidencing a positive relationship between prices and quantities sold.  The U.S. market for Levemir was strongly inelastic with a 95% correlation between list price and quantity sold, even after adjusting for the effect of increasing number of diabetics in the U.S.



Note: An adjustment was made to quantities to take out the effect of the rising diabetes population in the U.S. This was to measure the real relationship between quantities demanded based on price movements. Relationship measured from 2012-2014

| Quantity Measure | R2 | Correlation |
|---|---|---|
| Actual Quantity | 94% | 97% |
| Adjusted Quantity | 91% | 95% |

75.     Similarly, for NovoLog, list price and quantities sold also demonstrated a positive relationship.  After adjusting for the effect of increasing number of diabetics in the U.S., the correlation between price and quantities was 56%.  This positive relationship was inconsistent with a competitive market.



Note: An adjustment was made to quantities to take out the effect of the rising diabetes population in the U.S. This was to measure the real relationship between quantities demanded based on price movements. Relationship measured from 2012 to 2016

| Quantity Measure | R2 | Correlation |
| --- | --- | --- |
| Actual Quantity | 65% | 80% |
| Adjusted Quantity | 31% | 56% |

76.    Third, in a truly competitive market, commodity-like products would allow manufacturers to gain market share by cutting prices.  To effectively profit from the rebate scheme, all of the manufacturers had to raise prices – and in effect the rebate amount – in lockstep.  One manufacturer's price move without a corresponding move from another manufacturer would enable one competitor to take market share away by simply setting list price above another's price point.

77.    Insulin is an essential commodity as diabetics need insulin to live.  No long term, alternative drug or substance is available to control blood sugar levels in the body.  Type 1 diabetics must have insulin delivered by injection or pump to survive.  Type 2 diabetics also can become heavily reliant on insulin and oral

- 39 -

medications.  Thus, the lack of a viable substitute also encouraged the rebate scheme because diabetics cannot replace insulin with a different drug, enabling the drug manufacturers and PBMs to raise prices without altering demand.

78.     Fourth, the large rebates that the drug manufacturers were willing to pay created a significant barrier to entry for new manufacturers.  A high barrier to entry to the insulin market enabled the rebate scheme to be sustained over an extended period.

### E.     Defendants Misled Investors About the Reasons for and Sustainability of Novo's Growth

79.     Throughout the Class Period, defendants misled investors about the reason for Novo's successful growth, the sustainability of that growth, and the basis for inclusion of Novo's drugs as part of major managed care formularies.  Novo reported impressive sales, earnings, and forecasts without disclosing that all past and future successes resulted from and depended upon Novo's payments to PBMs for inclusion on drug formularies, which provided Novo with market access and enabled Novo's market share.

80.     For example, Novo continually stressed U.S. sales growth.   In its April 30, 2015 Form 6-K, filed with the SEC, defendants stated:  "Sales of insulin increased by 22% . . . sales growth was driven by North America."[4]   Defendants

---

[4]     During the Class Period, sales to the U.S. represented more than 90% of North American sales.

continued to tout U.S. sales growth throughout the Class Period.  *See* §VII.  Other examples include:

- Sales of insulin in North America increased by 30% (April 30, 2015 Form 6-K);

- Sales increased by 25% . . . North America was the main contributor (August 6, 2015 Form 6-K);

- Sales of modern insulin increased by 22% . . . North America accounted for 50% of the growth (August 6, 2015 Form 6-K);

- North America accounted for 66% of the [modern insulin sales] growth (February 3, 2016 6-K);

- North America was the main contributor [of sales growth] with 62% share of growth measured in local currencies (February 10, 2016 6-K);

- Sales growth is driven by North America (February 10, 2016 6-K); and

- North America accounted for 56% of the [modern insulin sales] growth (October 29, 2016 6-K).

81.    These statements, and similar misstatements and omissions concerning the Company's sales growth throughout the Class Period, were materially false and misleading.  In truth, Novo's reported sales, earnings and forecasts were unsustainable and unachievable, and were inflated through collusive behavior with the PBMs and entirely contingent on kickbacks to the PBMs.  The financial results that Novo reported to investors also concealed the true extent of the pricing pressures the Company was experiencing in the U.S.

82.    Moreover, defendants failed to make required SEC disclosures regarding the impact of rebate scheme on Novo's reported U.S. revenues and operating profit.

In particular, defendants were required to make SEC disclosures which would have allowed investors to assess the quality and sustainability of Novo's U.S. revenues and operating profit. By failing to make the required SEC disclosures, defendants' Class Period statements regarding Novo's U.S. operations, revenues and operating profit were rendered materially misleading. *See* §VII.

83.   Defendants also misleadingly touted Novo's products as unique and superior to its competitors' drugs, and claimed they would drive economic success. Novo failed to disclose, however, that the PBMs granted formulary access based primarily on rebate size, with little credence given to the marginal distinctions among commodity-like insulin drugs. For example, in Novo's 2015 Annual Report filed on February 10, 2016, it said: "The US is the world's largest market for pharmaceuticals, accounting for roughly 44% of global sales. ***Product success is largely based on competition on efficacy, safety, quality and price.***" At the time they made these and similar statements, defendants knew the PBMs did not select insulin drugs based on these criteria.

84.   Defendants also told investors that Novo had leverage when it came to pricing because of the strength of its products: "the pricing is made between the company and the payers. And we do compete, but we make our own decisions." This too was false because, contrary to defendants' statements, defendants knew the PBMs

- 42 -

controlled pricing, and Novo could only counteract the PBMs' pricing pressure through the unsustainable practice of increasing list prices.

85.     All three major PBMs corroborated defendants' fraudulent statements, which helped deceive the market.  On January 13, 2015, Express Scripts Chairman and CEO George Paz told investors that it did not make formulary decisions:  "We have a panel of outside doctors who do not work for Express Scripts; they are independent.  And they form the formulary for which we then go out and negotiate prices."  Express Scripts later reiterated this point in its 2016 Annual Report, filed on February 14, 2017:

> In making formulary recommendations, the National P&T Committee considers the drug's safety and efficacy, without any information on or consideration of the cost of the drug, ***including any discount or rebate arrangement we might negotiate with the manufacturer. This process is designed to ensure the clinical recommendation is not affected by our financial arrangements.***

86.     Similarly, on September 8, 2016, UnitedHealth President David Wichmann said "there is really no factual foundation for price increases so that rebates and things like that can be paid to PBMs or to others."  And on September 13, 2016, CVS CEO Larry Merlo denied accusations that PBMs are "simply middlemen in the pharmacy supply chain that are taking outsized profits at the expense of patients and payors."

87.     As the Class Period drew to a close, however, defendant Sørensen – who was set to retire in a few weeks – acknowledged the scheme with the PBMs and the

negative impact it had on patients.  According to a *Bloomberg* article published on November 11, 2016, Sørensen claimed Novo had to raise prices to satisfy the PBMs' increasing demands for large rebates.  He said, "the large growth is all being returned to insurance companies and PBMs."  When asked whether patients receive any benefit from the rebates, he said "I don't know.  All we can see is we are paying bigger and bigger and bigger rebates."  He ultimately acknowledged that the pricing system "isn't really fitted for the needs of the patients."

88.    Later that month, on November 30, 2016, Novo posted a statement on its website that admitting to the *quid pro quo* arrangement:

> As the manufacturer, we do set the "list price" and have full accountability for those increases. However, after we set the list price, ***we negotiate with the companies that actually pay for the medicines, which we call payers. This is necessary in order for our medicines to stay on their preferred drug list or formulary.*** The price or profit we receive ***after rebates, fees and other price concessions we provide to the payer*** is the "net price." The net price more closely reflects our actual profits.

89.    During an interview with Bloomberg on May 10, 2017, Jørgensen admitted that drug efficacy had not previously determined price.  He said Novo and the PBMs had only recently started to discuss "new ways to pay for drugs, with contracts that determine what companies get paid depending on the medicines' efficacy."

**F.    Prior to and Throughout the Class Period, Defendants
Denied Novo Was Subject to the Pricing Pressures that
Finally Came to Bear on the U.S. Insulin Market**

90.    Prior to the Class Period, Novo's competitors began to report the
negative impact of pricing pressures resulting from the ever-increasing rebates
necessary to access PBMs' formularies.  For example, during an October 28, 2014
conference call with investors to discuss earnings for the third quarter of 2014, Sanofi
reported lower-than expected earnings growth, explaining that "[t]he U.S. growth at
5.8% really reflect[ed] the increased competitive pressure at the payor level."  In the
company's financial report filed that same day on Form 6-K, Sanofi further disclosed
that "Sanofi has recently concluded payor negotiations in the U.S. and has secured
favorable formulary positions for Lantus with key payors.  ***The level of rebates
required to maintain these positions has increased significantly due to aggressive
discounting by competitors. . . .  The increased rebates in the US . . . will continue in
2015***."

91.    Although Novo was subject to the same market pricing pressures as its
competitors, defendants nevertheless reassured investors that Novo's earnings were
reliable and not at risk, and omitted to inform investors that increasing rebate levels in
the industry were coming to bear on Novo.

92.    Analysts were focused on the pricing pressures that Novo's competitors
had previously disclosed and why Novo (purportedly) would not suffer a comparable

earnings decline.   During Novo's February 3, 2015 earnings conference call, an analyst from Mitsubishi Financial Group bluntly asked:  "I still don't understand why at the Q3 numbers your competitor had to say the US outlook looks terrible from pricing and you were able to say we see no problems at all.  Can you just explain that?"  In response, defendant Sørensen denied that competitive pressures would have a negative impact:  "the contracting environment and the negotiation on contracts for 2015 which took place in the second half of 2014 is a poker game. . . .  And so *it is not necessarily because of competitive pressures* from the opponent, the real opponent, which is the other supplier."  Novo's then-President and COO Kåre Schultz added:  "To give a little bit of flavor to why we can predict what we can predict, *and that's nothing to do with competition*, . . .  We know what dramatic changes there might be, if any . . . this year we don't have any big changes. . . .  So it's a pretty steady situation we have and, therefore, we didn't feel it was so hard to predict that we had a pretty stable situation for 2015."

93.     At the same time that Novo was denying that market competition would negatively impact its present or future earnings, Sanofi was again representing to the market that competition-based pricing pressures would impact its earnings.  In an interview transcript released on February 5, 2015 along with its 2014 earnings, Sanofi's Chairman and CEO Serge Weinberg warned that, although "the market share of Lantus in the US has stabilized now over the past couple of months," the "increased

rebates in the US . . . [are] expected to impact the U.S. outlook of Lantus in 2015."
Sanofi further discussed its efforts to "mitigate this impact on the Diabetes division in
2015."

94.    The market credited Novo's false statements that it was better positioned
than its competitors to weather any pricing pressures, and would continue to raise
prices and grow earnings where competitors could not.  On April 9, 2015, an analyst
with the Mirabaud Group reported that:

> Novo management have indicated that the significant contract
> changes that saw NovoLog and Victoza drop off Express Scripts
> formulary in 2014 will not be repeated in 2015, but securing stability has
> likely come with price protection and a cap on maximum price.
> Essentially this means price is locked in and reported increases above
> this simply triggers a bigger rebate. . . .  ***Novo and Sanofi both
> cautioned in Q2-2014 that the pricing and contracting environment in
> the US had worsened due to pressure from private payers for greater
> rebates/discounts, in return for formulary access. . . .***  Sanofi has
> guided to diabetes franchise sales flat to slightly growing through 2018,
> which implies price reductions on Lantus, consensus thinks a 10% to
> 15% cut in ARP.  ***Novo, on the other hand, has said it is confident it
> will be able to raise prices in the US but only expects low single digit
> percentage increases, after rebates***.

95.    Novo's competitors continued to report on the negative impact that
pricing pressures and higher rebate levels to PBMs had on earnings, while Novo
continued to misleadingly represent to investors that its own earnings would not
suffer.  On April 30, 2015, on a conference call discussing its first-quarter 2015
earnings, Sanofi told investors that:

> As previously communicated, increased rebates from most contracts in the US for Lantus were required to secure favorable formulary position and became fully effective at the beginning of 2015. . . .  While the market share of Lantus in the US remains stable compared to the fourth quarter, US Lantus sales were down 13.1% in the quarter versus Q1 last year. . . .  For Lantus, the impact on the price is expected to remain at the similar level of the remaining quarters in 2015.

Moreover, Sanofi was clear that although it sold approximately the same volumes of Lantus (indeed, volumes were up), revenues declined significantly due to net pricing pressures, "volume increased 2% and price was down 15%."

96.     In contrast to the negative earnings figures reported and forecast by its competitors, defendant Sørensen told investors on Novo's April 30, 2015 earnings call to discuss first-quarter 2015 results that "[w]e are not anticipating any pricing impact in 2015."

97.     Analysts continued to credit Novo's false representations that the Company's earnings would not suffer due to pricing pressures affecting insulin sales in the United States.  For example, on April 30, 2015, analyst Kepler Cheuvreux wrote about Novo that "Bears may focus on comments about increased rebate levels in US and tougher competition in diabetes but we believe this was to be expected.  We expect consensus changes to estimates to increase by 2-3% on higher sales growth and lower tax rate.  All in all, better than expected."  Likewise, analyst Jyske Markets wrote on May 4, 2015 that "Novo Nordisk has delivered a strong Q1 '15 report . . . .  Sales of diabetes was broadly in line with expectations even [though] sales of insulin

analogues and new generation insulin fell short of expectations.  This was due to challenging US pricing environment . . . .  Novo do, however, still anticipates flat to slightly positive pricing in 2015 for all products."  Barclays similarly reported on July 20, 2015 that "[d]espite a market reduction in Novo's ability to increase net prices in the U.S., we expect the U.S. business to benefit from volume growth . . . resulting in 10% CER growth.  This should go some way to putting concerns to rest that without price increases Novo is seeing a significant reduction in growth potential."

98.    In connection with earnings releases for the second quarter of 2015, Novo's competitors continued to disclose the negative effects that pricing pressures placed on earnings, while Novo continued to falsely represent that its insulin drugs would enable the Company to avoid such negative consequences.

99.    On July 30, 2015, Sanofi released its second-quarter 2015 earnings, and reported that "sales of Lantus decreased 15.4% . . . due to increased rebates granted to maintain favorable formulary positions with key payers."  Further, Sanofi disclosed that "[d]iabetes sales in the U.S. decreased 14% year-over-year . . . mainly reflecting the continued pricing impact on Lantus."

100.    During Sanofi's July 30, 2015 conference call with investors to discuss second-quarter 2015 earnings, a BAML analyst noted price declines that Sanofi had reported, and asked whether Sanofi "expect[ed] similar or smaller price declines in

2016 in the basal insulin franchise?"  Sanofi responded that, although "2016 . . . pricing in the US will be a little hard to predict," "further price erosion on insulin glargine [*i.e.*, long-acting insulin analogues such as Lantus] has been embedded in our 2015 to 2018 guidance for diabetes, which by the way we are not changing . . . that additional price impact has been included in our guidance on diabetes for the next few years."

101.  Yet again, despite facing the same pricing pressures, Novo falsely reported positive guidance ostensibly based on drug-specific attributes.  During Novo's August 6, 2015 earnings conference call with investors, a Barclays analyst asked, "comparing the growth rates in North America to the volume growth," why "there doesn't seem to be any pricing headwinds for Levemir and NovoMix, so which part of the portfolio is really seeing price pressure, if any?"  Defendant Sørensen responded that although Novo had "slight" negative insulin pricing in the first half of the year, defendants had pricing visibility which indicated insulin prices would rise in 2015 and stabilize in 2016:

> ***When we look at insulins going forward, we are looking at full-year expectations from flat to slight positive pricing***.  And as we now have entered into contract for the remaining of 2015 and into 2016 without having had impact on the remaining of the year, ***we know the price picture*** – we don't know the channel mix, of course, but ***we know the price picture***.  So that would be our guidance for the full year.  And with ***the numbers we know today for 2016***, it would also indicate to us flat pricing for our insulin portfolio next year.

- 50 -

Defendant Brandgaard added, "it's clear that on top of that, . . . there is a positive impact on our gross margin . . . basically coming from an overall higher sales of Victoza and ***the modern insulin*** . . . . That's overall giving us a slight positive impact on gross margin from selling the higher value products." Defendants further represented that Novo's future earnings would be driven in large part by Tresiba sales.

102.  Analysts continued to credit Novo's explanations as to its positive outlook.  For example, on August 6, 2015, Morningstar wrote that "Novo and its insulin market peers have enjoyed tremendous U.S. pricing power in recent years, but the passing of the patent cliff and increased consolidation of PBMs could limit this power in the future."  Morningstar credited Novo's representation, however, that "Tresiba will support Novo's long-term pricing power."  Morningstar further reported on August 6, 2015 that it was "bullish on Tresiba's ability to differentiate.  Pricing had a neutral impact on growth in the first half of the year, and management noted ***the outlook going into 2016 looks flat to slightly positive***."

103.  Similarly, on August 6, 2015, Deutsche Bank reported that Novo's "management confirmed expectations of flat to limited US price growth over the remainder of 2015 and 2016, but this should leave behind fears of more negative pricing to keep its co-preferred status with key payers."  And Barclays similarly reported that "Management's expectations for flat pricing in [2Q 15] and also '16 suggests ***there is enough visibility for this not to be a concern***, and positive

comments about an ongoing mix benefit support this.  We continue to see high single digit growth potential for Novo's US diabetes business. . . . .  Levemir seems to be protected, and with management assuming flat pricing for the full year and also 2016, *this pricing pressure should not be a concern*."  Barclays further reported on August 28, 2015, that "Novo's pricing outlook for 2016 . . . seems credible."

104.   Rebates to the PBMs continued to drive the U.S. insulin market and cut into drug makers' earnings.  On Sanofi's October 29, 2015 earnings conference call to discuss earnings for the third quarter of 2015, Sanofi explained to investors that, "[l]ooking at the US market, Lantus sales were impacted by higher discounts as compared to last year," which contributed to a 16.4% decline in U.S. sales.  In contrast, that same day, Novo issued a positive earnings announcement including reaffirming its 7-9% sales-growth forecast for 2015.

105.   Analysts focused on Sanofi's lowered guidance, and in particular why Novo's forecast remained positive while Sanofi downwardly adjusted its forecast significantly based on market factors.  During Novo's October 29, 2015 earnings conference call, BAML's analyst asked whether Novo expected its guidance to remain unchanged, stating that "[o]bviously the reason for the question is Sanofi have cut their diabetes guidance today," and "Lilly are also talking on the third quarter call about slowing insulin market outlook."  The BAML analyst continued, "just wondering whether your outlook has changed and, if not, if you could outline why

- 52 -

you're different to competition."  Defendant Sørensen confirmed that Novo's insulin-market-growth guidance was unchanged, and "***the overall model still applies***."

106.   Following up on the BAML analyst's question, an analyst from Barclays then asked whether Novo's outlook had changed given that "[t]he Sanofi change to their guidance clearly implies some[thing] has changed."  Defendant Sørensen responded by both falsely claiming that Novo was immune to the negative effects of market pricing pressures and further by claiming that Sanofi likely revised its guidance based on the strength of Novo's new-to-market Tresiba, telling investors that "the only thing one can speculate on is of course that Sanofi's basal franchise is under pressure from two sides, under pressure from the launch of an innovative premium product, Tresiba, and the launch of a biosimilar, Abasaglar."  Defendant Riis, at the time Novo's Executive Vice President for China, Pacific, & Marketing, reiterated that Novo's drugs, rather than pricing, would allow the Company to outperform its competitors, responding that "when you compare what Sanofi has been out with and us, you could say we talked about Sanofi being pressured on both sides, so part of it coming from the – what Tresiba delivered.  So, when we look at our situation, Tresiba is of course – is positive, so we can add that in."  Riis continued, "the biosimilar version[] of glargine up against Lantus is more a dynamic within the glargine area and has a limited . . . direct impact on our current sales of Levemir when that takes place.

And I've said, on top of that, where we are then in a position where we can promote Tresiba, we sort of further withdraw ourselves from that dynamic."

107.   The next day, October 30, 2015, Novo held an earnings presentation, during which analysts once again repeatedly asked why Novo was not adjusting its guidance based on the same market factors that led Sanofi and Eli Lilly to lower guidance.  For example, an analyst from JP Morgan asked whether insulin market growth would slow or reverse, because "a competitor was alluding that, that was a slowing potentially in the basal area."  Defendant Brandgaard responded that it was "remarkable" how stable the U.S. insulin market is, and that "*I remain quite certain that we will see that growth*."  Riis added that "we can also anticipate that we see a little bit of momentum picking up as we are now introducing better versions of the mix, [and] better versions of the basal."

108.   Later in the call, BAML's analyst asked, similarly, "just a very simple high-level question, which is how do you rationalize your view of the insulin market in the US relative to Sanofi?  Just very simply, if Sanofi US Lantus is down in teens and are 60% of the market, for you to grow the overall US market implies substantial differentiation on both share and pricing."  Riis again replied by asserting that Novo was better situated because Tresiba would allow it to beat the competition, representing that the competitors "are both up against a biosimilar version of the product plus a new entrant, being Tresiba.  So, that's two things working against

them. . . .  And Tresiba is, of course, a growth driver for us.  That's why I think the situations are distinctly different."  Riis also represented that Novo could outperform its competitors because its pricing decisions were driven by the strength of Novo's products rather than market pricing pressures:  "on pricing, there's – the pricing is made between the company and the payers.  And we do compete, but *we make our own decisions*."

109.   Throughout the remainder of the Class Period, Novo continued to falsely represent to investors that its insulin-drug portfolio simply contained better drugs than its competitors', and thus that Novo's earnings would not suffer and its guidance remained reliable.  For instance, during a November 19, 2015 conference call with analysts as part of Novo's "Capital Markets Day," defendant Sørensen said that Novo would maintain its market share "based on the portfolio we have," and that "[w]e have seen clear signs of that in the markets where we have launched Tresiba, that it is indeed capable of taking a good share of the market."  An analyst from Verint Capital Partners pointedly asked, "[s]ince your competitors are so pessimistic, in particular Sanofi, how can you be so optimistic, considering that also the increased competition in the US market?"  Riis responded that "the case for Sanofi and Novo Nordisk is quite different. . . .  We are now coming [in] with the next-generation product, Tresiba, which we strongly believe is superior."

- 55 -

110.   In truth, however, the market-based pressures that led Novo's competitors to lower forecasts likewise meant that Novo's earnings faced substantial pressures.   Novo knew these pressures would come to bear.   Two independent witnesses – Brian Lundstrom and the Diabetes Marketing VP – recounted how Jesper Høiland, the former President of Novo's U.S. operations, informed executive management and the Board of Directors in early 2015 and throughout the Class Period that the increased pricing pressures in the U.S. insulin market meant that Novo could not meet its U.S. growth targets.   Defendants ignored these warnings and continuously touted Novo's strong U.S. revenue and profits without providing investors required detail of the kickback scheme that drove them.

### G.   Novo Falsely Represented that Tresiba Would Insulate the Company from Pricing Pressures

111.   Throughout the Class Period Novo falsely claimed that it would not be subject to the same U.S. pricing pressure in the basal insulin market as its competitors because of Tresiba, an innovative and superior drug for which it could obtain premium pricing and gain market share.   Analysts picked up on these statements, and credited them.   However, in truth, Novo knew that Tresiba was not innovative or superior – rather, it was virtually the same as the older insulin drugs (including its own) that were already on the market.   The Individual Defendants located in Denmark were warned by senior U.S. executives Sean Phillips (VP of Market Access Strategy) and Bill Breitenbach (head of marketing for Levemir and Lantus) in multiple conversations

beginning in 2014-2015 that Tresiba would not drive earnings in the U.S. due to the extreme pricing pressures and the fact that they couldn't substantiate premium pricing for the drug.

112.   Indeed, in 2014 the German Institute for Quality and Efficiency in Health Care (known as "IQWIG"), made a finding that Tresiba showed "no added benefit" over existing insulins in the marketplace.  In fact, experts at IQWIG said that not only is there no added benefit when compared to other medicines, in females there is in fact "a hint of greater harm regarding serious adverse events."  IQWIG's findings were then submitted to Germany's G-BA, who issued a rating of "Level 5," or "no additional benefit" (*i.e.*, the level just above "less benefit"), for Tresiba.  For that reason, in the summer of 2015, the relevant German authority (GKV-Spitzenverband), refused to allow Novo to charge premium pricing for Tresiba in Germany.

113.   Additionally, as Sørensen told investors on February 4, 2016, Novo had made a "price adjustment in Europe," which was required for Novo to relaunch Tresiba in Denmark.  France, however, rejected Novo's claim that Tresiba was an improvement over existing insulins, even with the price adjustment:

> [W]e have not been able to convince the authorities of any access is France.  It's very, very difficult in France to get recognition of any scientific significance, and this of course makes it very difficult to discuss reimbursement in France.  And we've already mentioned the discontinuation of Tresiba in Germany.

114.   The "truth" began to emerge in Q2 2016, when defendants announced that Novo's long-term targets were significantly impacted because Novo had to offer PBMs much larger rebates in order to maintain U.S. market share for 2017, as the PBMs did not view Tresiba as being sufficiently differentiated from the competition to warrant premium pricing over existing drugs.  Indeed, UnitedHealth, one of the three major PBMs, would not even cover Tresiba precisely because it was no better or different than existing drugs.  Novo's share price dropped over 10% on this news,  and continued to drop as it became more and more apparent that Tresiba could not "save" Novo from the increasing U.S. pricing pressure, as Novo had claimed.

115.   For example, Novo made the following statements during the Class Period building up Tresiba and indicating that Tresiba would be the reason why its profit growth would not be as impacted by increased U.S. pricing pressure as that of its competitors:

- April 30, 2015 earnings call regarding 1Q15 results:  An analyst asked, "[d]o you actually believe you could come back to double digit growth in the insulin market alone with the environment we see right now?"  Novo responds:  "Basically, *it's our anticipation that if and when we get approval for Tresiba in the US and when we are able to launch the degludec [Tresiba] family in the US, that will allow us to achieve 10% or more top-line growth in the diabetes market*."

- September 28, 2015 conference call about Tresiba FDA approval, Novo stated:  "*[W]e do believe that we have a superior label [on Tresiba] to the competing product out there*, being it Lantus or being it Trajenta.  Therefore, *we do believe that a modest premium would be warranted once we present the long-action profile; the long half-life; the flexibility; the dosing; the new device.  I think all of those will warrant*

- 58 -

*a modest premium* . . . .  We are of the opinion that we'd rather have a more steady penetration into the marketplace, *given that we believe we have the premium product*."

- October 29, 2015 Q3 earnings call, in response to a question about whether Lilly's launch of its biosimilar to Lantus will affect Novo, Novo stated:  "I think when you compare what Sanofi has been out with and us, you could say *we talked about Sanofi being pressured on both sides, so part of it coming from the – what Tresiba delivered.  So, when we look at our situation, Tresiba is of course – is positive, so we can add that in*. . . .  [T]he biosimilar versions of glargine up against Lantus is more a dynamic within the glargine area and has limited impact – direct impact on our current sales of Levemir where that takes place.  And I've said, *on top of that, where we are then in a position where we can promote Tresiba, we sort of further withdraw ourselves from that dynamic.  So, not that you can say it has no impact, but it's much, much less than when you sit and are getting squeezed from both sides, as is the case for others*."

- October 30, 2015 Q3 earnings presentation, in response to a question about "how [] you rationalize your view of the insulin market in the U.S. relative to Sanofi," because "if Sanofi US Lantus is down in teens and are 60% of the market, for you to grow the overall US market implies substantial differentiation on both share and pricing" – Riis responded: "[F]or others, there is the issue that they are both up against a biosimilar version of the product plus a new entrant, being Tresiba.  So that's two things working against them.  *You could say we do not face biosimilar competition in the basal segment.  And Tresiba is, of course, a growth driver for us.  That's why I think the situations are distinctly different.*"

- November 19, 2015 conference call:  "The historical price increase was driven by the US.  We think that is, to a significantly less degree, an opportunity going forward.  So we do not see this as a price-increase driven growth strategy.  But when it comes to market share, *we believe that we can reverse the market share trend for Novo Nordisk, based on the portfolio we have.  We have seen clear signs of that in the markets where we have launched Tresiba, that it is indeed capable of a taking a good share of the market* . . . the *biggest driver comes from converting from . . . human to modern insulin to next generation insulin*

[*Tresiba*] . . . .  [W]e believe that we are well positioned to both ***pursue the high end of the market, based on innovation***."

- November 19, 2015 conference call, in response to question about "[s]ince your competitors are so pessimistic, in particular Sanofi, how can you be so optimistic" in light of the "increased competition in the US market":  "So I think the case for Sanofi and Novo Nordisk is quite different.  They have done an excellent job so far in establishing, say, the gold standard in the basal segment.  ***We are now coming with the next-generation product, Tresiba, which we strongly believe is superior*** . . . . ***So we will be taking share*** . . . .  ***We can take share in the market. Then we will be pushing products up based on innovation that can get an average net take-home price at slightly higher than what we have today*** . . . ."

- November 19, 2015 conference call, in response to a question how low Novo would go on the price of Levemir to maintain market share: "[O]ur policies would be that ***there would be three levels of products. There will be Tresiba, where we will be less inclined to offer a rebate because of the premium characteristics of this product.***  Then there will be Levemir [which] will be rebated and priced on par with Lantus.  And then there will be [Basaglar], where the rebates have to be deeper to get access."

- February 3, 2016 earnings call re: 2015 results:  "***In the US, Tresiba was launched in January this year.  The initial feedback from physicians and patients are encouraging.  The dialogue with payers regarding formulary access is ongoing and coverage is increasing***."

- February 4, 2016 earnings presentation re: 2015 results, in response to a question about "the biggest risk" to Novo achieving 10% growth:  "[T]he biggest risk is failure of Tresiba in the United States or a dramatic change in the pricing environment for basals in the United States based on introduction of generic versions.  ***I don't think any of the two variants are rather likely, because we know from experience, and Lars Jørgensen demonstrated in markets outside the US that are often much more restrictive how well Tresiba has been doing.  So I think the clinical differentiation for Tresiba is there.  I still think it is possible to launch better product with a marginal premium, and we're doing in United States with some success.***  So I'm less worried about that."

- May 3, 2016 earnings presentation re: 1Q16 results, in response to whether there will be price pressure "across classes" of diabetes products: "I'll start by trying to address how we look at it from a payer perspective by first saying that *clearly in the US market there is an opportunity to sell innovative products also at a high price . . . there's a willingness to pay for innovation . . . we still see that a product like Tresiba in the basal segment is differentiated and there'll be a preference for such a product*. And you – *we can uphold the value of all of our portfolio based on that*."

116.   Analysts credited Novo's statements, reporting Tresiba would be the reason Novo could reach its long-term targets:

- Morningstar, August 6, 2015:  "Despite Novo's diversification, *the firm's long-term pricing power will be heavily influenced by Tresiba's prescribing label in the U.S. and future data, but we're bullish on Tresiba's ability to differentiate*."

- Barclays, August 7, 2015:  "Our feeling was that if Novo could keep the net pricing of Levemir flat to growing low single digits through 2015, *it could drive positive price/mix in its US basal insulin franchise through the launch of Tresiba even with competitor Lilly coming in with its glargine biosimilars 2016 onwards*."

- Morgan Stanley, September 28, 2015:  "*FDA's approval of Novo's new insulin Tresiba is a key milestone – label is close to our expectations . . . it could in our view trigger an upgrade of Novo's long-term targets*."

117.   As explained further below, the "truth" about Tresiba began to emerge on August 6, 2016, when Novo admitted that in many channels Tresiba had failed to generate premium pricing over Levemir, a drug that had been on the market for over a decade, since 2005.   Despite this, in Novo's 2Q16 earnings disclosures, and throughout the remainder of the Class Period, defendants continued to maintain that

- 61 -

Tresiba was a superior drug capable of warranting premium pricing, including statements that:

- "[W]ith Tresiba and with the improved label, I think we'll be standing in a position two, three years from now where it's being clear that we have the leading product in the basal segment."

- Stating that, in a year from now: "[W]e'll see a bifurcation of the basal market. So, there will be one group of products which would be viewed as similar. That would, of course, in particular, be Lantus and Basaglar, because they are biosimilars. Then it will be [a] question mark whether Toujeo will fall in that category . . . then we have Levemir. So, all these products, in my view, would hopefully fall in one category and then we have, based on our expectation, that the SWITCH data will be able to improve the label of Tresiba, then we will find Tresiba in a separate category of the basal market. So this will be our approach to any review that is taking place by the big payers and then we hope to be successful in doing that."

118. Ultimately, it was clear that Tresiba was a disappointment, that it was not a "premium product," that much of the market share it was gaining was from Novo's own drug Levemir, and that it could not support Novo's continued profit growth in the increasingly challenging U.S. market.

## H.   Public Outrage about Prohibitive List Prices Severely Impacted the U.S. Insulin Market

119. As the Class Period progressed, and Novo's and its competitors' insulin-drug list prices continued to rise, insulin drugs became unaffordable for many patients who (by virtue of high-deductible health plans or otherwise) were forced to pay full benchmark prices for their medicine. This public pressure – which coincided with public discussion of and outrage over ballooning prescription-drug prices more

- 62 -

generally – placed the U.S. insulin market under scrutiny and led to multiple government investigations into potential misconduct by the insulin companies and the PBMs.  That pressure also made it increasingly unpopular and difficult for Novo and its competitors to keep raising their list prices as they had been for years, cutting into the drug makers' earnings.

120.   Towards the end of October 2015, Sanofi ended Lantus' extended period of lockstep list price increases alongside Novo's Levemir.  Simultaneously, as discussed above, Sanofi slashed its three-year forecast for diabetes sales, and provided guidance for sales growth of -4% to -8% through 2018.  CVS excluded Lantus from its national formulary, which removed 19 million patients from the Lantus market.

121.   During a UBS Global Healthcare Conference in May 2016, CVS further pledged to respond to public pressures and help lower insulin prices, citing the "rhetoric in the market about the potential of health plans to in-source their PBM functions" as an additional market-based pressure.

122.   On June 8, 2016, during a Global Healthcare Conference hosted by Goldman Sachs, an analyst noted that "*[p]ricing in diabetes has been rather challenging for the last maybe four or five years, maybe even longer*," and asked what Eli Lilly was "seeing in pricing."  In response, Eli Lilly Diabetes President Enrique Conterno described how market pressures were forcing the insulin makers to accept lower net pricing in order to maintain market share:  "Clearly, ***consolidation of***

- 63 -

***payers and the narrowing of formularies create significant pressures when it comes to pricing.*** We try to be smart about our contracting and we want business that is profitable and sustainable longer term.  So, we think about contracting on that basis. . . .  We're interested in, basically, having sustainable share."

123.    For Novo, increased scrutiny and pricing pressures meant that defendants could no longer deny the substantial decline in earnings that the Company was facing. On August 5, 2016, the Company announced its earnings for the first six months of 2016.  Novo announced disappointing earnings results and disclosed that it faced mounting pressure against continuing list-price increases, and reported that, after completing formulary negotiations with PBMs, net prices were expected to be lower in 2017, due in part to "***a challenging pricing environment especially in the basal insulin***," or Levemir, segment.  Novo reported increasing pricing pressure across much of the Company's insulin portfolio, and downwardly adjusted its forecasts for sales growth for the year to 5-7% (from 5-9%), and its operating-profit growth to 5-8% (from 5-9%).

124.    In those disclosures Novo also admitted that, while "in certain channels, we are able to distinguish between Levemir and Tresiba, Tresiba being a higher priced product and therefore, taking home a higher net then Levemir," in other channels, "we have to be more aggressive to get Tresiba onto the market, and there would be then, in some channels, no premium to Levemir or to Lantus for that matter."

125.   The markets were surprised by Novo's negative earnings announcement and adjusted forecast given Novo's prior denials that the same pricing pressures affecting its competitors would drive down Novo's earnings as well.  In an August 5, 2016 analyst report, Deutsche Bank reported that Novo finally acknowledged the "elephant in the room" concerning intensifying pricing pressures, which "unnerved" investors and "created a stampede."  Similarly, on August 8, 2016, SEB Equities reported that "***it is [] evident that Novo had to offer large discounts across its franchise in order to maintain market access***," and it is an "ongoing challenge for Novo Nordisk to convince the largest PBM in the US market, Express Scripts, to include its products on their national drug lists."

126.   Analysts also commented on the growing realization, as a result of defendants' disclosures, that Tresiba was not a "premium product" able to "save" Novo's profit growth from the significant U.S. pricing pressures its competitors were facing.  For example:

- Morningstar, August 5, 2016:  "Management sees low to mid single digit pricing pressure on its U.S. diabetes franchise for 2017, as the firm was forced to offer Tresiba at pricing parity to Levemir and Lantus through some channels to maintain patient access."

- JP Morgan, August 9, 2016:  "Novo have acted to protect the volume opportunity of Tresiba . . . .  This has led them to prioritise access for Tresiba in the US rather than maintain the modest premium pricing. This has meant that in addition to the price concessions on Levemir (largely expected by the market), Novo have had to also take price cuts on Tresiba in 2017 (more of a surprise to investors)."

- Kepler Cheuvreux, August 9, 2016: "Tresiba and semaglutide are about as good as it will get, yet payers seem less willing than ever to pay a premium for these profiles. . . .  The reality has become this:  major net pricing upgrades in the US for Tresiba over Levemir are the exception and not the norm.  Concessions on Tresiba price have also been essential in many EU markets to get traction after some 'disappointing' launches there."

127.    In response to defendants' disclosures, Novo ADRs dropped $5.33 per ADR from a closing price of $55.20 per ADR on August 4, 2016 to close at $49.87 on August 5, 2016, a significant decline of 10.15%.  Further, on August 8, 2016, the next trading day following Novo's August 5 earnings release, the market continued to react to the Company's August 5 disclosure.  Novo ADRs fell by an additional $2.47 per ADR, closing at $47.13 per ADR, a statistically significant decline of 5.65%.  In total, between August 5 and 8, 2016, the price of Novo ADRs fell by $7.80 per ADR, or 12.83%.

128.    The full truth about Novo's exposure to pricing pressures and their effect on earnings remained hidden from investors, however, as defendant Sørensen attempted to reassure investors on the Company's August 5, 2016 earnings call by telling them that "we will see . . . more support for growth" in the coming year, specifically that "[w]e see very strong script growth, we see relatively more stable pricing, even in some instances opportunities to raise net price slightly. . . .  I still think it is reasonable for us to have as an ambition, to grow our diabetes portfolio with 10%."

- 66 -

129.   Less than a month later, on September 1, 2016, Novo suddenly announced that after 16 years at Novo, defendant Sørensen would leave the Company by the end of 2016.   That announcement was particularly surprising given that the Company had announced on April 30, 2015 that Sørensen would remain in his role through the end of his contract, which was due to expire in 2019.   Also on September 1, Novo announced the departure of Høiland, the Company's head of North America Operations, and several other senior executive changes.

130.   A Morgan Stanley analyst report issued on September 1, 2016 expressed concern about the organizational changes at Novo and reported that the changes signaled deeper problems, writing that given Novo's "very stable and conservative organization," Sørensen's and Høiland's departures reflected "unprecedented challenges such as US payer pressure and increased competition."

131.   On September 21, 2016, one of the three major PBMs – UnitedHealth – released its formulary list for 2017.   Tresiba was not covered (and Levemir was downgraded to "tier 2," in favor of Basaglar, Eli Lilly's cheaper biosimilar drug).   The reason UnitedHealth gave for excluding Tresiba was that it was not differentiated enough:

> JP Morgan Cazenove, September 21, 2016:  "As we expected, UnitedHealth still do not include Tresiba on their 2017 prescription drug list as **they still believe it is not differentiated enough to warrant the price premium**.  In order to promote biosimilar Lantus (Basaglar – Eli Lilly) use UHC have downgraded Levemir from tier 1 to tier 2 access, increasing the copay for patients."

- 67 -

132.   On September 29, 2016, Novo announced that it was laying off approximately 1,000 employees in order to "reduce operating costs as the company faces a challenging competitive environment in 2017, especially in its large US market."  In response to this disclosure, Novo ADRs dropped $1.94 per ADR from a closing price of $43.74 per ADR on September 28, 2016 to close at $41.80 on September 29, 2016, a significant decline of 4.54%.

## I.      Government Investigations and Legislative Action Related to the U.S. Insulin Market and Rebates to PBMs

133.   On September 29, 2016, *The Hill* published an article by Georgia Congressman Earl L. "Buddy" Carter, a member of the House Oversight Committee, titled "The man behind the curtain in drug price increases."  Carter stated:  "it's time to start paying attention to the man behind the curtain.  In the drug pricing equation, that is the Pharmacy Benefit Manager . . . it's hard to understand what value they bring to the health care system at all. . . .  *For manufacturers and distributors, questioning a PBM could result in their medications being shut out of a formulary list and therefore out of the reach of most patients*."

134.   In October 2016, The National Community Pharmacists Association urged the House Committee on Oversight and Government Reform to investigate PBMs and convene a hearing to determine PBMs' role in drug costs.

135.   On October 28, 2016, Novo announced its second consecutive quarter of disappointing earnings, including its first decline in U.S. insulin sales, and cut its

- 68 -

long-term profit-growth forecasts by 50%, specifically citing increased pricing pressures on diabetes drugs in the United States.  Novo cited "intensified competition and pressure in the United States," but still claimed "we are confident that our strong product pipeline of innovative products like Victoza, Tresiba and eventually semaglutide will enable us to deliver on our revised growth targets."  Novo nonetheless acknowledged the existence of continuing negative pricing pressure, "especially for the modern insulin, but also with [regard] to Tresiba and the premium that we are able to obtain on Tresiba in the US":

> Since February 2016, the market environment in the USA within both diabetes care and biopharmaceuticals has become significantly more challenging, negatively impacting future pricing for Novo Nordisk's products, especially for insulin and human growth hormone products.  Consequently, Novo Nordisk no longer deems it achievable to reach the operating profit growth target of 10%.  As a result hereof, the target has been revised and Novo Nordisk is now aiming for an average operating profit growth of 5%.

136.  Novo also once again cut its sales growth (to 5-6% from the 5-7% forecast the prior quarter) and operating-profit growth targets (to 5-7% from 5-8%).  Novo further disclosed that it expected flat to low-single-digit percentage growth in operating profits for 2017, and low-single-digit percentage growth in sales for 2017.  In addition, Novo announced that due to pricing pressures, it was forced to significantly cut costs and reduce the amount that it could invest in researching and developing new drugs.  As analyst Leerink reported in response, "***NVO mgmt finally owned up to the significant challenges it faces in the years ahead***."

- 69 -

137.   In a telling reversal of the pattern that emerged earlier in the Class Period – where Sanofi and Eli Lilly reported earnings misses and lowered forecasts, with analysts asking Novo why its financial reports were far more positive – analysts were keenly aware that Novo was reporting poor earnings while its competitors had already adjusted to market pressures.   On Sanofi's October 28, 2016 earnings conference call, a BAML analyst stated that he was "just trying to square the circle on **why Novo is changing guidance into 2017 and beyond and Sanofi isn't.**"  Sanofi CEO Oliver Brandicourt responded that it had already disclosed and adjusted its forecasts to the pricing pressures that had been present in the U.S. insulin market for years:

> [W]hy don't we change our guidance and Novo did . . . . I think it's fair to assume that when we issued our guidance two years ago, the famous minus 4% to minus 8%, that we have taken into account a certain number of things that we felt were coming and that it's probably a tribute to, I would say, reasonable and cautious planning when we give our guidances.

Sanofi Executive Vice President Peter Guenter agreed, adding, "[w]ell, on the Novo for let's say the pricing question, of course, as we mentioned, we are disappointed with some of those decisions. . . .  But, again, we anticipated this to some extent and, therefore, we are today in a position to confirm that guidance."

138.   Also on October 28, 2016, Novo announced that it had received a Civil Investigative Demand ("CID") from the U.S. Attorney's Office for the Southern

District of New York seeking information relating to Novo's contracts and business relationships with PBMs.

139.   In response to these October 28, 2016 disclosures, Novo ADRs dropped $5.28 per ADR from a closing price of $40.94 per ADR on October 27, 2016 to close at $35.66 on October 28, 2016, a significant decline of 13.81% - and the largest decline in the price of Novo ADRs in more than 14 years.

140.   Analysts' comments show Novo's stock price continued to drop because the market further understood the truth about the pricing pressures Novo faced, and that Tresiba would not save Novo from those pressures upon these disclosures:

- Morgan Stanley, October 28, 2016:  "We overestimated Novo's ability to innovate to maintain diabetes leadership and superior growth with well designed clinical trials in the context of toughening US market access and increased competition."

- SEB, October 31, 2016:  "Despite having Tresiba available and running huge DTC campaigns, the company has lost momentum and it has only secured a 1% market share gain for Tresiba and Levemir in combination. . . .  Obviously the US pricing environment has been the main contributor to the declining value of Novo's future cash flows, but pricing is only the consequence of something much worse; namely Novo's lack of ability to make innovations.  We actually continue to regard Tresiba as the best insulin in the world, but at the same time it is also obvious that its benefits are too small to drive market share gains."

- Morningstar, October 31, 2016:  "Novo now expects a 5% pricing headwind in the U.S. in 2017 and low single-digit pricing declines beyond, as recent formulary decisions by PBMs have either excluded Novo's products, put them on a less favorable tier, or required steeper discounts for continued strong positioning.  United Healthcare excludes Tresiba and has moved Levemir to tier 2 (from tier 1) beginning in 2017."

- SEB, November 10, 2016:  "[T]he uptake of Tresiba in the US market has so far been disappointing, especially when considering how much of Tresiba's gain has come at the expense of Novo Nordisk's own product, Levemir."

141.   Congress has continued to investigate PBMs' role in drug pricing and, specifically, the pricing pressures that PBMs create in the U.S. insulin market.  On November 3, 2016, Senator Bernie Sanders of Vermont and Representative Elijah Cummings of Maryland sent a letter to the U.S. Department of Justice calling on federal antitrust regulators to probe illegal collusion by Novo and the three other major insulin producers – Sanofi, Eli Lilly, and Merck – to set the prices for insulin and other diabetes drugs.

142.   Further, On November 18, 2016, the American Diabetes Association Board of Directors called on Congress "***to hold hearings to investigate dramatic increases in insulin prices*** and to take action to ensure that people have affordable access to the essential drug."  According to a *Bloomberg* article, "[t]he association also launched a petition, 'Stand up for affordable insulin,' asking people to sign on to let companies and Congress know that greater transparency and attention is needed to soaring insulin prices."

143.   In the face of this pressure, Novo, Sanofi, Eli Lilly, and the PBMs began a series of pledges to appease the public – actions characterized by CVS CEO Merlo as "pharmaceutical companies coming out with, I'll call it, their version of the social contract."  After years of profits flowing from persistent lockstep list price increases

- 72 -

(alongside growing rebates to PBMs), Novo's executives feigned incredulity at the effects of skyrocketing insulin prices on diabetic patients. On November 16, 2016, during an interview with *Bloomberg* defendant Sørensen called for "soul searching on the part of insurance companies, pharmacy benefit managers and pharmaceutical companies." He further stated that "[we] need to come together to ensure we don't get these stories where individuals cannot afford and have access to basic medication. That is simply not acceptable." On December 5, 2016, Novo's president Jacob Riis stated on the Company's website: "[w]hile we can debate who pays what in different scenarios, it doesn't change the fact that many patients simply can't afford the medicine they need." Riis resigned from the Company after 20 years on March 1, 2017 – shortly after being named the Executive Vice President of North American operations.

144.   On November 30, 2016, Novo announced that the Company would limit "any potential future list price increases [for our medicines] to no more than single-digit percentages annually." Shortly thereafter, Eli Lilly offered 40% discounts to the list prices for Humalog, Humulin, and Basaglar. In March 2017, Novo, in partnership with CVS, began offering human insulins at $25 per vial – $100 less than the list price. In May 2017, Sanofi pledged to cap list price increases to the health inflation rate as measured by the Centers for Medicare and Medicaid Services' National Health Expenditure.

- 73 -

145.   In addition, on January 11, 2017, as part of his 2017 State of the State address, New York Governor Andrew M. Cuomo announced a new proposal to "protect consumers from unfair business practices by intermediaries known as Pharmacy Benefit Managers."  Under the Governor's proposal, PBMs will be required to immediately register with the State, and be subject to new regulations requiring disclosure of financial incentives or benefits for promoting the use of certain drugs, as well as other financial arrangements affecting customers.

146.   Against that backdrop of increased public and governmental scrutiny, on February 2, 2017, Novo released its earnings for the fourth quarter and full-year 2016. Novo reported that its U.S. insulin sales had again declined, with fourth-quarter 2016 sales down by 3%.  Novo further lowered its sales-growth guidance to -1% to 4%, and its operating-growth guidance to -2% to 3%, due in part to "***lower realized prices in the USA, especially in the basal insulin***," or Levemir, segment.  The Company finally disclosed that pricing pressures had necessitated and caused a "***transformation of how we conduct business in the US.***"  The Company announced that it had lowered sales growth from a "low single-digit" increase to a range between -1% and 4%, and operating-profit growth from "flat to low single digit" increase to between -2% and 3%.  Further, Novo announced that lower realized prices in the United States were impacting the Company's sales, as PBMs were extracting larger rebates, and net pricing was declining.  In response to this disclosure, Novo ADRs dropped $3.21 per

ADR from a closing price of $36.69 on February 1, 2017 to close at $33.48 on February 2, 2017, a statistically significant decline of 9.10%.

## V.   WITNESS ACCOUNTS

### A.   A Former Novo Employee Confirms that Sørensen's and Høiland's Departures Were Related to Misconduct at the Company

147.   On January 2, 2017, Lundstrom filed a whistleblower action with the SEC alleging that Novo withheld material information from investors and on January 4, 2017, Lundstrom submitted a parallel filing with the FSA.  Lundstrom has had conversations with Novo's head of North America Operations during 2013-2016, Høiland, who as discussed above abruptly left the Company in September 2016.

148.   In their conversations, which occurred after Høiland's departure from Novo, Høiland told Lundstrom that Novo had "fired" both him and Sørensen, rather than the voluntary departures that the Company had publicly disclosed.

149.   Høiland also described to Lundstrom multiple conversations that he had with Novo executives as early as the beginning of 2015 about the unsustainability of Novo's financial forecasts.  According to Lundstrom, Høiland recounted regular trips to meet with senior Company management in Denmark, where Høiland informed senior management that Novo could not maintain its revenues long term, and would not meet the Company's long-term growth targets due to pricing pressures in the U.S., including from PBMs.  Høiland also warned that the Company would not be able to

drive profits through innovative products, because insulin is already highly effective and a mature product without much opportunity for meaningful improvement.

150.   In response to Høiland's dire warnings, Novo's senior management excoriated him, telling Høiland that it was his responsibility to meet the Company's forecasts and, if Novo did not, that Høiland would be fired.

151.   Lundstrom also reported that high-level Novo executives would have discussed the Company's unsustainable long-term forecasts during regular "forecast meetings," where lower-level employees discuss the bases for their projections directly with management.  As a matter of fact, Novo touts on its website that they strive to have the pharmaceutical industry's best financial forecasting reporting system.

## B.   Other Former Novo Employees Detail Defendants' Misconduct

152.   Other former Novo employees have provided information demonstrating that defendants' Class Period statements were false and misleading and that defendants knew or recklessly disregarded the falsity of their statements.  The former employees include individuals employed at Novo during the Class Period, whose accounts corroborate one another and Novo's eventual disclosures.  The former employees provided information on a confidential basis and are particularly described by their job descriptions, responsibilities, and durations of employment, thereby providing sufficient detail to establish their reliability and personal knowledge.  As set

- 76 -

forth below, the information provided by the former employees supports a strong inference that defendants acted with scienter.

153.  The Diabetes Marketing VP was Novo's Vice President of Diabetes Marketing for seven years until early 2016.  He was particularly responsible for Novolog and Novolog Mix 70/30, which combined to make up a huge part of the company's revenues.  The Diabetes Marketing VP also sat on Novo's PPC, which analyzed the U.S. pricing environment and attempted to develop realistic expectations for future business at Novo.  On a quarterly basis, the PPC formulated recommendations and recorded them on business updates called "revised estimates" ("REs").  The Diabetes Marketing VP and other PPC members presented the recommendations directly to U.S. executives, including Høiland, who then relayed the information to executives in Denmark.  When the issue involved a contract with a large PBM, like Express Scripts, CVS, or UnitedHealth, the U.S. executives would consult directly with Sørensen or Brandgaard.

154.  The REs created by the Diabetes Marketing VP and the other PPC members repeatedly highlighted the issues Novo was having with the PBMs, such as pricing pressure, rebate requests, and the PBMs' desire to renegotiate contracts before they expired.  The Diabetes Marketing VP recalls that in or around 2015, U.S. executives reported to Denmark that the Company was "under huge pressure from payers" and the "the leverage has shifted."  Thereafter, the U.S. team repeatedly told

- 77 -

Denmark that they were not going to be "anywhere near expectations." The Diabetes Marketing VP recalls that the U.S. staff was "screaming that we were under pressure on price." In response, Denmark executives such as Jørgensen, Sørensen, and Kåre Schultz said, "[t]oo freaking bad" and maintained forecasts. The Diabetes Marketing VP and other members of the PPC received this same message from U.S. executives when they voiced their concerns. The executives said "Great. We hear you. We got it. Too bad. Deliver this number."

155. The Diabetes Marketing VP and his colleagues heard the forecasts Novo executives made on earnings calls and elsewhere, including forecasts for Tresiba. He said everyone thought the projections were ridiculous because they were so unrealistic. He recalls that Bill Breitenbach, who spoke directly to Denmark executives about the PPC's recommendations, thought they were lacking any reasonable basis. Breitenbach told The Diabetes Marketing VP that "we are not going to get Levemir plus 10% or 20% pricing for Tresiba." The Diabetes Marketing VP also thought defendants' reliance on Tresiba was patently overblown, and described how PBMs "just don't care" about the incremental improvements from one generation of insulin drugs to the next. He also said Novo got "significantly less" than it wanted on the Tresiba label. The Diabetes Marketing VP described Tresiba as a "big puff of hot air" that is not clinically differentiated to do anything.

156.   In sum, The Diabetes Marketing VP claimed the executives in Denmark were "turning a blind eye" to the U.S. pricing environment.

157.   Defendants' fraudulent misconduct is also evidenced by the accounts of a former Novo employee (the "Regional Market Access Director") who worked at Novo for 16 years until the end of 2016.  During the relevant period, the Regional Market Access Director had eight account managers who reported to him.  In this capacity, the Regional Market Access Director dealt with PBMs, such as Express Scripts and UnitedHealth.  The Regional Market Access Director recalled when Express Scripts threw almost all of Novo's products off formulary, and further explained that it is very difficult to get back on formulary once the PBM has an exclusive contract with another company.  The Regional Market Access Director noted that Novo provided "very significant" discounts to get CVS's business after it lost Express Scripts because the Company could not lose any more business.

## VI.   POST-CLASS PERIOD DEVELOPMENTS

### A.   Novo Has Admitted Misleading Investors Concerning the Unlawful Rebate Scheme

158.   Since the close of the Class Period, defendants finally have admitted the extent of the pricing pressures created by the rising rebate levels to PBMs.  On February 9, 2017, Novo filed its 2016 Annual Report on Form 6-K stating that:

> The organisations with which Novo Nordisk negotiates rebates and access for its products are the pharmaceutical benefit managers (PBMs), which have seen their negotiating power increase due to a wave of

consolidation that has left only a handful of very large PBMs. At the same time, competition among the pharmaceutical companies within diabetes care intensified as new products entered an increasingly crowded marketplace. As a consequence of these developments, and as we announced in our half-year financial statement, contract negotiations for 2017 resulted in higher-than-anticipated rebates to obtain broader coverage for our products.

159.   As Novo continued to explain the *quid pro quo*, "*[t]he most prominent market risk materialising in 2016 was a more challenging business environment in the U.S.*  This was caused by a combination of several factors: through a wave of mergers and acquisitions, the main purchasers of medicines – pharmaceutical benefit managers (PBMs) – had strengthened their negotiating power, forcing pharmaceutical companies to either *increase their rebates to get their products onto the PBMs' lists of approved, reimbursed products – or lose the contract*."

160.   While certain of Novo's competitors acknowledged throughout the Class Period that revenue from their insulin franchises would dwindle given the increased pricing pressures from PBMs and government authorities, Novo falsely assured investors otherwise by maintaining its sales and operating profit growth guidance.

## B.   Novo Faces Additional Governmental Pressure and Investigations

161.   On March 3, 2017, Sanofi filed its 2016 Annual Report.  In that report, Sanofi disclosed that much of the pricing pressure affecting the U.S. insulin market was the result of governmental pressure and investigations, as well as public outcry over rising prescription drug costs.  According to Sanofi,

Affordability is a key concern globally.  *In 2016, patient, payer, and politicians' concerns about drug prices, reimbursement, and access reached new levels, generating headlines particularly in the US and Europe.*  The pricing of products as varied as insulin, generics, mature products, and new cholesterol-lowering biologics all have come under scrutiny, with patient activism and social media playing a new and distinctive role.

That public pressure, and governmental investigations, only intensified throughout 2017.

162.   On March 2, 2017, Congressman Doug Collins of Georgia introduced H.R. 1316, the Prescription Drug Price Transparency Act.  Rep. Collins described the act as designed to take pricing leverage away from PBMs, with the stated purpose of "protect[ing] taxpayers and the community pharmacists who serve them by requiring greater transparency from [PBMs]."  Collins stated:  "PBMs engage in predatory practices designed to boost their own profit margins at the expense of insurers, contracting pharmacies, patients, and – in their relationships with federal programs – taxpayers.  The lack of transparency in their operations has allowed them to control the market unjustly, with the result that these companies withhold savings that they have promised to pass on."

163.   On March 7, 2017, the Washington State Attorney General's office served Novo with a CID, demanding documents related to pricing and trade practices for Novo's insulin drugs dating back to Jan. 1, 2005.  The New Mexico Attorney

General's office made a similar demand on April 26, 2017, for documents and information on pricing of NovoLog and Novolin insulins beginning in January 2010.

164.   On March 15, 2017, U.S. Senator Ron Wyden of Oregon introduced legislation to the Senate Finance Committee that, similar to Rep. Collins's proposal in the House of Representatives, is designed with the goal to improve transparency between PBMs and drug makers.  The legislation, titled the "Creating Transparency to Have Drug Rebates Unlocked (C-THRU) Act," would require public disclosure of the total amount of rebates provided by manufacturers to PBMs and the proportion of those rebates that are passed on to health plans.  Sen. Wyden stated that "[i]t is time to lift the veil of secrecy on a powerful industry that claims it is bringing down the price of medicine that Americans pick up at their pharmacy . . . . Today the public knows virtually nothing about whether pharmaceutical benefit managers are saving money for the consumer or pocketing for itself."

165.   Similarly, in April 2017, the California Assembly Committee on Business and Professions voted in favor of AB 315, a PBM "transparency" law.  AB 315 would amend the California Business and Professions Code: (a) to require PBMs to obtain licensure from the state's Board of Pharmacy, (b) to state that PBMs have fiduciary duties to their "purchaser" clients (*i.e.*, health plans), and (c) to require PBMs to disclose to their purchaser clients' data regarding drug costs, rebates, and fees earned.

166. Moreover, on July 3, 2017, Senator Amy Klobuchar of Minnesota sent letters to the CEOs of Novo, Sanofi, and Eli Lilly, raising concerns about rising insulin-drug prices and demanding "*a written explanation for your continued insulin price increases and any documents examining the impact of list price increases on people with diabetes*."

## VII. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

### A. Novo's Earnings Release for the Fourth Quarter and Full-Year 2014

167. On February 3, 2015, the first day of the Class Period, Novo filed its 2014 Annual Report on Form 6-K with the SEC. The 2014 Annual Report, along with its materially false and misleading statements, was incorporated by reference into Novo's SEC filings throughout the Class Period, including the (i) 1Q15 6-K, (ii) 2Q15 6-K, (iii) 3Q15 6-K, and (iv) 2015 20-F.

168. In the 2014 Annual Report, Novo stated, in part:

> *We never compromise on quality and business ethics*.

*       *       *

> All over the world, payers – governments and insurance companies representing employers – try to limit the growth in healthcare costs that follow from ageing populations and demands for higher quality of care. Drug prices and reimbursement are often among the first areas to be targeted by such efforts. In the U.S. and other countries where large parts of the market are based on free pricing, this leads to tougher rebate negotiations with the large purchasing organisations. . . .

> ***However, Kare Schultz does not agree with the widespread notion that the business model of the pharmaceutical industry is undergoing fundamental changes as a result.*** "Our business model and reason for being is, and will continue to be, developing new and better medical treatments and making them available to the patients who need them."

*   *   *

> The North American region consists of the U.S. and Canada and is Novo Nordisk's largest in terms of sales. Novo Nordisk has experienced tremendous growth in the US in recent years.  Since 2010, sales in North America have grown from 23.5 billion Danish kroner (4.3 billion US dollars) to 43 billion kroner (7.8 billion US dollars) in 2014.  Sales in the US account for more than 90% of the region's total sales. . . .

> The main drivers of sales have been – and continue to be – the portfolio of modern insulin and Victoza®.  In 2014, sales of diabetes care products increased by 11% in local currencies in North America. This reflects continued market penetration by the modem insulins, especially Levemir® . . . .

169.   In the 2014 Annual Report, Novo also reported United States sales of NovoLog, Novolog Mix, and Levemir as set forth in Appendix 1, attached hereto.

170.   The Form 6-K, to which the 2014 Annual Report was attached and submitted to the SEC, was signed by defendant Sørensen and contained a "Statement by the Board of Directors and Executive Management on the Annual Report" stating that "the Board of Directors and Executive Management approved the Annual Report of Novo Nordisk A/S for the year 2014."  Executive Management included defendants Sørensen and Brandgaard.   In addition, the Board and Executive Management affirmed that "[i]n our opinion, the Consolidated financial statements and the Financial statements of the parent company give a true and fair view of the financial

- 84 -

position at 31 December 2014, the results of the Group's and parent company's operations, and consolidated cash flows for the financial year 2014. Furthermore, in our opinion, Management's Review includes a true and fair account of the development in the operations and financial circumstances, of the results for the year, and of the financial position of the Group and the parent company as well as a description of the most significant risks and elements of uncertainty facing the Group and the parent company."

171.   By virtue of the facts alleged herein, the statements referenced in ¶¶168-170 were materially false and misleading.  Considered as a whole, defendants' statements misled investors by presenting a materially false and misleading picture of Novo's business, financial results, operations and compliance policies by, among other things, failing to disclose and actively concealing that the Company had engaged in an improper scheme to provide kickbacks to the PBMs in order to gain access to the PBMs' formularies, maintaining that Novo was not subject to the pricing pressures that finally came to bear on the U.S. insulin market, and falsely representing that Tresiba would insulate the Company from those pricing pressures.  In particular, defendants knew or recklessly disregarded that:

(a)     The statements referred to above about pricing, pricing pressure, tougher pricing and rebate environment, and higher rebates in the U.S. marketplace for insulins were materially false and misleading because defendants failed to disclose

- 85 -

that the pricing for insulins was the product of a scheme to kickback money to the PBMs in order to secure Novo's position on the PBMs' formularies;

(b)     The statements referred to above in which defendants reassured investors that Novo's earnings were reliable and not at risk, were materially false and misleading because increasing rebate levels in the industry were coming to bear on Novo and causing a negative impact on the Company's earnings;

(c)     The statements referred to above about market access and market share were materially false and misleading because defendants failed to disclose that Novo's access to the U.S. insulin markets required Novo to provide the PBMs with ever-increasing kickbacks, which meant the PBMs completely controlled the markets; and

(d)     The statements referred to above about insulin sales and sales growth were materially false and misleading because insulin sales were artificially inflated by anticompetitive activities among the insulin manufacturers and the PBMs.

## B.     Novo's Earnings Release for the First Quarter 2015

172.   On April 30, 2015, Novo published its financial report for 1Q15, filed as Form 6-K with the SEC on May 5, 2015, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2015 (the "1Q15 6-K").

173.   In the 1Q15 6-K, Novo stated, in relevant part:

Sales of modern insulin increased by 23% in Danish kroner and by 8% in local currencies to DKK 11,498 million [USD 1,736 million]. ***North America accounted for 52% of the growth,*** followed by International Operations and Region China. Sales of modern insulin and new-generation insulin now constitute 80% of Novo Nordisk's sales of insulin measured in value.

*       *       *

**Sales growth** for 2015 is now expected to be 7–9% measured in local currencies. This reflects expectations for ***continued robust performance for the portfolio of modern insulin, Victoza® and Tresiba®*** as well as a modest sales contribution from the launches of Saxenda®, Xultophy® and NovoEight®. These sales drivers are expected to be partly countered by an impact from increased rebate levels in the US, intensifying competition within diabetes and biopharmaceuticals as well as macroeconomic conditions in a number of markets in International Operations.

174.   In the 1Q15 6-K, Novo also reported United States sales of NovoLog, Novolog Mix, and Levemir as set forth in Appendix 1, attached hereto.

175.   The 1Q15 6-K was signed by defendant Sørensen and contained a "Management Statement" stating "[t]he Board of Directors and Executive Management have reviewed and approved the financial report of Novo Nordisk A/S for the first three months of 2015."  Executive Management included defendants Sørensen and Brandgaard.  In addition, the Board and Executive Management affirmed that "[b]esides what has been disclosed in the quarterly financial report, no changes in the Group's most significant risks and uncertainties have occurred relative to what was disclosed in the consolidated annual report for 2014."

176.   On April 30, 2015, Novo also held an earnings call. On the call,

defendants reiterated the results and gave additional false and misleading information

in response to analysts' questions, including:

Terence McManus – Credit Suisse – Analyst: . . . I was wondering whether you have had any payers in the US or other key markets come back to you to renegotiate the Levemir contracts following the launch of Toujeo?

\*       \*       \*

Lars Rebien Sørensen – Novo Nordisk A/S – CEO: Yes, thank you. And the first question, Levemir Toujeo introduction, no, we have not seen any contract being reopened. ***And in general, our expectation for the pricing of our portfolio in the US remains the same as we announced in connection with the annual result***.

\*       \*       \*

Martin Parkhoi – Danske Bank – Analyst: . . . If we look at the insulin market and the three big players which now have reported Q1, I can see that underlying growth for these three players combined is something between 1% and 2%, which of course is driven by the – of course, this big decline in Lantus, but also the pressure on prices US.

Do you actually believe you could come back to double-digit growth in the insulin market alone with the environment we see right now? That was the first question.

And in that context, you could of course comment on the development you've seen in US for your products, where we have seen a negative price impact in the first quarter but you still expect a positive or flat effect for the full year.

\*       \*       \*

Lars Rebien Sørensen – Novo Nordisk A/S – CEO: Thank you very much, Martin. I will give you my point of view on the Tresiba growth story and the US pricing. ***Basically, it's our anticipation that if and when we get approval for Tresiba in the US and when we are able***

- 88 -

***to launch the degludec family in the US, that will allow us to achieve 10% or more top-line growth in the diabetes market.***

177.   On May 5, 2015, defendants made an earnings presentation, where they again reiterated the financial results from the 1Q15 6-K.   They also made the following false and misleading statements:

Jesper Brandgaard – Novo Nordisk A/S – EVP, CFO:  . . . ***The sales outlook has been updated and we've narrowed in the range, so now we expect the sales growth of 7% to 9%*** and a significant positive currency impact of around 16%. So in reported terms it will be between 23% to 25% given the rates we used for the guidance.

178.   By virtue of the facts alleged herein, the statements referenced in ¶¶173-177 were materially false and misleading.   Considered as a whole, defendants' statements misled investors by presenting a materially false and misleading picture of Novo's business, financial results, operations and compliance policies by, among other things, failing to disclose and actively concealing that the Company had engaged in an improper scheme to provide kickbacks to the PBMs in order to gain access to the PBMs' formularies, maintaining that Novo was not subject to the pricing pressures that finally came to bear on the U.S. insulin market, and falsely representing that Tresiba would insulate the Company from those pricing pressures.   In particular, defendants knew or recklessly disregarded that:

(a)   The statements referred to above about pricing, pricing pressure, tougher pricing and rebate environment, and higher rebates in the U.S. marketplace for insulins were materially false and misleading because defendants failed to disclose

- 89 -

that the pricing for insulins was the product of a scheme to kickback money to the PBMs in order to secure Novo's position on the PBMs' formularies;

(b)     The statements referred to above in which defendants reassured investors that Novo's earnings were reliable and not at risk, were materially false and misleading because increasing rebate levels in the industry were coming to bear on Novo and causing a negative impact on the Company's earnings;

(c)     Defendants representations above that Tresiba would insulate Novo from U.S. pricing pressures, including statements concerning Tresiba's attributes and Novo receiving premium pricing and paying lower rebates for Tresiba's placement on the PBMs' formularies, were false and misleading because Tresiba's perceived innovations were not nearly enough to warrant such benefits from the PBMs, which, as defendants knew, were primarily concerned with increasing their kickbacks in exchange for formulary access;

(d)     The statements referred to above about competition in the U.S. insulin marketplace, including that competition was getting tougher and intensifying, were materially false and misleading because the market for insulin was collusive and lacked true competition;

(e)     The statements referred to above about market access and market share were materially false and misleading because defendants failed to disclose that Novo's access to the U.S. insulin markets required Novo to provide the PBMs with

- 90 -

ever-increasing kickbacks, which meant the PBMs completely controlled the markets; and

(f)     The statements referred to above about insulin sales and sales growth were materially false and misleading because insulin sales were artificially inflated by anticompetitive activities among the insulin manufacturers and the PBMs.

## C.     Novo's Earnings Release for the Second Quarter 2015

179.   On August 6, 2015, Novo published its financial report for 2Q15, filed as Form 6-K with the SEC on August 7, 2015, announcing certain of the Company's financial and operating results for the first half of 2015 and the quarter ended June 30, 2015 (the "2Q15 6-K").

180.   In the 2Q15 6-K, Novo stated, in relevant part:

Sales of modern insulin increased by 22% in Danish kroner and by 6% in local currencies to DKK 24,102 million [USD 3,603 million]. North America accounted for 50% of the growth, followed by International Operations and Region China. Sales of modern insulin and new-generation insulin now constitute 81% of Novo Nordisk's sales of insulin measured in value.

\*        \*        \*

**Sales growth** for 2015 is expected to be 7–9% measured in local currencies. This reflects expectations for continued robust performance for the portfolio of modern insulin, Victoza® and Tresiba® as well as a modest sales contribution from the launches of Saxenda®, Xultophy® and NovoEight®. These sales drivers are expected to be partly countered by an impact from increased rebate levels in the US, intensifying competition within diabetes and biopharmaceuticals as well as macroeconomic conditions in China and a number of markets in International Operations.

181.   In the 2Q15 6-K, Novo also reported United States sales of NovoLog, Novolog Mix, and Levemir as set forth in Appendix 1, attached hereto.

182.   The 2Q15 6-K was signed by defendant Sørensen and contained a "Management Statement" stating "[t]he Board of Directors and Executive Management have reviewed and approved the financial report of Novo Nordisk A/S for the first six months of 2015."   Executive Management included defendants Sørensen and Brandgaard.   In addition, the Board and Executive Management affirmed that "[b]esides what has been disclosed in the quarterly financial report, no changes in the Group's most significant risks and uncertainties have occurred relative to what was disclosed in the consolidated annual report for 2014."

183.   On August 6, 2015, Novo also held an earnings call where defendants reiterated the financial information and also made these additional false and misleading statements:

> <u>Michael Leuchten – Barclays – Analyst</u>:  Thank you very much. Two questions, please.   One, on pricing, Lars, there's been some comments or you have been quoted on newswires in terms of what you saw in terms of pricing in H1 and what you expect in terms of pricing for the rest of the year and then into 2016.   So if I could ask you to clarify what exactly you were saying, both in terms of pricing and whether that means price and mix effect and also the time period.   And then also, which part of the portfolio that relates to, because comparing the growth rates in North America to the volume growth, there doesn't seem to be any pricing headwinds for Levemir and NovoMix, so which part of the portfolio is really seeing price pressure, if any?

*       *       *

Lars Rebien Sørensen – Novo Nordisk A/S – President & CEO: ***When we look at insulins going forward, we are looking at full-year expectations from flat to slight positive pricing***. And as we now have entered into contract for the remaining of 2015 and into 2016 without having had impact on the remaining of the year, we know the price picture – we don't know the channel mix, of course, but we know the price picture. So that would be our guidance for the full year.

And ***with the numbers we know today for 2016, it would also indicate to us flat pricing for our insulin portfolio next year***. And the extent to which Victoza continues to outperform, there might be a slight positive impact from Victoza if you add the mix. Thank you.

Jesper Brandgaard – Novo Nordisk A/S – EVP, CFO: And then if I just may add, to be certain that it's clear that on top of that, when you look at the gross margin, ***there is a positive impact on our gross margin*** to the magnitude of 50 basis points the first half of this year, ***basically coming from an overall higher sales of Victoza and the modern insulin*** at the expense of the older version products like, for example, human insulin. That's overall giving us a slight positive impact on gross margin from selling the higher value products. ***And that trend is also expected to continue into second half and potentially also 2016***.

184.   The following day, August 7, 2015, defendants made an earnings presentation and again reiterated the financial results from the 2Q15 6-K. Defendant Brandgaard further represented that Novo would see "***a value increase coming from higher prices*** . . . . ***Currently we are competing with levemir***," and "***we are competing well with levemir***, indicated in the light-green line here. You're seeing our capture rate of new scripts. And you can see that we continue to grow our overall franchise, now being north – around 27% market share overall for levemir."

185.   By virtue of the facts alleged herein, the statements referenced in ¶¶180-184 were materially false and misleading.   Considered as a whole, defendants'

- 93 -

statements misled investors by presenting a materially false and misleading picture of Novo's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that the Company had engaged in an improper scheme to provide kickbacks to the PBMs in order to gain access to the PBMs' formularies, maintaining that Novo was not subject to the pricing pressures that finally came to bear on the U.S. insulin market, and falsely representing that Tresiba would insulate the Company from those pricing pressures.  In particular, defendants knew or recklessly disregarded that:

(a)     The statements referred to above about pricing, pricing pressure, tougher pricing and rebate environment, and higher rebates in the U.S. marketplace for insulins were materially false and misleading because defendants failed to disclose that the pricing for insulins was the product of a scheme to kickback money to the PBMs in order to secure Novo's position on the PBMs' formularies;

(b)     The statements referred to above in which defendants reassured investors that Novo's earnings were reliable and not at risk, were materially false and misleading because increasing rebate levels in the industry were coming to bear on Novo and causing a negative impact on the Company's earnings;

(c)     The statements above referring to flat insulin pricing and positive impact on gross margin in the second half of 2015 and full year 2016 were materially

false and misleading because defendants "kn[e]w the price picture," which indicated 2016 pricing and gross margins would decline significantly;

(d)     The statements referred to above about competition in the U.S. insulin marketplace, including that competition was getting tougher and intensifying, were materially false and misleading because the market for insulin was collusive and lacked true competition;

(e)     The statements referred to above about market access and market shares were materially false and misleading because defendants failed to disclose that Novo's access to the U.S. insulin markets required Novo to provide the PBMs with ever-increasing kickbacks, which meant the PBMs completely controlled the markets;

(f)     The statements referred to above about insulin sales and sales growth were materially false and misleading because insulin sales were artificially inflated by anticompetitive activities among the insulin manufacturers and the PBMs; and

(g)     The statements referred to above about the robust programs Novo had in place in the U.S. to ensure compliance with laws and regulations governing Novo's business was materially false and misleading because defendants had engaged in schemes to inflate sales and profitability and divide and maintain market shares.

### D.     Novo's September 28, 2015 Announcement of the FDA's Approval of Tresiba

186.    On September 28, 2015, Novo held a conference call to announce and discuss U.S. approval of Tresiba.  During the call, Sørensen repeatedly made material misstatements and omissions concerning Tresiba's advantages to patients and the pricing and rebate premiums Novo would receive from those proposed advantages.  Among other things, defendants stated the following:

> Lars Rebien Sørensen – Novo Nordisk A/S – President & CEO:
> In regards to the labeling and pricing discussion, the label did not come up largely as we expected, so there is no real change in communication regarding our launch and pricing than what we have communicated earlier.
>
> **Namely, that we intend to launch Tresiba in the US market with a moderate premium**.  The contracts are already entered into for all of 2016, and they are non-exclusive.  This gives us an opportunity to get moderate access in 2016, however not in the party part of the market; so, that will have to wait until 2017.
>
> We have no intentions of leveraging our full portfolio of insulins in the US market as a way of accelerating access, because *we do believe the product itself warrants a premium price*, and this will be apparent as we start to get clinical experience in the US with the product.
>
> *                *                *
>
> [W]e do believe that we have a superior label to the competing product out there, being it Lantus or being it Trajenta.  Therefore, *we do believe that a modest premium would be warranted once we present the long-action profile; the long half-life, the flexibility; the dosing; the new device.  I think all of those will warrant a modest premium.*
>
> Then – but you should, of course – the main thing that you need to look at is, of course, the rebate levels that has to be given to get access.  *We are of the opinion that we'd rather have a more steady penetration*

- 96 -

*into the marketplace, given that we believe we have the premium product*.

*Therefore, you should expect a relatively modest access in the beginning, and then increasing over time, much like we have seen it in the past*, when we have launched Victoza and other premium products.

\*　　\*　　\*

*We do think we are able, and this is the get-to-the-market strategy, to leverage these properties [of Tresiba] to a slight premium.*

### E.   Novo's Earnings Release for the Third Quarter 2015

187.   On October 29, 2015, Novo published its financial report for 3Q15, filed as Form 6-K with the SEC on October 30, 2015, announcing certain of the Company's financial and operating results for the first nine month of 2015 and the quarter ended September 30, 2015 (the "3Q15 6-K").

188.   In the 3Q15 6-K, Novo stated, in relevant part:

Sales of modern insulin increased by 21% in Danish kroner and by 6% in local currencies to DKK 36,602 million [USD 5,465 million]. North America accounted for 56% of the growth, followed by International Operations and Region China. Sales of modern insulin and new-generation insulin now constitute 82% of Novo Nordisk's sales of insulin measured in value.

\*　　\*　　\*

**Sales growth** for 2015 is still expected to be 7-9% measured in local currencies. This reflects expectations for continued robust performance for the portfolio of modern insulin, Victoza® and Tresiba® as well as a modest sales contribution from the launches of Saxenda®, Xultophy® and NovoEight®. These sales drivers are expected to be partly countered by an impact from increased rebate levels in the US, intensifying competition within diabetes and biopharmaceuticals as well as macroeconomic conditions in China and a number of markets in International Operations.

- 97 -

189.   In the 3Q15 6-K, Novo also reported United States sales of NovoLog, Novolog Mix, and Levemir as set forth in Appendix 1, attached hereto.

190.   The 3Q15 6-K was signed by defendant Sørensen and contained a "Management Statement" stating "[t]he Board of Directors and Executive Management have reviewed and approved the financial report of Novo Nordisk A/S for the first nine months of 2015."   Executive Management included defendants Sørensen and Brandgaard.   In addition, the Board and Executive Management affirmed that "[b]esides what has been disclosed in the quarterly financial report, no changes in the Group's most significant risks and uncertainties have occurred relative to what was disclosed in the consolidated annual report for 2014."

191.   On October 29, 2015, defendants reiterated Novo's financial results during an earnings call, making the following additional false and misleading statements:

> Jesper Brandgaard – Novo Nordisk A/S – EVP, CFO:  **The preliminary plans reflect expectations for continued robust performance of the portfolio of modern insulins, Tresiba and Victoza**, as well as a positive sales contribution from Saxenda and Xultophy.  **Intensifying competition within both diabetes and biopharmaceuticals and challenging market access**, as well as macroeconomic conditions in China and a number of markets in international operations, are expected to partly offset the aforementioned sales drivers.
>
> *        *        *
>
> Sachin Jain – BofA Merrill Lynch – Analyst:  Hi.  Thanks for taking my questions; two, please.  Firstly, just a repeat of a question I asked on the Q2 call, I think, which is could you remind us of your

- 98 -

expectations for the long term insulin market growth? Do you remain at roughly 7% volume and 3% price? Obviously the reason for the question is Sanofi have cut their diabetes guidance today. Lilly are also talking on the third quarter call about slowing insulin market outlook. So, just wondering whether your outlook has changed and, if not, if you could outline why you're different to competition.

And then secondly, just on Tresiba pricing, again your commentary, the wording has changed a little bit, in my perception, to a small premium to your own products versus a small premium to the broader basal market. Sanofi guidance again clearly implies price declines over time, which suggests that price premium for Tresiba at launch could increase with time. How do you think about that on a three to four year view in terms of the price premium increasing? Thank you.

<u>Lars Rebien Sørensen – Novo Nordisk A/S – President, CEO</u>: ***So, the overall model still applies***, that we are assuming that we will get 7%, the volume lift. The value will very much be dependent on the pricing environment, the competitive pressure, and pricing reforms. We have previously said that, well penetrated, it should look like 3% plus coming from mix and price.

This outlook is perhaps somewhat optimistic, given the current conditions, so we'll have to adjust as we go along. But, overall expectations for market growth, 5% in volume, Novo Nordisk beating the market growth with market share gains. And 7% is a pretty good guess in that regard.

Then in regard to the price of Tresiba in the United States, we have picked a price that we know, which is Levemir, and then we have added the premium to Levemir. In fact, we have added a 10% premium to Levemir.

\*       \*       \*

<u>Michael Leuchten – Barclays Capital – Analyst</u>: The Sanofi change to their guidance clearly implies somewhat has changed. And the one thing that may or may not be a driver of that is clearly the arrival of a biosimilar in Europe, rest of world. We do see a healthy uptake of that biosimilar in Japan, for example. So, question to you, how do you see the

environment change at all in the basal space where that biosimilar is available, please?

_Jakob Riis – Novo Nordisk A/S – EVP, China, Pacific & Marketing_: I think when you compare what Sanofi has been out with and us, you could say we talked about Sanofi being pressured on both sides, so part of it coming from the – what Tresiba delivered. **So, when we look at our situation, Tresiba is of course – is positive, so we can add that in**.

And we would, as we've stated before, say that the biosimilar competition – the biosimilar versions of glargine up against Lantus is more a dynamic within the glargine area and has a limited impact – direct impact on our current sales of Levemir where that takes place. **And I've said, on top of that, where we are then in a position where we can promote Tresiba, we sort of further withdraw ourselves from that dynamic**.

**So, not that you can say it has no impact, but it's much, much less than when you sit and are getting squeezed from two sides, as is the case for others.**

192.   The following day, October 30, 2015, Novo Nordisk gave an earnings

presentation where defendants restated the false and misleading financial information

in the 3Q15 6-K.  In addition, they made the following statements:

_Richard Vosser – JPMorgan – Moderator_: Richard Vosser, JPMorgan. Just going to the insulin market growth, I think a competitor was alluding that, that was a slowing potentially in the basal area. Is there an element that the renewed growth of GLP-1s, and maybe the SGLT2s, taking away some growth at the moment? And should – how long do you expect that to continue?

_Jakob Riis – Novo Nordisk A/S – EVP, China, Pacific & Marketing_: And I think there's another element of insulin growth that we also need to factor in: that is the more insulins that are being launched and promoted, with better clinical effects, and fewer side-effects will also have a positive impact. And that's why you can say it's swings and carousels.

And we can also anticipate that *we see a little bit of momentum picking up as we are now introducing better versions of the mix; better versions of the basal*; and new opportunities to introduce insulin with, for instance, a [sulfate] category.

*I think, as you said, the end result is likely going to be we're going to continue to see a volume growth that is right around the fifth – 5%*.

\*        \*        \*

Sachin Jain – BofA Merrill Lynch – Analyst: [H]ow do you rationalize your view of the insulin market in the U.S. relative to Sanofi? Just very simply, if Sanofi U.S. Lantus is down in teens and are 60% of the market, for you to grow the overall U.S. market implies substantial differentiation on both share and pricing.

Jakob Riis – Novo Nordisk A/S – EVP, China, Pacific & Marketing: And then you could say, on the other part, the comments on share and pricing, for others, there is the issue that they are both up against a biosimilar version of the product plus a new entrant, being Tresiba. So, that's two things working against them.

You could say we do not face biosimilar competition in the basal segment. *And Tresiba is, of course, a growth driver for us*. That's why I think the situations are distinctly different.

*And finally, on pricing, there's – the pricing is made between the company and the payers. And we do compete, but we make our own decisions*.

And when we guide on pricing, as we've done both for this year and next year, it is with very, very good visibility; and actually, most, if not all, of the significant contracting done.

193.    By virtue of the facts alleged herein, the statements referenced in ¶¶186-192 were materially false and misleading.  Considered as a whole, defendants' statements misled investors by presenting a materially false and misleading picture of Novo's business, financials, operations and compliance policies by, among other

- 101 -

things, failing to disclose and actively concealing that the Company had engaged in an improper scheme to provide kickbacks to the PBMs in order to gain access to the PBMs' formularies, maintaining that Novo was not subject to the pricing pressures that finally came to bear on the U.S. insulin market, and falsely representing that Tresiba would insulate the Company from those pricing pressures.  In particular, defendants knew or recklessly disregarded that:

(a)     The statements referred to above about pricing, pricing pressure, tougher pricing and rebate environment, and higher rebates in the U.S. marketplace for insulins were materially false and misleading because defendants failed to disclose that the pricing for insulins was the product of a scheme to kickback money to the PBMs in order to secure Novo's position on the PBMs' formularies;

(b)     The statements referred to above in which defendants reassured investors that Novo's earnings were reliable and not at risk, were materially false and misleading because increasing rebate levels in the industry were coming to bear on Novo and causing a negative impact on the Company's earnings;

(c)     Defendants' representations above that Tresiba would insulate Novo from U.S. pricing pressures, including statements concerning Tresiba's attributes and Novo receiving premium pricing and paying lower rebates for Tresiba's placement on the PBMs' formularies, were false and misleading because Tresiba's perceived innovations were not nearly enough to warrant such benefits from the

PBMs, which, as defendants knew, were primarily concerned with increasing their kickbacks in exchange for formulary access;

(d)     The statements referred to above about competition in the U.S. insulin marketplace, including that competition was getting tougher and intensifying, were materially false and misleading because the market for insulin was collusive and lacked true competition;

(e)     The statements referred to above about market access and market shares were materially false and misleading because defendants failed to disclose that Novo's access to the U.S. insulin markets required Novo to provide the PBMs with ever-increasing kickbacks, which meant the PBMs completely controlled the markets; and

(f)     The statements referred to above about insulin sales and sales growth were materially false and misleading because insulin sales were artificially inflated by anticompetitive activities among the insulin manufacturers and the PBMs.

### F.     Novo's November 19, 2015 Capital Markets Day

194.   On November 19, 2015, Novo held its Capital Markets Day in Copenhagen.  The event involved several presentations, during which defendants reiterated their false and misleading financial results and also made the following false and misleading statements:

Lars Fruergaard Jørgensen – Novo Nordisk A/S – EVP, Corporate Development: Then you can see that we have taken out the price

element, based on some of the changes we see. The historical price increase was driven by the U.S. We think that is, to a significant less degree, an opportunity going forward. So we do not see this as a price increase-driven growth strategy.

*But when it comes to market share, we believe that we can reverse the market share trend for Novo Nordisk*, based on the portfolio we have. *We have seen clear signs of that in the markets where we have launched Tresiba*, that it is indeed capable of taking a good share of the market. And we will review some of these data later on today.

And then, I think, even more importantly, there is a continued value upgrade mix effect to be gained from constantly upgrading the patients to better and better medications; again, from the vial/syringe to devices. But the biggest driver comes from converting from modern to – sorry, from human to modern insulin, and from modern insulin to next-generation insulin. And we do see that we can continue what we have seen over the past five years, going forward, so we can upgrade the value of the market.

So, in conclusion, this is a slide to show that there's both a significant value opportunity to be taken, but there's also a significant volume game to compete in. *And we believe that we are well positioned to both pursue the high end of the market, based on innovation. And we believe that we're well-positioned, based on an effective manufacturing setup, to also compete in the lower end of the market where we have to take the value, and then, longer down the road, can upgrade to higher priced markets.*

\*     \*     \*

Marcus Hermani – Verint Capital Partners – Analyst: Since your competitors are so pessimistic, in particular Sanofi, how can you be so optimistic, considering that also the increased competition in the U.S. market?

Jakob Riis – Novo Nordisk A/S – EVP China, Pacific and Marketing: . . .So *I think the case for Sanofi and Novo Nordisk is quite different*. They have done an excellent job so far in establishing, say, the gold standard in the basal segment, based on glargine. *We are now*

*coming with the next-generation product, Tresiba, which we strongly believe is superior. So, we will be taking share.*

Then at the same time, you can say we have a relative low share in the basal segment worldwide that will be growing, so the mix component also goes in our favor. And a combination of **us moving up in the premium-priced basal segment**, taking share, and then also launching a broader portfolio of products means that **we think it's quite realistic that the underlying market growth is still to be there**. We can take share in that market. **Then we will be pushing products up based on innovation that can get an average net take-home price at slightly higher than what we have today**.

So I think the two cases are a function of the portfolio of products and the position you are in today and what is your growth potential. I would not think that Sanofi has a significant different view on what is your overall market size. I think there is an excellent acceptance of that, **so it's simply a function of the respective competitive position in that**.

\*       \*       \*

Keyur Parekh – Goldman Sachs – Analyst: And then secondly, as you think about the pre-level gearing for the basal insulin market – I realize this is not in your hands. But just help us think about **what is the level of pricing that you might be happy to go down to maintain volume on Levemir**?

\*       \*       \*

Lars Rebien Sørensen – Novo Nordisk A/S – President, CEO: And so, to answer a little vaguely on rebates, as you probably expected, I think there will be – our policies would be that there would be three levels of products. There will be Tresiba, where we will be less inclined to offer rebate because of the premium characteristics of this product. Then there will be Levemir will be rebated and priced on par with Lantus. And then there will be Abasaglar, where the rebates have to be deeper to get access. So that's basically the policy that we want to pursue in all markets, basically.

195.   By virtue of the facts alleged herein, the statements referenced in ¶194 were materially false and misleading. Considered as a whole, defendants' statements

- 105 -

misled investors by presenting a materially false and misleading picture of Novo's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that the Company had engaged in an improper scheme to provide kickbacks to the PBMs in order to gain access to the PBMs' formularies, maintaining that Novo was not subject to the pricing pressures that finally came to bear on the U.S. insulin market, and falsely representing that Tresiba would insulate the Company from those pricing pressures.  In particular, defendants knew or recklessly disregarded that:

(a)    The statements referred to above about pricing, pricing pressure, tougher pricing and rebate environment, and higher rebates in the U.S. marketplace for insulins were materially false and misleading because defendants failed to disclose that the pricing for insulins was the product of a scheme to kickback money to the PBMs in order to secure Novo's position on the PBMs' formularies;

(b)    The statements referred to above in which defendants reassured investors that Novo's earnings were reliable and not at risk, were materially false and misleading because increasing rebate levels in the industry were coming to bear on Novo and causing a negative impact on the Company's earnings;

(c)    Defendants' representations above that Tresiba would insulate Novo from U.S. pricing pressures, including statements concerning Tresiba's attributes and Novo receiving premium pricing and paying lower rebates for Tresiba's

- 106 -

placement on the PBMs' formularies, were false and misleading because Tresiba's perceived innovations were not nearly enough to warrant such benefits from the PBMs, which, as defendants knew, were primarily concerned with increasing their kickbacks in exchange for formulary access;

(d)   The statements referred to above about competition in the U.S. insulin marketplace, including that competition was getting tougher and intensifying, were materially false and misleading because the market for insulin was collusive and lacked true competition; and

(e)   The statements referred to above about market access and market shares were materially false and misleading because defendants failed to disclose that Novo's access to the U.S. insulin markets required Novo to provide the PBMs with ever-increasing kickbacks, which meant the PBMs completely controlled the markets.

G.   **Novo's Earnings Release for the Fourth Quarter and Full-Year 2015**

196.   On February 3, 2016, Novo published its financial report for 4Q15, filed as Form 6-K with the SEC on February 5, 2016, announcing certain of the Company's financial and operating results for 2015 and the quarter ended December 31, 2015 (the "4Q15 6-K").

197.   In the 4Q15 6-K, Novo stated, in relevant part:

Sales of modern insulin increased by 21% in Danish kroner and by 7% in local currencies to DKK 50,164 million [USD 7,457 million]. North America accounted for 66% of the growth, followed by

- 107 -

International Operations and Region China. Sales of modern insulin and new-generation insulin now constitute 82% of Novo Nordisk's sales of insulin.

*     *     *

Sales growth for 2016 is expected to be 5-9% measured in local currencies. This reflects expectations for continued robust performance for the portfolio of modern insulin, Victoza® and Tresiba® as well as a contribution from Saxenda® and Xultophy®. These sales drivers are expected to be partly countered by an impact from a contract loss in the U.S., healthcare reforms, the loss of exclusivity for products within hormone replacement therapy, intensifying competition within diabetes and biopharmaceuticals as well as macroeconomic conditions in China and a number of markets in International Operations.

*     *     *

The target level for long-term operating profit growth has been set at 10%, reflecting the current outlook for organic sales growth and opportunities for operating margin leverage.

198.   In the 4Q15 6-K, Novo also reported United States sales of NovoLog, Novolog Mix, and Levemir as set forth in Appendix 1, attached hereto.

199.   The 4Q15 6-K was signed by defendant Sørensen and contained a "Management Statement" stating "[t]he Board of Directors and Executive Management have approved the Annual Report 2015 of Novo Nordisk A/S – including the audited consolidated financial statements. The Board of Directors and Executive Management also approved this financial statement containing condensed financial information for 2015."   Executive Management included defendants Sørensen and Brandgaard.

200.   On February 3, 2016, Novo held a conference call to discuss the 4Q15

financial results, during which defendants made additional false and misleading

statements, including:

> Lars Rebien Sørensen – Novo Nordisk A/S – President, CEO:
> Diluted earnings per share increased by 34% to DKK13.52.  The outlook
> for 2016 sales growth is 5% to 9%.  ***Operating profit growth is also
> expected to be 5% to 9%*** measured in local currencies adjusted for the
> income from the partial divestment of NNIT and the non-recurring out-
> licensing income from the divestment of the inflammation assets, both in
> 2015.
>
> The continued solid performance has also led us to revisit our long-term
> financial targets and make significant change to two of the four historic
> targets.  First, a new target for operating profit growth has been set at
> 10%.  Secondly, we decided not to establish a new target for the
> operating margin as it is expected to remain at the current level of around
> 44%.
>
> Jesper Brandgaard – Novo Nordisk A/S – EVP, CFO: ***The target
> level for long-term operating profit growth has been set at 10%,
> reflecting the current outlook for organic sales growth and the
> opportunities for operating margin leverage.***

201.   The following day, February 4, 2016, Novo hosted an earnings

presentation to investors where defendants again relayed false and misleading 4Q15

financial information and made additional false and misleading statements, including:

> Jesper Brandgaard – Novo Nordisk A/S – CFO: If we look to the
> long-term financial targets, we have based on this assumption said ***we
> believe that our long-term target should be growing our operating
> profit to the tune of 10%, and that 10% is really based on the growth
> level from our diabetes care franchise***.

202.   On February 10, 2016, Novo filed its 2015 Annual Report on Form 6-K

with the SEC, reiterating the financial and operating results previously announced in

the 4Q15 6-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2015.

203.   In the 2015 Annual Report, Novo stated, in part:

LETTER FROM THE CHAIRMAN

In light of the significant improvement in operating margin during the past years and the need to invest in sustaining sales growth, further improvement of the operating margin is not a strategic priority in the coming years.  Reflecting this, *we have set the long-term target for operating profit growth at 10%, underlining our confidence in the growth outlook for the company*.

\*      \*      \*

2015 PERFORMANCE AND 2016 OUTLOOK

Sales increased by 22% in Danish kroner and by 8% measured in local currencies.  North America was the main contributor with 62% share of growth measured in local currencies, followed by International Operations with 26%. Sales growth was realised within both diabetes care and biopharmaceuticals, with the majority of growth originating from modern insulin and Victoza®. . . .

Sales of modern insulin increased by 21% in Danish kroner and by 7% in local currencies to DKK 50,164 million. North America accounted for 66% of the growth, followed by International Operations and Region China.  Sales of modern insulin and new generation insulin now constitute 82% of Novo Nordisk's sales of insulin.

\*      \*      \*

*Sales growth for 2016 is expected to be 5-9% measured in local currencies*.  This reflects expectations for continued robust performance for the portfolio of modern insulin, Victoza and Tresiba as well as a contribution from Saxenda and Xultophy.  These sales drivers are expected to be partly countered by an impact from a contract loss in the U.S., healthcare reforms, the loss of exclusivity for products within hormone replacement therapy, intensifying competition within diabetes

- 110 -

and biopharmaceuticals as well as macroeconomic conditions in China and a number of markets in International Operations. . . .

*      *      *

*The target level for long-term operating profit growth has been set at 10%, reflecting outlook for organic sales growth and opportunities for operating margin leverage*.

*      *      *

*We never compromise on quality and business ethics*.

*      *      *

THE FUTURE OF PHARMACEUTICALS

The U.S. is the world's largest market for pharmaceuticals, accounting for roughly 44% of global sales.  Product success is largely based on competition on efficacy, safety, quality and price.

204.   In the 2015 Annual Report, Novo also reported United States sales of NovoLog, Novolog Mix, and Levemir as set forth in Appendix 1, attached hereto.

205.   The Form 6-K, to which the 2015 Annual Report was attached and submitted to the SEC, was signed by defendant Sørensen and contained a "Statement by the Board of Directors and Executive Management on the Annual Report" stating that "the Board of Directors and Executive Management approved the Annual Report of Novo Nordisk A/S for the year 2015."  Executive Management included defendants Sørensen and Brandgaard.  In addition, the Board and Executive Management affirmed that "[i]n our opinion, the Consolidate financial statements and the Financial statements of the parent company gave a true and fair view of the financial position at 31 December 2015, the results of the Group's and parent company's operations, and

- 111 -

consolidated cash flows for the financial year 2015.  Furthermore, in our opinion,
Management's Review includes a true and fair account of the development in the
operations and financial circumstances, of the results for the year, and of the financial
position of the Group and the parent company as well as a description of the most
significant risks and elements of uncertainty facing the Group and the parent
company."

206.   In addition, the 2015 Annual Report referred investors to the Form 20-F,
an "[a]nnual reporting requirement by the US Securities and Exchange Commission
(SEC) for foreign private issuers with equity shares listed on exchanges in the United
States.  Form 20-F is filed using a standardised reporting form so that investors can
evaluate the company alongside US domestic equities."

207.   On February 10, 2016, on the same day as the filing of the Form 6-K
2015 Annual Report, Novo filed a Form 20-F Annual Report with the SEC for the
fiscal year ended December 31, 2015.  The 2015 20-F incorporated by reference the
2014 Annual Report and the 2015 Annual Report filed with the SEC on Form 6-Ks
and their materially false and misleading statements set forth therein.

208.   Additionally, the 2015 20-F contained the following materially false and
misleading statements:

> In 2015, payers globally have managed the cost of diabetes care
> by exerting pressure on the prices of Novo Nordisk's products and
> competitors have tried to capture market share from Novo Nordisk. In
> spite of this, ***Novo Nordisk has been able to maintain the leading***

*position in the overall diabetes care market through the quality and innovative value of the company's diabetes care products*.

209. The 2015 20-F contained signed certifications pursuant to SOX by defendants Sørensen and Brandgaard, stating that the financial information contained in the 2015 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. In addition, defendants Sørensen and Brandgaard certified that they were "responsible for establishing and maintaining disclosure controls and procedures" and that such controls and procedures ensured that "information required to be disclosed in reports that Novo Nordisk files or submits under the Securities Exchange Act of 1934, as amended, [was] recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the United States Securities and Exchange Commission, and that such information is accumulated and communicated to management of the Company, including the Chief Executive Office and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure."

210. By virtue of the facts alleged herein, the statements referenced in ¶¶197-209 were materially false and misleading. Considered as a whole, defendants' statements misled investors by presenting a materially false and misleading picture of Novo's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that the Company had engaged in an improper scheme to provide kickbacks to the PBMs in order to gain access to the

- 113 -

PBMs' formularies, maintaining that Novo was not subject to the pricing pressures that finally came to bear on the U.S. insulin market, and falsely representing that Tresiba would insulate the Company from those pricing pressures.  In particular, defendants knew or recklessly disregarded that:

(a)     The statements referred to above about pricing, pricing pressure, tougher pricing and rebate environment, and higher rebates in the U.S. marketplace for insulins were materially false and misleading because defendants failed to disclose that the pricing for insulins was the product of a scheme to kickback money to the PBMs in order to secure Novo's position on the PBMs' formularies;

(b)     The statements referred to above in which defendants reassured investors that Novo's earnings were reliable and not at risk, were materially false and misleading because increasing rebate levels in the industry were coming to bear on Novo and causing a negative impact on the Company's earnings;

(c)     Defendants' representations above that Tresiba would insulate Novo from U.S. pricing pressures, including statements concerning Tresiba's attributes and Novo receiving premium pricing and paying lower rebates for Tresiba's placement on the PBMs' formularies, were false and misleading because Tresiba's perceived innovations were not nearly enough to warrant such benefits from the PBMs, which, as defendants knew, were primarily concerned with increasing their kickbacks in exchange for formulary access;

- 114 -

(d)     The statement above that U.S. "[p]roduct success is largely based on competition on efficacy, safety, quality and price" was materially false and misleading because, in reality, defendants were aware that the selection of drugs for managed care formularies was based on the largest rebates and list prices, not on efficacy, safety, or quality;

(e)     The statements referred to above about competition in the U.S. insulin marketplace, including that competition was getting tougher and intensifying, were materially false and misleading because the market for insulin was collusive and lacked true competition;

(f)     The statements referred to above about market access and market shares were materially false and misleading because defendants failed to disclose that Novo's access to the U.S. insulin markets required Novo to provide the PBMs with ever-increasing kickbacks, which meant the PBMs completely controlled the markets;

(g)     The statements referred to above about insulin sales and sales growth were materially false and misleading because insulin sales were artificially inflated by anticompetitive activities among the manufacturers and the PBMs; and

(h)     The statements referred to above concerning guidance for 2016 sales growth and operating profit growth, and long-term operating growth were materially false and misleading because the guidance was unrealistic, lacked a reasonable basis, and failed to appropriately account for the unsustainability of Novo's

- 115 -

growth because of increasing price pressure from the PBMs, and mounting social and political pressure arising from the extended period of escalating insulin prices.

### H.    Novo's Earnings Release for the First Quarter 2016

211.    On April 29, 2016, Novo published its financial report for 1Q16, filed as Form 6-K with the SEC on May 3, 2016, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2016 (the "1Q16 6-K").

212.    In the 1Q16 6-K, Novo stated, in part:

> Sales growth for 2016 is still expected to be 5-9% measured in local currencies. This reflects expectations for continued robust performance for the portfolio of modern insulin, Victoza® and Tresiba® as well as a contribution from Saxenda® and Xultophy®. These sales drivers are expected to be partly countered by an impact from a contract loss in the US, healthcare reforms, the loss of exclusivity for products within hormone replacement therapy, intensifying competition within diabetes and biopharmaceuticals as well as macroeconomic conditions in China and a number of markets in International Operations.

213.    In the 1Q16 6-K, Novo also reported United States sales of NovoLog, Novolog Mix, and Levemir as set forth in Appendix 1, attached hereto.

214.    The 1Q16 6-K was signed by defendant Sørensen and contained a "Management Statement" stating "[t]he Board of Directors and Executive Management have reviewed and approved the financial report of Novo Nordisk A/S for the first quarter of 2016." Executive Management included defendants Sørensen and Brandgaard.  In addition, the Board and Executive Management affirmed that

"[b]esides what has been disclosed in the quarterly financial report, no changes in the Group's most significant risks and uncertainties have occurred relative to what was disclosed in the consolidated annual report for 2015."

215.   On April 29, 2016, Novo also held a conference call to discuss its 1Q16 financial results.   During the conference call, defendants reiterated the false and misleading financial results and made additional false and misleading statements, including:

> <u>Jesper Brandgaard – Novo Nordisk A/S – CFO</u>: Please turn to the next slide for the financial outlook.   ***Sales growth for 2016 is still expected to be 5% to 9% measured in local currencies***.   This reflects expectations for a continued robust performance for our modern insulins, Victoza – sorry, for our modern insulins, Victoza and Tresiba, as well as contribution from the launches of Saxenda and Xultophy.

> \*          \*          \*

> <u>Michael Novod – Nordea – Analyst</u>: Two questions, one on Levemir. And despite actually seeing some switching into Tresiba you still have 11% growth local currency in the U.S. Could you talk a bit about that?

> \*          \*          \*

> <u>Lars Rebien Sørensen – Novo Nordisk A/S – CEO</u>: ***It is correct that we see still quite strong growth of Levemir in the US.*** There is some volume, but there is also a price effect. ***We took a price increase last year***, so I would say probably half is price and half is volume of the 11%.

216.   On May 3, 2016, defendants made an earnings presentation where they again reiterated the false and misleading financial results from the 1Q16 6-K and made additional false and misleading statements, including:

- 117 -

Jesper Brandgaard – Novo Nordisk A/S – CFO: Diluted earnings per share decreased by 2%, but if we adjust for the divestment of NNIT it actually increased by 23%. ***The financial outlook for 2016 in local currencies is maintained both for sales and operating profit at a growth level of 5% to 9%.*** However, we had to increase the expectations for the negative currency impact, so the sales impact is now increased to 3% lower, as reported, and for operating profit 4% lower, as expected.

\*       \*       \*

Richard Vosser – JPMorgan – Analyst: Second question just on the U.S. payer environment and whether they – you foresee them adopting different approaches to pricing for different classes of diabetes drugs, whether the size of the diabetes cost means that price pressure is on the agenda across classes, or whether that might be confined to insulin. Your thoughts there would be great. Thanks.

\*       \*       \*

Lars Fruergaard – Novo Nordisk A/S – EVP and Chief of Staff: Yes. So I'll start by trying to address how we look at it from a payer perspective by first saying that clearly in the US market there is an opportunity to sell innovative products also at a high price. ***So when you look across therapy areas you can see in multiple areas that products are getting to the market and there's a willingness to pay for innovation.***

\*       \*       \*

But we still see that a product like Tresiba in the basal segment is differentiated and there'll be a preference for such a product. And you – we can uphold the value of all of our portfolio based on that.

217.    By virtue of the facts alleged herein, the statements referenced in ¶¶212-216 were materially false and misleading. Considered as a whole, defendants' statements misled investors by presenting a materially false and misleading picture of Novo's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that the Company had engaged in an

- 118 -

improper scheme to provide kickbacks to the PBMs in order to gain access to the PBMs' formularies, maintaining that Novo was not subject to the pricing pressures that finally came to bear on the U.S. insulin market, and falsely representing that Tresiba would insulate the Company from those pricing pressures.  In particular, defendants knew or recklessly disregarded that:

(a)     The statements referred to above about pricing, pricing pressure, tougher pricing and rebate environment, and higher rebates in the U.S. marketplace for insulins were materially false and misleading because defendants failed to disclose that the pricing for insulins was the product of a scheme to kickback money to the PBMs in order to secure Novo's position on the PBMs' formularies;

(b)     The statements referred to above in which defendants reassured investors that Novo's earnings were reliable and not at risk, were materially false and misleading because increasing rebate levels in the industry were coming to bear on Novo and causing a negative impact on the Company's earnings;

(c)     Defendants' representations above that Tresiba would insulate Novo from U.S. pricing pressures, including statements concerning Tresiba's attributes and Novo receiving premium pricing and paying lower rebates for Tresiba's placement on the PBMs' formularies, were false and misleading because Tresiba's perceived innovations were not nearly enough to warrant such benefits from the

PBMs, which, as defendants knew, were primarily concerned with increasing their kickbacks in exchange for formulary access;

      (d)    The statements referred to above about competition in the U.S. insulin marketplace, including that competition was getting tougher and intensifying, were materially false and misleading because the market for insulin was collusive and lacked true competition;

      (e)    The statements referred to above about market access and market shares were materially false and misleading because defendants failed to disclose that Novo's access to the U.S. insulin markets required Novo to provide the PBMs with ever-increasing kickbacks, which meant the PBMs completely controlled the markets; and

      (f)    The statements referred to above about insulin sales and sales growth were materially false and misleading because insulin sales were artificially inflated by anticompetitive activities among insulin manufacturers and the PBMs.

## I.    Novo's Earnings Release for the Second Quarter 2016

218.   On August 5, 2016, Novo published its financial report for 2Q16, filed as Form 6-K with the SEC on August 8, 2016, announcing certain of the Company's financial and operating results for the first half of 2016 and the quarter ended June 30, 2016 (the "2Q16 6-K").

219.    In the 2Q16 6-K, Novo partially revealed the truth about the effects of

pricing competition in the U.S. and also made material misstatements and omissions,

including in part:

> ***For 2016, the range for expected sales growth has been
> narrowed to 5-7% and growth in adjusted operating profit is now
> expected to be 5-8%***, both measured in local currencies. For 2017, Novo
> Nordisk has completed the majority of formulary negotiations in the
> USA and average prices after rebates are expected to be moderately
> lower, ***while the market access for the Novo Nordisk products is
> expected to remain largely unchanged***.

*    *    *

> Sales of insulin in the USA were broadly unchanged measured in
> both local currencies and Danish kroner. Sales were driven by the
> introduction of Tresiba® as well as Levemir® benefitting from the
> underlying volume growth of the insulin market.

*    *    *

> For 2016, the range for expected sales growth has been narrowed
> to 5-7% measured in local currencies. This reflects expectations for
> continued robust performance for Victoza® and Tresiba® as well as a
> contribution from Saxenda® and Xultophy®. These sales drivers are
> expected to be partly countered by an impact from a contract loss in the
> USA for NovoLog®, the loss of exclusivity for products within hormone
> replacement therapy in the USA, intensifying competition within
> diabetes and biopharmaceuticals especially in the USA, as well as
> adverse macroeconomic conditions in several markets in International
> Operations. Given the current level of exchange rates versus the Danish
> krone, growth reported in DKK is now expected to be around 2
> percentage points lower than the local currency level.

220.    In the 2Q16 6-K, Novo also reported United States sales of NovoLog,

Novolog Mix, and Levemir as set forth in Appendix 1, attached hereto.

221.   On August 5, 2016, Novo held a conference call where defendants reiterated the Company's financial results and made the following disclosures:

Turn to slide number 11.  The majority of the US formulary negotiations for 2017 have been finalized, including negotiations with the three largest payers.  The market access to our key products is anticipated to remain largely unchanged compared to 2016.

\*      \*      \*

Sachin Jain – BofA Merrill Lynch – Analyst: Secondly, taking pricing to midterm, obviously with your midterm guidance/aspirations you issued at full-year results, I think within that was implied flat global diabetes pricing. Does that aspiration for global diabetes pricing flat midterm still stand? And if not, how is the mix of pricing versus pipeline contribution in the midterm guidance changing? . . .

\*      \*      \*

Jesper Brandgaard – Novo Nordisk A/S – CFO: And in terms of the long-term financial guidance we provided in early February, we noted there that we had not assumed a positive impact from the LEADER trial and we didn't have full knowledge of the outcome of the SWITCH trial when we provided that guidance. It is also correct that on a global basis, we assumed that prices would be broadly flat.

With the development we've subsequently seen for the US, it is apparent that the pricing assumption near term for US is going to be slightly more adverse than what we had in our guidance.

On the other hand, the labels that we can operate under for core products like Victoza and Tresiba are slightly better.

***It is not so that you should anticipate that we in any way revise our long-term targets.*** We strive towards our long-term targets. ***We still believe that they are ambitious and relevant goals for Novo Nordisk to pursue based on a market-leading portfolio of diabetes care products and a diabetes care segment where patient numbers continue to evolve***.

222.   By virtue of the facts alleged herein, the statements referenced in ¶¶219-221 were materially false and misleading.   Considered as a whole, defendants' statements misled investors by presenting a materially false and misleading picture of Novo's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that the Company had engaged in an improper scheme to provide kickbacks to the PBMs in order to gain access to the PBMs' formularies, maintaining that Novo was not subject to the pricing pressures that finally came to bear on the U.S. insulin market, and falsely representing that Tresiba would insulate the Company from those pricing pressures.   In particular, defendants knew or recklessly disregarded that:

(a)   The statements referred to above about pricing, pricing pressure, tougher pricing and rebate environment, and higher rebates in the U.S. marketplace for insulins were materially false and misleading because defendants failed to disclose that the pricing for insulins was the product of a scheme to kickback money to the PBMs in order to secure Novo's position on the PBMs' formularies;

(b)   The statements referred to above in which defendants reassured investors that Novo's earnings were reliable and not at risk, were materially false and misleading because increasing rebate levels in the industry were coming to bear on Novo and causing a negative impact on the Company's earnings;

- 123 -

(c)     Defendants' representations above that Tresiba would insulate Novo from U.S. pricing pressures, including statements concerning Tresiba's attributes and Novo receiving premium pricing and paying lower rebates for Tresiba's placement on the PBMs' formularies, were false and misleading because Tresiba's perceived innovations were not nearly enough to warrant such benefits from the PBMs, which, as defendants knew, were primarily concerned with increasing their kickbacks in exchange for formulary access;

(d)     The statements referred to above about competition in the U.S. insulin marketplace, including that competition was getting tougher and intensifying, were materially false and misleading because the market for insulin was collusive and lacked true competition;

(e)     The statements referred to above about market access and market shares were materially false and misleading because defendants failed to disclose that Novo's access to the U.S. insulin markets required Novo to provide the PBMs with ever-increasing kickbacks, which meant the PBMs completely controlled the markets; and

(f)     The statements referred to above about insulin sales and sales growth were materially false and misleading because insulin sales were artificially inflated by anticompetitive activities among insulin manufacturers and the PBMs.

- 124 -

**J.      Novo's Earnings Release for the Third Quarter 2016**

223.   On October 28, 2016, Novo published its financial report for 3Q16, filed as Form 6-K with the SEC on November 1, 2016, announcing certain of the Company's financial and operating results for the first nine months of 2016 and the quarter ended September 30, 2016 (the "3Q16 6-K").

224.   In the 3Q16 6-K, Novo partially revealed the truth about the effects of pricing competition in the U.S. and also made material misstatements and omissions, including in part:

> *The financial outlook for 2016 has been updated and the range for sales growth is now expected to be 5-6%, whereas growth in adjusted operating profit is now expected to be 5-7%, both measured in local currencies*. . . .
>
> *Novo Nordisk no longer deems it achievable to reach the operating profit growth target of 10% set in February 2016.  As a result, the target has been revised and Novo Nordisk is now aiming for an average operating profit growth of 5%*.  The two other financial targets remain unchanged.
>
> Lars Rebien Sørensen, president and CEO: "We have reassessed our long-term target for operating profit growth and our R&D strategy in the light of the challenging market environment in the USA. As a result, we are reducing our global cost base and parting company with some of our valued employees. *Going forward we are confident that our strong product portfolio with innovative products like Tresiba®, Victoza® and semaglutide will enable us to deliver on our revised growth targets*."
>
> \*      \*      \*
>
> *For 2016, the range for sales growth is now expected to be 5–6%* measured in local currencies. *This reflects expectations for continued robust performance for Victoza® and Tresiba®* as well as a contribution from Saxenda® and Xultophy®. These sales drivers are

- 125 -

expected to be partly countered by an impact from a contract loss in the USA for NovoLog® and NovoLog® Mix 70/30, the loss of exclusivity for products within hormone replacement therapy in the USA, further intensifying competition within diabetes and biopharmaceuticals especially in the USA, as well as adverse macroeconomic conditions in several markets in International Operations. Given the current level of exchange rates versus the Danish krone, growth reported in DKK is still expected to be around 2 percentage points lower than the local currency level.

225.   In the 3Q16 6-K, Novo also reported United States sales of NovoLog, Novolog Mix, and Levemir as set forth in Appendix 1, attached hereto.

226.   On October 28, 2016, Novo also held a conference call where defendants reiterated the Company's financial results and made the following disclosures:

> Jesper Brandgaard – Novo Nordisk A/S – CFO: Please turn to slide 18.  For 2016, ***the range for sales growth has been narrowed to 5% to 6%, measured in local currencies.  The new range reflects a sustained, unfavorable volume development in the U.S. market, especially within modern insulins***.
>
> \*       \*       \*
>
> ***[T]he preliminary plans for 2017 indicate low-single digit growth in sales and flat to low-single digit growth in operating profit***, both measured in local currencies.
>
> \*       \*       \*
>
> Since February 2016, the competitive environment in the U.S. within both diabetes care and biopharmaceuticals has become more challenging, negatively impacting the price of our products, especially for insulin and human growth hormone products.
>
> ***Consequently, we no longer deem it achievable to reach the aspiration of operating profit growth of 10%.  As a result hereof, the target has been revised and we are now aiming for an average operating profit growth of 5%***.

- 126 -

\*     \*     \*

Lars Rebien Sørensen – Novo Nordisk A/S – President, CEO:
Thank you very much, Jesper.  Regrettably, the intensified competition
and pressure in the United States has made it necessary for us to revise
our long-term financial targets and lay off some of our valued
employees.

However, *we are confident that our strong product pipeline of
innovative products like Victoza, Tresiba and eventually semaglutide
will enable us to deliver on our revised growth targets*.

227.   By virtue of the facts alleged herein, the statements referenced in ¶¶224-

226 were materially false and misleading.  Considered as a whole, defendants'

statements misled investors by presenting a materially false and misleading picture of

Novo's business, financials, operations and compliance policies by, among other

things, failing to disclose and actively concealing that the Company had engaged in an

improper scheme to provide kickbacks to the PBMs in order to gain access to the

PBMs' formularies, maintaining that Novo was not subject to the pricing pressures

that finally came to bear on the U.S. insulin market, and falsely representing that

Tresiba would insulate the Company from those pricing pressures.  In particular,

defendants knew or recklessly disregarded that:

(a)    The statements referred to above about pricing, pricing pressure,

tougher pricing and rebate environment, and higher rebates in the U.S. marketplace

for insulins were materially false and misleading because defendants failed to disclose

that the pricing for insulins was the product of a scheme to kickback money to the

PBMs in order to secure Novo's position on the PBMs' formularies;

- 127 -

(b)     The statements referred to above in which defendants reassured investors that Novo's earnings were reliable and not at risk, were materially false and misleading because increasing rebate levels in the industry were coming to bear on Novo and causing a negative impact on the Company's earnings;

(c)     Defendants' representations above that Tresiba would insulate Novo from U.S. pricing pressures, including statements concerning Tresiba's attributes and Novo receiving premium pricing and paying lower rebates for Tresiba's placement on the PBMs' formularies, were false and misleading because Tresiba's perceived innovations were not nearly enough to warrant such benefits from the PBMs, which, as defendants knew, were primarily concerned with increasing their kickbacks in exchange for formulary access;

(d)     The statements referred to above about competition in the U.S. insulin marketplace, including that competition was getting tougher and intensifying, were materially false and misleading because the market for insulin was collusive and lacked true competition;

(e)     The statements referred to above about market access and market shares were materially false and misleading because defendants failed to disclose that Novo's access to the U.S. insulin markets required Novo to provide the PBMs with ever-increasing kickbacks, which meant the PBMs completely controlled the markets;

- 128 -

(f)     Defendants' representation above that market access to Novo's key products in 2017 remain largely unchanged compared to 2016 was false and misleading because defendants knew that UnitedHealth had already determined to downgrade Levemir in its 2017 formulary to tier 2 in favor of Basaglar, Eli Lilly's cheaper biosimilar drug.  Defendants also knew that Tresiba would not be included on UnitedHealth's 2017 formulary; and

(g)     The statements referred to above about insulin sales and sales growth were materially false and misleading because insulin sales were artificially inflated by anticompetitive activities among insulin manufacturers and the PBMs.

## VIII.  NOVO'S FAILURE TO MAKE REQUIRED SEC DISCLOSURES WHICH RENDERED ITS REVENUE AND OPERATING PROFIT STATEMENTS MISLEADING

228.   During the Class Period, defendants failed to make required SEC disclosures regarding the impact the rebates to PBMs had on Novo's reported U.S. revenues and operating profit.  In particular, defendants were required to make SEC disclosures which would have allowed investors to assess the quality and sustainability of Novo's U.S. revenues and operating profit.  By failing to make the required SEC disclosures described below, defendants' Class Period statements regarding Novo's U.S. operations, revenues and operating profit were rendered materially misleading.

### A.  Novo's U.S. Sales Were Contingent on Complying with the Ever-Growing Demands of the PBMs

229.  In SEC Staff Accounting Bulletin No. 104 ("SAB 104"), the SEC Staff provided specific guidance on required disclosures pertaining to a Company's revenue and changes in revenue:

> Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also ***include an analysis of the reasons and factors contributing to the increase*** or decrease.

230.  Likewise, the SEC has provided the following example of required revenue disclosures:

> [I]f a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should ***analyze the reasons underlying the*** decline in ***sales*** when the reasons are also material and determinable.  The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.[5]

231.  The intent of the above SEC disclosure requirements is clear:  without additional detail on the various factors underlying sales trends, investors can be easily misled. Investors need additional detail to assess the quality and sustainability of revenue and sales trends.  This was precisely the case with Novo during the Class Period.

---

[5]  SEC Release Nos. 33-8350; 34-48960; FR-72.

232.   Defendants' failure to disclose the rebate scheme in accordance with the required SEC disclosures described above rendered Novo's Class Period statements regarding its U.S. sales materially misleading.  Throughout the Class Period, Novo stressed U.S. sales growth.

233.   Novo's statements regarding U.S. sales growth were misleading because, unbeknownst to investors, Novo's U.S. sales were entirely contingent on kickbacks to the PBMs, which was unsustainable.  Likewise, because the U.S. represented "*by far Novo Nordisk's largest market*," the rebate scheme in the U.S. was a critical factor affecting Novo's outsized operating profit projections during the Class Period.

234.   As alleged herein, the revenue generated from the PBM relationships was unsustainable.  Indeed, the former President of Novo's U.S. operations, Høiland, informed executive management and the Board of Directors in early 2015 and throughout the Class Period that the increased pricing pressures in the U.S. insulin market and the unsustainability of the demands from the PBMs meant that Novo could not meet its U.S. growth targets.

235.   In a tacit acknowledgement of its improper conduct, Novo pledged on November 30, 2016 to limit all future drug list price increases to single-digit percentages. This had a material impact on Novo's revenues and profits.  In its Q3 2016 earnings announcement, defendants disclosed that Novo was slashing its operating profit due to U.S. pricing pressures.  By failing to make the required SEC

disclosures described above, defendants' Class Period statements regarding Novo's U.S. sales were rendered materially misleading.

## B. The Rebate Scheme was Unsustainable

236. As alleged herein, the long-term continuation of the PBMs' demands was wholly unsustainable. As a result, Novo's U.S. sales and profits were equally unsustainable. By the end of the Class Period, defendants were forced to announce that the Company could no longer raise insulin prices in the U.S. This had a material impact on Novo's revenues and profits. In its Q3 2016 earnings, defendants disclosed that Novo was slashing its operating profit due to U.S. pricing pressures. The dramatic impact on Novo's revenues and profits demonstrated the material impact the PBMs' demands had on driving Novo's unsustainable revenue and profit growth trends during the Class Period.

237. The SEC explicitly requires companies to make disclosures regarding the sustainability of its revenue and profits. For example:

> Describe any **known trends or uncertainties that** have had or that the registrant reasonably expects **will have a** material favorable or **unfavorable impact on net sales or revenues or income** from continuing operations.

*     *     *

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that **would cause reported financial information not to be necessarily indicative of future operating results**.

- 132 -

238.   At all times during the Class Period, defendants were aware that the ever-growing rebate demands facilitated by list price increases were unsustainable.  Still, defendants continuously touted Novo's strong U.S. revenue and profits without providing investors required detail that PBMs demanded kickbacks and how Novo's future operating results were contingent on the continued participation in the scheme. By failing to make the required SEC disclosures described above, defendants' Class Period statements regarding Novo's U.S. operations, revenues and operating profit were rendered materially misleading.

### C.   The Rebate Scheme Involved a New Distribution Channel with High Rebates and Low Margins

239.   Defendants were also required to disclose details of the relationships with the PBMs to prevent the statements regarding its U.S. Operations and U.S. distribution channels from being misleading.   By the start of the Class Period, Novo's participation in the scheme represented a distinct new distribution channel with different characteristics than Novo's traditional sales channels in the United States and the rest of the world.  Defendants have since admitted that the PBMs' consolidation and adoption of exclusive formularies represented a major shift in its U.S. operations. Defendants have further admitted that PBMs have had and will continue to have a material adverse impact on Novo's U.S. sales.  The SEC has provided specific examples of required disclosures regarding sales channels and distribution  channels. For example:

Changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have *a significant effect on future sales* or sales returns.

An increasing trend toward sales to a different class of customer, such as a *reseller distribution channel that has a lower gross profit margin* . . . .[6]

240.   Defendants' failure to disclose the PBMs' demands in accordance with the required SEC disclosures described above rendered Novo's Class Period statements regarding its U.S. operations and distribution channels materially misleading. First, defendants made misleading statements regarding the origin of price increases and increased rebates to PBMs.  Defendants disclosed significant increases in "gross-to-net" sales provisions paid to PBMs as part the distribution of its drugs to end users in the U.S., as shown in the chart below.   During the Class Period, defendants represented that Novo controlled the level of these rebates by electing to increase prices.   Defendants stated "Contracts . . . often have price protection mechanisms built in, which means *that list price increases automatically trigger an increased rebate level*."   Thus, according to defendants' Class Period statements, Novo, and not the PBMs controlled the rebates and the significant impact that such rebates had on Novo's U.S. sales and profitability.

---

[6]   SAB 104, Topic 13.B.

| | **2013** | **2014** | **2015** | **2016** |
|---|---|---|---|---|
| Total U.S. Gross Sales | $67.6 | $80.3 | $124.7 | $139.5 |
| PBM Rebates | ($12.5) | ($17.5) | ($33.2) | ($40.9) |
| PBM Rebates as a % of Gross Sales | 19% | 22% | 27% | 29% |
| Increase v. Prior Year | -- | 16% | 23% | 7% |

241.   Novo's statements regarding rebates to PBMs were misleading because, unbeknownst to investors, the dramatic increases in sales provisions were tied to demands from the PBMs whereby Novo significantly deliberately inflated its list prices in order to pay higher and higher kickbacks to the PBMs.  After the Class Period, defendants disclosed new details on the PBM scheme and admitted that Novo had "continued to increase the list [price] in an attempt to offset the increased rebates, discounts and price concessions [paid to PBMs] to maintain a profitable and sustainable business."  Defendants also admitted that Novo's Class Period price hikes and involvement in the PBM scheme were required to "maintain[] a profit margin that has been dropping significantly since health policy changed in the U.S."  Finally defendants belatedly vowed to "improve the system and create more transparency."  By failing to make the required SEC disclosures described above, defendants' Class Period statements regarding Novo's U.S. operations and distribution channels, including its reported rebates and sales provisions, were rendered materially misleading.

242.   Second, defendants made misleading statements regarding the role of PBMs in including Novo's drugs as part of major managed care formularies.  For example defendants stated:   "The US is the world's largest market for

- 135 -

pharmaceuticals, accounting for roughly 44% of global sales.  Product success is largely based on competition on efficacy, safety, quality and price."[7]  At all times during the Class Period, defendants knew that the inclusion of Novo's drugs on managed care formularies had a material impact on Novo's U.S. sales and profitability.  These statements were misleading because, in reality, defendants were aware that selecting drugs for managed care formularies was based on the largest rebates and list prices, not on efficacy, safety, or quality.  After the Class Period, defendants disclosed new details admitting that as part of "negotiat[ions] with the companies that actually pay for the medicines [payers]," Novo provided "rebates, fees and other price concessions . .  to the payer" and that "***[t]his is necessary in order for our medicines to stay on their preferred drug list or formulary***."  By failing to make the required SEC disclosures described above, defendants' Class Period statements regarding Novo's U.S. operations and distribution channels, including its reported rebates and sales provisions, were rendered materially misleading.

## IX.   ADDITIONAL EVIDENCE OF SCIENTER

### A.   The Fraud Infected Novo's Core Operations, Which Defendants Closely Monitored

243.   The significance of (i) Novo's relationship with the PBMs, (ii) U.S. pricing and growth, and (iii) Tresiba to Novo's operations cannot be overstated. Defendants regularly acknowledged that Novo's ability to grow its business depended

---

[7]   2015 Annual Report filed with the SEC on Form 6-K (Feb.  10, 2016).

on U.S. pricing and market share, and Tresiba's ability to command premium pricing. That is why these topics were addressed at length in virtually all of the earnings conference calls throughout the Class Period.  During those calls, the Individual Defendants confirmed their personal involvement with setting prices and negotiating PBM contracts.

### B.  Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised Novo's Controls and Procedures

244.   In the 2015 20-F, defendants Sørensen and Brandgaard certified that they personally supervised and participated in the evaluation of Novo's financial controls and procedure, and that the Company's financial disclosures fairly and accurately presented its financial condition.  In addition, defendants Sørensen and Brandgaard certified that they were "responsible for establishing and maintaining disclosure controls and procedures" and that such controls and procedures ensured that "information required to be disclosed in reports that Novo Nordisk files or submits under the Securities Exchange Act of 1934, as amended, [was] recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the United States Securities and Exchange Commission, and that such information is accumulated and communicated to management of the Company, including the Chief Executive Office and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure."

245.   Further, in the Form 6-K that attached the 2015 Annual  Report, Novo included a "Statement by the Board of Directors and Executive Management on the Annual Report," signed by Sørensen, Brandgaard, and Jørgensen.  The statement attested that "Executive Management approved the Annual Report of Novo Nordisk A/S for the year 2015."   Management also affirmed that "[i]n our opinion, the Consolidated financial statements and the Financial statements of the parent company give a true and fair view of the financial position at 31 December 2015, the results of the Group's and parent company's operations, and consolidated cash flows for the financial year 2015.  Furthermore, in our opinion, Management's Review includes a true  and  fair  account  of  the  development  in  the  operations  and  financial circumstances, of the results for the year, and of the financial position of the Group and the parent company as well as a description of the most significant risks and elements of uncertainty facing the Group and the parent company."

246.   Finally, each Form 6-K that attached a quarterly financial report during the  Class  Period  included  a  "Management  Statement"  stating  that  "Executive Management  ha[s]  reviewed  and  approved  the  financial  report."   In  addition, Executive  Management  affirmed  that  "[b]esides  what  has  been  disclosed  in  the quarterly  financial  report,  no  changes  in  the  Group's  most  significant  risks  and uncertainties have occurred" since the latest Annual Report.

## C.    Defendants' Compensation Structure Incentivized Fraud

247.   As a result of Novo's compensation structure, defendants had a direct incentive to manipulate Novo's revenues.  Novo explained its compensation structure, including financial incentives, in its Annual Reports.  Novo provides incentive awards in both cash and Company shares.  The Company describes the cash-based incentives as dependent on the achievement of (a) "a number of predefined short-term financial, process, people and customer targets" enumerated on the Company's "Balanced Scorecard," and (b) "a number of personal targets relating to the individual executive and their position."  However, the Company does not disclose the content of the Balanced Scorecard or more information about the individual goals.

248.   Share-based incentives, on the other hand, are "based on a calculation of economic value creation compared with planned performance" and measured by the Company's "operating profit after tax."  Each year, the  Board of Directors sets the maximum amount executives can recover from share-based incentives.  The potential awards are significant, allowing some executives to nearly double their compensation for the year.

249.   In 2015, during the height of the scheme, the Board of Directors set the maximum share-based incentives at "12 months' fixed base salary including pension contribution for the CEO and up to nine months' fixed base salary plus pension contribution for the other members of Executive Management."  As a result of the

- 139 -

Company's strong financial performance that year, the Company determined that "participants in the share-based long-term incentive programme will receive the maximum share allocation."

250.  In 2016, the Board of Directors set the maximum share-based incentive as "12 months' fixed base salary plus pension contribution for the chief executive officer, a maximum of 8.5 months' fixed base salary plus pension contribution for executives on international assignments and a maximum of 8 months' fixed base salary plus pension contribution for the remaining members of Executive Management based in Denmark."  Novo again received inflated revenues but their scheme began to unravel in the latter half of the year.  As a result, the Company failed to meet its goals, and all executives received just 27% of their maximum share-based incentives.  The Company claimed the reduced compensation "was a result of the company not meeting the targets for sales performance but also reflecting that some of the non-financial targets have not been met."   The Company also slashed cash-based incentives dramatically, providing 50% to the CEO and 55% to the other executives.

251.  The following table summarizes total compensation[8] for several Novo executives in 2015 and 2016:

---

[8]   Amounts originally reported in DKK, but converted to USD using the "Period End" exchange rate Novo reported in its Form 20-F for 2015 and 2016.

| Name | Year | Salary | Cash Bonus | Pension | Benefits | Share Bonus[9] | Total |
|------|------|--------|-----------|---------|----------|---------------|-------|
| Sørensen | 2016 | $1,687,943 | $851,064 | $638,298 | $42,553 | $628,085 | **$3,847,943** |
|  | 2015 | $1,551,977 | $1,551,977 | $775,988 | $43,924 | $2,327,965 | **$6,251,830** |
| Jørgensen | 2016 | $780,142 | $255,319 | $255,319 | $42,553 | $279,574 | **$1,612,908** |
|  | 2015 | $761,347 | $512,445 | $322,108 | $43,924 | $1,083,455 | **$2,723,280** |
| Brandgaard | 2016 | $865,248 | $283,688 | $283,688 | $42,553 | $310,213 | **$1,785,390** |
|  | 2015 | $878,477 | $585,652 | $366,032 | $43,924 | $1,244,510 | **$3,118,594** |
| Riis | 2016 | $510,638 | $255,319 | $198,582 | $28,369 | $191,489 | **$1,184,397** |
|  | 2015 | $761,347 | $409,956 | $292,826 | $43,924 | $1,054,173 | **$2,562,225** |

### D.    Sørensen and Høiland Abruptly Leave

252.   On September 1, 2016, less than one month after the initial disclosure, Novo announced that defendant Sørensen would retire at the end of the year, more than two years earlier than the Company previously planned.  At the same time, Novo replaced Høiland as the head of its U.S. operations.

253.   These departures were seen as abrupt and unexpected by analysts and industry insiders.  A J.P Morgan analyst wrote: "we believe that investors were expecting Lars Rebien Sørensen to remain as CEO until 2019 and guide Novo through the current challenges of payer pressure in the US."  The analyst also noted that the removal of Høiland "highlights that Novo felt they needed new management to lead the task of delivering U.S. growth against the backdrop of US pricing pressure."  J.P Morgan concluded, "[o]verall the unexpected timing of CEO retirement and the

---

[9]    Novo does not distribute shares until three years after issuance.  These are expected distributions based on the reported percentage of maximum salary plus pension.

change to the Head of U.S. operations, will likely increase the near-term uncertainty around Novo's future development."

## X.   LOSS CAUSATION

254.   Novo's ADRs are traded on the NYSE.  The underlying security for the ADRs is Novo Class B common shares, which trade on the NASDAQ Copenhagen exchange.  Each Novo ADR represents one share of Novo Class B common share. The markets for both Novo's Class B common shares and Novo's ADRs were open, well-developed and efficient at all relevant times.

255.   As detailed herein, during the Class Period, defendants made false and misleading statements and engaged in a scheme that artificially inflated Novo's ADR price.  Defendants misled investors about Novo's financial health and performance and its prospects for future financial success by failing to disclose the details of its rebate scheme with the PBMs, maintaining that Novo was not subject to the pricing pressures that finally came to bear on the U.S. insulin market, and falsely representing that Tresiba would insulate the Company from those pricing pressures.  Because insulin is essentially a commodity, and the PBMs could easily drop Novo's products in favor of a competitor's product, Novo was at the mercy of the PBMs and was forced to accept the PBM's pricing and rebate demands.  Unbeknownst to investors, the rebate scheme, and as a result the revenue that was derived from the scheme, could not be maintained.

256.   When defendants' prior misrepresentations and fraudulent conduct was revealed to the market in a series of partial disclosures, the price of Novo's ADRs significantly dropped, as the artificial inflation came out of the price over time.  As a result of their purchases of Novo's ADRs during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

257.   Partial disclosures relating to the rebate scheme and the impact to Novo's operations and forecasts began to enter the market when 2Q 2016 earnings were announced.  On August 5, 2016, Novo announced it 2Q 2016 earnings results and adjusted its second half 2016 and 2017 forecasts.  The Company announced that moderate pricing pressures in the U.S. contributed to the poor results and lowered forecasts.

258.   Analysts took note.  Deutsche Bank stated that the U.S. modern inulin sales "stood out" in the sales miss, "showing evidence of tough payer pressure." Deutsche Bank also noted that Novo's August 5 share price movement "reflect[ed] the realization that Novo is not immune" from pressure from U.S. PBMs.   Kepler Cheuvreux's August 5 analyst report noted that Novo's "commentary on lower U.S. prices is likely to be taken negatively by the markets."  Similarly, the August 5 UBS analyst report stated, "[w]e expect a negative reaction given the guidance and deteriorating US market."

259.   The price of Novo's ADRs dropped $5.33 on August 5, 2016, or 10.15%, to close at $49.87.  Meanwhile, the CRSP Market Index increased 0.87% on the same day.

260.   On August 8, 2016, the next day of trading following the August 5 earnings release, analysts continued to report on the 2Q 2016 earnings and future guidance announcement.  A Leerink analyst reported that Novo's price target was cut because of "insulin pricing headwinds pressure."  The August 8, 2016 SEB analyst report noted that "[t]he reimbursement Novo has secured for its products in the US market seems to have come at a high price."  The SEB analyst report also stated, "[i]t is obvious that drug prices in general are being criticized for being too high and the cost of insulin is brought up again and again."

261.   On August 8, 2016, the price of Novo's ADRs continued to fall due to the announcement and analysis of the information disclosed in connection with 2Q 2016 earnings release.  The price of Novo's ADRs dropped $2.47, or a 5.65%, to close at $47.13.  The CRSP Index dropped merely 0.07% on August 8, 2016.

262.   But Novo's ADR price remained inflated because defendants continued to conceal the existence and full impact of the rebate schemes and continued to falsely insist Novo would achieve long-term growth and that Tresiba was a superior drug capable of demanding premium pricing.

263.   On September 29, 2016, Novo announced that it would reduce its workforce by approximately 1000 employees.  According to the news release, the reason for the layoffs was to "reduce operating costs as the company faces a challenging competitive environment in 2017, especially in its large U.S. market." The announcement further disclosed changes in the U.S. operations and the need to lower costs due to the volatile nature of the U.S. market.  On September 29, 2016, Novo's ADRs dropped $1.94, or 4.54%, to close at $41.80.  Meanwhile the CRSP Index dropped only 0.97%.

264.   On October 28, 2016, in its 3Q 2016 earnings announcement, Novo again slashed its long-term annual profit growth guidance, reducing the 10% profit growth guidance to 5%.  Once again the Company blamed the reduction on a challenging market environment in the U.S. where it was forced to offer ever-deeper discounts on its insulin products.  Novo also reduced 2016 sales growth range to 5%-6%, expecting sales growth to be 2% below the guidance.  Likewise, 2016 operating profit growth range was reduced to 5%-7%, with an expectation of it being 2% below guidance. The reduction was due to "sustained, unfavorable volume development in the U.S. market, especially within modern insulins."  The Company now revealed that "since February 2016, the competitive environment in the U.S. within both diabetes care and biopharmaceuticals has become more challenging, negatively impacting the price of [Novo's] product, especially for insulin and human growth hormone products."

- 145 -

265.   Analysts took note that Novo, which had a history of reliable growth, was now lowering growth.  An October 28, 2016 Kepler Cheuvreux analyst report stated, "[t]his is a huge negative change in the outlook, driven by U.S. pricing pressure which 'has become significantly more challenging.'"  Recognizing that Novo could have previously revealed the extent of the U.S. pricing impact, an October 30, 2016 Leerink analyst report stated, "***NVO management finally owned up to the significant challenges it faces in the years ahead***, lowering its previous long term operating profit growth target from 10% to 5%."

266.   The Novo ADRs reacted accordingly on October 28, 2016, falling $5.28, a 13.81% drop, to close at $35.66.  On the same day, the CRSP Index dropped merely 0.27%.

267.   Novo's ADR price remained artificially inflated because although Novo reduced long term guidance, defendants continued to conceal the existence and full impact of the rebate scheme and falsely assured investors of their confidence that growth would be achieved, again citing Tresiba as one of the primary drivers.

268.   On February 2, 2017, while announcing 4Q 2016 results, Novo revealed further reductions in its 2017 guidance, lowering sales growth from a "low single-digit" increase to a range between -1% and 4% and operating profit growth from "flat to low single digit" increase to between -2% and 3%.  The Company announced that lower realized prices in the U.S. were impacting sales, the PBMs were taking larger

rebates and net pricing was declining.  Novo finally admitted to a "transformation of how we conduct business in the US."

269.   Analysts took notice of Novo's admission that there was a new way of doing business with the PBMs and Novo needed to adjust, despite the fact that the rebate scheme was prevalent throughout the Class Period.  In its February 2, 2017 analyst report, Morningstar stated, "the biggest concern in the long-acting insulin market (and for Novo as a firm) remains the U.S. pricing environment."  The Morningstar analyst report also noted that now Novo "does have a longer-term strategy for controlling pricing headwinds in the future."  The following day, an HSBC analyst report described the shift in power that Novo previously concealed as follows: "[w]ith the structural change in U.S. drug pricing, Pharma companies having lost pricing power to payers, mainly Pharmacy Benefit Managers, and with Novo entrenched in two of the most competitive therapeutic areas – Diabetes and Haemophilia – which are likely to see sustained pricing pressure in the U.S., Novo is no longer the master of its own destiny."

270.   The Novo ADR price dropped in response to this revelation.   On February 2, 2017, Novo's ADR's dropped $3.21, a 9.10% decline, to close at $33.48. The drop in the price of Novo's ADRs was in contrast to the 0.06% increase of the CRSP Index.

271.   Each disclosure of adverse facts that removed inflation from Novo's ADR price was connected to defendants' false statements and omissions and fraudulent conduct alleged herein.  The timing and magnitude of Novo's ADR price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.  As a direct result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of Novo's ADRs, Plaintiffs and the Class have suffered significant losses and damages.

## XI.   NO SAFE HARBOR

272.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

273.   None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about pricing pressures that Novo and its competitors faced.

274.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual

- 148 -

results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted defendants' statements regarding the pricing pressures that Novo faced and was experiencing.  Given the then-existing facts contradicting defendants' statements, any generalized risk disclosures made by Novo were not sufficient to insulate defendants from liability for their materially false and misleading statements.

275.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those materially false and misleading forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the false and misleading forward-looking statement was authorized and/or approved by an executive officer of Novo who knew that the statement was false or misleading when made.

## XII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

276.   Plaintiffs and members of the putative Class are entitled to a presumption of reliance on defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Novo ADRs was open, efficient and well developed for the following reasons, among others:

- 149 -

(a)    Novo ADRs met the requirements for cross-listing, and were cross-listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    The price of Novo ADRs reacted promptly to the dissemination of new information regarding the Company.  Novo ADRs were actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional investor participation.  The average daily trading volume for Novo ADRs during the Class Period was over 2 million ADRs, and the average weekly volume as a percentage of ADRs outstanding was 4.22%;

(c)    As a regulated issuer, Novo filed periodic reports with the SEC and the New York Stock Exchange;

(d)    Novo regularly communicated with public investors via established market-communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)    Novo was followed extensively by the media, and by numerous securities analysts employed by major brokerage firms who wrote analyst reports about Novo during the Class Period that were distributed to those brokerage firms'

- 150 -

sales forces and certain customers.  Each of those reports was publicly available and entered the public marketplace.

277.   As a result of the foregoing, the market for Novo ADRs promptly digested current information regarding Novo from all publicly available sources and reflected such information in the price of Novo ADRs. Under these circumstances, all purchasers of Novo ADRs during the Class Period suffered similar injury through their purchase of Novo ADRs at artificially inflated prices and the presumption of reliance applies.

278.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on defendants' material omissions. Because this action involves defendants' failure to disclose material adverse information regarding Novo's sales of insulin – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Novo's insulin business, as set forth above, that requirement is satisfied here.

## XIII.  PLAINTIFFS' CLASS ACTION ALLEGATIONS

279.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the ADRs of Novo during the Class Period (the "Class").  Excluded from the Class are defendants and their families, directors, and officers of Novo and their families and affiliates.

280.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of December 31, 2015, Novo had over 240 million ADRs outstanding, owned by hundreds or thousands of investors.

281.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

  (a) Whether defendants violated the Exchange Act;

  (b) Whether defendants omitted and/or misrepresented material facts;

  (c) Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

- 152 -

(d)     Whether defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether the price of Novo ADRs was artificially inflated;

(f)     Whether defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damage sustained by Class members and the appropriate measure of damages.

282.   Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from defendants' wrongful conduct.

283.   Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

284.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Joinder of all Class members is impracticable.  In addition, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

285.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

286.   During the Class Period, defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Novo ADRs at artificially inflated prices.

287.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADRs in an effort to maintain artificially high market prices for Novo ADRs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

288.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

- 154 -

289.   During the Class Period, defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

290.   Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal Novo's true condition from the investing public and to support the artificially inflated prices of the Company's ADRs.

291.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Novo ADRs.  Plaintiffs and the Class would not have purchased the Company's ADRs at the prices they paid, or at all, had they been aware that the market prices for Novo ADRs had been artificially inflated by defendants' fraudulent course of conduct.

292.   As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's ADRs during the Class Period.

293.   By virtue of the foregoing, defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants)

294.   Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

295.   The Individual Defendants acted as controlling persons of Novo within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-today operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Novo, the Individual Defendants had the power and ability to control the actions of Novo and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.   Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

- 156 -

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED:  August 4, 2017                SEEGER WEISS LLP
                                      CHRISTOPHER A. SEEGER
                                      DAVID R. BUCHANAN


                                      */s/  Christopher A. Seeger*
                                      CHRISTOPHER A. SEEGER

                                      550 Broad Street, Suite 920
                                      Newark, NJ  07102
                                      Telephone:  973/639-9100
                                      973/639-9393 (fax)

                                      SEEGER WEISS LLP
                                      JENNIFER R. SCULLION
                                      77 Water Street, 26th Floor
                                      New York, NY  10005
                                      Telephone:  212/584-0700
                                      212/584-0799 (fax)

                                      CARELLA, BYRNE, CECCHI, OLSTEIN,
                                        BRODY & AGNELLO, P.C.
                                      JAMES E. CECCHI
                                      5 Becker Farm Road
                                      Roseland, NJ  07068
                                      Telephone:  973/994-1700
                                      973/994-1744 (fax)

                                      Co-Liaison Counsel and Executive
                                      Committee Members for the Class

- 157 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
LUKE O. BROOKS
RYAN A. LLORENS
ERIC I. NIEHAUS
ANGEL P. LAU
JEFFREY J. STEIN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

BERNSTEIN LITOWITZ BERGER &
  GROSSMANN LLP
SALVATORE J. GRAZIANO
KATHERINE M. SINDERSON
HANNAH ROSS
AVI JOSEFSON
ADAM D. HOLLANDER
1251 Avenue of the Americas
New York, NY  10020
Telephone:  212/554-1400
212/554-1444 (fax)

Co-Lead Counsel for the Class

SAXENA WHITE P.A.
JOSEPH E. WHITE
5200 Town Center Circle, Suite 601
Boca Raton, FL  33486
Telephone:  561/394-3399
561/394-3382 (fax)

SAXENA WHITE P.A.
STEVEN B. SINGER
4 West Red Oak Lane
Suite 312
White Plains, NY  10604
Telephone:  914/437-8551
888/631-3611 (fax)

Executive Committee Member

# APPENDIX 1

# APPENDIX 1

## Reported Sales of Modern Insulin in the United States

| (DKK Million) | FY14* | 1Q15 | 2Q15 | 3Q15 | 4Q15 | 1Q16 | 2Q16 | 3Q16 |
|---|---|---|---|---|---|---|---|---|
| NovoLog: | 10,191 | 2,669 | 3,053 | 3,013 | 3,449 | 2,532 | 2,691 | 2,639 |
| NovoLog Mix: | 2,483 | 596 | 762 | 702 | 719 | 563 | 536 | 418 |
| Levemir: | 9,386 | 2,788 | 3,172 | 3,377 | 3,645 | 3,171 | 3,038 | 3,132 |
| Total: | 22,060 | 6,053 | 6,987 | 7,092 | 7,813 | 6,266 | 6,265 | 6,189 |

*The 2014 numbers include both U.S. and Canadian sales, as reported by Novo

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 4, 2017, I caused true and correct copies of

these documents to be served via this Court's ECF system to all counsel of record.

Dated:   New York, New York
         August 4, 2017

                          */s/  Christopher A. Seeger*
                          Christopher A. Seeger
                          SEEGER WEISS LLP
                          550 Broad Street, Suite 920
                          Newark, NJ  07102
                          Telephone: 973/693-0100
                          Facsimile:  973/639-9393