SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
973/639-9393 (fax)

CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO, P.C.
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)

Co-Liaison Counsel and Executive Committee Members for the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re NOVO NORDISK SECURITIES LITIGATION | ) ) ) | Master File No. 3:17-cv-00209-BRM-LHG |
| | ) ) | CLASS ACTION |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ......................................................1

II.    ARGUMENT.................................................................................5

    A.   The Class Should Be Certified Under Rule 23(a) and (b)(3)...............5

    B.   Plaintiffs Satisfy Rule 23(a) ...................................................6

        1.   The Proposed Class Is Numerous ................................6

        2.   Plaintiffs Raise Common Questions of Law and Fact..............8

        3.   Plaintiffs' Claims are Typical of the Class's Claims...............10

        4.   Plaintiffs and Counsel are Adequate Class
            Representatives ..........................................................11

            a.   Plaintiffs Are Adequate to Serve as Class
                Representatives .............................................12

            b.   Proposed Class Counsel Are Adequate ..........................15

    C.   Plaintiffs Satisfy Rule 23(b)(3) ...............................................15

        1.   Common Questions Predominate .............................................16

            a.   All Class Members Are Presumed to Have Relied
                Upon Defendants' Misleading Statements and
                Omissions ........................................................19

                (1)   The NYSE Is an Efficient Market.......................20

                (2)   The *Cammer* Factors ...........................................21

                (3)   The *Krogman* Factors...........................................28

            b.   The Class is Entitled to a Presumption of Reliance
                  Under *Affiliated Ute*........................................30

        2.   Class Treatment Is Superior to Other Methods of
            Adjudication........................................................32

III.   CONCLUSION.............................................................................34

1546375_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)...............................................................18, 31, 32

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)..........................................................................12, 16

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013).........................................................................*passim*

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).........................................................................*passim*

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) ..............................................................15, 23

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989).........................................................*passim*

*Cheney v. Cyberguard Corp.*,
  213 F.R.D. 484 (S.D. Fla. 2003)......................................................................30

*City of Sterling Heights Gen. Emps. Ret. Sys.*
  *v. Prudential Fin., Inc.*,
  No. 12-5275, 2015 WL 5097883
  (D.N.J. Aug. 31, 2015)...................................................................*passim*

*Dartell v. Tibet Pharms., Inc.*,
  No. 14-3620, 2016 WL 718150
  (D.N.J. Feb. 22, 2016) ....................................................................7, 8

*Dewey v. Volkswagen Aktiengesellschaft*,
  681 F.3d 170 (3d Cir. 2012) ..............................................................13

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  296 F.R.D. 261 (S.D.N.Y. 2014) ..............................................................31, 32

*Erika P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011).........................................................................10, 16, 17

1546375_1

**Page**

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976).................................................................5

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)........................................................*passim*

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983).................................................................5

*In re Constar Int'l Sec. Litig.*,
   585 F.3d 774 (3d Cir. 2009) ..............................................5, 15

*In re DVI Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Pa. 2008)......................................21, 22, 23, 29

*In re DVI, Inc. Sec. Litig.*,
   639 F.3d 623 (3d Cir. 2011),
   *abrogated on other grounds by*
   *Amgen*, 568 U.S. 455 (2013)..................................................20

*In re Enron Corp. Sec. Litig.*,
   586 F. Supp. 2d 732 (S.D. Tex. 2008)........................................15

*In re Heckmann Corp. Sec. Litig.*,
   No. 10-378-LPS-MPT, 2013 WL 2456104
   (D. Del. June 6, 2013) ............................................8, 11, 32

*In re Honeywell Int'l Inc. Sec. Litig.*,
   211 F.R.D. 255 (D.N.J. 2002)..................................................12

*In re Merck & Co., Inc. Sec. Derivative*
   *& ERISA Litig.*,
   No. 1658 (SRC), 2013 WL 396117
   (D.N.J. Jan. 30, 2013) ...................................................*passim*

*In re Merck & Co., Vytorin/Zetia Sec. Litig.*,
   No. 08-2177 (DMC)(JAD), 2012 WL 4482041
   (D.N.J. Sep. 25, 2012) ...................................................*passim*

- iii -

**Page**

*In re PHP Healthcare Corp.*,
128 F. App'x 839 (3d Cir. 2005) (per curiam) ...................................................20

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
No. 8-397 (DMC)(JAD), 2012 WL 4482032
(D.N.J. Sept. 25, 2012) ................................................................................*passim*

*In re Tyson Foods, Inc.*,
No. Civ.A. 01-425-SLR, 2003 WL 22316548
(D. Del. Oct. 6, 2003) ........................................................................................14

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) ...............................................................................24

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D.Tex. 2001) ..............................................................28, 29, 30

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
967 F.2d 742 (2d Cir. 1992) ...............................................................................31

*Local 703, I.B. of T. Grocery & Food Emps.*
*Welfare Fund v. Regions Fin. Corp.*,
762 F.3d 1248 (11th Cir. 2014) .........................................................................14

*Neale v. Volvo Cars of N. Am.*,
794 F.3d 353 (3d Cir. 2015) ...............................................................................17

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) .........................................................................10, 11

*Reyes v. Netdeposit, LLC*,
802 F.3d 469 (3d Cir. 2015) .................................................................................8

*Skeway v. China Nat. Gas, Inc.*,
No. 10-728-RGA, 2014 WL 2795466
(D. Del. June 18, 2014).......................................................................................31

*Stewart v. Abraham*,
275 F.3d 220 (3d Cir. 2001) .................................................................................7

- iv -

**Page**

*Unger v. Amedisys*,
   401 F.3d 316 (5th Cir. 2005) ...............................................................28

*United States v. Schiff*,
   602 F.3d 152 (3d Cir. 2010) ...............................................................24

*W. Palm Beach Police Pension Fund*
   *v. DFC Glob. Corp.*,
   No. 13-6731, 2016 WL 4138613
   (E.D. Pa. Aug. 4, 2016)...............................................................8, 14

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017), *cert. denied*,
   __ U.S. __, 138 S. Ct. 1702 (2018)............................................20, 24

*Williams v. Jani-King of Phila., Inc.*,
   837 F.3d 314 (3d Cir. 2016) ...............................................................6

## STATUTES, RULES AND REGULATIONS

17 C.F.R.
   §239.13..................................................................................................23
   §240.10b-5(b)........................................................................................31

Securities Exchange Act of 1934
   §10(b)...........................................................................................2, 11, 17
   §10b-5 .................................................................................................19
   §20(a) ........................................................................................2, 11, 17

Federal Rules of Civil Procedure
   Rule 23 .....................................................................................1, 5, 6, 16
   Rule 23(a)........................................................................................*passim*
   Rule 23(a)(1).........................................................................................6
   Rule 23(a)(2).........................................................................................8
   Rule 23(a)(3).......................................................................................10
   Rule 23(b)(3)(A)-(D) ...........................................................................32

1546375_1

Pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), Plaintiffs Central States, Southeast and Southwest Areas Pension Fund, Lehigh County Employees' Retirement System, Oklahoma Firefighters Pension and Retirement System, Boston Retirement System, and Employees' Pension Plan of the City of Clearwater (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their Motion for Class Certification ("Motion").

## I.    PRELIMINARY STATEMENT

Plaintiffs move for certification of a class consisting of:

> All persons or entities who purchased the American Depositary Receipts ("ADRs") of Novo Nordisk A/S ("Novo" or the "Company") between February 3, 2015 and February 2, 2017, inclusive (the "Class Period"), and were damaged thereby (the "Class").[1]

"[I]t is well-settled that the class action is a particularly appropriate vehicle for adjudication of federal securities cases." *City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*, No. 12-5275, 2015 WL 5097883, at *13 (D.N.J. Aug. 31, 2015). This case is no exception, and Plaintiffs' Motion should be granted.

Novo is a global healthcare company and one of three diabetes drug manufacturers that dominate the United States and global insulin markets. ¶3.[2] Novo

---

[1]    Excluded from the Class are: (i) Novo; (ii) any directors and officers of Novo during the Class Period and members of their immediate families; (iii) the subsidiaries, parents and affiliates of Novo; (iv) any firm, trust, corporation or other entity in which Novo has or had a controlling interest; and (v) the legal representatives, heirs, successors and assigns of any such excluded party.

[2]    All "¶__" and "¶¶__" references are to the Consolidated Amended Class Action Complaint (ECF No. 71) ("Complaint").

ADRs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "NVO." ¶34. The Company and three of its highest ranking current and former officers – Class Period Chief Executive Officer Lars Rebien Sørensen, Chief Financial Officer Jesper Brandgaard, and head of North American operations Jakob Riis – are the Defendants in this action. ¶¶35-37.

Plaintiffs allege that Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") by making a series of materially false and misleading statements and omissions throughout the Class Period that falsely attributed Novo's revenues and growth to purported innovation and product-specific qualities. For example, throughout the Class Period, Defendants told investors that Novo's success was due to "*a very strong position with a gold standard product*," that its new drug Tresiba would "*allow us to achieve 10% or more top-line growth in the diabetes market*," and that Defendants were "*quite certain*" that Novo would realize its forecasted growth, particularly because on pricing, "*we make our own decisions*." ¶¶15, 18.[3]

In truth, however, Novo's financial results were driven by a scheme in which the Company paid increasingly large kickbacks, dubbed "rebates," to pharmacy benefit managers ("PBMs") in exchange for market access, while Novo raised list prices for its insulin drugs in lockstep with its competitors in order to support those

---

[3]   All citations are omitted and all emphasis is added unless otherwise noted.

ever-growing kickbacks. ¶¶48-49. But as PBMs demanded higher and higher rebates, consumers and regulators balked at further list price increases, leaving Novo and its competitors with the choice of paying the rebates to maintain market access and losing profits, or rejecting PBMs' rebate demands and losing market share. *See* ¶¶4, 6. Faced with the same circumstances, Novo's competitors came clean to the market and lowered forecasts before the start of the Class Period. ¶¶4, 90, 95, 99-100. In contrast, Novo falsely maintained it was better situated because its drugs were superior to its competitors', such that it could maintain both high prices and market share. ¶¶5-6, 92, 101, 168. It could not.

Novo's inability to further raise list prices rendered its improper anticompetitive sales model unsustainable, and ultimately forced the Company to report lower earnings and lowered forecasts on August 5, 2016, October 28, 2016 and February 2, 2017, contradicting its prior positive statements. ¶¶257, 264, 268. Novo also announced it would reduce its workforce by approximately 1,000 employees on September 29, 2016. ¶263. Not surprisingly, given the central importance of insulin sales to Novo's earnings – representing 80% of revenues, with 54% coming from the U.S. insulin market – investors reacted strongly to this series of disclosures, with the price of Novo ADRs plummeting 15.8%, 13.81%, 9.10% and 4.54%, respectively. ¶¶259-61, 263, 266, 270.

Plaintiffs' claims arising from these facts are ideally situated for class treatment. And because Plaintiffs satisfy each of Rule 23(a) and (b)(3)'s requirements, Plaintiffs' Motion should be granted. As explained in full below, this is a securities class action involving a widely held security that was actively traded on a major national exchange – the NYSE – by thousands of investors throughout the Class Period; Plaintiffs' and the Class's claims all concern the damages caused by Defendants' alleged materially false and misleading statements and omissions to the investing public; and Plaintiffs are precisely the kind of sophisticated institutional investors that Congress intended to serve as class representatives for such cases. Accordingly, the Rule 23(a) requirements of (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy, and the Rule 23(b)(3) requirements of predominance and superiority are readily satisfied. The proposed Class should thus be certified.

Accordingly, Plaintiffs respectfully request that the Court grant this Motion; certify the Class; appoint Plaintiffs as Class Representatives; and appoint Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") as Class Counsel, and Seeger Weiss LLP ("Seeger Weiss") and Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. ("Carella Byrne") as Co-Liaison Counsel.[4]

---

[4]    Pursuant to the Court's June 1, 2017 Order Appointing Co-Lead Plaintiff, Approving Selection of Class Counsel, and Consolidating Related Actions (ECF No. 42) ("Lead Plaintiff Order"), Carella Byrne, Seeger Weiss and Saxena White P.A. ("Saxena White") were appointed to an Executive

## II.    ARGUMENT

### A.    The Class Should Be Certified Under Rule 23(a) and (b)(3)

"[F]ederal securities actions are 'well suited' for litigation under Rule 23."  *In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*, No. 1658 (SRC), 2013 WL 396117, at *13 (D.N.J. Jan. 30, 2013).  Indeed, the Supreme Court has repeatedly stressed the importance of the class action device in redressing wrongs under the federal securities laws.  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267-68 (2014) ("*Halliburton II*"); *Basic Inc. v. Levinson*, 485 U.S. 224, 229-30, 249-50 (1988); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 380 n.10 (1983); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196 (1976).  As this Court has noted:

> 'The Supreme Court as well as every circuit that has confronted the issue of class certification in the area of securities litigation has recognized its utility and necessity in a society where geographically dispersed shareholders cannot individually challenge violations by powerful and wealthy corporate defendants because of their small holdings and the unyielding costs of securities litigation.'

*Merck*, 2013 WL 396117, at *13.

To certify the Class, Plaintiffs must establish that the requirements of Rule 23(a) and at least one subsection of Rule 23(b) are satisfied.  *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013); *In re Constar Int'l Sec. Litig.*, 585

---

Committee to represent the Class.  Following certification, Plaintiffs will maintain the same decision-making framework detailed in the Lead Plaintiff Order, and the Executive Committee of Saxena White, Seeger Weiss, and Carella Byrne shall continue to work at the direction of Co-Lead Counsel and assist Co-Lead Counsel in prosecuting this case.  *See id.*, ¶2.

F.3d 774, 780 (3d Cir. 2009).  As Supreme Court and Third Circuit authority make clear, the inquiry at the class certification stage is not concerned with whether the plaintiff will ultimately prevail on the merits, but rather whether the requirements of Rule 23 are met.  *See Amgen*, 568 U.S. at 465-66; *Williams v. Jani-King of Phila., Inc.*, 837 F.3d 314, 322 (3d Cir. 2016).  Accordingly, "[m]erits questions may be considered to the extent – ***but only to the extent*** – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen*, 568 U.S. at 466.

### B.  Plaintiffs Satisfy Rule 23(a)

There are four requirements under Rule 23(a) to certify a class: (1) the class must be "so numerous that joinder of all members is impracticable"; (2) "questions of law or fact common to the class" must exist; (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class"; and (4) "the representative parties" must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  As described below, Plaintiffs satisfy each of these requirements.

### 1.  The Proposed Class Is Numerous

Plaintiffs meet Rule 23(a)(1)'s numerosity requirement because the proposed Class is so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  To satisfy this requirement, Plaintiffs need not offer direct evidence of the

exact number of class members. *Cf. Merck*, 2013 WL 396117, at *3. Rather, "'circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition'" is sufficient. *Id.* "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of [Rule 23(a)] has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001); *see Merck*, 2013 WL 396117, at *3.

Numerosity "is readily met in securities cases involving an issuer whose stock trades publicly on the NYSE," such as this one. *Prudential*, 2015 WL 5097883, at *8. During the Class Period, Novo averaged 241.5 million ADRs outstanding and an average weekly trading volume of 10.07 million. Report on Market Efficiency by Professor Steven P. Feinstein (Ex. 1) ("Feinstein Rpt."), ¶¶57, 88.[5] Moreover, Novo ADRs publicly trade on the NYSE, "one of the most renowned, most liquid, and most efficient forums for trading securities in the world." *Id.*, ¶73. These facts easily establish numerosity. *See Prudential*, 2015 WL 5097883, at *8 (numerosity satisfied where "Prudential stock trade[d] on the NYSE with significant daily volume"); *Dartell v. Tibet Pharms., Inc.*, No. 14-3620, 2016 WL 718150, at *3 (D.N.J. Feb. 22, 2016) (numerosity satisfied where "there were three million shares of stock sold in the

---

[5] All "Ex. __"citations are to exhibits attached to the Declaration of Christopher A. Seeger in Support of Plaintiffs' Motion for Class Certification ("Seeger Decl."), filed concurrently herewith.

IPO"); *In re Heckmann Corp. Sec. Litig.*, No. 10-378-LPS-MPT, 2013 WL 2456104, at *10 (D. Del. June 6, 2013) (numerosity "clearly" satisfied where "there were between 69 million and 128 million shares of Heckmann stock outstanding, with an average of 3.4 million common shares traded on a weekly basis").

### 2.     Plaintiffs Raise Common Questions of Law and Fact

Rule 23(a)(2)'s commonality requirement is met where, as here, there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement is "not particularly demanding," *Prudential*, 2015 WL 5097883, at *8, and is satisfied where proposed class representatives share "at least one question of fact or law with the grievances of the prospective class," *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015); *see W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. 13-6731, 2016 WL 4138613, at *8 (E.D. Pa. Aug. 4, 2016) ("The bar to satisfy the commonality requirement is not high: a single common question is sufficient."). This common contention need only be "'of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Merck*, 2013 WL 396117, at *4. "'Where [a]ll plaintiffs, both individual representatives and member[s] of the class, seek to establish the defendants' fraudulent conduct under the federal securities laws, commonality is found to exist.'" *Dartell*, 2016 WL 718150, at *3.

This action raises paradigmatically common factual and legal issues: the Complaint details a common course of conduct arising from materially false and misleading statements and omissions Defendants made to the investing public in Novo's SEC filings and press releases and on conference calls, and the Complaint's allegations concern all Class members. Accordingly, this action is replete with questions that are common to the Class, including: (1) whether Defendants violated the Exchange Act; (2) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (3) whether Defendants knew or were deliberately reckless in not knowing that their statements and/or omissions were false and misleading; (4) whether the price of Novo ADRs was artificially inflated; (5) whether Defendants' conduct caused the members of the Class to sustain damages; and (6) the extent of damage sustained by Class members and the appropriate measure of damages. *See* ¶281(a)-(g).

Each of these questions demonstrates a common theory of recovery for Plaintiffs and the Class, which satisfies the commonality requirement:

> Defendants made misrepresentations about the [sustainability of Novo's profits and growth despite ever-increasing demands for rebates by PBMs] and/or concealed material information about this topic; Plaintiffs purchased [Novo ADRs], in reliance on the public information about [Novo] as incorporated into the stock price; and Plaintiffs suffered a loss

when their artificially inflated [ADRs] dropped in price upon the
disclosure of corrective information about [Novo].

*Merck*, 2013 WL 396117, at *4; *see also Erika P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804, 813 (2011) ("*Halliburton I*") (holding that materiality and loss
causation present common questions); *Amgen*, 568 U.S. at 470 ("the question of
materiality is common to the class"); *Prudential*, 2015 WL 5097883, at *8 ("the
issues of materiality and loss causation both present common questions of law and
fact and can be proven with common evidence"); *In re Merck & Co., Vytorin/Zetia
Sec. Litig.*, No. 08-2177 (DMC)(JAD), 2012 WL 4482041, at *4 (D.N.J. Sep. 25,
2012) ("This securities fraud class action involves questions such as whether
Defendants' alleged statements and omissions were misleading, whether these
statements and omissions were material, and whether Defendants acted with scienter.
Accordingly, the commonality element is met."); *In re Schering-Plough
Corp./ENHANCE Sec. Litig.*, No. 8-397 (DMC)(JAD), 2012 WL 4482032, at *4
(D.N.J. Sept. 25, 2012) (same).

### 3. Plaintiffs' Claims are Typical of the Class's Claims

Plaintiffs satisfy Rule 23(a)(3)'s typicality requirement because Plaintiffs'
claims are "typical" of the claims of the proposed Class. Fed. R. Civ. P. 23(a)(3). "If
the claims of the named plaintiffs and putative class members involve the same
conduct by the defendant, typicality is established regardless of factual differences."
*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir.

2001).  The typicality requirement is "undemanding," *Prudential*, 2015 WL 5097883, at *9, and "'does not mandate that all putative class members share identical claims,'" *Newton*, 259 F.3d at 184.

Here, Plaintiffs purchased Novo ADRs during the Class Period.  Ex. 2, ¶3; Ex. 3, ¶3; Ex. 4, ¶3; Ex. 5, ¶3; Ex. 6, ¶3.  As explained above, Plaintiffs' claims are founded on the same alleged facts and legal theories as the claims of all Class members, *i.e.*, Defendants' Class Period material misstatements and/or omissions and their impact on the price of Novo ADRs.  *See supra* §II.B.2.  Moreover, the injury Plaintiffs suffered is the same injury suffered by the putative Class as a whole.  *See* Feinstein Rpt., ¶¶198-199, 203-205.  Because "Plaintiffs' claims arise from the very same alleged Exchange Act violations as those that give rise to the claims of the absent class members," typicality is satisfied.  *Merck*, 2013 WL 396117, at *5; *see also Prudential*, 2015 WL 5097883, at *9 (typicality satisfied in class action alleging §§10(b) and 20(a) violations where "[t]he factual and legal predicates of [the proposed class representative's] claims are the same as those for the class members"); *Heckmann*, 2013 WL 2456104, at *11 (same); *Schering-Plough*, 2012 WL 4482032, at *5 (same).

### 4.    Plaintiffs and Counsel are Adequate Class Representatives

Plaintiffs' demonstrated ability and continuing willingness to fairly and adequately protect the interests of absent Class members satisfies the adequacy

requirement of Rule 23(a)(4).  Fed. R. Civ. P. 23(a)(4).  The adequacy prerequisite has two prongs: (1) "the class representatives' interests are not adverse to those of other members of the class"; and (2) "the class representative is represented by attorneys who are qualified, experienced, and generally able to conduct the litigation." *Schering-Plough*, 2012 WL 4482032, at *6.

### a.    Plaintiffs Are Adequate to Serve as Class Representatives

The adequacy requirement """"serves to uncover conflicts of interest between named parties and the class they seek to represent.""" *Schering-Plough*, 2012 WL 4482032, at *6.  The crux of this inquiry is whether the proposed class representatives are "part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997).  The alignment of interests and incentives between the class representatives and absent class members is the "'linchpin'" of the adequacy inquiry.  *In re Honeywell Int'l Inc. Sec. Litig.*, 211 F.R.D. 255, 261 (D.N.J. 2002).

However, the adequacy requirement "'does not mandate that the interests of all class members be identical.'" *Schering-Plough*, 2012 WL 4482032, at *6.  Indeed, some divergence between the representative parties and the class will not defeat adequacy so long as those conflicts are not "fundamental," which exists only where "'some [class] members claim to have been harmed by the same conduct that

- 12 -

benefitted other members of the class.'"  *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012); *Merck*, 2013 WL 396117, at \*9.

Here, there are no fundamental conflicts between Plaintiffs and the putative Class.  Rather, the interests of Plaintiffs are perfectly aligned with those of the Class. Like all Class members, Plaintiffs purchased Novo ADRs at inflated market prices during the Class Period and were injured by Defendants' misconduct.  Plaintiffs are thus incentivized to establish Defendants' liability and maximize their recovery, and by doing so, Plaintiffs will necessarily do the same for the absent Class members.  *See Schering-Plough*, 2012 WL 4482032, at \*6 ("'[W]hen Lead Plaintiffs have a strong interest in establishing liability under federal securities law, and seek similar damages for similar injuries, the adequacy requirement can be met.'"); *see also id.* (adequacy satisfied where plaintiffs "purchased Schering securities during the Class Period and have been injured by the allegedly wrongful course of conduct at issue").

Each Plaintiff has demonstrated its willingness and ability to serve as a Class Representative.  Ex. 2, ¶¶4-5; Ex. 3, ¶¶4-5; Ex. 4, ¶¶4-5; Ex. 5, ¶¶4-5; Ex. 6, ¶¶4-5. Each Plaintiff has also demonstrated its commitment to this litigation through its active participation in the discovery process, including by receiving and reviewing periodic updates and other correspondence from its counsel; reviewing pleadings and other documents in this case; producing documents and providing written responses to Defendants' requests for production and interrogatories, respectively; and

- 13 -

1546375_1

participating in discussions with counsel regarding case strategy and significant developments in the litigation, including the November 19, 2018 mediation. Ex. 2, ¶4; Ex. 3, ¶4; Ex. 4, ¶4; Ex. 5, ¶4; Ex. 6, ¶4.  Plaintiffs have amply demonstrated their commitment to monitoring and participating in the prosecution of this action, which "is all that is required." *DFC Global*, 2016 WL 4138613, at *10; *see also id.* (adequacy satisfied where "[p]laintiffs have testified that they have communicated with their lawyers, reviewed filings prior to their submission to the Court, . . . have aided counsel in responding to discovery requests," and "have shown a basic understanding of the facts and claims underlying this litigation").

In addition, Plaintiffs are large pension funds that collectively invest approximately $22.5 billion in assets on behalf of nearly 450,000 participants.  Ex. 2, ¶2; Ex. 3, ¶2; Ex. 4, ¶2; Ex. 5, ¶2; Ex. 6, ¶2.  Their status as institutional investors further supports a finding of adequacy because "both Congress and the courts have recognized that [large institutional] investors are generally preferred as class representatives in securities litigation." *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1260 (11th Cir. 2014); *In re Tyson Foods, Inc.*, No. Civ.A. 01-425-SLR, 2003 WL 22316548, at *6 (D. Del. Oct. 6, 2003) (express intent of Congress was "to favor institutional investors").  In sum, Plaintiffs – five large institutional investors who have been faithfully overseeing this

litigation and safeguarding the Class members' best interests – are more than adequate.

### b.      Proposed Class Counsel Are Adequate

To satisfy Rule 23(a)(4), class counsel must be "qualified, experienced, and generally able to conduct the [proposed] litigation." *Schering-Plough*, 2012 WL 4482032, at *6. Plaintiffs here have retained attorneys who satisfy this requirement. *See* Exs. 7-9. As many courts have recognized, Robbins Geller is "'one of the most successful law firms in securities class actions, if not the preeminent one, in the country.'" *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 158 (S.D.N.Y. 2012) (quoting *In re Enron Corp. Sec. Litig.*, 586 F. Supp. 2d 732, 789-90 (S.D. Tex. 2008)). Likewise, this Court has recognized that there is "no doubt" Bernstein Litowitz is "qualified, experienced, and generally able to conduct [securities class action] litigation." *Schering-Plough*, 2012 WL 4482032, at *6. Counsel is more than adequate.

### C.      Plaintiffs Satisfy Rule 23(b)(3)

In addition to satisfying the four requirements of Rule 23(a), a plaintiff seeking class certification must also satisfy at least one subsection of Rule 23(b). *See Amgen*, 568 U.S. at 459; *Constar*, 585 F.3d at 780. Here, Plaintiffs seek to certify the Class under Rule 23(b)(3). Certification under this subsection is appropriate where common questions of law or fact predominate over individual questions, and the class action is

superior to other available means of adjudication.  *See* Fed. R. Civ. P. 23(b)(3).  Both of those requirements are satisfied.

### 1.    Common Questions Predominate

"The Rule 23(b) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  This inquiry is satisfied where "***questions*** of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses." *Amgen*, 568 U.S. at 467 (emphasis is original).  It does ***not*** permit inquiry into whether those common questions "will be answered, on the merits, in favor of the class." *Id.* at 459.  Accordingly, while the inquiry "begins . . . with the elements of the underlying cause of action," *Halliburton I*, 563 U.S. at 809, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," *Amgen*, 568 U.S. at 466.

As the Supreme Court has explained, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625.  This securities fraud case is no different.  Here, once the common questions are resolved, little will remain other than the mechanical act of computing the amount of damages suffered by each Class member.  Accordingly, common questions of law and fact predominate over individual issues.

Plaintiffs seek certification of the putative Class to pursue claims under §§10(b) and 20(a) of the Exchange Act.  The elements of a §10(b) claim are: "'(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Amgen*, 568 U.S. at 460-61.  There can be no dispute that falsity, scienter, materiality and loss causation are issues common to the Class because "failure of proof" on any of these elements "would end the case" for all Class members.  *See id.* at 467-68 ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)"); *id.* at 475 ("this Court has held that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified"); *Halliburton I*, 563 U.S. at 813 (holding plaintiff need not prove loss causation at class certification).

Likewise, the calculation of damages is no barrier to certification.  "Class certification will not necessarily be defeated where there are individual issues with respect to the calculation of damages."  *Prudential*, 2015 WL 5097883, at *13.  And "in securities cases such as this one where all other issues are provable by common evidence, denial of class certification solely on the basis of individual damages calculations would be 'an abuse of discretion.'"  *Id.* (quoting *Neale v. Volvo Cars of N. Am.*, 794 F.3d 353, 375 (3d Cir. 2015)).  Here, damages can be determined on a

- 17 -

Class-wide basis using the same model and formula for all Class members.  Feinstein Rpt., ¶¶198-205.  This showing is all that is required at the class certification stage. *See Prudential*, 2015 WL 5097883, at *6-7 (certifying securities fraud action for class treatment and rejecting defendants' objection to Dr. Feinstein's damages model).

Reliance will also be proven by evidence common to the Class.  Plaintiffs and the Class are entitled to presume reliance under the fraud-on-the-market theory because Novo ADRs traded in an efficient market throughout the Class Period.  This theory, first endorsed by the Supreme Court in *Basic* and affirmed in *Halliburton II*, creates a presumption of reliance on behalf of all Class members who purchase shares in an efficient market because "'the price of a company's stock is determined by the available material information regarding the company and its business.'"  *Basic*, 485 U.S. at 241-42.  Thus, by purchasing a security at the price set by an efficient market, an investor is presumed to have relied upon all of the public information about the company, including material misrepresentations and omissions.  *Id.*; *see Halliburton II*, 573 U.S. at 268.

Plaintiffs and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972), which permits purchasers of a company's securities to presume reliance on omitted material information, *i.e.*, information "that a reasonable investor might have considered . . . important . . . ."  Under either *Basic* or *Affiliated Ute*, reliance is presumed on a Class-

wide basis and is thus a common question.  Therefore, the common questions identified in §II.B.2, *supra*, predominate over any questions affecting individual Class members, and the Class may be properly certified.  *See Merck*, 2013 WL 396117, at *12-13 (concluding common issues predominate over individual issues after finding the class was entitled to presume reliance based on the fraud-on-the-market theory).[6]

### a.   All Class Members Are Presumed to Have Relied Upon Defendants' Misleading Statements and Omissions

The premise of the fraud-on-the-market reliance theory is that, "'in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.'"  *Basic*, 485 U.S. at 241-42; *see also Halliburton II*, 573 U.S. at 270 ("'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations'") (quoting *Basic*, 485 U.S. at 246); *Amgen*, 568 U.S. at 466 ("in an efficient market, all publicly available information is rapidly incorporated into, and thus transmitted to investors through, the market price").  Accordingly, "'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule

---

[6]   Common questions also predominate as to Plaintiffs' §20(a) control person claim because it is derivative of the §10(b) claim and the individual "Defendant[s'] alleged exercise of control over [Novo] and whether [their] conduct constitutes culpable participation in [Novo's] Rule 10b-5 violations" is provable by "common evidence."  *Id.* at *13.

10b-5 action.'"  *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246-47).

To invoke the presumption at this stage, Plaintiffs need only show that Defendants'

false statements were publicly made – as they were here, in SEC filings and otherwise,

¶¶167-170, 172-174, 176-177, 179-181, 183-184, 186-189, 191-192, 194, 196-198,

200-204, 207-208, 211-213, 215-216, 218-221, 223-226 – and that Novo ADRs traded

in an efficient market.  *Halliburton II*, 573 U.S. at 277-78; *Merck*, 2013 WL 396117,

at *12.  "[T]he Supreme Court has suggested that the burden required to establish

market efficiency 'is not an onerous one.'"  *Waggoner v. Barclays PLC*, 875 F.3d 79,

97 (2d Cir. 2017), *cert. denied*, __ U.S. __, 138 S. Ct. 1702 (2018).

Each of the pertinent legal inquiries establishes that, during the Class Period,

Novo ADRs traded in an efficient market.

### (1)    The NYSE Is an Efficient Market

As an initial matter, Novo ADRs traded on the NYSE, "one of the most

efficient capital markets in the world."  *In re PHP Healthcare Corp.*, 128 F. App'x

839, 848 (3d Cir. 2005) (per curiam).  The Third Circuit has found that "the listing of

a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of

a finding of market efficiency."  *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir.

2011), *abrogated on other grounds by Amgen*, 568 U.S. 455 (2013); *see also Merck*,

2013 WL 396117, at *11 (noting that stocks traded on the NYSE are "'well suited for

application of the fraud on the market theory'"); *Merck*, 2012 WL 4482041, at *5

("securities traded on the NYSE are routinely recognized as trading in an efficient market").  The Class Period market for Novo ADRs is no exception.

### (2)    The *Cammer* Factors

In evaluating market efficiency, courts weigh the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).  These *Cammer* factors are: (1) weekly trading volume, (2) analyst coverage, (3) the existence of market makers, (4) the company's ability to file SEC Forms S-3, and (5) the "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."  *Id.* at 1287.  Each of these factors supports a finding of market efficiency for Novo ADRs during the Class Period.

*Weekly Trading Volume.*  A high weekly trading volume supports a finding of market efficiency because "'many investors are executing trades on the basis of newly available or disseminated corporate information.'"  *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 208 (E.D. Pa. 2008) (quoting *Cammer*, 711 F. Supp. at 1286).  Here, Novo ADRs traded on the NYSE during the Class Period with an average weekly trading volume of 10.07 million shares, or 4.19% of Novo's outstanding shares.  Feinstein Rpt., ¶57.  As Courts in this Circuit recognize, that level of trading volume supports "a strong presumption that the market . . . is an efficient one . . . ."  *Cammer*, 711 F. Supp. at 1286; *see also Merck*, 2012 WL 4482041, at *5 (weekly trading volume of 2.8% "justif[ied] a 'strong presumption'" of market efficiency).

- 21 -

*Analysts.* "Extensive coverage by securities analysts likewise indicates market efficiency, since the price of a company's security is often affected by analysts' reports of information learned through their own investigation and analysis." *DVI*, 249 F.R.D. at 209 (citing *Cammer*, 711 F. Supp. at 1286). Here, at least 32 securities analysts covered Novo during the Class Period, including well-known firms such as Barclays, JPMorgan, Morgan Stanley and UBS. Feinstein Rpt., ¶¶60-61. This factor supports market efficiency. *See Merck*, 2012 WL 4482041, at *5 (coverage by "well known firms such as A.G. Edwards, Bear Stearns, Citibank, JP Morgan, and Merrill Lynch" weighed in favor of market efficiency); *DVI*, 249 F.R.D. at 209-10 (coverage by three analysts "sufficient to favor a finding of market efficiency").

*Market Makers.* "[T]he existence of market makers and arbitrageurs . . . ensure[s] completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. Because Novo ADRs traded on the NYSE, the Court need not consider the existence of market makers. *See Merck*, 2012 WL 4482041, at *5 n.1 (finding this factor "'not relevant'" in the context of securities traded on the NYSE). Nonetheless, this factor favors a finding of market efficiency because Novo ADRs traded on the NYSE under the supervision of a Designated Market Maker. *See* Feinstein Rpt., ¶¶73, 77. In addition, during the Class

Period, there were at least 135 market makers for Novo ADRs, including well-known firms like Barclays, Goldman Sachs, JPMorgan, Morgan Stanley and UBS. *Id.*, ¶76.

**Form F-3.** A company is eligible to file an SEC Form S-3 Registration Statement if it has filed SEC reports for 12 consecutive months and has at least $75 million of float. *See* 17 C.F.R. §239.13. In the case of a foreign issuer like Novo, the Form F-3 is the "functional equivalent" of the Form S-3. *Billhofer*, 281 F.R.D. at 154; *see* Feinstein Rpt., ¶78. A company's eligibility to file a Form S-3 or F-3 is indicative of market efficiency because the ability to file these forms indicates that the company is easily able to issue new securities. *DVI I*, 249 F.R.D. at 210 & n.23. Here, Novo was eligible to file Forms F-3 throughout the Class Period, further confirming Novo ADR's efficient market. Feinstein Rpt., ¶¶81-82; *see Merck*, 2012 WL 4482041 at *5 (finding the market efficient and the plaintiffs entitled to the presumption of reliance based in part on the defendant company's eligibility to file Forms S-3 during the class period).

**Cause-and-Effect Relationship.** The final *Cammer* factor asks whether Plaintiffs can make a *prima facie* showing that, during the Class Period, Novo ADR prices quickly responded to the release of new, Company-specific, "unexpected" news events. *Cammer*, 711 F. Supp. at 1287 (efficiency may be shown by the "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"); *see DVI*, 249 F.R.D. at 210. But this direct

- 23 -

evidence of price impact – usually shown through an event study – "is not always necessary to establish market efficiency and invoke the *Basic* presumption[.]" *Waggoner*, 875 F.3d at 86, 96-97; *see also id.* at 98-99 (finding district court did not abuse its discretion in not requiring direct evidence of price impact where "[a]ll seven of the indirect factors considered by the district court (the first four *Cammer* factors and the three *Krogman* factors) weighed so clearly in favor of concluding that the market for [the company's securities] was efficient").

Plaintiffs' expert – Professor Steven P. Feinstein, Ph.D., CFA – has conducted two sets of empirical tests of the efficiency of the market for Novo ADRs: (1) an event study of earnings announcement dates during the Class Period; and (2) a set of tests that examined a broad set of information collectively to determine whether Novo ADRs observably responded to the increased flow of information that generally transpires on earnings announcement dates. Feinstein Rpt., ¶¶102, 179-180. Dr. Feinstein's empirical tests – viewed either collectively or independently – establish that Novo ADRs traded in an efficient market during the Class Period. *See id.*, ¶¶177-178, 187-192, 194-195.

Dr. Feinstein's first empirical test is an event study, the "'standard operating procedure in federal securities litigation.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016); *see United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir. 2010) (an event study "is the tool 'most often used by experts to isolate the economic

losses [from] the alleged fraud"). As the Supreme Court explained in *Halliburton II*, 573 U.S. at 280, event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." Dr. Feinstein's event study investigates whether Novo ADRs reacted significantly on earnings announcement dates during the Class Period. *See* Feinstein Rpt., ¶102. He concludes there was "a consistent cause-and-effect relationship between new, unexpected, valuation-relevant information and appropriate reactions in the market price of the Novo Nordisk ADRs." *Id.*, ¶178.

The events selected for purposes of an event study "should be selected on the basis of an independent analysis of which candidate events are most informative about market efficiency." *Id.*, ¶107. This "does not require a comprehensive identification of all events during a class period on which new allegation-related information was disclosed, or testing of all events identified in a complaint." *Id.* Indeed, "[t]o test for market efficiency, the events need not be allegation-related at all." *Id.*

Here, Dr. Feinstein focused on the eight dates during the Class Period on which Novo made earnings announcements. *Id.*, ¶¶110-111. His use of earnings announcement dates is supported by the finance literature, which "notes that [new, unexpected, highly impactful valuation] information frequently arrives on earnings announcement dates." *Id.*, ¶108. It is also supported by "[n]umerous well-known and

highly-regarded academic studies," which "concur that earnings announcements are generally important information events." *Id.*, ¶109.

Using statistical analysis, Dr. Feinstein isolated the portion of Novo price movements on these eight dates that cannot be attributed to market or sector factors, *i.e.*, the residual return. *Id.*, ¶¶139-141. Of the eight dates he analyzed, Dr. Feinstein concluded "there was a strong statistically significant price reaction to Company-specific news" on six of the earnings announcement dates. *Id.*, ¶177; *see id.* ¶¶162, 164, 166, 172, 174, 176. Of those six, the residual return on one date was "statistically significant at the 95% confidence level," meaning that the likelihood that the Novo ADR-price reaction on this date was attributable to random volatility is less than 5%. *Id.*, ¶162. The price reaction on the other five dates was so severe that the chance the reaction could be attributed to random volatility is "virtually nil." *Id.*, ¶¶164, 166, 172, 174, 176; *see Merck*, 2012 WL 4482041, at *5 (finding plaintiffs demonstrated a causal relationship as evidenced by "the drops in Merck stock in response to the events at issue" and plaintiffs' expert report).

Dr. Feinstein concluded the remaining two earnings announcement dates were not statistically significant at the 95% confidence level. Feinstein Rpt., ¶¶158, 168. But "[t]he absence of statistical significance" on these two dates "does not prove that the new information had no effect on the value of Novo Nordisk ADR . . . ." *Id.*, ¶169; *see* ¶159. Rather, it is indeterminate because both days were accompanied by

- 26 -

mixed news or news in line with market expectations. *See id.*, ¶¶160, 170. As Dr. Feinstein explains, in an efficient market, announcements in line with the market's expectations or mixed news can be expected to not result in a price reaction. *Id.*, ¶¶103-106. In the former scenario, an announcement in line with the market's expectations may not change the total mix of information. *Id.*, ¶104. In the latter, the impact of positive information can offset the impact of negative information. *See id.*

Here, on April 30, 2015, Novo's financial results and product pipeline news was positive, but the announcement of then-President and Chief Operating Officer Kare Schultz's sudden departure from the Company took the market by surprise. *Id.*, ¶¶112-115, 160. The news on April 29, 2016 was similarly mixed because Novo's reported net sales were in line with consensus expectations, but some analysts pointed to negative trends. *Id.*, ¶¶125-126, 170.

Thus, because the news on these two dates was mixed and/or in line with market expectations, the lack of a statistically significant price reaction on these two dates is not inconsistent with market efficiency. *Id.*, ¶177; *see Prudential*, 2015 WL 5097883, at *7 (finding reliable Dr. Feinstein's determination of market efficiency where his event study examined stock price movement on seven dates, six of which were statistically significant after accounting for confounding information).

Dr. Feinstein's second empirical analysis was a set of tests that examine a broad set of information events collectively. Feinstein Rpt., ¶¶180, 185-186. These

- 27 -

collective tests – an F-Test and an Ansari-Bradley Test – address whether Novo ADRs exhibited market efficiency by examining whether the stock observably responded to the increased flow of information that generally transpires on earnings announcement dates by moving more on these dates collectively as compared to all ordinary non- or lesser-news dates. *Id.*, ¶¶179-180.

According to the finance literature, the flow of company-specific information is elevated on earnings announcement dates. *Id.*, ¶¶180, 184. The comparison of price reaction on news dates to non- or lesser-news dates is widely supported by finance experts and scholarly articles, and has been accepted by several courts. *Id.*, ¶¶181-183. Each of Dr. Feinstein's collective tests found a greater level of stock price movement on the group of days that have a greater level of information flow. *Id.*, ¶¶187-191. Thus, "[b]oth collective tests indicate that there was a cause-and-effect relationship between Company news and reactions in the Novo Nordisk ADR price, which further supports the conclusion that Novo Nordisk ADR traded in an efficient market during the Class Period." *Id.*, ¶192.

### (3)    The *Krogman* Factors

In addition to the five *Cammer* factors (each of which indicates market efficiency here), courts have identified three additional factors that are also indicative of market efficiency. *See Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005); *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D.Tex. 2001). These factors, commonly referred to as

- 28 -

the *Krogman* factors, are: (1) the company's market capitalization, (2) the company's float, and (3) the typical bid-ask spread.  Like the *Cammer* factors, each *Krogman* factor is indicative of market efficiency in this case.

> ***Market Capitalization and Public Float.***  "'Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations.'"  *DVI*, 249 F.R.D. at 212 (quoting *Krogman*, 202 F.R.D. at 478).  Meanwhile, a company's public float – "the percentage of a security held by the public as opposed to company insiders" – is also relevant to market efficiency because "'the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security.'"  *Id.* (quoting *Krogman*, 202 F.R.D. at 478).  During the Class Period, Novo's market capitalization and public float averaged $12.3 billion and $12.2 billion, respectively, which were larger than at least 90% of all other publicly traded companies in the United States.  Feinstein Rpt., ¶¶84, 87.  Novo's public float constituted 99.74% of its outstanding ADRs during the Class Period.  *Id.*, ¶88.  Novo's sizeable market capitalization and public float during the Class Period support a finding of market efficiency.  *Id.*, ¶¶86, 89; *see also DVI*, 249 F.R.D. at 212 (market capitalization ranging "between $300 million to $12 million" indicative of market efficiency);

- 29 -

*Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 502 (S.D. Fla. 2003) (95% float indicative of market efficiency).

**Bid-Ask Spread.**  "The bid-ask spread . . . [is] the difference between the price that potential buyers are willing to pay and the price at which potential sellers are willing to sell." *Prudential*, 2015 WL 5097883, at *6.  "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478.  Here, the bid-ask spread of Novo ADRs during the Class Period averaged 0.02% of the average list price, which supports a finding of market efficiency.  Feinstein Rpt., ¶¶92-94.

In sum, each *Cammer* and *Krogman* factor supports a finding that the market for Novo ADRs was efficient during the Class Period.  Plaintiffs and the Class are thus entitled to presume reliance under the fraud-on-the-market theory.  *See Prudential*, 2015 WL 5097883, at *10 ("Professor Feinstein's expert report also establishes that each of the widely-cited *Cammer/Krogman* factors weighs in favor of a finding of market efficiency. . . .  The Court is therefore convinced that Prudential's stock trades in an efficient market.  Thus, the *Basic* presumption affirms that the investors relied on the alleged misrepresentations . . . .").

### b.    The Class is Entitled to a Presumption of Reliance Under *Affiliated Ute*

Plaintiffs and the Class are also entitled to rely on the *Affiliated Ute* presumption of reliance to meet Rule 23(b)(3)'s predominance requirement.  This

presumption is available where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992). To invoke the presumption, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Affiliated Ute*, 406 U.S. at 131. As explained above, materiality is a common question that Plaintiffs need not prove at the class certification stage. *See supra* §II.B.2. Thus, to invoke the *Affiliated Ute* presumption at this stage, materiality need only be properly alleged, which this Court has already held Plaintiffs have done. *See* ECF No. 99 at 13-14; *see also Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 269 (S.D.N.Y. 2014) (*Affiliated Ute* presumption could be invoked at class certification stage because "'Dodona has sufficiently alleged the materiality of the omissions'").

Reliance may be presumed here because the Complaint alleges Defendants' failures to disclose the true nature of Novo's financial condition, the true quality of Tresiba, and that increasing rebate levels in the industry were coming to bear on Novo. *E.g.*, ¶¶82-83, 171, 178, 185, 193, 195, 210, 217, 222, 227, 255, 278. Because this case involves Defendants' failures to disclose facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," 17 C.F.R. §240.10b-5(b), the *Affiliated Ute* presumption applies. *See, e.g.*, *Skeway v. China Nat. Gas, Inc.*, No. 10-728-RGA, 2014 WL 2795466, at *6

1546375_1

(D. Del. June 18, 2014) (applying *Affiliated Ute* where securities claims "'involve[d] primarily a failure to disclose'" by persons with a duty to disclose); *Dodona*, 296 F.R.D. at 269-70 (finding *Affiliated Ute* presumption applicable at class certification where plaintiff's claims "are based on omissions," notwithstanding existence of class-period "affirmative misrepresentations").

### 2.   Class Treatment Is Superior to Other Methods of Adjudication

The superiority requirement of Rule 23(b)(3) requires that class treatment be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In making this assessment, courts must consider: (1) the interests of members of the class in individually controlling the prosecution of separate actions; (2) whether other litigation has already commenced; (3) the desirability of concentrating claims in one forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). Superiority "is easily satisfied in securities fraud cases where 'there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant.'" *Heckmann*, 2013 WL 2456104, at *8.

Here, the Class members' interests in individually controlling the prosecution of separate actions are minimal. Indeed, Plaintiffs are not aware of any related individual actions. In addition, "individual damages may well be small enough to render individual litigation prohibitively expensive," particularly in light of the high

- 32 -

hurdles – and corresponding litigation costs – set by the Private Securities Litigation Reform Act of 1995.  *Schering-Plough*, 2012 WL 4482032, at *7; *see also Merck*, 2013 WL 396117, at *13 ("Separate actions threaten to leave many individuals who might otherwise have a meritorious claim without relief, given the disincentive to undertake the expensive task of developing and proving these Exchange Act claims.").

Also, the maintenance of a consolidated class action in this District will avoid the "needless waste of both private and judicial resources" resulting from the prosecution of thousands of "individual actions that would involve similar if not identical evidence and certainly identical legal theories . . . ." *Id.*  Class treatment here will also avoid "the risk of inconsistent adjudications."  *Id.*

In addition, the District of New Jersey is a desirable forum for this class action because individual Class members are geographically dispersed, Novo is located in this District, and many of the acts and practices complained of occurred in substantial part in this District.  This Court is also well acquainted with this action, having already considered (and denied in its entirety) Defendants' motion to dismiss.

Finally, Plaintiffs do not foresee any management difficulties that will preclude this action from being maintained as a class action.  In fact, the alternative of innumerable individual actions by each Novo shareholder of record during the Class Period would be, at best, impracticable to manage.  Thus, class certification in this case would not only be superior to other available methods of fairly and efficiently

adjudicating the controversy; it appears to be the *only* reasonable method for fairly and efficiently litigating the claims of all members of the putative Class. Accordingly, this action "is a classic example of a case that warrants class" treatment. *Schering-Plough*, 2012 WL 4482032, at *7.

## III.   CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court grant this Motion, certify the proposed Class, appoint Plaintiffs as Class Representatives, and appoint Robbins Geller and Bernstein Litowitz as Class Counsel and Seeger Weiss and Carella Byrne as Co-Liaison Counsel.

DATED:  April 1, 2019                    Respectfully submitted,

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN


               s/ CHRISTOPHER A. SEEGER
               CHRISTOPHER A. SEEGER

55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
973/639-9393 (fax)

SEEGER WEISS LLP
JENNIFER R. SCULLION
77 Water Street, 26th Floor
New York, NY  10005
Telephone:  212/584-0700
212/584-0799 (fax)

- 34 -

CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO, P.C.
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)

Co-Liaison Counsel and Executive
Committee Members for the Class

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
LUKE O. BROOKS
RYAN A. LLORENS
ERIC I. NIEHAUS
ANGEL P. LAU
JEFFREY J. STEIN
ERIKA OLIVER
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

BERNSTEIN LITOWITZ BERGER &
  GROSSMANN LLP
SALVATORE J. GRAZIANO
HANNAH ROSS
AVI JOSEFSON
KATHERINE M. SINDERSON
ADAM D. HOLLANDER
1251 Avenue of the Americas
New York, NY  10020
Telephone:  212/554-1400
212/554-1444 (fax)

- 35 -

Co-Lead Counsel for the Class

SAXENA WHITE P.A.
JOSEPH E. WHITE, III
BRANDON T. GRZANDZIEL
DIANNE M. ANDERSON
150 East Palmetto Park Road, Suite 600
Boca Raton, FL  33432
Telephone:  561/394-3399
561/394-3382 (fax)

SAXENA WHITE P.A.
STEVEN B. SINGER
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: 914/437-8551
888/631-3611 (fax)

Executive Committee Member