SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
JENNIFER R. SCULLION
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
973/639-9393 (fax)

CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO, P.C.
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)

Co-Liaison Counsel and Executive Committee Members for the Class

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re NOVO NORDISK SECURITIES LITIGATION | Master File No. 3:17-cv-00209-ZNQ-LHG |
| This Document Relates To: | <u>CLASS ACTION</u> |
| ALL ACTIONS. | |

**JOINT DECLARATION OF ADAM D. HOLLANDER AND LUKE O. BROOKS IN SUPPORT OF: (I) MOTION FOR FINAL APPROVAL OF SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION; AND (II) MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES, AND AWARDS TO LEAD PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4)**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................3

II.   HISTORY AND PROSECUTION OF THE ACTION ..................................7

    A.    Background ..................................................................7

    B.    Procedural History..................................................................8

        1.    Commencement of the Action and the Appointment of Lead Plaintiffs and Co-Lead Counsel ..........................................8

        2.    Defendants' Motion to Dismiss ................................................11

        3.    Plaintiffs' Counsel's Litigation Team.......................................13

    C.    Class Certification ..................................................................17

        1.    Lead Plaintiffs' Motion for Class Certification .......................17

        2.    Lead Plaintiffs' Successful Opposition to Defendants' Rule 23(f) Interlocutory Appeal of the Class Certification Order ..................................................................22

        3.    Class Notice ..................................................................23

    D.    The Parties' Extensive Discovery Efforts ..........................................24

        1.    Document Discovery from Defendants and Third Parties........28

        2.    Defendants' Document Requests to Lead Plaintiffs.................29

        3.    Fact Witness Depositions.........................................................30

        4.    Written Discovery ....................................................................33

        5.    Expert Discovery......................................................................35

        6.    Discovery Disputes ..................................................................39

            a.    Disputes with Defendants..............................................39

            b.    Disputes with Third Parties ...........................................45

**Page**

E.   Defendants' Motion for Summary Judgment.......................................46

F.   Mediation and Settlement........................................................48

III.   RISKS OF CONTINUED LITIGATION ........................................52

A.   Risks Concerning Liability...................................................53

B.   Risks Related to Damages....................................................55

IV.   PRELIMINARY APPROVAL OF THE SETTLEMENT...........................58

V.   LEAD PLAINTIFFS' COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER..........................................................59

VI.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ..............61

VII.   THE FEE AND EXPENSE APPLICATION................................................64

A.   Lead Counsel's Fee Request Is Fair and Reasonable and Warrants Approval ...........................................................65

1.   The Favorable Settlement Achieved.........................................65

2.   The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases.........................................................66

3.   The Time and Labor Devoted to the Action by Plaintiffs' Counsel.........................................................67

4.   The Quality of Plaintiffs' Counsel's Representation................70

B.   Lead Counsel's Request for Litigation Expenses Warrants Approval ...........................................................71

1.   Lead Counsel Seek Payment of Plaintiffs' Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund ...........................................................71

2.   Reimbursement to Lead Plaintiffs Is Fair and Reasonable........74

VIII.   CONCLUSION...........................................................76

ADAM D. HOLLANDER and LUKE O. BROOKS declare as follows pursuant to 28 U.S.C. §1746:

1.      We, Adam D. Hollander and Luke O. Brooks, are partners of the law firms of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz" or "BLB&G") and Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "RGRD"), respectively.[1]  Bernstein Litowitz and Robbins Geller serve as Court-appointed Lead Counsel for Lead Plaintiffs and Class Representatives Lehigh County Employees' Retirement System ("Lehigh County"), Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters" or "OKFF"), Boston Retirement System ("Boston" or "BRS"), Employees' Pension Plan of the City of Clearwater ("Clearwater"), and Central States, Southeast and Southwest Areas Pension Fund ("Central States") (collectively, "Lead Plaintiffs"), in the above-captioned action (the "Action"), which alleges violations of Sections 10(b) and 20(a) of the Securities Exchange of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against defendants Novo Nordisk A/S ("Novo" or the "Company"), Lars Rebien Sørensen ("Sørensen"), Jesper Brandgaard ("Brandgaard"), and Jakob Riis ("Riis," and

---

[1]    Unless otherwise stated or defined in this Joint Declaration, all capitalized terms used herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated as of November 23, 2021 (ECF 311-3) (the "Stipulation").

collectively with Novo, Sørensen, and Brandgaard, "Defendants"). We have personal knowledge of the matters set forth herein based on our active supervision of and participation in the prosecution and resolution of the Action.

2.     We submit this declaration in support of Lead Plaintiffs' motion, pursuant to Federal Rule of Civil Procedure 23(e), for final approval of the proposed Settlement with Defendants that will resolve the claims asserted in the Action and approval of the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation") and Lead Counsel's motion, on behalf of all Plaintiffs' Counsel,[2] for an award of attorneys' fees and litigation expenses and for awards to the Lead Plaintiffs pursuant to 15 U.S.C. §78u-4(a)(4) (the "Fee and Expense Application").

3.     In support of these motions, Lead Plaintiffs and Lead Counsel are also submitting the exhibits attached hereto, the Memorandum of Law in Support of Motion for Final Approval of Settlement and Approval of Plan of Allocation (the "Settlement Memorandum"), and the Memorandum of Law in Support of Motion

---

[2]     The Court appointed Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. ("Carella Byrne"), Seeger Weiss LLP ("Seeger Weiss"), and Saxena White P.A. ("Saxena") as the Executive Committee to represent Lead Plaintiffs and the putative class. Carella Byrne and Seeger Weiss were also appointed as Co-Liaison Counsel for the Class. Collectively, Bernstein Litowitz, Robbins Geller, Carella Byrne, Seeger Weiss, Saxena, and Levi & Korsinsky, LLP are referred to as "Plaintiffs' Counsel."

for Attorneys' Fees and Litigation Expenses, and Awards to Lead Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) (the "Fee Memorandum").

## I.   INTRODUCTION

4.     Since this Action began over five years ago, Lead Plaintiffs and Plaintiffs' Counsel actively and vigorously prosecuted the claims in this Action. Only after this significant effort did Lead Plaintiffs and Plaintiffs' Counsel succeed in obtaining an outstanding recovery for the Class, totaling $100 million in cash.  As detailed herein, Lead Plaintiffs and Plaintiffs' Counsel believe that the proposed Settlement represents an excellent result and is in the best interest of the Class.

5.     Lead Plaintiffs and Plaintiffs' Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they reached the proposed Settlement.  As described in further detail herein, by the time they agreed to the proposed Settlement, Lead Plaintiffs and Plaintiffs' Counsel had:

(a)     conducted an extensive investigation into the alleged violations of the securities laws at issue, including a thorough review of United States Securities and Exchange Commission ("SEC") filings and other publicly filed documents, securities analyst reports, press releases, Company presentations, media reports, and other publicly available information;

(b)     drafted a detailed Amended Complaint (the "Complaint") based on this investigation;

(c)     successfully defeated Defendants' Motion to Dismiss the Complaint;

(d)     successfully moved for class certification, including conducting related discovery and preparing an expert report on market efficiency, and defeating Defendants' appellate challenge to the Court's decision certifying the Class;

(e)     undertook substantial and highly contested fact discovery efforts, which included obtaining and reviewing more than five million pages of documents produced by Defendants and third parties; taking, defending, or participating in over three dozen fact witness depositions; serving and responding to contention interrogatories; and engaging in a number of significant discovery disputes;

(f)     consulted extensively with experts concerning damages and loss causation, pharmaceutical industry access and pricing, diabetes treatment, and relevant disclosure obligations throughout the litigation, including submitting expert reports and conducting expert discovery;

(g)     responded to the full briefing of Defendants' motion for summary judgment; and

(h)     participated in three separate mediation sessions with Defendants.

6.     The Settlement was achieved only after extensive and contentious arm's-length negotiations between the Parties, including a formal mediation process

overseen by former U.S. District Judge Layn R. Phillips and retired New Jersey state Judge Harry G. Carroll, highly respected mediators with extensive experience mediating large complex class actions.  The Parties engaged in three mediation sessions.  Following the third mediation session, which was held on September 2, 2021, Judge Phillips issued a mediator's proposal to settle all claims in exchange for $100 million in cash, which the Parties accepted.

7.     Lead Plaintiffs and Plaintiffs' Counsel believe that the Settlement represents a very favorable outcome for the Class and that its approval would be in the best interests of the Class because, as detailed below, the proposed $100 million Settlement represents a substantial percentage of the estimated recoverable damages that Lead Plaintiffs reasonably believed could be established at trial, and Lead Plaintiffs faced significant risks in establishing Defendants' liability and proving damages in the Action.

8.     Thus, as explained further below, the Settlement provides a considerable benefit to the Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks of continued litigation, including additional litigation expenses and the risk that the Class could recover less than the Settlement Amount (or nothing at all) after years of additional litigation and delay.

9.     In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation.  As discussed in further detail

below, the Plan of Allocation, which is set forth in the Notice mailed to Class Members, provides for the distribution of the Net Settlement Fund to Class Members who submit Claim Forms that are approved for payment by the Court on a pro rata basis based on the number of Novo American Depositary Receipts ("ADRs") they purchased that were eligible to participate in the Settlement.

10.     Plaintiffs' Counsel worked hard and skillfully to overcome substantial obstacles and achieve an extremely beneficial Settlement for the Class.  Plaintiffs' Counsel prosecuted this case on a fully contingent basis and incurred significant Litigation Expenses and thus bore all the risk of an unfavorable result.  For their considerable efforts in prosecuting the case and negotiating the Settlement, Lead Counsel is applying for an award of attorneys' fees for Plaintiffs' Counsel of 29% of the Settlement Fund.  As discussed in the Fee Memorandum, the requested fee of 29% of the Settlement Fund – which has been reviewed and approved by Lead Plaintiffs – is well within the range of percentage awards granted by courts in this Circuit and elsewhere in similarly sized securities class action settlements.  The requested fee is further confirmed as reasonable because it calculates to a substantial discount to the lodestar incurred by Plaintiffs' Counsel, representing a lodestar multiplier of approximately 0.47, whereas in contingent cases like this, plaintiffs' counsel are typically paid a multiple above its actual lodestar when reaching a highly successful outcome.  Lead Counsel respectfully submit that the fee request is fair

and reasonable in light of the result achieved in the Action, the efforts of Plaintiffs' Counsel, and the risks and complexity of the litigation.

11.    Lead Counsel's Fee and Expense Application also seeks payment of Litigation Expenses incurred by Plaintiffs' Counsel in connection with the institution, prosecution, and settlement of the Action totaling $2,738,023.93, plus reimbursement of $40,019.05 in the aggregate to the Lead Plaintiffs for their costs and expenses directly related to their representation of the Class, as authorized by the PSLRA.[3]

## II.    HISTORY AND PROSECUTION OF THE ACTION

### A.    Background

12.    In this Action, Lead Plaintiffs alleged that Defendants were liable for materially untrue statements and omissions of material fact to investors, including in Novo's SEC filings, earnings calls, and presentations between February 3, 2015 and February 2, 2017 (the "Class Period").

13.    Defendant Sørensen was Novo's President and Chief Executive Officer at all times during the Class Period until December 31, 2016.

14.    Defendant Brandgaard is, and was at all relevant times, Novo's Executive Vice President and Chief Financial Officer.

---

[3]    The time and expense figures discussed herein include those incurred by Levi & Korsinsky, LLP, counsel for lead plaintiff movant Brian Lundstrom, which performed work in connection with Mr. Lundstrom's deposition and at the direction of Lead Counsel.

15.     Defendant Riis was Novo's Executive Vice President for North America and President of Novo Nordisk Inc., the Company's U.S. subsidiary, from September 2016 through March 2017. From January 2013 to September 2016, Riis was Novo's Executive Vice President for China, Pacific & Marketing, and from January 2006 through September 2016, Riis was Novo's Senior Vice President for Global Marketing.

16.     Lead Plaintiffs alleged that Defendants' Class Period public statements contained false and misleading statements and omissions because they failed to disclose that the Company was exposed to market pressures in the United States that affected the pricing and profitability of its diabetes-drug portfolio, the prospects of Novo Nordisk's insulin drug Tresiba were not enough to drive the Company's growth, and Novo Nordisk was unable to meet certain financial targets that it publicly represented.

17.     Lead Plaintiffs contend that these alleged misstatements and omissions caused the Company's ADRs to trade at artificially inflated prices during the Class Period.

**B.     Procedural History**

   **1.     Commencement of the Action and the Appointment of Lead Plaintiffs and Co-Lead Counsel**

18.     On January 11, 2017, BLB&G and Carella Byrne filed an initial securities class action complaint on behalf of named plaintiff Lehigh in the United

States District Court for the District of New Jersey (the "Court"), styled *Lehigh County Employees' Retirement System v. Novo Nordisk A/S, Lars Rebien Sørensen, and Jesper Brandgaard*, No. 3:17-cv-00209 (the "Action").  ECF 1.  In the initial complaint, Lehigh alleged that, between April 30, 2015 and October 27, 2016, Defendants Novo, Sørensen, and Brandgaard were liable for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule l0b-5 promulgated thereunder.

19.     In accordance with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), notice to the public was published via *PR Newswire* setting forth the deadline by which putative class members could move the Court to be appointed as lead plaintiff in the Action.

20.     In January 2017, additional putative securities class actions were commenced in this District asserting claims against Novo and its officers for violations of Sections 10(b) and 20(a) of the Exchange Act.  *See Don Zuk v. Novo Nordisk A/S, Lars Rebien Sørensen, and Jesper Brandgaard*, No. 3:17-cv-00358-BRM-LHG ("*Zuk Action*"); *Joseph R. Zaleski, Jr. v. Novo Nordisk A/S, Lars Rebien Sørensen, and Jesper Brandgaard*, No. 3:17-cv-00506-BRM-LHG ("*Zaleski Action*").

21.     On March 13, 2017, Lehigh, as well as several other movants, timely filed motions seeking appointment as lead plaintiff in the Action and consolidation of the Action with the *Zuk* and *Zalenski* Actions.  ECF 6, 8, 9, and 12.

- 9 -

22.     On April 24, 2017, an in-person status conference was held to discuss the pending motions seeking appointment as lead plaintiff and for consolidation of the actions.  The Parties were directed to continue to meet and confer regarding the pending motions.  ECF 39.

23.     The Parties continued to meet and confer regarding appointment of lead plaintiff as memorialized in the letter to the Court on April 28, 2017.  ECF 40.

24.     On May 8, 2017, the Court held an off-the-record telephonic status conference regarding the pending motions for the appointment of lead plaintiff.

25.     On June 1, 2017, the Court ordered consolidation of the *Zuk* and *Zalenski* Actions into this Action under the caption *In re Novo Nordisk Securities Litigation*, Master File No. 3:17-cv-209-BRM-LHG, and further ordered that any subsequently filed, removed, or transferred actions related to the claims asserted in the consolidated Action will also be consolidated into this Action for all purposes. ECF 42.

26.     On June 14, 2017, the Court entered an Order appointing Lehigh, OKFF, BRS, Clearwater, and Central States as Co-Lead Plaintiffs pursuant to the PSLRA, 15 U.S.C. §78u-4(a)(3)(B); approving those Plaintiffs' selection of BLB&G and RGRD as Co-Lead Counsel for the Class; appointing Carella Byrne, Seeger Weiss, and Saxena to an Executive Committee to represent Co-Lead

Plaintiffs and the putative class; and appointing Carella Byrne and Seeger Weiss as Co-Liaison Counsel for the Class.

27.     On August 4, 2017, Lead Plaintiffs filed the Consolidated Amended Class Action Complaint (the "Complaint").   ECF 71.   The Complaint asserted claims: (1) under Section 10(b) of the Exchange Act and Rule 10b-5 against Defendants Novo Nordisk, Sørensen, Brandgaard, and Riis; and (2) under Section 20(a) of the Exchange Act against Defendants Sørensen, Brandgaard, and Riis.  *Id.*

28.     The Complaint alleged that Defendants made materially false and misleading statements and omissions concerning (i) the Company's exposure to market pressures in the United States that affected the pricing and profitability of Novo's diabetes-drug portfolio, (ii) the prospects of Novo's insulin drug Tresiba to drive Company's growth, and (iii) Novo's inability to meet certain financial targets. The Complaint further alleged that these misstatements and omissions caused Novo's ADRs to trade at artificially inflated prices during the Class Period, and that as the truth was revealed through a series of public disclosures, the price of the ADRs fell dramatically, which caused significant economic harm to Lead Plaintiffs and the Class.  *Id.*

### 2.     Defendants' Motion to Dismiss

29.     On October 3, 2017, Defendants filed their Motion to Dismiss the Amended Consolidated Complaint.  ECF 81.

30.     Defendants' motion to dismiss argued that the Complaint should be dismissed because, among other things, Lead Plaintiffs failed to adequately allege actionable misrepresentations and omissions concerning (a) rebates paid to pharmacy benefit managers ("PBMs"), because Novo Nordisk had publicly and fully disclosed the role of rebates in securing market access; (b) U.S. pricing pressures in the insulin market, because Novo's public statements did not represent that the company was immune from those pricing pressures; and (c) Tresiba's U.S. launch, because Defendants' alleged misrepresentations and omissions  adequately disclosed risks that Tresiba would not have a successful launch.   ECF 81-1. Defendants also argued that the Complaint failed to allege any actionable omissions; that Lead Plaintiffs failed to plead particular facts giving rise to scienter; and that Defendants' alleged actionable misstatements were forward-looking statements and statements of opinion that were protected from liability by the PSLRA.  *Id.*

31.     On November 17, 2017, Lead Plaintiffs filed and served their opposition to Defendants' Motion to Dismiss the Amended Consolidated Complaint. ECF 87-88.  Lead Plaintiffs argued, among other things, that Defendants should face liability for their alleged material misrepresentations and omissions about: (a) Novo's rebate payments to PBMs, because Novo's pricing and earnings relied on the size of rebates it was willing and able to pay PBMs, not on any differences between Novo's insulin drugs and its competitors; (b) Novo's exposure to pricing

pressures, because Defendants repeatedly told investors that Novo's earnings were not at risk because its financial results were driven by the qualities of its drugs, which shielded Novo from market-wide pressures; and (c) Tresiba, because Defendants falsely represented publicly that it was a superior drug for which Novo could obtain premium pricing and gain market share.  *Id*.

32.     On December 18, 2017, Defendants filed and served their reply papers in further support of their motion to dismiss.  ECF 91.

33.     On July 25, 2018, the Court heard oral argument on Defendants' motion to dismiss.  ECF 96.

34.     On August 16, 2018, the Court entered an Order and Opinion denying in its entirety Defendants' motion to dismiss.  ECF 99, 100.

### 3.     Plaintiffs' Counsel's Litigation Team

35.     Throughout this litigation, Plaintiffs' Counsel took all reasonable measures to ensure that the Action was staffed appropriately, in order to minimize costs and lodestar wherever reasonably possible without negatively impacting the prosecution of the Action and Lead Plaintiffs' ability to maximize the potential recovery to members of the Class.

36.     Defendants hired top defense law firms Davis Polk & Wardwell ("Davis Polk") and Gibbons P.C. ("Gibbons") to defend them in this lawsuit.  Those defense firms expended tremendous resources and assembled a large team of

- 13 -

partners and associates to defend the Action.  Given the nature of complex securities litigation, each firm also most likely had substantial numbers of additional attorneys, paralegals, and support staff working behind the scenes.

37.    As such, Co-Lead Counsel had to assemble a legal team that could effectively and efficiently litigate against Defendants' well-funded and formidable defense team, while still litigating efficiently and economically.  The primary team members involved in prosecuting the Action from Co-Lead Counsel BLB&G included partners Salvatore Graziano, Katherine Sinderson, and Adam Hollander, and associate James Fee.  Other attorneys from BLB&G also worked on the case and assisted with specific aspects of the litigation.  The primary team members involved in prosecuting the Action from Co-Lead Counsel RGRD included partners Luke Brooks, Ryan Llorens, and Jeffrey Stein, and associate Erika Oliver.  Other attorneys from RGRD also worked on the case and assisted with specific aspects of the litigation.  In addition, Executive Committee member Saxena played a key role on Plaintiffs' Counsel's legal team.   The primary Saxena attorneys involved in prosecuting the Action included partners Steven Singer and Brandon Grzandziel.

38.    In addition, Plaintiffs' Counsel assembled teams of senior staff and staff attorneys for the extremely time-intensive and critical tasks of reviewing, analyzing, and digesting the large volume of complex documents produced in the case.  As discussed below, Plaintiffs' Counsel's staff attorneys primarily focused on

reviewing and analyzing electronically produced documents and preparing for depositions – including through the class certification, fact discovery, and expert discovery phases of this litigation.   These lawyers also played a key role in connection with responding to Defendants' summary judgment motion and to Defendants' written discovery requests.   To avoid any doubt, Plaintiffs' Counsel's staff attorneys did far more than merely code documents or engage in rote word searches.   They were integrally involved in analyzing Defendants' and non-parties' sizable document productions, which involved finding and developing critical information about (among other things) Novo Nordisk's internal accounting and policies, practices, and procedures.   The attorneys' work of scouring the voluminous productions and following up on that information was critical to Lead Plaintiffs' successful prosecution of this Action.

39.   Staff attorneys also made critical contributions to counsel's preparation for the numerous depositions taken in the Action.   Indeed, our staff attorneys, on their own and in collaboration with other team members, performed extensive searches to identify critical witnesses to depose, and prepared detailed memoranda and "witness kits" for fact and expert witnesses who were deposed in the case.   These witness kits typically consisted of approximately 150-200 documents, as well as a detailed index describing the documents and a memorandum analyzing the included information and proposing key documents and topics to guide the deposition.   The

witness kits also included a memorandum analyzing the key documents and topics and how they best support the allegations as set forth in the Complaint. Staff attorney deposition preparation involved extensive analysis of the facts and the witness, as well as the exercise of significant critical judgment in deciding which of the many hundreds of thousands of documents to include for potential use with a deposition witness. In preparing deposition materials, these attorneys became, in effect, subject matter experts on a particular witness and, working closely with the more senior attorneys taking the depositions, they contributed significantly to the preparation and conduct of the examination of the witness.

40. By assembling a team of experienced, highly capable, and trusted staff attorneys (who are experienced in securities fraud litigation), Plaintiffs' Counsel ensured that they could devote talented attorneys to the critical tasks of analyzing documents and preparing for depositions, assisting with the preparation of briefing and other submissions, and other tasks. These attorneys dedicated themselves to the prosecution of the Action, and developed knowledge of complex facts. They were critical in allowing Plaintiffs' Counsel to litigate effectively against the team of highly talented lawyers who defended the Action.

**C.     Class Certification**

    **1.     Lead Plaintiffs' Motion for Class Certification**

    41.    On April 1, 2019, Lead Plaintiffs filed and served their motion for class

certification and appointment of class representatives and class counsel.  ECF 136.

Lead Plaintiffs argued, among other things, that the Court should certify the Class

and appoint Lead Plaintiffs as Class representatives as well as Plaintiffs' Counsel as

counsel to represent the Class, because:

    a)    Rule 23(a)(1)'s numerosity requirement was satisfied because joinder of all class members was impracticable, as Novo averaged 241.5 million ADRs outstanding and an average weekly trading volume of 10.07 million;

    b)    Rule 23(a)(2)'s commonality requirement was satisfied because the action raised common questions of law and fact regarding a common course of conduct arising from materially false and misleading statements Novo made to the investing public in its SEC filings, press releases and conference calls;

    c)    Rule 23(a)(3)'s typicality requirement was satisfied, because Lead Plaintiffs' claims were typical of those of the proposed class, as Lead Plaintiffs' claims were "founded on the same alleged facts and legal theories as the claims of all class members, *i.e.*, Defendants' Class Period material misstatements and/or omissions and their impact on the price of Novo ADRs;"

    d)    Rule 23(a)(4)'s adequacy requirement was satisfied, because Lead Plaintiffs' interests were aligned with those of the proposed class because, like other members, Lead Plaintiffs purchased Novo ADRS at inflated market prices during the Class Period and were injured by Defendants' misconduct, and, thus, incentivized to establish Defendants' liability and maximize their recovery; each of the Lead Plaintiffs had demonstrated a willingness and ability to serve as class representatives; Lead Plaintiffs are large pension funds and the type of

institutional investor both Congress and the courts have recognized as generally preferred as representatives in securities litigation;

e)      Adequacy was further established because, as courts have recognized, the firms proposed as Co-Lead Counsel are eminently qualified and experienced;

f)      Rule 23(b)(3)'s predominance requirement was satisfied because common issues of falsity, scienter, materiality, loss causation, damages and reliance predominated over any questions affecting individual Class members;

g)      damages could be determined "on a Class-wide basis using the same model and formula for all Class members;"

h)      the Class was entitled to presume reliance under both the fraud-on-the-market theory and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972); and

i)      Rule 23(b)(3)'s superiority requirement was satisfied because a class action was superior to other available methods for the fair and efficient adjudication of the controversy, because class members' interest in individually controlling separate actions was minimal; there were no other related individual actions identified; and concentrating the litigation before the Court avoided needless waste of private and judicial resources and eliminated the risk of inconsistent adjudication.

ECF 136-1.  Lead Plaintiffs filed nine exhibits in support of their motion for class certification, (ECF 136-3-136-11), including an expert report from Lead Plaintiffs' market efficiency, loss causation, and damage expert, Professor Feinstein, opining that (1) the ADRs of Novo traded in an efficient market during the class period, and (2) damages for investors could be calculated through a common methodology.  ECF 136-3.

42.     In May 2019, Plaintiffs' Counsel defended six depositions of Lead Plaintiffs' representatives regarding their knowledge of the Company and investment processes and procedures.   *See also* Section II.D.3 (Fact Witness Depositions), *infra*.

43.     On June 13, 2019, Defendants filed and served their opposition to Lead Plaintiffs' class certification motion.  ECF 147-148.  Defendants contended among other things that:

> a)     the group of five Lead Plaintiffs were not adequate class representatives because they could not work together as a group to supervise outside counsel; and
>
> b)     Lead Plaintiffs had not satisfied their burden of commonality because Lead Plaintiffs' expert, Professor Feinstein, had not provided a specific methodology to calculate class-wide damages.

ECF 147.

44.     On June 13, 2019. Defendants also moved to strike the report of Prof. Feinstein.  ECF 146.  They attached a report of their own expert, Dr. Paul Zurek, (ECF 146-4), and argued that the Court should strike Prof. Feinstein's report and exclude his opinions because: (1) Professor Feinstein had failed to offer a specific methodology for damages, and (2) his damages methodology did not account for variations in ADR price inflation, improperly focused on risk realization, and failed to provide a method for measuring price inflation of different misstatement categories.  ECF 147.

45.    On July 18, 2019, Plaintiffs' Counsel took the deposition of Defendants' expert, Dr. Zurek.

46.    On July 25, 2019, Lead Plaintiffs filed and served an omnibus brief in further support of their class certification motion and in opposition to Defendants' motion to exclude the Feinstein report.  ECF 152.  Lead Plaintiffs argued, among other things, that:

a)    Defendants' attacks on the Lead Plaintiff structure, which constituted a belated challenge to the Court-ordered case leadership structure, failed, including because Defendants had not even suggested, let alone shown, that any conflict existed between the proposed Lead Plaintiffs or between Lead Plaintiffs and members of the putative Class;

b)    Defendants' challenge of Professor Feinstein's submission on the calculation of damages was premature at best, as a detailed damages model was not required at the class certification stage;

c)    Professor Feinstein was highly qualified, and Defendants had not challenged Professor Feinstein's qualifications;

d)    Professor Feinstein's proposed damages methodology was reliable and is commonly used in Section 10(b) cases;

e)    Courts have expressly rejected Defendants' argument that Professor Feinstein's damages must account for "variations in inflation over time" at the class certification stage;

f)    Defendants offered no analysis to support their claim that the differing categories of information would have affected the market's assessment of Novo's ADRs in ways that precluded class certification; and

g)    Defendants' argument that Professor Feinstein was required to disaggregate the impacts of certain misstatements was premature.

*Id.*  Lead Plaintiffs' reply papers were supported by 36 exhibits, including a rebuttal report from Professor Feinstein.  ECF 152-1, 152-2.

47.  On August 22, 2019, Defendants filed a reply in further support of their motion to strike the Feinstein report.  ECF 161.

48.  On August 28, 2019, November 18, 2019, and January 8, 2020, Lead Plaintiffs submitted supplemental authority to the Court, which, among other items, addressed the opinions of Professor Feinstein and his damages methodology.  ECF 162, 167, 178.

49.  On January 31, 2020, the Court entered an Order granting Lead Plaintiffs' motion for class certification and denying Defendants' motion to exclude Professor Feinstein's report.  ECF 181.  The Court noted that it had previously found Professor Feinstein to be credible to offer expert opinions on damages among other things, and that Defendants' argument regarding the specificity of Dr. Feinstein's damages calculation was premature before the record was fully developed.  ECF 182.

50.  The Court further determined that the proposed Class representative group of five Lead Plaintiffs was not overly large and had the "ability and incentive to represent the claims vigorously."  ECF 182.  The Court concluded that Lead Plaintiffs had satisfied the requirements of Rule 23 and had proven market efficiency as required to establish a fraud-on-the-market theory of reliance.  *Id.*

51.    Accordingly, the Court certified the Class, defined as:

All persons or entities who purchased the American Depositary Receipts ("ADRs") of Novo Nordisk A/S ("Novo" or the "Company") between February 3, 2015 and February 2, 2017, inclusive (the "Class Period"), and were damaged thereby (the "Class").

ECF 136, 182.  The Court appointed Lead Plaintiffs as class representatives for the

certified Class, BLB&G and RGRD as co-lead counsel, Seeger Weiss and Carella

Byrne as co-liaison counsel, and Saxena White as an executive committee member.

*Id.*

### 2.    Lead Plaintiffs' Successful Opposition to Defendants' Rule 23(f) Interlocutory Appeal of the Class Certification Order

52.    On February 14, 2020, Defendants filed and served a petition for

interlocutory appeal under Rule 23(f), requesting that the Third Circuit Court of

Appeals consider whether this Court's order certifying the Class should be reversed.

(*Lehigh Cnty. Emps Ret. Sys. v. Novo Nordisk A S*, Case No. 20-8016 (3d Cir. 2020),

ECF 1).  Defendants primarily argued that the Court erred when it held that the Lead

Plaintiff structure was adequate.  *Id.*

53.    On February 24, 2020, Lead Plaintiffs filed and served their opposition

to Defendants' Rule 23(f) petition.  ECF 3.  Lead Plaintiffs argued that Defendants

failed to meet the burden required for interlocutory review because, among other

things, the Court's class certification opinion correctly applied, and Defendants did

not challenge the application of, the two-pronged inquiry required in the Third

Circuit to determine class representative adequacy, namely that: (1) Lead Plaintiffs' interest were sufficiently aligned with the interests of the Class, and (2) Plaintiffs' Counsel were qualified to represent the Class. *Id.*

54.     On March 2, 2020, Defendants filed a motion for leave to file a reply in support of their Rule 23(f) petition along with their proposed reply.  ECF 9.

55.     On March 17, 2020, the Third Circuit Court of Appeals entered an order granting the motion to file a reply and denying Defendants' Rule 23(f) petition.  ECF 10.

### 3.     Class Notice

56.     On July 13, 2020, Lead Plaintiffs filed their unopposed motion to approve the form and manner of class notice, (ECF 191), which the Court granted on July 20, 2020.  ECF 192.

57.     At that time, the Court approved the proposed form and manner for providing the Notice of Pendency of the Action (the "Class Notice") and the Summary Notice of Pendency of Class Action ("Summary Class Notice"), and appointed JND Legal Administration ("JND") to provide notice.  ECF 192.

58.     In accordance with the Court's Order granting the motion to provide notice of pendency of the Action, over 350,000 copies of the Class Notice were mailed to potential Class Members.  Only 107 requested exclusion.  *See* ECF 223 ¶¶8, 12.  JND also published the Summary Class Notice in the *Wall Street Journal*

and *Investor's Business Daily* on August 23, 2020, and via *PR Newswire* on August 24, 2020, (*id.* at ¶9), and established a telephone hotline and website pursuant to the Court's order. *Id.* at ¶¶10-11.

59.     On October 28, 2020, Lead Plaintiffs filed their declaration regarding the mailing of the class notice and required publication.  ECF 223.

### D.     The Parties' Extensive Discovery Efforts

60.     Discovery in the Action commenced in September 2018, and was completed in March 2021.  As outlined below, discovery involved significant efforts by Lead Plaintiffs and Plaintiffs' Counsel, including substantial document discovery, written discovery efforts, and depositions – all conducted concurrently. In addition, throughout the discovery process, Plaintiffs' Counsel continued to consult extensively with experts, and participated in expert discovery.

61.     Discovery in the Action was highly contested.  Co-Lead Counsel and counsel for the Defendants exchanged voluminous correspondence and participated in numerous meet-and-confer sessions regarding discovery and disputes over the scope of documents produced.  Notably, many of these efforts took place while the COVID-19 pandemic displaced counsel from their office space.  Notwithstanding these obstacles, Co-Lead Counsel made every effort, working through difficult circumstances, to keep the process moving expeditiously in light of the Court's discovery schedule.

62.    On October 1, 2018, Defendants filed and served their Answer to the Complaint.  ECF 112.  Defendants denied that any of the statements or omissions at issue were materially false or misleading.  *Id*.  Defendants also asserted 28 affirmative defenses, including that they did not make any statements that were false or misleading or omit to state any material facts; some or all of the matters claimed by Lead Plaintiffs to have been omitted from Novo Nordisk's public disclosures were fully disclosed; and that Defendants had no duty to disclose any of the alleged omitted material information.  *Id*.

63.    On December 13, 2018, after the initial conference with the Court on November 14, 2018, the Court entered its Scheduling Order.  ECF 121.  The key deadlines set forth in this order were as follows:

| | |
|---|---|
| Fed. R. Civ. P. 26 Disclosures | 11/20/2018 |
| Motion for Class Certification | 4/1/2019 |
| Affirmative expert reports | 4/2/2020 |
| Substantial completion of document production in response to all document requests issued | 6/3/2019 |
| Opposition to Motion for Class Certification | 6/3/2019 |
| Reply in Support of Motion for Class Certification | 7/3/2019 |
| Deadline to add parties and to amend pleadings | 7/12/2019 |
| Completion of fact discovery | 3/2/2020 |
| Rebuttal expert reports | 5/4/2020 |
| Completion of expert discovery | 6/3/2020 |
| Deadline to file potentially dispositive motions | 7/3/2020 |

- 25 -

64.    On January 24, 2019, the Parties submitted a Joint Letter to the Court regarding multiple discovery disputes related to Lead Plaintiffs' request for Defendants to produce documents included in prior productions in related matters; Lead Plaintiffs' request that Defendants use Technology Assisted Review to help facilitate document discovery; and Lead Plaintiffs' request for Defendants to produce certain documents in order to properly respond to Lead Plaintiffs' Interrogatories. ECF 127.

65.    In addition, in December 2018 and January 2019, the Parties negotiated the terms of a discovery confidentiality order and protective order governing the treatment of documents and other information produced in discovery.  The parties submitted a joint status report to the Court on January 10, 2019 stating their positions on the terms of a discovery confidentiality order and stipulated protective order. ECF 124.  On January 29, 2019, the Court entered the discovery confidentiality order and stipulated protective order.  ECF 128-129.

66.    On April 26, 2019, the Parties submitted to the Court a letter outlining the outstanding discovery disputes.  ECF 137.  Among those disputes were Lead Plaintiffs' request for Defendants to produce Novo's response to requests for information from the U.S. Senate Finance Committee, Defendants' production in related matters, Novo's policies and procedures concerning communications with competitors, and Lead Plaintiffs' knowledge of PBMs.  *Id.*

67.     On May 13, 2019, a teleconference regarding discovery disputes was held concerning the issues discussed in the Parties' April 26, 2019 letter to the Court.

68.     On May 21, 2019, the Court entered an order to extend the discovery schedule by approximately two weeks.  ECF 143.  The key deadlines set forth in this order were as follows:

| | |
|---|---|
| Opposition to Motion for Class Certification | 6/13/2019 |
| Reply on Class Certification due | 7/18/2019 |
| Substantial Completion of the production of documents | 8/5/2019 |
| Exchange of Privilege Logs | 8/20/2019 |

69.     On March 19, 2020, as COVID 19 shutdowns started first in Denmark and then in the United States, the Court entered an order rescheduling the March 24, 2020 teleconference to May 12, 2020.  The Parties continued to work diligently to continue discovery, including agreeing on a remote deposition protocol and refining their witness list.

70.     On May 20, 2020, the Court entered an order extending discovery deadlines.  ECF 190.  The key deadlines set forth in this order were as follows:

| | |
|---|---|
| Substantial Completion of the production of documents | 3/31/2020 |
| Completion of Fact Discovery | 9/25/2020 |
| Affirmative Expert Reports | 10/16/2020 |
| Rebuttals to Expert Reports | 11/24/2020 |
| Replies to Rebuttal Expert Reports | 12/23/2020 |
| Completion of Expert Discovery | 1/15/2021 |
| Dispositive Motions | 2/19/2021 |
| Opposition Motions | 3/19/2021 |
| Reply to Opposition Motions | 4/12/2021 |

71.     On July 23, 2020, Lead Plaintiffs filed their application for the issuance of an international letter of request pursuant to the provisions of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. §1781, in order to take the deposition of Jesper Høiland, NNI's former President of North American operations.  ECF 193, 202. On August 3, 2020, the Court approved the application. ECF 195.

72.     On September 25, 2020, the Court again entered an order extending discovery deadlines.  ECF 207.  The key deadlines set forth in this order were as follows:

| | |
|---|---|
| Affirmative Expert Reports | 11/13/2020 |
| Rebuttals to Expert Reports | 12/23/2020 |
| Replies to Rebuttal Expert Reports | 1/29/2021 |
| Completion of Expert Discovery | 2/19//2021 |
| Dispositive Motions | 3/19/2021 |
| Opposition Motions | 4/21/2021 |
| Reply to Opposition Motions | 5/7/2021 |

### 1.    Document Discovery from Defendants and Third Parties

73.     On November 2, 2018, Lead Plaintiffs served their first request for production of documents on Defendants. Plaintiffs' Counsel subsequently spent significant time negotiating the scope of discovery with Defendants, including regarding search terms, time periods, and the number and identities of custodians from whom Defendants would collect documents.

- 28 -

74.     On December 14, 2018, Defendants served their Responses and Objections to Plaintiffs' First Request for Production of Documents.  The parties continued to meet and confer concerning issues arising out of Lead Plaintiffs' requests for production and Defendants' objections.

75.     In addition, over the course of discovery, Lead Plaintiffs subpoenaed and negotiated production of documents from 19 non-parties.  Lead Plaintiffs engaged in extensive negotiations with many of these third parties over search terms, custodians, and time frames for production.  Lead Plaintiffs issued subpoenas to PBMs Prime Therapeutics, CVS Health, OptumRX, and Express Scripts; to pharmaceutical competitors Eli Lilly and Company and Sanofi-Aventis; to advisors Ernst & Young LLP, McKinsey & Company, Charles River Associates, and PricewaterhouseCoopers, LLP; and to other third parties, including NaviSync, IQVIA, and ZS Associates, Inc.

76.     In total, Defendants and non-parties produced more than 1,837,800 documents, totaling nearly 5,727,300 pages.   Together with Lead Plaintiffs' productions, which required Plaintiffs' Counsel's review prior to production, the discovery record totaled over 5,745,000 pages of documents.

## 2.     Defendants' Document Requests to Lead Plaintiffs

77.     On November 20, 2018, Defendants served their first requests for production of documents on Lead Plaintiffs.

78.     Plaintiffs' Counsel prepared responses and objections to these requests and negotiated extensively with Defendants over the scope of the production. Lead Plaintiffs devoted significant resources to searching their databases, over several custodians, for a time period spanning nearly 3 years, to collect relevant documents. Plaintiffs' Counsel worked with each of the Lead Plaintiffs to gather potentially relevant and responsive materials and carefully reviewed these documents for privilege and relevance.

79.     Lead Plaintiffs made their first of 17 productions of documents to Defendants on February 8, 2019, and made their last production on June 10, 2019. Ultimately, Lead Plaintiffs produced over 800 documents, totaling more than 18,500 pages, to Defendants.

### 3.     Fact Witness Depositions

80.     Discovery in the Action included 43 fact witness depositions, including 28 depositions of current and former Novo employees, depositions of representatives of each Lead Plaintiff, and depositions of several nonparties.

81.     Lead Plaintiffs deposed several key figures, including Defendants Brandgaard, Sørensen, and Riis, and former NNI head Høiland.

82.     We believe that information elicited during these depositions was supportive of Lead Plaintiffs' claims.  We recognize, however, that there was also information elicited during these depositions that a jury could view as supportive of

- 30 -

Defendants' positions.   Nevertheless, these depositions, and the documents discussed therein, provided Lead Counsel with a solid basis to understand the risks and strengths of the case, and on how to move forward in the litigation, including defending against Defendants' summary judgment motion and preparing for trial.

83.   The chart below identifies the fact depositions that were taken in the Action, categorized by deponent, deposition date, and the witness's affiliation or title during the Class Period:

| Deponent | Date | Witness Affiliation or Title |
|---|---|---|
| Brian Ravins | 5/7/2019 | 30(b)(6) witness Clearwater |
| Mark Vieu | 5/8/2019 | 30(b)(6) witness for Central States |
| Charles Lee | 5/9/2019 | 30(b)(6) witness for Central States |
| Timothy Reeves | 5/15/2019 | 30(b)(6) witness for Lehigh |
| John Kelly | 5/23/2019 | 30(b)(6) witness for BRS |
| Chase Rankin | 5/29/2019 | 30(b)(6) witness for OKFF |
| Arie Sukendro | 12/09/2019 | Director, Business Analytics at NNI |
| Daye Bexley | 12/18/2019 | Director - National Accounts - CVS Caremark at NNI |
| George McAvoy | 1/16/2020 | VP - Marketing - Novolog® /Novolog Mix 70/30 at NNI |
| Mads Krogsgaard Thomsen | 1/30/2020 | 30(b)(6) witness, Novo's Chief Science Officer (CSO) |
| Hans Rommer | 1/31/2020 | 30(b)(6) witness, VP, Insights & Forecasting at Novo |
| Peter Hunkel | 2/7/2020 | 30(b)(6) witness for WCM, (Outside Investment Manager for OKFF, Central States, and Clearwater) |
| Jameson Ivens | 2/21/2020 | 30(b)(6) witness, Director – FP&A Sales Reporting & Forecasting at NNI |
| Sean Phillips | 3/6/2020 | Novo's VP of Market Access Strategy |
| Steve Albers | 6/8/2020 | 30(b)(6) witness, VP – Market Access – National Accounts at NNI |
| Dave Smith | 6/10/2020 | Novo Forecasting Manager |
| Bill Breitenbach | 6/12/2020 | VP - Portfolio - Levemir & INS Degludec Franch at NNI |
| Karen Yee | 6/17/2020 | Associate Director – Strategic Pricing at NNI |

| Deponent | Date | Witness Affiliation or Title |
|---|---|---|
| Curtis Scott Jr | 7/17/2020 | 30(b)(6) witness for Todd Asset Management (Outside Investment Manager for BRS) |
| Erik Zbranak | 7/21/2020 | Director - Market Access Portfolio Contracting & Innovations at NNI |
| Raymond Kall | 7/30/2020 | Novo Director Area Accounts - Northwest |
| Peter Ankersen | 8/6/2020 | 30(b)(6) witness, Novo's Head of Investor Relations |
| Tim Slee | 8/12/2020 | 30(b)(6) witness, Novo's Corporate VP - Global Market Access |
| Joanne Golankiewicz | 8/14/2020 | Novo's VP, Commercial Effectiveness |
| Lars Green | 8/27/2020 | Senior VP - Finance & Operations at NNI |
| Michael Mow | 8/28/2020 | 30(b)(6) witness for Chautaqua Capital Management (Outside Investment Manager for OKFF) |
| Rich DeNunzio | 8/31/2020 | VP - Market Access Strategy & Innovation at NNI |
| Kasper Poulsen | 9/2/2020 | Novo Corporate VP, Corporate Financial Planning |
| Jakob Riis | 9/8/2020 | Defendant; Executive VP - Head of North America Operations & President of NNI |
| Jesper Brandgaard | 9/11/2020 | Defendant; Novo Executive VP, CFO - Finance, Legal & Investor Relations |
| Carl Bilbo | 9/15/2020 | Novo Corporate VP, Commercial Planning |
| Jesper Brandgaard | 9/16/2020 | Defendant; Novo Executive VP, CFO - Finance, Legal & Investor Relations |
| Alexandra Lee | 9/18/2020 | 30(b)(6) witness for Sustainable Growth Advisors (Outside Investment Manager for Lehigh) |
| Brian Lundstrom | 9/24/2020 | Former Novo Employee discuss in the Complaint |
| Peter Boggild | 9/25/2020 | VP, Finance & Supply Chain at NNI |
| Lars Rebien Sørensen | 9/25/2020 | Defendant; Novo's President and CEO |
| Lars Fruergaard Jorgensen | 9/30/2020 | Novo's CEO beginning in 2017 |
| Doug Langa | 10/2/2020 | Senior VP - Market Access at NNI |

| Deponent | Date | Witness Affiliation or Title |
|---|---|---|
| Debra Netschert | 10/9/2020 | 30(b)(6) witness for Jennison Associates (Outside Investment Advisor for Central States) |
| Camille Lee | 11/6/2020 | Senior VP - Diabetes & Obesity Marketing at NNI |
| Jesper Høiland | 1/29/2021 | Executive VP of NNI, Head of North America Operations |
| Colleen Bloom | 2/19/2021 | 30(b)(6) witness, Associate Director – Strategic Pricing Insights |
| Peter Boggild | 2/22/2021 | 30(b)(6) witness, Vice President, Finance & Supply Chain |

### 4.  Written Discovery

84.    The Parties exchanged 47 interrogatories and more than 1,000 pages of responses, and Lead Plaintiffs served 48 requests for admission on Defendants.

85.    On November 2, 2018, Lead Plaintiffs served their first set of interrogatories on Defendants, which included thirteen requests seeking and concerning the identities of persons responsible for pricing of Novo's drugs, negotiations with PBMs, and Novo's forecasting of its drug sales.

86.    On November 20, 2018, the Parties exchanged their initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedures.  These initial disclosures identified individuals likely to have discoverable information, and descriptions and locations of documents in the Parties' possession that may support the Parties' claims and defenses.

87.    Also on November 20, 2018, Defendants served their first sets of interrogatories on each of the five Lead Plaintiffs.

88.    On December 14, 2018, Defendants served their responses and objections to Lead Plaintiffs' first set of interrogatories, in response to which Defendants identified 120 Company employees as responsible for pricing, negotiations or forecasting regarding the drugs at issue.

89.    On December 17, 2018, each of the five Lead Plaintiffs served its responses and objections to Defendants' first set of interrogatories, with those responses and objections totaling 152 pages.

90.    On August 21, 2020, Lead Plaintiffs served their second set of interrogatories on Defendants, which sought information regarding the net costs of Tresiba, Levemir and other Novo drugs.  The same day, Lead Plaintiffs served their first set of requests for admissions, which contained 48 requests.

91.    On September 11, 2020, Defendants served their second set of interrogatories on Lead Plaintiffs, which included contention interrogatories requesting that Lead Plaintiffs identify every misstatement and all facts, witnesses and documents that Lead Plaintiffs contended supported each alleged misstatement.

92.    On October 12, 2020, Defendants responded to Lead Plaintiffs' second set of interrogatories and first set of requests for admission with more than 70 pages of objections and information.

93.    As discussed in Section II.D.6, *infra*, Defendants' responses to Lead Plaintiffs' Interrogatory Nos. 13 and 15 were the subject of ongoing dispute and

negotiations, about which the parties submitted joint letters to the Court on October 26, 2020 and January 15, 2021.  ECF 221, 235, 237, 253.

94.     On November 30, 2020 and January 19, 2021, Defendants supplemented their response to Lead Plaintiffs' Interrogatory No. 15, which sought details regarding the level of access and time period of such access for "each formulary on which Tresiba was placed during the Relevant Period."

95.     On December 4, 2020, Defendants supplemented their response to Lead Plaintiffs' Interrogatory No. 13, which requested that Defendants "[i]dentify all rebates relating to Novo Drugs other than Tresiba that Novo paid as part of an agreement to secure formulary access for Tresiba during the Relevant Period" and to provide details regarding such rebates.

96.     On December 11, 2020, Lead Plaintiffs responded to Defendants' second set of interrogatories by identifying 66 statements and including more than 1,000 pages of supporting facts, witnesses, and documents that Lead Plaintiffs contended proved that the identified statements were false and made with the requisite scienter.

### 5.     Expert Discovery

97.     In addition to conducting comprehensive fact discovery, Plaintiffs' Counsel retained experts while investigating and prosecuting the case.  These experts offered opinions in the areas of damages, loss causation, risk reporting, disclosure

practices, dynamics in the U.S. insulin-drug market, and the role of PBMs in that market.  The process of assisting the experts in offering their opinions involved careful analysis of the discovery record, including deposition transcripts and documents produced by Defendants and third parties.  The expert opinions were used to support Lead Plaintiffs' motion for class certification,[4] to oppose Defendants' motion for summary judgment, during mediation, and to prepare Lead Plaintiffs' case for trial.  A significant portion of Lead Plaintiffs' consultation with these experts occurred during the COVID-19 pandemic, requiring Lead Plaintiffs and counsel to effectively share information, strategize, and coordinate with these experts in a remote environment.

98.     Lead Plaintiffs served three opening expert reports on November 13, 2020:

a)      Professor Steven P. Feinstein, Doctor of Economics, Chartered Financial Analyst, faculty in the Finance Division at Babson College and President of Crowninshield Financial Research, Inc., who opined on loss causation and damages under the securities laws;

b)      D. Paul Regan, Certified Professional Accountant and certified in financial forensics, who opined on whether Novo appropriately disclosed uncertainties and known risks under the securities laws; and

c)      Dr. Surya C. Singh, MD, former Corporate Vice President and Chief Medical Officer, CVS Health, Inc., who opined on dynamics in the U.S. insulin-drug market and the role of PBMs in that market.

---

[4]    Expert reports filed in support of Lead Plaintiffs' class certification motion are discussed in the Section II.C (Class Certification) above.

99.    In total, Lead Plaintiffs' opening expert reports encompassed 276 pages along with voluminous supporting exhibits, and cited hundreds of documents and multiple deposition transcripts.

100.   Defendants also submitted two expert reports on November 13, 2020:

a)     Professor Steven Davidoff Solomon, Professor at the Berkeley School of Law, who opined on disclosure practices under the securities laws; and

b)     Margaret Kyle, Ph.D. and professor of economics at the MINES ParisTech, who opined on factors affecting the commercial success of pharmaceuticals.

101.   In total, Defendants' two expert reports encompassed 291 pages and cited hundreds of documents and multiple deposition transcripts.

102.   In response to Defendants' expert reports, Lead Plaintiffs worked closely with their experts to prepare two rebuttal expert reports.  Lead Plaintiffs served these rebuttal reports from Dr. Singh, who responded to Ms. Kyle, and Dr. Matthew D. Cain, who responded to Professor Solomon, on December 23, 2020.

103.   On the same day, Defendants served on Lead Plaintiffs six expert rebuttal reports, which totaled 593 pages.

104.   In response to Defendants' rebuttal reports, Lead Plaintiffs again worked closely with their experts and, on February 5, 2021, submitted reply reports from Professor Feinstein, Mr. Regan and Dr. Singh.

105. On February 5, 2021, Defendants also submitted two reply reports from experts Solomon and Kyle, which totaled 120 pages.

106. In addition, Plaintiffs' Counsel took and/or defended the depositions of ten expert witnesses, including all of Lead Plaintiffs' experts and Defendants' experts. The chart below identifies the expert depositions taken in the Action by deponent, date of deposition, and affiliation:

| Deponent | Deposition Date | Expert Affiliation |
|----------|-----------------|--------------------|
| Scott A. Taub | 2/4/2021 | Defendants' Expert on Risk Reporting |
| Prof. Steven P. Feinstein | 2/17/2021 | Lead Plaintiffs' Expert on Loss Causation & Damages |
| Dr. Surya C. Singh. MD | 2/25/2021 | Lead Plaintiffs' Expert on the Pharmaceutical Market, PBMs and Clinical Differentiation of Tresiba |
| Matthew D. Cain, Ph.D. | 2/26/2021 | Lead Plaintiffs' Expert on Disclosure Practices |
| Albert I. Wertheimer, Ph.D. | 3/1/2021 | Defendants' Expert on PBMs |
| Douglas J. Skinner, Ph.D. | 3/2/2021 | Defendants' Expert on Loss Causation and Damages |
| Margaret Kyle, Ph.D. | 3/4/2021 | Defendants' Expert on the Pharmaceutical Market |
| D. Paul Regan, CPA | 3/9/2021 | Lead Plaintiffs' Expert on Risk Reporting |
| Prof. Steven Davidoff Solomon | 3/15/2021 | Defendants' Expert on Disclosure Practices |
| Wendy S. Lane, MD | 3/16/2021 | Defendants' Expert on Clinical Differentiation of Tresiba |

107. Plaintiffs' Counsel further consulted with Lead Plaintiffs' experts throughout the course of the litigation of the Action.

### 6.    Discovery Disputes

108.    As noted above, discovery in this Action was hard fought, and Lead Plaintiffs and Plaintiffs' Counsel expended significant time and effort to resolve discovery disputes that arose.

### a.    Disputes with Defendants

109.    In the early stages of discovery, the Parties negotiated the terms of a discovery confidentiality order and protective order governing the treatment of documents and other information produced in discovery.  The parties submitted a joint status report to the Court on January 10, 2019, stating their positions on the terms of the discovery confidentiality order and stipulated protective order.  ECF 124.  On January 29, 2019, the Court entered the discovery confidentiality order and stipulated protective order.  ECF 128,129.

110.    In January 2019, after extensive negotiations, the Parties reached an impasse over discovery disputes and filed a joint letter with the court regarding: (i) Defendants' production of materials from prior productions; (ii) Lead Plaintiffs' request that Defendants use technology assisted review; (iii) Defendants objections to producing several categories of documents in response to Lead Plaintiffs' requests; (iv) Defendants response to Lead Plaintiffs' Interrogatory No. 7, which requested a list of rebates paid by Novo to PBMs; (v) Defendants' refusal to produce current and former employees living in Denmark for deposition in the United States;

(vi) third-party objections to subpoenas; and (vii) Defendants' requests related to Lead Plaintiffs' knowledge about PBMs.   ECF 127.   The parties met via teleconference or in person with Magistrate Judge Lois H. Goodman on January 29, 2019, February 19, 2019, March 12, 2019, and April 9, 2019.   During these proceeding and in other communications, the parties resolved the majority of their extant discovery disputes.

111.   On April 26, 2019, the Parties submitted to the Court a joint letter outlining the remaining disputes.  ECF 137.  Lead Plaintiffs' three remaining issues concerned their requests that Defendants produce documents regarding Novo's: (i) response to a February 22, 2019 letter from the U.S. Senate Finance Committee, (ii) productions to government entities in response to investigative demands, and (iii) policies and procedures regarding communications with competitors.  (*Id.*). Defendants' remaining issue concerned discovery related to Lead Plaintiffs' knowledge of PBMs.  *Id.*  Following a telephone status conference on May 13, 2019 (ECF 142), the Court entered a consent order granting in part and denying in part the Parties' requests.  ECF 151.

112.   The parties also had a dispute regarding Lead Plaintiffs' disclosure of the identities of certain former employees discussed in the Complaint.  On July 30, 2019, the parties participated in a status conference before Magistrate Judge Goodman, following which Judge Goodman ordered the parties to submit a joint

letter if they could not resolve their dispute over Lead Plaintiffs' identification of the former employees.  *See* ECF 153.  The parties subsequently resolved this dispute.

113.   Between March 2020 and June 2020, Lead Plaintiffs sought to schedule the deposition of NNI's former President of North American Operations, Jesper Høiland.  ECF 202.  In June 2020, Counsel for Defendants informed Lead Plaintiffs that they did not represent Mr. Høiland, who had moved from the United States to Denmark, and that Mr. Høiland would not appear voluntarily for his deposition.  *Id.*

114.   After contacting Mr. Høiland's counsel, Lead Plaintiffs filed an application with the Court on July 23, 2020, for the issuance of an international letter of request ("Letter of Request") pursuant to the provisions of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, 28 U.S.C. §1781, in order to take the deposition of Mr. Høiland.  ECF 193, 202.  On August 3, 2020, the Court approved the application. ECF 195.

115.   Lead Plaintiffs subsequently sent the Letter of Request to Denmark's Ministry of Justice.  Ultimately, the matter of Mr. Høiland's deposition was resolved when his counsel informed Lead Plaintiffs that Mr. Høiland had moved again, this time to Princeton, New Jersey, and that Mr. Høiland agreed to sit for his deposition. Lead Plaintiffs took Mr. Høiland's deposition on January 29, 2021.

116.   Other disputes regarding depositions, such as whether Novo President and CEO Lars Fruergaard Jørgensen would voluntarily sit for his deposition, were resolved without recourse to the Court.

117.   On August 21, 2020, Lead Plaintiffs served their second set of interrogatories on Defendants, which sought information regarding the net sales of Tresiba, Levemir and other Novo drugs after rebates and other costs.  In particular, Interrogatory No. 13 asked Defendants to "[i]dentify all rebates relating to Novo Drugs other than Tresiba that Novo paid as part of an agreement to secure formulary access for Tresiba during the Relevant Period" and provide certain details about those rebates.  Interrogatory No. 15 sought details regarding the level of access and time period of such access for each formulary on which Tresiba was placed.

118.   Meanwhile, the parties' dispute over Lead Plaintiffs' Interrogatory No. 7, which requested all historical list prices and rebates paid for Novo drugs during the relevant time period, continued.   On September 21, 2020, Lead Plaintiffs requested leave of Court to file a motion to compel a response to Interrogatory No. 7 after the fact discovery cut-off if necessary, which the Court so ordered on September 22, 2020.  ECF 206.  Ultimately, the parties resolved the dispute over Interrogatory No. 7 without the Court's intervention.

119.   Defendants provided their responses and objections on October 12, 2020.  For their responses to Interrogatory Nos. 13 and 15, Defendants identified a

series of PBM agreements and other documents rather than providing a written response.  Lead Plaintiffs contended that Defendants' response was inadequate, and that Defendants should provide a written response including the specific information and data points requested.  The parties met and conferred via telephone on October 19, 2020 regarding Defendants' responses.  *See* ECF 235.

120.    Unable to resolve the matter, the parties submitted a joint 25-page letter with 36 exhibits to the Court on October 26, 2020.  ECF 221, 235.  Lead Plaintiffs took the position that, for Interrogatories 13 and 15, Defendants had referenced an incomplete set of documents that did not provide the information requested.  Lead Plaintiffs also sought further responses to their contention interrogatories seeking information supporting Defendants' contentions and affirmative defenses.

121.  In a teleconference on November 5, 2020, the Court ordered Defendants to indicate where in the production the answers to Interrogatories 13 and 15 resided.  *See* ECF 237, 242.  If Novo did not possess the information needed to provide a full response, Defendants agreed to try to negotiate a written representation regarding the lack of information.  *See* ECF 237.  The Court also raised, *sua sponte*, that a 30(b)(6) deposition would likely resolve the matter.  *See* ECF 237, 242.

122.  Following the November 5, 2020 conference, the parties met and conferred several times and attempted to memorialize in writing the Court's orders from the November 5, 2020 conference.  ECF 237.  Lead Plaintiffs also sought to

negotiate a written representation regarding the lack of information responding to Interrogatory No. 13, or to schedule a 30(b)(6) deposition to clarify Defendants' responses to Interrogatories 13 and 15.  *Id.*

123.   On or about November 30, 2020, Defendants supplemented their response to Interrogatory No. 15 by providing two charts related to Tresiba's formulary placement.

124.   On December 4, 2020, Defendants provided a supplemental response to Interrogatory No. 13, which again listed the same PBM agreements, this time with certain specific page references.

125.   On January 15, 2021, the parties again briefed the Court about remaining disputes over Lead Plaintiffs' Interrogatories 13 and 15.  ECF 237, 253. In the 18-page letter submitted jointly to the Court, Lead Plaintiffs requested 30(b)(6) depositions, pursuant to the Court's suggestion on November 5, 2020, to answer Interrogatories 13 and 15.  *Id.*

126.   Magistrate Judge Goodman held a teleconference on January 19, 2021. ECF 238, 242.  Earlier that day, Defendants had provided a written supplement to Interrogatory No. 15, and the parties resolved their dispute over Interrogatory No. 15.  The Court heard the parties' arguments regarding Interrogatory No. 13 and granted Lead Plaintiffs' request to take a limited 30(b)(6) deposition.

127.   Lead Plaintiffs took the resulting 30(b)(6) depositions of Colleen Bloom on February 19, 2021 and Peter Boggild on February 22, 2021.

### b.   Disputes with Third Parties

128.   In addition to the negotiations with Defendants, Lead Plaintiffs engaged in negotiations with third parties regarding their responses to subpoenas.   For example, although the Court had previously entered stipulated confidentiality and protective orders governing the treatment of documents and other information produced in discovery (ECF 124, 128, 129), several third-party PBMs required additional protections.   Lead Plaintiffs negotiated and Defendants agreed to a supplemental protective order for documents produced by Prime Therapeutics LLC, which the Court so ordered on April 30, 2019.   ECF 138.   Subsequently, Lead Plaintiffs negotiated similar supplemental orders for CVS Caremark and OptumRx Inc. that were entered on August 12, 2019, (ECF 158), and May 14, 2020, (ECF 189), respectively.

129.   For a subpoena served on Novo's outside auditors PricewaterhouseCoopers ("PwC"), Lead Plaintiffs were forced to file a motion to compel with the Court in order to obtain a complete response.   On April 24, 2020, Lead Plaintiffs subpoenaed PwC seeking, *inter alia*, documents and communications concerning services performed for Novo by PwC, personnel reductions, contracting with PBMs, and business forecasting.   ECF 234-1, 255.   PwC objected that Lead

Plaintiffs' requests were overly broad.  Lead Plaintiffs and PwC engaged in attempts to resolve the dispute between May 2020 and September 2020.  ECF 230-1, 255.

130.   Ultimately, Lead Plaintiffs and PwC reached an impasse, causing Lead Plaintiffs to file a motion to compel PwC's production of documents on October 1, 2020.  ECF 210, 212, 234.  PwC filed its memorandum in opposition on October 19, 2020.  ECF 216, 230.  Lead Plaintiffs filed a reply on October 26, 2020, (ECF 219), and PwC filed a sur-reply.  ECF 231.  On March 30, 2021, the Court issued an order granting the motion in part and denying it in part.  ECF 255.  The Court further directed the parties to meet and confer regarding the adequacy of PwC's document search efforts.  *Id.*

## E.   Defendants' Motion for Summary Judgment

131.   On April 20, 2021, Defendants served their motion for summary judgment.  ECF 267-273.  Defendants contended that there were no disputed issues of material fact that precluded summary judgment, including that the evidence adduced in discovery could not establish scienter, loss causation, nor that Novo had made any actionable misstatements.  Among other things, Defendants specifically argued that:

> a)   Lead Plaintiffs had failed to establish that Novo made false statements about its financial guidance and long-term financial targets because Novo met its guidance for 2015 and 2016 and the remaining statements were forward looking;

b)      Lead Plaintiffs had failed to establish that Defendants made false statements about Tresiba because their opinions about Tresiba's clinical differentiation were well supported;

c)      Novo had not made false claims that it was exempt from pricing pressures but rather truthfully and fully disclosed such pressures;

d)      Lead Plaintiffs had failed to provide evidence showing that the Individual Defendants or employees responsible for disclosures acted with the requisite mindset to establish scienter or had a motive to commit fraud; and

e)      Lead Plaintiffs had failed to establish loss causation because the alleged disclosures were nonactionable materialization of known and previously disclosed risks.

ECF 268.  Defendants' motion was supported by a filing setting forth 183 purported statements of undisputed fact pursuant to Rule 56.1, (ECF 268-1), as well as 209 exhibits.  ECF 269.

132.   On June 3, 2021, Lead Plaintiffs served their opposition to the motion for summary judgment on Defendants.  ECF 274-287.  Lead Plaintiffs argued, among other things, that:

a)      Defendants had made false statements about Novo's exposure to market pressures with scienter because they knew or were severely reckless in not knowing that, *inter alia,* competition from biosimilar drugs constituted a "big threat" and PBMs had so much leverage over Novo that they could disregard contractual terms and demand increased rebates.

b)      Defendants had made false statements about Tresiba's ability to bolster Novo's sales with scienter because they recklessly ignored warnings that Tresiba's innovation was challenged by payers who would not pay a premium price for the drug;

c)      Defendants had made false statements about Novo's forecasting and guidance with scienter because executive management knew, or was reckless in not knowing, that their expectations for double digit growth were "unrealistic";

d)      Loss causation was established, as discussed in Professor Feinstein's report in which he concluded, based on his event study and regression analyses, that Novo's ADR price experienced statistically significant declines on five dates when Novo made partial corrective disclosures; and

e)      Defendants had provided no evidence that Novo's corrective disclosures were merely materialization of known and previously disclosed risks.

ECF 274.  Lead Plaintiffs' opposition papers also included a statement of undisputed fact pursuant to Rule 56.1, (ECF 274-2), which included 381 paragraphs and 573 exhibits.   ECF 275.   Lead Plaintiffs' responses to Defendants' statement of undisputed material facts comprised 308 pages.  ECF 274-1.

133.   On July 12, 2021, Defendants served their reply in further support of their summary judgment motion (ECF 288-289), along with an additional 10 exhibits and a 551-page response to Lead Plaintiffs' statement of additional disputed material facts.  *Id.*  Also on July 12, 2021, the parties filed their summary judgment papers with the Court.  ECF 267-289.  The motion was pending at the time this Settlement was reached.

## F.    Mediation and Settlement

134.  Following the Court's entry of its Order and Opinion denying Defendants' motion to dismiss and at the beginning of fact discovery, the Parties

- 48 -

discussed the possibility of resolving the Action through a private mediator.  To that end, the Parties retained former U.S. District Judge Layn R. Phillips and retired New Jersey state Judge Harry G. Carroll to serve as mediators.

135.   On November 19, 2018, the Parties participated in a full-day, in-person mediation session (the "First Mediation") before Judge Phillips and Judge Carroll. The First Mediation was attended by Plaintiffs' Counsel and counsel for Defendants, and representatives of each of the Lead Plaintiffs were available by phone.

136.   In advance of the First Mediation, the Parties exchanged (and submitted to Judges Phillips and Carroll) detailed initial and responsive mediation statements addressing liability and damages.   The mediation briefs addressed the specific evidence and legal arguments each side believed supported their respective claims and defenses.  Although the First Mediation ended without a settlement and with the Parties far apart, the Parties remained in communication with the mediators while litigation continued.

137.   Following the First Mediation session, the Parties continued with the discovery and briefing described above.  In addition, the Parties engaged in various teleconferences, phone calls, and emails with Judge Phillips concerning a potential resolution of the Action.

138.   The Parties held a second mediation session with Judges Phillips and Carroll on April 24, 2020 using the Zoom videoconferencing platform (the "Second

Mediation").  The participants included Plaintiffs' Counsel, counsel for Defendants, representatives of Defendant Novo Nordisk, and representatives of Defendants' insurance carriers.  Representatives of each of the Lead Plaintiffs were available during the mediation by phone.

139.   In advance of the Second Mediation session, the Parties exchanged and submitted supplemental mediation statements.  The supplemental mediation statements further set out the relative merits of each side's positions.

140.   Although the Parties negotiated in good faith, the Parties were still far apart and did not reach a settlement at the Second Mediation, and litigation continued.

141.   The Parties held a third mediation session on September 2, 2021 (the "Third Mediation").  Some participants attended in person while others attended via Zoom.  The participants included Plaintiffs' Counsel, representatives of certain Lead Plaintiffs; counsel for Defendants; representatives of Defendant Novo Nordisk; and representatives of Defendants' insurance carriers.  Representatives of the Lead Plaintiffs who did not attend the Third Mediation were available during the mediation by phone.

142.   In advance of the Third Mediation, the Parties exchanged and submitted supplemental mediation statements.  The extensive supplemental mediation statements further set out the relative merits of each side's positions, informed by

the facts obtained through discovery that had completed by then and the parties' summary judgment briefing.

143.   Although the Parties negotiated in good faith, the Parties were still far apart and did not reach a settlement at the Third Mediation.   After the Third Mediation, Judge Phillips continued discussions with the Parties.

144.   Following additional negotiations, Judge Phillips issued a mediator's proposal to resolve the Action for $100 million.   The Parties accepted Judge Phillips's recommendation and memorialized their agreement in principle to settle the Action in a term sheet executed on September 24, 2021 (the "Term Sheet").   The Term Sheet set forth, among other things, the Parties' agreement to settle and release all claims against Defendants in return for a cash payment by or on behalf of Defendants for $100 million in cash for the benefit of the Class, subject to the execution of a customary "long form" stipulation and agreement of settlement and related papers.

145.   After execution of the Term Sheet, the Parties spent additional weeks negotiating the final terms of the Settlement as embodied in the Stipulation and the exhibits thereto, and exchanged multiple drafts of the Stipulation and its exhibits. On November 23, 2021, the Parties executed the Stipulation setting forth their

binding agreement to settle the Action (and superseding and replacing the Term Sheet).[5]

146.   Defendants have made a cash payment of $100 million into escrow for the benefit of the Class certified by the Court, and upon the Settlement becoming effective, the Parties will provide mutual releases, as defined in the Stipulation.

147.   As Judge Phillips states in his accompanying declaration, he "believe[s] that the Settlement represents a recovery and outcome that is reasonable and fair for the Class and all parties involved" and he "support[s] the Court's approval of the Settlement in all respects." Ex. 1, ¶18.  For the additional reasons discussed below, Lead Plaintiffs respectfully agree, and therefore ask the Court to approve the Settlement.

## III.    RISKS OF CONTINUED LITIGATION

148.   Lead Plaintiffs and Plaintiffs' Counsel have a thorough understanding of the strengths and potential weaknesses of the Action.   Lead Plaintiffs and Plaintiffs' Counsel were prepared to proceed to trial, and believe they have gathered substantial evidence to support the Class's claims.

---

[5]   On November 23, 2021, the Parties also entered into a confidential Supplemental Agreement that set forth the conditions under which Defendants may terminate the Settlement if the Court provided Class Members with an additional opportunity to request exclusion from the Class and the subsequent requests for exclusion reached a certain threshold. The Preliminary Approval Order (ECF 344) did not provide Class Members with a second opportunity to request exclusion in connection with the Settlement Notice. Accordingly, the Supplemental Agreement is now moot.

149.   Nonetheless, Lead Plaintiffs recognize that they faced considerable challenges and defenses – both factual and legal – if the Action were to continue through trial, as well as the inevitable appeals that would follow even if Lead Plaintiffs won a favorable verdict against Defendants.

150.   The Settlement provides an immediate and certain benefit to the Class in the form of a $100 million cash payment and represents a significant portion of the recoverable damages in the Action.   Lead Plaintiffs and Plaintiffs' Counsel believe that the proposed Settlement is a positive, outstanding result for the Class considering these risks of continued litigation, some of the most serious of which are discussed below.

### A.     Risks Concerning Liability

151.   While Lead Plaintiffs and Plaintiffs' Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize that this Action presented several substantial risks to establishing Defendants' liability.   At all stages of this litigation, Defendants had vigorously contended that there were no material misstatements or omissions at issue in the public statements, and they would have continued this argument vigorously through trial.

152.   *First*, Defendants have strenuously argued that Lead Plaintiffs have not adduced evidence to support jury findings that any alleged misstatements were false or misleading because, among other things, (i) Novo Nordisk met its stated financial

guidance during the relevant periods; (ii) Tresiba commanded a premium price over other insulin products, as Defendants predicted; and (iii) Novo Nordisk properly publicly disclosed increased market pressures.

153.   ***Second***, Defendants argued that Lead Plaintiffs could not establish the element of scienter, because the evidence did not support that any statements, even potentially misleading ones, were made with the requisite intent to defraud.

154.   While many of these arguments were made unsuccessfully by Defendants in their motion to dismiss, when the Court was required to accept all allegations in the Complaint as true, there was a significant possibility that Defendants could have succeeded in these arguments at subsequent stages of the litigation, when allegations in the Complaint would need to be supported by admissible evidence.

155.   Moreover, Lead Plaintiffs' claims would be subject to complex expert testimony, offered by Defendants' experts, that conflicts with Lead Plaintiffs' experts' analyses. Indeed, the opinions of each side's experts vary substantially, and continued litigation poses the risk that Defendants would prevail in a "battle of experts."  Such a battle would increase the expense involved with advancing the litigation, as well as the risk that a jury might credit Defendants' experts and accordingly reject Lead Plaintiffs' claims.

156.   Even if Lead Plaintiffs had prevailed at summary judgment, Lead Plaintiffs would still have to prevail at several additional stages in the litigation, including at trial, as well as on the appeals that would likely follow.  At each of those stages, there are significant risks attendant to the continued prosecution of the Action, and there are no guarantees that further litigation would have resulted in a higher recovery, or any recovery at all.

**B.     Risks Related to Damages**

157.   Even assuming that Lead Plaintiffs overcame each of the above risks and successfully established liability, they also faced substantial risks in proving damages and loss causation.  Throughout the litigation, Defendants maintained that, even if liability were established, Lead Plaintiffs' claims did not give rise to any cognizable damages.  Relatedly, Defendants contended and would have continued to argue, among other things, that Lead Plaintiffs could not show loss causation to support their damages theory.

158.   Defendants have challenged Lead Plaintiffs' theory of loss causation (and therefore recoverable damages), maintaining that losses on the alleged "corrective disclosure" dates were not caused by any alleged fraud: *i.e.*, nothing about the disclosures revealed to the market that any of Novo Nordisk's prior statements were false or misleading.  Instead, Defendants have contended and would continue to argue that the disclosures primarily represented the materialization of

the risks that the Company previously and adequately disclosed both before and during the Class Period, such as the risk that market pressures would negatively impact the Company's financial performance.

159.   This case presented complex questions with respect to determining the amount of damages that could be recovered and the range of possible damages varied widely depending on assumptions and methodology adopted.   The $100 million recovery exceeds 6.7% of estimated recoverable damages in the best-case scenario for Lead Plaintiffs, which assumes that Lead Plaintiffs would prevail on all of their arguments regarding the causes of the declines in Novo Nordisk's ADR price on the "corrective disclosure" dates Lead Plaintiffs alleged, among other issues.  This result more than doubles the 2.3% average percentage recovery in securities class actions settled between 2012-2020 where investor losses exceed $1 billion.  *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements: 2021 Review and Analysis*, at 6, fig. 5, (Cornerstone Research 2022).   Furthermore, in light of the numerous persuasive arguments presented by Defendants and their experts concerning loss causation and damages, including that each of the alleged stock price declines was not cognizable and that Lead Plaintiffs' expert overstated the amount of each decline that was attributable to the fraud, even if Lead Plaintiffs were able to prove liability, the amount of damages Lead Plaintiffs would be reasonably likely to prove at trial a fraction of the best-case scenario.

160.   Notably, moreover, had Defendants' loss causation arguments been accepted in full or even in part at summary judgment or trial, damages could have been significantly lower than that amount, or eliminated entirely.   Even if Lead Plaintiffs were successful at trial, Defendants could have challenged the damages of each and every large class member in post-trial proceedings, substantially reducing any aggregate recovery by Lead Plaintiffs.   Accordingly, the $100 million Settlement represents a substantial percentage of damages that could be reasonably expected to be proved at trial and, particularly considering the considerable other litigation risks discussed above, represents a very favorable resolution of the Action for Class Members.

161.   Finally, even if Lead Plaintiffs had succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants would almost certainly have appealed.   An appeal would not only have renewed all the risks faced by Lead Plaintiffs and the Class, as Defendants would have re-asserted all their arguments summarized above, but also would have resulted in significant additional delay and costs before Class Members could have received any recovery from this case.

162.   Given the complexity of this case and the risks and delay inherent in continued litigation, the $100 million Settlement is an exceptional result.   Taking into account that the case has been litigated for five years, and the significant amount of the recovery, the Settlement here falls well within the range of reasonableness in

light of the attendant risks and uncertainties of litigation, and should be finally approved. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

## IV.   PRELIMINARY APPROVAL OF THE SETTLEMENT

163.   On November 23, 2021, Lead Plaintiffs filed their unopposed Motion for Preliminary Approval of Class Action Settlement ("Preliminary Approval Motion"), which included a copy of the Stipulation and a memorandum in support. ECF 311.

164.   On March 8, 2022, the Court entered the Order Preliminarily Approving Settlement and Providing for Notice (ECF 344) (the "Preliminary Approval Order"), which among other things: (i) preliminarily approved the Settlement, finding that "it will likely be able to finally approve the Settlement under Rule 23(e)(2) as being fair, reasonable, and adequate to the Class, subject to further consideration at the Settlement Hearing"; (ii) approved the form of Settlement Notice, Summary Settlement Notice, and Claim Form, and authorized notice to be given to Class Members through mailing of the Settlement Notice and Claim Form, posting of the Settlement Notice and Claim Form on the case website, and publication of the Summary Settlement Notice in *The Wall Street Journal* and *Investor's Business Daily* and over the *PR Newswire*; (iii) established procedures and deadlines by which Class Members could participate in the Settlement or object to the Settlement, the proposed Plan of Allocation, or the Fee and Expense

Application; and (iv) set a schedule for the filing of opening and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application.  The Preliminary Approval Order also set a time and date for the Settlement Hearing to determine, among other things, whether the Settlement should be finally approved as fair, reasonable, and adequate.

## V.   LEAD PLAINTIFFS' COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER

165.   The Preliminary Approval Order directed that the Settlement Notice and Claim Form be disseminated to Class Members.  The Preliminary Approval Order also set a June 6, 2022 deadline for Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application.

166.   In compliance with the Preliminary Approval Order, Court-approved Claims Administrator JND, which had previously conducted the mailing of the Class Notice, mailed copies of the Court-approved Settlement Notice and the Claim Form to putative Class Members and nominees, and published the Summary Settlement Notice.  The Settlement Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Class Members' rights to participate in the Settlement and/or object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application.  The Settlement Notice also informs Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund, and for payment of

Litigation Expenses incurred by Plaintiffs' Counsel in an amount not to exceed $3.3 million.  JND disseminated the Settlement Notice and Claim Form (together, the "Settlement Notice Packet") to all potential Class Members who had previously been identified in the prior mailing of the Class Notice, as well as to any additional potential Class Members who were identified in response to dissemination of the Settlement Notice Packet.  *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Settlement Notice and Claim Form and (B) Publication of the Summary Settlement Notice ("Segura Decl."), attached hereto as Exhibit 7, ¶¶2-4.

167.  On March 29, 2022, JND disseminated 356,465 copies of the Settlement Notice Packet to potential Class Members and nominees by first-class mail.  *Id*.  As of May 20, 2022, JND had disseminated a total of 378,723 copies of the Settlement Notice Packet.  *Id.*

168.  In accordance with the Preliminary Approval Order, on April 11, 2022, JND caused the Summary Notice to be published in *The Wall Street Journal* and *Investor's Business Daily* and to be transmitted over the *PR Newswire*.  *Id.*, ¶5.

169.  JND also made copies of the Settlement Notice and Claim Form available on the case website, www.NovoNordiskSecuritiesLitigation.com.  *Id.*, ¶7. JND also added information concerning the Settlement to that website and provided access to the Stipulation and Preliminary Approval Order.  *Id.*

170.   As set forth above, the deadline for Class Members to file objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Allocation, is June 6, 2022.  To date, no objections to the Settlement, the Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received.  Lead Counsel will file reply papers on or before June 20, 2022 that will address any objections that are received.

## VI.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

171.   Pursuant to the Preliminary Approval Order, and as set forth in the Settlement Notice, all Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (a) any taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court, (d) any attorneys' fees awarded by the Court, and (e) any other costs or fees approved by the Court) must submit a valid Claim Form with all required information postmarked (if mailed), or submitted online, no later than July 27, 2022.

172.   The plan of allocation proposed by Plaintiffs (the "Plan of Allocation" or "Plan") is set forth in Appendix A to the Settlement Notice.  If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Authorized Claimants.  The proposed Plan of Allocation is designed to achieve an equitable and rational distribution of the Net Settlement Fund.  However, the Plan of Allocation is not a formal damages analysis and the calculations made pursuant

to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Class Members might have been able to recover after a trial.

173.   Lead Counsel developed the Plan of Allocation in conjunction with Lead Plaintiffs' damages expert.  The Plan of Allocation creates a framework for the equitable distribution of the Net Settlement Fund among Class Members who suffered economic losses because of Defendants' alleged violations of the federal securities laws.

174.   In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of alleged artificial inflation in the per share closing prices of Novo Nordisk ADRs that was allegedly proximately caused by Defendants' alleged materially false and misleading statements and omissions.  In calculating the estimated artificial inflation allegedly caused by those misrepresentations and omissions, Lead Plaintiffs' damages expert considered price changes in Novo Nordisk ADRs in reaction to public disclosures that allegedly corrected the respective alleged misrepresentations and omissions, adjusting the price change for factors that were attributable to market, industry, and foreign exchange forces, and for non-fraud related Company-specific information.  Plan of Allocation ¶3.

175.   Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase of Novo Nordisk ADRs during the Class Period that is listed in the Claim Form and for which adequate documentation is provided.  The

calculation of Recognized Loss Amounts will depend upon several factors, including: (a) when the Novo Nordisk ADRs were purchased and at what price; and (b) whether the Novo Nordisk ADRs were sold or held through the end of the Class Period or the 90-day look-back period under the PSLRA, and if the shares were sold, when and for what amounts. *Id.*, ¶¶6-7.

176.   Claimants who purchased Novo Nordisk ADRs during the Class Period but did not hold those ADRs through at least one "corrective disclosure" that impacted the market price of Novo Nordisk ADRs will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions. *Id.*, ¶¶4-5.

177.   Under the Plan of Allocation, the sum of a Claimant's Recognized Loss Amounts for all their purchases and any sales of Novo Nordisk ADRs during the Class Period is the Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated *pro rata* to Authorized Claimants based on the relative size of their Recognized Claims. *Id.*, ¶¶10-11.

178.   The Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Class Members based on the losses they suffered on transactions in Novo Nordisk ADRs that were attributable to the conduct alleged in the Complaint.  Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

179.   As noted above, through May 20, 2022, 378,723 copies of the Settlement Notice, which contains the Plan of Allocation and advises Class Members of their right to object to it, have been sent to potential Class Members.  *See* Segura Decl., ¶4.   To date, no objections to the proposed Plan of Allocation have been received.

## VII.   THE FEE AND EXPENSE APPLICATION

180.   In addition to seeking final approval of the Settlement and approval of the Plan of Allocation, Lead Counsel, on behalf of all Plaintiffs' Counsel, are applying for an award of attorneys' fees and payment of expenses incurred by Plaintiffs' Counsel during the course of the Action.   Specifically, Lead Counsel are applying for attorneys' fees in the amount of 29% of the Settlement Fund and for Litigation Expenses in the total amount of $2,738,023.93.   This total expense amount includes reimbursement in the aggregate amount of $40,019.05 to Lead Plaintiffs (*i.e.*, $10,410.50 for Lehigh County, $3,237.50 for Oklahoma Firefighters, $8,932.26 for Boston, $5,343.79 for Clearwater, and $12,095.00 for Central States) for costs incurred directly in connection with their representation of the Class in accordance with the PSLRA, 15 U.S.C. §78u-4(a)(4).   *See* Declaration of Sarah M. Murray ("Murray Decl."), ¶¶8-9, Declaration of Chase Rankin ("Rankin Decl."), ¶¶8-9, Declaration of Timothy J. Smyth ("Smyth Decl."), ¶¶8-9, Declaration of Jay Ravins ("Ravins Decl."), ¶¶8-9, Declaration of Charles Lee ("Lee Decl."), ¶¶8-9,

attached hereto as Exhibits 2-6, respectively.  As noted above, Lead Counsel's Fee and Expense Application is consistent with the amounts set forth in the Settlement Notice and, to date, no objections to Lead Counsel's request for attorneys' fees and expenses has been received.[6]

181.   Below is a summary of the primary factual bases for Lead Counsel's Fee and Expense Application.  A full analysis of the factors considered by courts in this Circuit when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee Memorandum.[7]

### A.   Lead Counsel's Fee Request Is Fair and Reasonable and Warrants Approval

#### 1.   The Favorable Settlement Achieved

182.   Courts have consistently recognized that the result achieved is a key factor to be considered in making a fee award.  *See* Fee Memorandum, §III.D.3.  As described above, when viewed in absolute terms, the $100 million Settlement is a

---

[6]   In fact, the fee request is less than the 30% noted in the Settlement Notice.

[7]   The Third Circuit has noted that a district court should consider the following factors, among others, in determining a fee award: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases." *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000) (citations omitted).  *See* also Fee Memorandum, §III.D.

significant result – representing approximately 6.7% of the estimated reasonably recoverable damages for the Class. This percentage recovery far exceeds the 2.3% average recovery of investor losses in securities class actions settled between 2012-2020 where investor losses were in excess of $1 billion. *See supra*, ¶159. This result is also significant when considered in view of the substantial risks and obstacles to obtaining a larger recovery (or, any recovery) were the Action to continue towards trial. Here, as a result of the Settlement, thousands of Class Members will immediately benefit and receive compensation for their losses and avoid the substantial risks to recovery in the absence of settlement.

> ### 2. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

183. The risks faced by Lead Counsel in prosecuting this Action are highly relevant to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement. Here, Defendants adamantly deny any wrongdoing and, if the Action had continued, would have aggressively litigated their defenses through summary judgment, a trial, and the appeals that would likely follow. As detailed in Section III above, Lead Counsel and Lead Plaintiffs faced significant risks to proving Defendants' liability, loss causation, and damages at all stages of litigation.

### 3. The Time and Labor Devoted to the Action by Plaintiffs' Counsel

184. Lead Counsel and the other Plaintiffs' Counsel firms devoted substantial time to the prosecution of the Action. As more fully described above, Lead Counsel: (i) conducted an exhaustive investigation into the Class's claims; (ii) researched and prepared a detailed amended complaint; (iii) successfully opposed Defendants' motions to dismiss; (iv) served document requests, requests for admission, and interrogatories on Defendants, and engaged in numerous meet and confers regarding the scope of the discovery requested and the objections thereto; (v) reviewed and analyzed the resulting productions of more than 5 million pages of documents produced from Defendants and 19 third parties; (vi) responded to Defendants' document requests, requests for admissions, and interrogatories; (vii) conducted extensive expert discovery, consisting of the retention of four experts, who produced reports and sat for depositions that Lead Plaintiffs defended, and the taking of depositions of Defendants' six retained experts; (viii) successfully moved for class certification; (ix) fully briefed Defendants' motion for summary judgment; and (x) prepared for and engaged in settlement negotiations with Defendants, including three formal mediation sessions. Lead Counsel advanced the litigation to achieve the most successful outcome for the Class, whether through settlement or trial, by the most efficient means possible.

185.   Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action.  As the lead partners on the case, we personally monitored and maintained control of the work performed by other lawyers at Bernstein Litowitz and Robbins Geller and at other Plaintiffs' Counsel's firms throughout the litigation.  Other experienced attorneys at Lead Counsel were also involved in the drafting of pleadings, motion papers, and in the settlement negotiations.  More junior attorneys, paralegals, and other support staff worked on matters appropriate to their skill and experience level.

186.   The time devoted to this Action by Plaintiffs' Counsel is set forth in the Fee and Expense Declarations attached hereto as Exhibits 8 through 13.  Included with the Fee and Expense Declarations are schedules that summarize the time expended by the attorneys and professional support staff employees at each firm, as well as expenses ("Fee and Expense Schedules").  The Fee and Expense Schedules report the amount of time spent by each attorney and professional support staff employee who worked on the Action and their resulting "lodestar," *i.e.*, their hours multiplied by their current hourly rates.

187.   The hourly rates of Plaintiffs' Counsel here range from $700 to $1,300 per hour for partners, $350 to $1,090 per hour for other attorneys, $125 to $400 per hour for paralegals and law clerks, and $255 to $600 per hour for in-house

- 68 -

investigators.  *See* Bernstein Litowitz Fee and Expense Decl., Ex. A; Robbins Geller Fee and Expense Decl., Ex. A; Carella Byrne Fee and Expense Decl., Ex. A; Seeger Weiss Fee and Expense Decl., Ex. A; Saxena Fee and Expense Decl., Ex. A; and Levi Fee and Expense Decl., Ex. A.  These hourly rates are reasonable for this type of complex litigation.

188.   In total, from the inception of this Action through November 23, 2021, the date of execution of the Stipulation of Settlement, Plaintiffs' Counsel expended over 123,862 hours on the investigation, prosecution, and resolution of the claims against Defendants, for a total lodestar of $60,856,642.25.[8]

189.   Thus, pursuant to a lodestar "cross-check," Lead Counsel's fee request of 29% of the Settlement Fund (or $29,000,000 plus interest), if awarded, would yield a negative multiplier of approximately 0.47 on Plaintiffs' Counsel' lodestar, which falls well below the range of positive fee multipliers typically awarded by courts in this Circuit and elsewhere in comparable securities class actions and other complex representative litigation involving significant contingency fee risk.  *See* Fee Memorandum, §III.E.

---

[8]   Lead Counsel will continue to perform legal work on behalf of the Class should the Court approve the Settlement.  Additional resources will be expended assisting Class Members with their Claim Forms and related inquiries and working with the Claims Administrator, JND, to ensure the smooth progression of claims processing.  No additional legal fees will be sought for this work.

### 4.      The Quality of Plaintiffs' Counsel's Representation.

190.   The skill and diligence of Plaintiffs' Counsel also supports the requested fee.  As demonstrated by the firm résumés included as Exhibits G and H to the Bernstein Litowitz Fee and Expense Decl. and the Robbins Geller Fee and Expense Decl., respectively, Lead Counsel are among the most experienced and skilled law firms in the securities litigation field, with long and successful track records representing investors in such cases and are consistently ranked among the top plaintiffs' firms in the country.  The other Plaintiffs' Counsel's firms are also highly experienced in complex litigation.  *See* Seeger Weiss Fee and Expense Decl., Ex. D; Saxena Fee and Expense Decl., Ex. E.  *See also* Levi Fee and Expense Decl., Ex. F.  The substantial result achieved for the Class here reflects the superior quality of this representation.

191.   Defendants in this case were represented by experienced counsel from the nationally prominent litigation firm Davis Polk & Wardwell LLP and Gibbons P.C.  These firms vigorously and ably defended the Action for over five years.  In the face of this formidable defense, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the Action on terms that are very favorable to the Class.

B.     **Lead Counsel's Request for Litigation Expenses Warrants Approval**

1.     **Lead Counsel Seek Payment of Plaintiffs' Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund**

192.   Lead Counsel seek payment from the Settlement Fund of $2,738,023.93 for expenses, costs, and charges that were reasonably and necessarily incurred by Plaintiffs' Counsel in connection with the Action.  The Settlement Notice informs the Class that Lead Counsel will apply for payment of Litigation Expenses in an amount not to exceed $3.3 million, which amount may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs directly related to their representation of the Class in accordance with 15 U.S.C. §78u-4(a)(4).  The amount of Litigation Expenses requested by Lead Counsel, along with the aggregate amount requested by Lead Plaintiffs (*i.e.*, $2,778,042.98), is substantially below the maximum expense amount set forth in the Notice.

193.   From the inception of this Action, Plaintiffs' Counsel were aware that they might not recover any of the expenses they incurred in prosecuting the claims against Defendants and, at a minimum, would not recover any expenses until the Action was successfully resolved.  Plaintiffs' Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants.  Plaintiffs' Counsel were motivated to, and

did, take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the Action.

194.   Lead Counsel maintained strict control over the expenses in this Action. Indeed, many of the expenses incurred were paid out of a litigation fund created by Lead Counsel and maintained by Robbins Geller ("Litigation Fund"). Robbins Geller, Bernstein Litowitz, and Saxena collectively contributed $1,869,862.84 to the Litigation Fund. A description of the payments from the Litigation Fund by category is included in the individual firm declaration submitted on behalf of Robbins Geller. *See* Exhibit G to Robbins Geller Fee and Expense Decl.

195.   Plaintiffs' Counsel's expenses are summarized in each firms' declarations, which identify each category of expense and the amount incurred for each.  Plaintiffs' Counsel's expenses include charges for, among other things: (i) experts and consultants in connection with various stages of the litigation; (ii) establishing and maintaining a database to house the millions of documents produced in discovery; (iii) deposition-related expenses; (iv) online factual and legal research; (v) mediation; and (vi) photocopies.[9]  Courts have consistently found that

---

[9]   Plaintiffs' Counsel's expenses are listed in detail in their firm's respective declarations. *See* Exhibits 8 through 13.  As set forth in the firms' Fee and Expense Declarations, the expenses incurred by each Plaintiffs' Counsel's firm are reflected on the books and records maintained by the firm.  These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.  These expense items are billed separately and are not duplicated in each firm's hourly rates.

these kinds of expenses are payable from a fund recovered by counsel for the benefit of a class.

196.   The largest component of Plaintiffs' Counsel's expenses (*i.e.*, $1,341,769.83, or approximately 49% of their total expenses) was incurred for experts and consultants.  As noted above, Lead Counsel consulted with experts in the fields of damages and loss causation, pharmaceutical industry access and pricing, diabetes treatment, and relevant disclosure obligations at various stages of the litigation, including during their investigation and the preparation of the Complaint, throughout fact and expert discovery, in connection with briefing on motions including Lead Plaintiffs' opposition to Defendants' motion for summary judgment, in preparation for mediation, and in connection with the development of the proposed Plan of Allocation.  *See supra*, ¶¶46-48.  These experts and consultants were essential to the prosecution of the Action.

197.   Another significant expense (*i.e.*, $141,947.18) was incurred for legal and factual research.  This amount includes charges for computerized research services such as Westlaw and PACER.  It is standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class.

198.  Plaintiffs' Counsel also incurred a total of $341,648.19 for document hosting and management/litigation support.  In addition, Lead Counsel incurred $83,206.00 for charges related to mediation with Judge Phillips and Judge Carroll.

199.  The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, telephone costs, copying, and postage and delivery expenses.  All of the litigation expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Lead Plaintiffs.  *See* Murray Decl., ¶7, Rankin Decl., ¶7, Smyth Decl., ¶7, Ravins Decl., ¶7, Lee Decl., ¶7.

### 2.   Reimbursement to Lead Plaintiffs Is Fair and Reasonable

200.  The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class."  15 U.S.C. §78u-4(a)(4).  Accordingly, Lead Plaintiffs seek reimbursement of their reasonable costs incurred directly for their work supervising counsel and participating in the litigation (and individuals associated with a Lead Plaintiff who performed services on the Lead Plaintiff's behalf in support of Lead Plaintiffs' participation in the litigation) in the aggregate amount of $40,019.05.  Specifically, Lehigh County seeks reimbursement of $10,410.50 for 148.50 hours expended in

connection with the Action by Deputy Solicitor Sarah M. Murray, Assistant Solicitor Catherine Roseberry, Chief Fiscal Officer Tim Reeves, Chief Information Officer Robert Kennedy, former County Solicitor Matt Sorrentino, and former County Executive Tom Muller (*see* Murray Decl., ¶¶8-9); Oklahoma Firefighters seeks reimbursement of $3,237.50 for 64.75 hours expended in connection with the Action by Executive Director Chase Rankin (*see* Rankin Decl., ¶¶8-9); Boston seeks reimbursement of $8,932.26 for 118.25 hours expended in connection with the Action by Executive Officer Timothy J. Smyth, former General Counsel Padraic Lydon, Investment Analyst John Kelly, Interim General Counsel Natacha Thomas, and Patrick Collins of the City of Boston's Department of Innovation and Technology (*see* Smyth Decl., ¶¶8-9); Clearwater seeks reimbursement of $5,343.79 for 94.00 hours expended in connection with the Action by Finance Director Jay Ravins and Senior Network Analyst Jeffrey Nolan (*see* Ravins Decl., ¶¶8-9); and Central States seeks reimbursement of $12,095 for 89.5 hours expended in connection with the Action by Deputy General Counsel Charles Lee and Senior Division Manager, Asset Monitoring Mark Vieu (*see* Lee Decl., ¶¶8-9).

201. As discussed in the Fee Memorandum and in Lead Plaintiffs' supporting declarations, each Lead Plaintiff has been fully committed to pursuing the Class's claims since they became involved in the litigation. Lead Plaintiffs have provided valuable assistance to Lead Counsel during the prosecution and resolution

of the Action.  Moreover, the efforts expended by Lead Plaintiffs during the course of this Action, as set forth in Lead Plaintiffs' declarations submitted herewith, including communicating with Lead Counsel, reviewing pleadings and motion papers, gathering and reviewing documents in response to discovery requests, preparing for deposition and being deposed, and participating in the settlement negotiations, are precisely the types of activities courts have found to support reimbursement to class representatives, and fully support the request for reimbursement here.

## VIII.  CONCLUSION

202.   For all the reasons set forth above, Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submit that the requested fee in the amount of 29% of the Settlement Fund should be approved as fair and reasonable, and the request for Plaintiffs' Counsel's Litigation Expenses in the amount of $2,738,023.93, and Lead Plaintiffs' costs in the aggregate amount of $40,019.05, should also be approved.

We declare, under penalty of perjury, that the foregoing is true and correct.

Executed in New York, New York this 23rd day of May 2022.

_____
ADAM D. HOLLANDER

Executed in San Diego, California this 23rd day of May 2022.

_____
LUKE O. BROOKS