```
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
 2

 3  ━━━━━━━━━━━━━━━━━━━━━━━

    LEHIGH COUNTY EMPLOYEES'        CIVIL ACTION NUMBER:
 4  RETIREMENT SYSTEM, on behalf
    of itself and all others        3:17-cv-00209-ZNQ-LHG
 5  similarly situated,,
                                    FAIRNESS HEARING
 6      Plaintiffs,                 VIA REMOTE ZOOM
                                    VIDEOCONFERENCE
 7      v.

 8  NOVO NORDISK A/S, LARS
    REBIEN SORENSEN, and JESPER
 9  BRANDGAARD,

10      Defendants.
    ━━━━━━━━━━━━━━━━━━━━━━━
11      Clarkson S. Fisher Building & U.S. Courthouse
        402 East State Street
12      Trenton, New Jersey  08608
        July 13, 2022
13      Commencing at 11:00 a.m.

14  B E F O R E:             THE HONORABLE ZAHID N. QURAISHI,
                             UNITED STATES DISTRICT JUDGE
15

    A P P E A R A N C E S:
16
        CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.
17      BY:  JAMES E. CECCHI, ESQUIRE
             DONALD A. ECKLUND, ESQUIRE
18           KEVIN G. COOPER, ESQUIRE
        5 Becker Farm Road
19      Roseland, NJ 07068
        For the Plaintiffs

20

21

22

23          Megan McKay-Soule, Official Court Reporter
                  megansoule430@gmail.com
                     (609) 815-2319
24

    Proceedings recorded by mechanical stenography; transcript
25       produced by computer-aided transcription.
```

**A P P E A R A N C E S CONT'D**

BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
BY: ADAM HOLLANDER, ESQUIRE
    KATHERINE M. SINDERSON, ESQUIRE
    DAVID L. DUNCAN, ESQUIRE
1251 Avenue of the Americas
New York, NY 10020
For the Lead Plaintiffs and the Class

ROBINS GELLER RUDMAN & DOWD LLP
BY: RYAN LLORENS, ESQUIRE
    ELLEN GUSIKOFF STEWART, ESQUIRE
    LUKE O. BROOKS, ESQUIRE
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
For the Plaintiffs

SAXENA WHITE
BY:  KYLA GRANT, ESQUIRE
10 Bank Street, 8th Floor
White Plains, NY 10606
For the Co-lead Plaintiff City of Clearwater

SEEGER WEISS, LLP
BY:  JENNIFER SCULLION, ESQUIRE
100 Church Street
New York, NY 10007
For the plaintiffs

GIBBONS P.C.
BY:  MICHAEL R. GRIFFINGER, ESQUIRE
One Gateway Center
Newark, NJ 07102
For the Defendants

DAVIS POLK
BY: NEAL A. POTISCHMAN, ESQUIRE
    1600 El Camino Real
    Menlo Park, CA 94025
For the Defendants

DAVIS POLK
BY:  PATRICK W. BLAKEMORE, ESQUIRE
450 Lexington Avenue
New York, NY 10017
For the Defendants

1  **<u>A P P E A R A N C E S</u>** <u>CONT'D</u>

2  HAMILTON LINCOLN LAW INSTITUTE
   BY:  NEVILLE HEDLEY, ESQUIRE
3  1629 K Street NW, Suite 300
   Washington, D.C. 20006
4  Pro Se Objector

5

6
   ALSO PRESENT:  Signe Konkel, client representative from Novo
7  Nordisk

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (PROCEEDINGS held via remote Zoom video conference before

2  The Honorable ZAHID N. QURAISHI, United States District Judge,

3  on July 13, 2022, at 11:00 a.m.)

4         THE COURT:  Good morning, everyone.  We are on the

5  record in in re:  Novo Nordisk Securities Litigation.  The

6  docket number is 17-209 for a final approval of the proposed

7  settlement as well as request for attorneys' fees.

8         First, before I even take appearances, I want to put on

9  the record my apologies.  This hearing was supposed to be

10  scheduled on two prior occasions.  The Court had to move it

11  due to conflicts in scheduling, which is not something that I

12  take lightly.  So I do want to just put on the record that I

13  appreciate the patience and understanding of the parties as

14  well as counsel in allowing the Court to move this today.

15  Although, we'll get through it, but I just want to make sure I

16  have it on the record.

17         Now that I've said that, and I thank you all for your

18  patience and your understanding, let me get appearances from

19  counsel.

20         MR. CECCHI:  Good morning, Your Honor.  James Cecchi,

21  Carella Byrne on behalf of the plaintiffs and the Class.  With

22  me from my office today is Don Ecklund and Kevin Cooper.  I'm

23  going to let my other esteemed colleagues introduce

24  themselves, starting with Mr. Hollander.

25         MR. HOLLANDER:  Good morning, Your Honor.  Adam

1  Hollander from Bernstein Litowitz Berger & Grossmann on behalf

2  of the lead plaintiffs and the Class.  With me from my firm

3  today are my colleagues, Katherine Sinderson and David Duncan.

4        THE COURT:  Good afternoon to all of you.  Do I have

5  any other counsel on here from the defense?

6        MR. LLORENS:  Also for the plaintiffs is Ryan

7  Llorens, Ellen Gusikoff, and Luke Brooks from Robbins Geller.

8  And we also have two summer associates in the conference room

9  with us, Jeremy Daniels and Servinos Kervosi.

10        THE COURT:  Full team over there.  Okay.

11        MS. GRANT:  Good morning, Your Honor.  We also have

12  Kyla Grant from Saxena White.  The firm is an executive

13  committee member and counsel for co-lead plaintiff City of

14  Clearwater.

15        THE COURT:  Good afternoon.

16        MS. SCULLION:  One more, Your Honor.  Good morning.

17  Jennifer Scullion from Seeger Weiss for the plaintiffs.

18        THE COURT:  Good afternoon, Ms. Scullion.

19      Is that everybody?

20        MR. CECCHI:  That's it, Judge.

21        MR. GRIFFINGER:  Good morning, Your Honor.  Michael

22  Griffinger from Gibbons for defendants.

23        MR. POTISCHMAN:  Good afternoon, Your Honor.  This is

24  Neal Potischman from Davis Polk on behalf of the defendants.

25  With me today is Patrick Blakemore from Davis Polk.  And also

1    on the line is a client representative from Novo Nordisk,

2    Signe Konkel.

3          MR. HEDLEY:  Good morning, Your Honor.  Neville

4    Hedley from Hamilton Lincoln Law Institute, pro se objector.

5          THE COURT:  Mr. Hedley, I just wanted to make sure

6    you were here, too.  I'll put on the record, too, that I've

7    received all the written submissions from the parties.  Let me

8    just make sure I at least put that on the record so you know

9    what the Court has reviewed for purposes of today.  I've got

10   Lead Plaintiffs' Memorandum of Law in Support of a Motion for

11   Final Approval of Settlement and Approval of Plan of

12   Allocation.  That was at docket number 350 on the public

13   docket.

14         I've got Lead Counsel's Memorandum of Law in Support of

15   Motion for Attorneys' Fees and Litigation Expenses, and Award

16   to Lead Plaintiffs, which is docket number 351.

17         Mr. Hedley, I've got your objection that was filed, I

18   believe, on docket number 354.

19         I've got Lead Plaintiff Reply Brief in Further Support

20   of their Motion for Final Approval of Settlement and Approval

21   of Plan of Allocation as well as the Motion for Attorneys'

22   Fees and Litigation Expenses, Awards to Lead Plaintiffs, which

23   I believe is at docket number 357.

24         Counsel, does that sound accurate on your end from

25   plaintiff and from defense?

1            MR. HOLLANDER:  Yes, Your Honor.

2            THE COURT:  Mr. Hedley, that accurately identifies

3    your written submission for your objections?

4            MR. HEDLEY:  Yes, Your Honor.

5            THE COURT:  All right.  Let me do this.  Let me just

6    briefly say what we're going to do today and how we'll

7    approach it and then we'll go from there.  On March 8th of

8    this year the Court granted preliminary approval of the class

9    action settlement, which was at docket number 344.  We're here

10   today for a final hearing on the fairness, reasonableness, and

11   adequacy of the settlement reached.

12           Two other items are pending before the Court.  One is

13   plaintiffs' motion for attorneys' fees, expenses, and service

14   awards, and the Class Member's objection, Mr. Hedley's

15   objection to those fees.  Even though the notice was required

16   from Class Members who intended to appear at today's hearing,

17   and the Court did not receive any notice of any intention to

18   appear, I'll allow any Class Members who are present to speak,

19   if they so choose.

20           First, I think I want to hear from Class counsel on the

21   Class certification under Rule 23, the fairness of the

22   settlement allowing you to place on the record the terms of

23   the settlement agreement, the notice that was sent to the

24   Class Members, the response provided by the Class Members, and

25   anything else you believe that I ought to know.

1    Second, I'll also hear from the Class Representative

2 and defense counsel as well as any objectors, in this case Mr.

3 Hedley.

4    Lastly, the Court will turn to Class counsel for their

5 motion for attorneys' fees and costs.

6    Any objection to kind of just running through that in

7 that manner from plaintiff?

8         MR. CECCHI:  No, Your Honor.

9         MR. HOLLANDER:  No, Your Honor.

10         THE COURT:  All right.  With respect to the

11 plaintiffs or Class counsel, who's speaking, or is it more

12 than one person?

13         MR. CECCHI:  Judge, it will be more than one person.

14 Mr. Hollander will address some of the issues raised by Mr.

15 Hedley.  I can briefly go through the 23(e)(2) and *Girsh*

16 factors, if Your Honor would like.  Sort of an overview of the

17 settlement and why we think it's fair, reasonable, and

18 adequate, and should be approved.

19         THE COURT:  Why don't we do that, Mr. Cecchi.  Why

20 don't we put some of the basics of the terms of the settlement

21 and some of the other kind of information that I ought to

22 know, even though I know a lot of that has been provided to

23 the Court at least in written submission.  And you can give me

24 a sense of what the Class Representative is going to receive

25 from the settlement agreement and some other terms, and we'll

1    go from there.

2          MR. CECCHI:  So, Judge, I want to say on behalf of

3    the plaintiffs' team, myself, Seeger Weiss, RGRD and BLBG,

4    we're certainly proud of the result we've achieved in this

5    settlement and pleased to present it to Your Honor for final

6    approval.  We believe it's an outstanding result.  It meets

7    all the 23(e)(2) and *Girsh* factors.

8          Let me start by saying this is a four-year-old

9    litigation that was vigorously defended by my friends from

10   Davis Polk and Mr. Griffinger's firm.  It was a vigorous

11   defense where they raised significant credible defenses and

12   fought valiantly.  There was over 40 depositions that were

13   taken in this case.  We went through Class certification, and

14   before Your Honor is a fully briefed summary judgment motion,

15   which I know Your Honor hasn't ruled on, but the record before

16   Your Honor bespeaks, A, the quality of the work that's been

17   done on both sides of the ledger, and B, the complexity of

18   this case.  That's one of the factors under 23(e)(2) and *Girsh*

19   that Your Honor has to put into the mix when you're

20   considering if this is fair, reasonable, and adequate.

21         It's also important from our perspective to consider --

22   because Mr. Hedley and Mr. Hollander will touch on this in

23   detail -- suggests that this was not a complex case or this

24   was an easy case.  I would suggest to Your Honor that anyone

25   who's done pharmaceutical litigation, either pharmaceutical

1    securities litigation, pharmaceutical patent litigation,

2    pharmaceutical antitrust litigation knows that in general the

3    pharmaceutical space is amongst the most challenging space to

4    work in for plaintiffs' lawyers.  It's the most complex.  And

5    within that space I would suggest that this case involving

6    insulin pricing, the interplay between the pharmaceutical

7    benefit managers and the manufacturers, list price, net price,

8    what we call kickbacks, what the defendant calls rebates, is

9    highly complex, and the team on the plaintiffs' side of the

10   ledger had to master all of that information, that highly

11   complex pricing information to litigate this case.  And I

12   would suggest to Your Honor that we did so professionally and

13   with great skill, the entire team that mastered that complex

14   space.

15        So I would say that the complexity of the case favors

16   the settlement here.  The reaction of the Class, what does

17   that tell us?  The vast majority of this Class, Judge,

18   consists of institutional investors.  You don't have one

19   objection to the settlement or the fee from a single

20   institutional objector.  Indeed, you only had one objection,

21   and that's my friend, Mr. Hedley, who only objects to the fee.

22   He doesn't object to the fairness of the settlement.  So that

23   is really a very important data point that Your Honor should,

24   we suggest, put into the mix.

25        THE COURT:  Mr. Hedley, since I have you today I just

1   want to make sure that nobody is mischaracterizing your

2   position.  But you don't object to the actual certification or

3   the Class; you're only objecting to fees, correct?

4           MR. HEDLEY:  That's correct, Your Honor.

5           THE COURT:  Okay.  Go ahead, Mr. Cecchi.  That was my

6   understanding as well, but I wanted to confirm that with Mr.

7   Hedley.

8           MR. CECCHI:  Great.  So the other point that's, I

9   think, under 23(e)(2) and *Girsh* that's really important is

10  this case did not settle early, as Your Honor knows.  It only

11  settled after it was fully litigated and both the plaintiffs

12  and the defendants had a full awareness of the risks of

13  liability, risk of damages, and after I think three -- at

14  least three in-person mediation sessions with Layn Phillips.

15  And I mention Layn Phillips -- I should say Judge Layn

16  Phillips.  He's a retired United States Attorney from

17  Oklahoma.  He's a retired federal judge, and in case he's

18  listening here, which I'm not sure he is, but he is the

19  leading and most outstanding securities mediator in the

20  country.  And the settlement only came about after the parties

21  couldn't agree and he made a mediator's proposal.  So the

22  involvement of Layn Phillips, the difficulty of those

23  negotiations on the backs of the long, vigorous litigation

24  also goes to the fairness of this settlement.

25          The only other thing I would mention, Judge -- and,

1   again, Mr. Hollander will address in detail Mr. Hedley's fee

2   objection -- is, you know, having done these types of cases in

3   this district for many years, this fee and this settlement is

4   right in the heartland.  It's right in the heartland of the

5   types of cases we've resolved.  I point Your Honor to the

6   Vytorin and Zetia case, which both Mr. Hollander's firm was

7   involved in and I was involved in and Seeger Weiss was

8   involved in.  Twenty-eight percent of the $215,000,000

9   settlement.  AremisSoft, 28 percent of 194 percent -- million

10  dollar settlement.  That was our friend Judge Pisano.

11      So I just point that out because really it's -- we're

12  not asking for anything that's not in the heartland.  So

13  unless there's other 23(e)(2) factors Your Honor wants me to

14  touch -- I can touch them all -- but I thought that those were

15  the main issues I'd want to bring to Your Honor's attention.

16      THE COURT:  Is there anything else you want to put on

17  the record?  Do you want to put any additional terms of the

18  settlement on the record?

19      MR. CECCHI:  Sure.  The settlement, as Your Honor

20  knows, it's a $100 million dollar all cash, non-reversionary

21  settlement, which is the best type of settlement.  We were

22  joking with our friend Mr. Hedley before.  You know, that's

23  the premier type of settlement you want.  All cash,

24  non-reversionary.  We had the best possible notice, direct

25  mail notice, and again not one institutional objector who owns

1    these ADRs objected to it.  The plaintiff allocation -- Mr.

2    Hollander can discuss or Mr. Brooks -- is the typical plan

3    under securities cases.  It's fair.  It doesn't treat anyone

4    differently, and it measures the Class Members' damages using

5    expert -- our expert's analysis.  So it's what is done

6    normally and usually in securities cases.  So I would suggest

7    that $100 million dollars is an adequate -- more than adequate

8    resolution.  And as we pointed out in our brief, relying upon

9    Cornerstone Research, it's higher than the mean and average of

10   many of the securities cases where the theoretical maximum

11   damages are over a billion dollars.

12        So we think it's fair.  We think it's a great result.

13   And, again, I'll end where I started: we're proud to present

14   it to Your Honor.

15        THE COURT:  Thank you, Mr. Cecchi.  I'm not going to

16   get to Mr. Hollander just yet because I still want to hear

17   from defense counsel as well with respect to their position on

18   the settlement, but we will get to fees.

19        From defense counsels' perspective on behalf your

20   clients, do you approve of the settlement, agree with the

21   terms?  Who's speaking on behalf of the defense?

22        MR. HOLLANDER:  Very quickly, Your Honor.  I'm sorry

23   to interrupt.  I was hoping to put a bit more on the record

24   about the notice program that we also believe fully supports

25   the settlement.

1          THE COURT:  Sure.

2          MR. HOLLANDER:  As Your Honor noted, on March 8th the

3     Court granted preliminary approval of the settlement.

4     Following that order we worked with the claims administrator

5     JND Legal Administration.  Claims administrator mailed notice

6     packets to over 378,000 possible Class Members.  There was an

7     initial mailing on March 29th of this year as well as

8     supplemental mailings through May 20th, 2022.  Those notice

9     packets went out to the approximately 350,000 potential Class

10    Members who received Class notice following the Court's Class

11    certification order earlier in the case as well as additional

12    possible Class Members that were identified by the

13    administrator in response to those notice packets going out as

14    well as the summary notices that were published in *The Wall*

15    *Street Journal*, *PR Newswire* and *Investors Business Daily* as

16    well as the settlement website that we set up along with the

17    claim's administrator to provide key information about the

18    case.  And then once preliminary approval was granted came

19    information about the settlement and the settlement process.

20    There were no objections to the settlement, no objections to

21    the final allocation, and the one objection from Mr. Hedley to

22    the fees.  We believe the response of the Class in response to

23    that extensive notice program fully supports plaintiffs'

24    application here today.

25          THE COURT:  Thank you, Mr. Hollander.  I appreciate

```
 1   that.
 2          From defense counsel, anybody chiming in here?
 3          MR. GRIFFINGER:  It's Mike Griffinger.  I'm going to
 4   defer to Mr. Potischman who is involved with the settlement
 5   negotiations, Your Honor.
 6          THE COURT:  Thanks, Mr. Griffinger.
 7      Mr. Potischman, are you on?
 8          MR. POTISCHMAN:  I am.  Good afternoon, Your Honor.
 9          THE COURT:  Good afternoon.
10          MR. POTISCHMAN:  Your Honor, we fully endorse
11   approval of the settlement.  Beyond what's already been noted
12   about the lack of objections, I'll just note for the record as
13   reflected in docket 358, CAFA notice went out to 57 government
14   officials in accordance with the settlement and in accordance
15   with federal law, and there have been no objections,
16   obviously, lodged by any government officials, either state or
17   federal as well.  So we fully endorse approval of the
18   settlement, Your Honor.
19          THE COURT:  All right.  All your clients' concerns
20   have been addressed, I presume?
21          MR. POTISCHMAN:  Correct, Your Honor.
22          THE COURT:  Is the Class Representative on?
23          MR. HOLLANDER:  No, Your Honor.  We don't have any
24   representatives present from the Lead Plaintiffs themselves.
25          THE COURT:  Can you represent that they have no
```

1   concerns regarding the proposed settlement?  I presume you

2   can.

3          MR. HOLLANDER:  Yes, Your Honor.  That is also

4   reflected in the declaration from each of the five Lead

5   Plaintiffs that were attached to the final approval papers

6   fully supporting the settlement and fee request.

7          THE COURT:  The Court has those documents, so I'll

8   accept that.

9       Mr. Hedley, do you want to at this point -- I know I've

10  received your written submission, but do you want to address

11  your objection now and the basis for it?  I'll probably have

12  to hear from at least Mr. Hollander subsequent to you, but

13  I'll give you an opportunity now to raise your objection and

14  the basis.

15         MR. HEDLEY:  Surely, Your Honor.  So, you know, I

16  think my initial filing speaks for itself, but in the 30 pages

17  of the reply there was not one reference to the operative

18  statute, and the operative statute is mandatory language.  And

19  the fees need to be or shall be reasonable in comparison to

20  what the Class Members are actually paid.

21         In this situation, if the Class -- if Class counsel

22  gets their wish of a 29 percent fee on top of the expenses

23  that they are also seeking, that will essentially amount to

24  them and their fees and their awards to -- to the Class

25  Representatives essentially amounting to 47 or 48 percent of

1   what the Class Members will get.  And at this point we don't

2   really know what the Class Members are going to get because we

3   haven't seen any of the claims data, and they want to be paid

4   up front.

5        You know, I do want to point out that in their response

6   to my objection there was some, I would say, somewhat

7   disingenuous allusion to the fact that I cited out-of-circuit

8   cases when their reply had multiple citations to non-Third

9   Circuit cases, district court cases outside the Third Circuit.

10       THE COURT:  The Court is well aware of what's binding

11   on me and what's persuasive, so I'm not too concerned about

12   where you guys are citing from as long as you're going to give

13   me some direction to point out.  I appreciate that.  I think I

14   can safely say I know what I'm bound to follow and what I can

15   ignore or consider.

16       MR. HEDLEY:  I'm sure, Your Honor.  I didn't mean to

17   allude that you didn't, but I just wanted to focus on the

18   Third Circuit case that I think is somewhat illustrative here,

19   which is the *AT&T* case, which was also a

20   hundred-million-dollar award and the damages were 25 percent

21   of what was alleged.  That case moved further into litigation,

22   actually went to summary judgment, and the fee award was far

23   closer to what I'm advocating for in that case.  Exact same

24   amount, a hundred million dollars, and a far better result to

25   the Class Members than what was achieved here in terms of what

1   will actually be distributed to the Class.  And that fee award

2   was far less than the 29 percent that counsel is seeking.  So

3   if we're going to point to and rely on Third Circuit case law,

4   I think that *AT&T* case is very illustrative and an excellent

5   guide in terms of where this fee award should come down.

6        THE COURT:  Anything further, Mr. Hedley?  I don't

7   want to cut you off.  I didn't know if that was a pause.  I

8   have your submission, but I didn't know if there was anything

9   else you wanted to put on the record.

10       MR. HEDLEY:  Not right now, Your Honor.  I guess I

11  would reserve to what Mr. Hollander has to say.  But I'm happy

12  to address any other issues or concerns that the Court might

13  have with respect to the objection, but for now I will keep my

14  powder dry.

15       THE COURT:  All right.  Fair enough.

16       Mr. Hollander, I presume you're going to respond to the

17  objections, but it may also make sense for you to just put on

18  the record a little bit more about how the fees will be paid

19  and what the rates were and how you guys came to those fees

20  and all the rest of it.  I'll leave it to you on kind of how

21  you want to respond to the objection.

22       MR. HOLLANDER:  Yes, Your Honor.  What I'd like to do

23  first is briefly address generally the factors that we believe

24  support the fee application and then respond to some of the

25  points that Mr. Hedley made.

1    Regarding fee and expense application generally,

2  counsel, as Mr. Cecchi discussed earlier, litigated this case

3  vigorously for over four years prior to reaching the

4  settlement, and we believe the extensive work that went into

5  the case as well as the excellent result for the Class fully

6  supports the fee and expense application.

7    I want to just begin, you know, very basically with the

8  percentage method which is commonly accepted within this

9  district as a method to determine the award of attorneys'

10  fees.  It's been blessed by the Third Circuit.  We cite cases

11  extensively at pages 8 to 9 of our fee brief.  Here the 29

12  percent request is squarely within the range of percentage

13  fees awarded in the Third Circuit and in this district in

14  comparable cases.  I would point specifically to the *Icon* case

15  where there was a 30 percent award on a $111 million dollar

16  settlement.  The *Icon* case similarly cites other cases and

17  notes that awards of 30 percent are not uncommon in securities

18  class actions as well as numerous other cases that we've cited

19  in our briefing.

20    Second, the fee request is eminently reasonable when

21  cross-checked against the lodestar of counsel.  In regard to

22  Your Honor's question concerning rates, I believe it's

23  appropriate and helpful to look at the lodestar information,

24  which is detailed in the declarations of counsel, attached to

25  our final approval papers.  As Your Honor, I'm sure, can

1   imagine, over the course of four-plus years, including over 40

2   fact depositions, ten expert depositions, summary judgment

3   briefing being fully complete, extensive contention,

4   interrogatory responses and other work that was done, Class

5   certification briefing, the appeal to the Third Circuit, under

6   Rule 23(f) of the Class certification order there was quite a

7   bit of work that was involved as well as reviewing over five

8   million pages of documents.  The work that went into the case

9   was reasonable and necessary in furtherance of securing a

10  maximum recovery for the Class.  Although the percentage

11  method is what is appropriate, we believe that the lodestar

12  which shows a negative multiplier reflecting less than half of

13  the value of the time that counsel spent on the case fully

14  supports why the fee is reasonable, particularly in light of

15  the risks that counsel took working on contingency that at the

16  end day there may be little or no fee available to counsel.

17       I do want to speak a little bit to the risks of the

18  case and the complexity of the case.  Mr. Cecchi already

19  addressed some of the complexity of the issues with the

20  pharmaceutical industry and pricing issues in that industry.

21  In addition, just very specific to this case, the discovery

22  record revealed a substantial amount of risk that we believe

23  we faced at summary judgment and further if we were to try

24  this case to a jury.  By way of brief background, there were

25  three categories of false statements that we alleged in this

1    case.  One concerned the financial guidance that Novo Nordisk

2    issued.  One concerned Novo Nordisk's exposure to the same

3    market pressures that its competitors face, and one concerned

4    a new drug that Novo Nordisk had coming to market called

5    Tresiba® and its ability to drive growth and earnings for the

6    company.  With respect to each of those, there were

7    substantial risks regarding proving liability because the

8    company met its guidance, because the company had made certain

9    disclosures regarding its exposure to market pressures, and

10   because Tresiba®, in at least certain circumstances, did get

11   the market access at premium pricing that defendants had

12   tolled the market.  In addition, we believe there was

13   substantial risk concerning loss, causation, and damages

14   issues.  Defendants argued at summary judgment and had strong

15   expert reports supporting arguments that any market declines

16   in response to the alleged corrective disclosures were not, in

17   fact, caused by what we alleged were the false statements and

18   the truth coming to light but by other matters.  And if the

19   jury were to agree with defendants on those points, and very

20   well-qualified experts on both sides that was certainly

21   possible, there is the risk that the damages that we could

22   prove, even if we proved liability, would have been far less

23   or even zero.

24          With regard to what we believe was the strongest

25   argument we had on loss causation or the particular corrective

1    disclosure that we believe we had the strongest arguments on,

2    it was concerning the drug Tresiba®.  The expert's analysis

3    was that damages traceable to that corrective disclosure were

4    approximately $350 million dollars.  Against that the $100

5    million dollar settlement is, you know, an excellent result.

6    We believe it's an excellent result even against the over a

7    billion dollars of maximum damages if we succeeded on every

8    argument with regard to liability and damages.

9         So I wanted to point that out because this was not an

10   instance, despite some of the suggestions in Mr. Hedley's

11   papers, where we got over a motion to dismiss and essentially

12   there was a foregone positive conclusion.  The litigation was

13   hard fought every step of the way.  We had three in-person

14   mediation sessions over the course of several years.  One

15   after the motion to dismiss was decided.  One after Class

16   certification was decided.  Both of those were ordered by the

17   Court.  Neither of those were successful or even productive in

18   the slightest, to be honest, without saying more to violate

19   the mediation privilege.  The third was not successful either,

20   but after some continued hard work from the mediator and from

21   both sides, we were eventually able to reach a resolution

22   pursuant to the mediator's recommendation, and that reflected

23   the strength and the risks of both sides of the case.  And so

24   we believe that that amply supports all the work that went

25   into the case and the fee request that's here today.

1      I will now turn to some of the claims that Mr. Hedley

2  raised.  You know, he -- and respectfully many of the points

3  in Mr. Hedley's objection appear to concern Class action,

4  attorneys' fees, more broadly.  As Your Honor is aware, and as

5  we detail in our papers, any award of fees here should be

6  determined based on the particular factors present in this

7  case.  And, respectfully, to the extent that Mr. Hedley

8  addresses factors in this case, he appears to mischaracterize

9  or misunderstand much of the litigation and much of the terms

10  of the settlement and the plan of allocation.  He, this

11  morning, began with the language of the PSLRA regarding

12  attorneys' fees and what is actually paid to the Class.  And I

13  believe it's helpful to point to case law with courts

14  construing that language to refer to the amount of recovery

15  that the Class received in the settlement, which here is the

16  $100 million dollars cash that was received in the settlement.

17  If Your Honor were to look at the *Rite Aid* case from the Third

18  Circuit, and that's at 396 F.3d 294 at page 100, it refers to

19  that provision of the PSLRA as to how the percentage of the

20  recovery method was incorporated in the PSLRA.

21      In addition, I would point to -- there was a case

22  called *In re:  Bank America Corporation* out of the Eighth

23  Circuit.  The citation is 15 F.4th 865 at page 872.  It's a

24  2021 case citing the legislative history of the PSLRA and

25  discussing this provision as concerning a reasonable

1  percentage of the amount of recovery awarded to the Class and

2  declining to base attorneys' fees in that matter on the amount

3  paid out in the distribution process.  So we believe that's

4  fairly on point, that the statute does not require any other

5  approach by this Court.  And other courts to consider the

6  question are in accord as well.

7      I will also address Mr. Hedley's concerns about the

8  quick-pay provision, what it's colloquially referred to as,

9  the quick-pay provision upon which attorneys' fees would be

10  paid out on approval of the settlement by Your Honor.  These

11  provisions are somewhat standard in securities Class action

12  settlements, particularly where -- here it is an all cash

13  settlement without any reversion.  We believe they are

14  appropriate to reflect the risks or to address the risks that

15  plaintiffs' counsel has taken by litigating this matter on a

16  fully contingent basis for as long as we have here as well as

17  there are provisions in the settlement agreement requiring us

18  to repay within 30 days any amount that is later reversed or

19  otherwise reduced, and we would, of course, comply with that.

20  And in no way does the application of the quick-pay provision

21  reduce any amount that is available to the Class or change the

22  timing of payment to the Class.

23      So for those reasons we don't believe that Mr. Hedley's

24  concerns, you know, in any way undermine or argue against

25  granting of the fee consistent with the terms that are in the

1    settlement agreement and before Your Honor.

2        THE COURT:  Thank you, Mr. Hollander.

3        Mr. Hedley, do you have any additional response that

4    you want to provide to the Court?  I didn't know if you did or

5    not.  I'll give you that opportunity at this time.

6        MR. HEDLEY:  Yes, Your Honor.  I appreciate a chance

7    to respond.

8        Again, I would just say if we're going to talk about

9    comparable cases I would point to the *AT&T* case as being the

10   most comparable case in the Third Circuit in terms of what was

11   achieved for the Class, and that's what we should be focused

12   on here.  What was achieved for the Class in that case was 25

13   percent of the alleged damages, and the fee award was far

14   lower than what Class counsel is seeking here.

15       I will also note that the language of the statute is

16   pretty clear.  It says total attorneys' fees and expenses

17   awarded by the Court to counsel for the plaintiffs' Class

18   shall not exceed a reasonable percentage of the amount of any

19   damages and prejudgment interest actually paid to the Class.

20       That $100 million dollars is not going to be paid to

21   the Class.  We're going to have already expenses being taken

22   out, awards to Class Representatives, the fee award for

23   counsel.  Those are the things that need to be looked at to

24   what is actually paid to the Class, and that's what the

25   statute requires.  What Mr. Hollander's referring to is

1    essentially, yes, the PSLRA essentially blessed the percentage

2    of recovery method as the preferred method for paying

3    attorneys' fees, but it needs to be done in relation to what

4    is actually paid to the Class.  Class counsel has a fiduciary

5    duty to those Class Members, and when they're claiming 47 or

6    48 percent of what is actually going to the Class, I would

7    argue that that's not doing a very good fiduciary job for the

8    Class.  And so I think that is something to really focus on

9    here is that that's what the statutory language requires.

10   That is the plain language of the statute, very easy

11   interpretation of the statute in using the percentage of

12   recovery method.

13        So that -- I just wanted to actually kind of note a

14   couple other points, Your Honor.  Yes, I am the only objector.

15   Given the small amounts based on what was disclosed in their

16   notice and plan of allocation, again, those things are

17   required by the PSLRA to actually inform Class Members, and

18   based on their own notice.  I didn't prepare it; they prepared

19   that notice.  Their expert helped prepare that notice, and it

20   basically showed that the recovery was going to be far less

21   than, say, the *AT&T* case based on their computation of the

22   $100 million dollar and how that would be distributed across

23   the Class and then how the fee award and expenses were going

24   to be distributed across the Class.  And that essentially

25   dramatically lowered what Class Members would be receiving.

1    And that's all in the notice.  That's required by the PSLRA

2    for folks like me or other Class Members to evaluate what are

3    we going to get out of this.  And so I think that is somewhat

4    informative of the fact when they make a big deal out of the

5    fact that there aren't a lot of objectors --

6            THE COURT:  I don't think they're making a big deal.

7    Look, it's a factor that the Court is going to consider.  Mr.

8    Hedley, you're the only objector that is objecting to the

9    fees.  I mean, the law requires me to consider that.  It's

10   something the Court can consider, and I'm going to have to

11   consider it.

12           MR. HEDLEY:  I understand that, Your Honor, but I

13   would also just note that silence is not necessarily

14   acceptance.  These institutional investors aren't from a

15   practical perspective --

16           THE COURT:  I'm not here to presume that there are

17   another hundred objectors out there that didn't show up today

18   and filed an objection with the Court.  I'm not going to make

19   that finding.

20           MR. HEDLEY:  I'm not suggesting you would, Your

21   Honor.  I'm just suggesting as a practical matter

22   institutional investors aren't going to go out and hire

23   counsel to object to then get a few more cents on the dollar,

24   which is what we're talking about here, Your Honor.

25           THE COURT:  All right.

```
 1        Mr. Cecchi, do you want to voice anything?  I don't
 2   know if that finger is for me or one of your counsel.  You're
 3   on mute.
 4          MR. CECCHI:  Very briefly, I would suggest that the
 5   math that Mr. Hedley is doing is just sleight of hand.  We all
 6   can do math.  We all can subtract from the common fund some
 7   numbers and say, ah, it's only 50 percent.  You're seeking a
 8   50 percent fee.  That's just smoke and mirrors.  The recovery
 9   for the Class here is $100 million dollars.  The case law that
10   Mr. Hollander cited and routinely in this district is that's
11   the recovery, and the fee is routinely determined based upon
12   that recovery.  If I had one client in this case and I
13   recovered a $100 million dollars, my fee would be calculated
14   off that $100 million dollars.  Not after subtracting whatever
15   Mr. Hedley wants to subtract, notice, costs.  It's just --
16   it's routinely not done that way and it's not the way it
17   should be done.  The work before Your Honor, the record before
18   Your Honor, this four years of this true warfare in this case
19   more than supports this fee.
20        As Mr. Hollander pointed out, it's a negative
21   multiplier.  I would much rather be here today, Judge, asking
22   you to award a five multiplier instead of a negative
23   multiplier.  We did the work because we had to do the work.
24   The lodestar cross-check more than supports this fee request
25   under the percentage of the fund.  So I suggest his position
```

1   just sounds good when you do math like that, but it's not the

2   math that should be done here.  Thank you, Judge.

3          THE COURT:  All right.  I think -- I don't know what

4   these hand gestures are.  Do you want to say something?  I

5   will tell you all that primarily almost everything that's

6   being told to me has also been submitted in writing to the

7   Court.  I promise you that in our district court we read all

8   your papers.  So I am well aware of the arguments.  They're

9   all familiar to me, and I will tell you, if anything, I've

10  delayed a little bit of this hearing based on scheduling

11  conflicts.  So I'm prepared to make some findings and

12  conclusions today so that we're not delaying this any further.

13         Notwithstanding that, Mr. Hollander, I don't want to

14  cut you off.  I will allow you a brief opportunity to say

15  something, but let's make it quick.

16         MR. HOLLANDER:  That's fine, Your Honor, and I

17  appreciate that.  The one last thing I was going to respond to

18  is on the *AT&T* case just pointing out that the multiplier in

19  that case was a positive multiplier of 1.28 reflecting -- or

20  which supported the finding that the fee awarded there was

21  reasonable here where we have a negative multiplier.  I would

22  say that that factor cuts slightly differently.  Otherwise,

23  Your Honor, I will leave it at that.

24         THE COURT:  All right.  Listen, I want to thank you

25  all.  I appreciate your time, and again I appreciate your

1   patience.  And like I just mentioned a moment ago, I think

2   there's been enough delay.  I think after plaintiffs'

3   briefings, the declarations, the correspondence from counsel,

4   getting defense counsel's position, hearing from Mr. Hedley

5   directly today as well as his written submission on his

6   objections, I'm prepared to enter my findings and conclusions

7   on the record now.

8       For efficiency I will tell you all I will not be

9   reading citations, but they will be inserted into the

10  transcript later so that you can see them there.  You can

11  obtain a copy of the transcript by contacting my court

12  reporter.  So don't call me; don't call my law clerks.  Call

13  the court reporter, request the transcript if that is

14  something that you deem appropriate, and she will be able to

15  connect with you and touch base with you on that.

16      Having reviewed plaintiffs' motion for final approval

17  of the Class action settlement and all other pleadings,

18  documents and testimony, or at least positions of counsel that

19  were provided today in declarations, this Court is satisfied

20  that the terms of the settlement agreement are fair,

21  reasonable, and adequate.

22      First, the Court will address the certification of the

23  Class.  Specifically, this Court finds that the settlement

24  Class meets all the necessary Rule 23(a) and (b) requirements

25  for certification and settlement purposes.  The parties have

1   proposed certification of the following Class: all persons and

2   entities who purchased or otherwise acquired Novo American

3   Depositary Receipts ("ADRs") between February 3rd, 2015

4   through February 2nd, 2017, inclusive.  The Court finds that:

5           (1) the proposed Class is so numerous that joinder of

6   all members of the Class is impracticable, Fed. R. Civ. P.

7   23(a)(1);

8           (2) there are questions of law or fact that are common

9   to the Class, Fed. R. Civ. P. 23(a)(2);

10          (3) the Class Representatives' claims are typical of

11  the claims of the other Class Members, and they will fairly

12  and adequately represent and protect the interests of the

13  Class Members, Fed. R. Civ. P. 23(a)(3),(4);

14          (4) questions of law and fact common to Class Members

15  predominate over any questions affecting only individual

16  members, Fed. R. Civ. P. 23(b)(3);

17          (5) this class action is the superior method for

18  efficiently adjudicating the claims asserted, *id*;

19          (6) counsel have demonstrated that they are qualified

20  to serve as Class counsel, Fed. R. Civ. P. 23(g); and

21          (7) notice to the Class has been properly and

22  adequately provided to potential Class Members in accordance

23  with this Court's Preliminary Approval Order and Rule 23, *see*

24  Fed. R. Civ. P. 23(c)(2).(*See also* ECF No. 344)

25          The Court, accordingly, certifies this Class for the

1    purposes of settlement.

2          If I'm going a little fast, again, you can get a

3    transcript of this, and so contact my court reporter.

4          Next, the Court will certify the lead plaintiff and

5    Class counsel.  For the purposes of the settlement only, the

6    Court certifies Lehigh County Employees' Retirement System,

7    Oklahoma Firefighters Pension and Retirement System, Boston

8    Retirement System, Employees' Pension Plan of the City of

9    Clearwater, and Central States, Southeast and Southwest

10   Pension Fund as Class Representatives for the Class and

11   appoints Counsel Robbins Geller Rudman & Dowd LLP and

12   Bernstein Litowitz Berger & Grossmann LLP, as Class Counsel

13   for the Class.

14         Certification of the settlement amount.  Third, the

15   Court will certify the settlement amount.  As for the proposed

16   settlement, the Court finds the $100 million dollar cash

17   payment is fair and reasonable based on the surrounding

18   circumstances and complexity of this matter.  The Court is

19   satisfied that the settlement agreement, as outlined by

20   counsel on the record, is fair, reasonable, and adequate to

21   the Class Members in light of the complexity, expense, and

22   duration of this litigation and the risks involved with going

23   to trial and demonstrating liability and damages.  As

24   supported by counsel's showing on the record and in briefing,

25   the proposal was negotiated at arm's length between

1   experienced counsel, *see* Fed. R. Civ. P.23(e)(2)(B); there

2   would be significant costs, risks, and delay if this case were

3   taken to trial, *see* Fed. R. Civ. P. 23(e)(2)(C)(i); the

4   proposed settlement treats Class Members equitably relative to

5   each other, *see* Fed. R. Civ. P. 23(e)(2)(D); the proposed

6   settlement automatically distributes funds to the Class

7   Members without requiring an onerous claims process, *see* Fed.

8   R. Civ. P. 23(e)(2)(C)(ii); and agreements made with Class

9   Representatives in connection with the proposal do not raise

10  concerns that the proposed settlement was improperly

11  negotiated or agreed to, *see* Fed. R. Civ. P. 23(e)(2)(C)(iv).

12  The Court also finds fair and reasonable the award of

13  $40,019.05 for the Class Representative given its active role

14  in this action.  *See* 15 U.S.C. §78u-4(a)(4).

15       Fourth, the Court will address the attorneys' fees and

16  the objector's concerns.  Based on Class counsel's request for

17  an award of attorneys' fees and litigation expenses, as well

18  as the positions and arguments made here today in court, the

19  Court finds fair and reasonable the attorneys' fees in the

20  amount of $29,000,000 (which represents 29 percent of the

21  settlement fund).  The Court also finds $2,738,023.93 in

22  litigation expenses and costs are fair and reasonable.  Fed.

23  R. Civ. P. 23(e)(2)(C)(iii).

24       Moving Brief

25       A. Objection to the fee and Plan of Allocation.

As for the objector's concerns, Hedley first argues that the fee request is unreasonable in several ways. (Objector Moving Br. at 4, ECF No. 354-1.) He contends that the fee request is unreasonably disproportionate to the overall settlement amount because counsel's fee request is based on a calculation that includes millions of dollars which will not be paid to the Class. (*Id.* at 5.) Specifically, he contends that the gross settlement amount should have been adjusted to exclude expenses associated with the settlement and the fee request of 29 percent should be based on the adjusted gross settlement fund. (*Id.*) Hedley further argues that the expense amount is therefore misleading and was not properly calculated. (*Id.* at 6.) Hedley asserts that the fee percentage is excessive in light of the overall settlement amount. (*Id.*) He posits that the settlement amount should consider economies of scale to prevent a windfall for plaintiffs' attorneys at the expense of the Class. (*Id.*) Hedley argues, based on empirical data he cites, that the attorneys' fees in a case with a similar settlement, exceeds the typical median of 25 percent. (*Id.* at 7-8.)

Hedley also contends the Plan of Allocation is flawed because the per share damage recovery computed by plaintiffs is trivial compared to the damages arising from defendants' alleged fraudulent conduct. (*Id.* at 8.) Hedley argues the loss amounts highlighted in the Plan of Allocation is not

reasonably related to the damages suffered by the shareholders. (*Id.*) As it relates to him, Hedley argues that the loss amount calculation, for example, does not accurately represent his loss and his damages. (*Id.* at 9-10.)

Moreover, Hedley asserts plaintiffs' counsels do not provide any data to support their calculation that 6.7 percent represents the recovery for the Class, concluding that percentage only fairly compensates the Class Representatives but not the whole Class and that the figure is misleading. (*Id.* at 10-11.) Hedley also argues that the settlement does not adequately reflect each Class Members' loss, explaining that some members who did not suffer as great a financial loss will now receive a greater recovery than others whose losses were greater. (*Id.* at 11.) In essence, Hedley contends that the damage amount each investor will receive is not in parity with the fees the attorneys will receive. (*Id.* at 11-12.) Hedley suggests the primary beneficiaries of the settlement are plaintiffs' counsels and not the Class Members. (*Id.* at 12.)

Next, Hedley contends the case was not excessively complex, risky, or unique that might justify the upper range fee plaintiffs' counsels are seeking. (*Id.* at 13.) He argues the allegations were straightforward and the time it took to resolve the claims were not exceptionally long to justify the fees. (*Id.*)

1    Third, Hedley contends the Court should not consider

2  the minimal number of objectors because some investors who may

3  want to object do not have the resources or knowledge to do

4  so. (*Id.* at 14.)

5    Fourth, Hedley argues that plaintiffs' counsels mislead

6  the Court by charactering the 29 percent fee request as

7  "normally negotiated" because one plaintiffs' counsels

8  routinely negotiate fee requests less than what is at issue.

9  (*Id.*)  He contends that in the cases where fee requests have

10  exceeded 25 percent, which he argues is standard, has been

11  partly because there was a sliding-scale fee arrangement.

12  (*Id.*)

13    Fifth, Hedley contends the fee request fails to

14  disclose how the fees will be allocated and the fee petition

15  gives counsel unchecked authority on how to allocate the fees.

16  (*Id.* at 15.)  Hedley highlights that the six law firms who

17  stand to benefit from the fee request sought a single lump sum

18  as opposed to a more individual award, raising some

19  pay-to-play concerns and requesting that the Court require

20  disclosure of the allocation and allocate the fees itself.

21  (*Id.* at 17-18.)

22    Sixth, Hedley argues plaintiffs' counsels' immediate

23  request for payment of fees and expenses violates the Private

24  Securities Litigation Reform Act ("PSLRA") because the Class

25  should be paid before the attorneys. (*Id.* at 19.) Hedley

1 proposes that the Court only award attorney fees and expenses

2 after the Class has been paid. (*Id.*)

3      Last, Hedley contends that plaintiffs' counsels

4 misjudged the value of the case at $1 billion, and the hours

5 expended by the attorneys did not yield the results they had

6 predicted. (*Id.* at 20.) Hedley posits that plaintiffs'

7 counsels' repeated acknowledgment of the strength of

8 defendants' case was a concession of the difficulties of their

9 case. (*Id.*)

10      <u>Reply</u>

11      First, plaintiffs' counsels begin by arguing that the

12 settlement should be approved in light of the overwhelming

13 positive reaction from the Class. (Pl.'s Reply at 1, ECF No.

14 357.) Counsel contends that 378,728 copies of the settlement

15 notice were sent to potential Class Members and nominees, and

16 now that the deadline for objections has passed there has not

17 been any objections to the Settlement or Plan of Allocation.

18 (*Id.* at 2.) Instead, they note that there was a sole objector,

19 and their objection is not to the settlement but to the

20 attorneys' fees, which they contend is significant. (*Id.*)

21 Counsel further contends attorneys' fees should be awarded

22 because the "final total amount requested for litigation

23 expenses . . . is lower than the total amount reserved in the

24 Settlement Notice." (*Id.* at 3.) Counsel also argues their fee

25 request is reasonable in light of the result achieved, their

1  skills and experience, and the contingency basis of the fees.

2  (*Id.* at 4.)

3      Second, plaintiffs' counsels assert that significantly

4  there were no institutional objectors, even though there were

5  more than 1,200 institutions involved in the suit. (*Id.* at 5.)

6  Plaintiffs' counsels contend Hedley's objection is boilerplate

7  in that the argument -- that the settlement could be higher

8  and the fee smaller -- could be launched for any claim for

9  attorneys' fees. (*Id.* at 6.) Plaintiffs' counsels argue the

10 objector's concern, which is not with the settlement itself,

11 is unfounded because he miscalculates the impact of the fee

12 award. (*Id.*)

13     Third, plaintiffs' counsels assert, contrary to

14 Hedley's suggestion, courts nationwide regularly award

15 percentage fee awards in securities class actions based on the

16 settlement amount, inclusive of expenses. (*Id.* at 8.)

17     Fourth, counsel further argues Hedley's assertion that

18 a lesser fee percentage should apply is unwarranted because

19 courts should perform a case-specific assessment of whether a

20 fee decline is necessary. (*Id.* at 9.) Moreover, they argue

21 courts have recognized Hedley's "proposed declining fee

22 structure would likely result in lower net Class recoveries

23 because it disincentivizes counsel to assume the higher risk

24 of pursuing higher settlements, misaligning the interests of

25 Class counsel and the Class." (*Id.* at 10.) Counsel also

contends the settlement amount is above the average recovery within our circuit and argues Hedley's supporting statistical data does not support his position. (*Id.* at 11.) Counsel posits Hedley's statistical support underscores the amount recovered, and they state the percentage recovered is respectively 20 percent and 34 percent higher than the median within this circuit and national median for cases of any size. (*Id.* at 11-12.)

Fifth, counsel contends, contrary to Hedley's assertion, the Class Members' recovery, specifically Hedley's, will not be inadequate because Hedley's own recovery will be greater than the average as Hedley purchased and retained his damaged ADR when it had the highest artificial inflation. (*Id.* at 13.) Moreover, counsel argues that courts generally uphold pro rata distributions as is the case here. (*Id.*)

Sixth, plaintiffs' counsels also reject Hedley's position that investors whose market losses are greater should recover more. (*Id.*) They posit that those investors' claims are limited because they may only recover losses caused by the fraud. (*Id.*)

Seventh, counsel argues the settlement does not in any way harm current holders of Novo Nordisk ADRs. (*Id.* at 15.) They additionally argue the minimum distribution of $10 is reasonable and appropriate in light of the fact courts have upheld minimum distributions similar to this one. (*Id.* at 16.)

1    Eighth, rejecting Hedley's position, counsel contends

2    the settlement was a product of extensive and complex

3    litigation, highlighting that there were complicated issues

4    and risks involved in this litigation and that Hedley fails to

5    address any of them. (*Id.* at 17.) Here, counsel highlights

6    that the mediator, a former federal judge, and former U.S.

7    Attorney, reviewed the settlement in its entirety and approved

8    of it, and in doing so, recognized that it was a large and

9    complex case. (*Id.* at 18.) Counsel also highlights that the

10   pandemic's effect, requiring the use of remote interactions

11   and proceedings in this case, also adds to the case's

12   complexity. (*Id.*) Counsel states the sophistication of the

13   lead plaintiffs and institutional investors, all of whom

14   approved the settlement, also supports their understanding of

15   the duration and complexity of the case. (*Id.*) Counsel

16   summarily rejects Hedley's contention that the fee was not

17   justified because the risk of litigation was limited after the

18   case survived the motion to dismiss stage, noting that this

19   argument discounts counsels' efforts in this case and contrary

20   to Third Circuit precedent, the fact that a case proceeds

21   longer favors attorneys' fees. (*Id.* at 19.)

22   Plaintiffs' counsels strongly assert that its fees are

23   well within the market range citing a host of cases in

24   support. (*Id.* at 19-20.) Even though they acknowledge there

25   are cases where fees are lower, they nonetheless assert this

1    case's complexity and result warrant the fee. (*Id.* at 21.)

2         Plaintiffs' counsels also posit that lead counsel will

3    adequately allocate the attorneys' fees consistent with the

4    leadership structure the Court ordered at the outset of the

5    case. (*Id.* at 22.) Counsel further rejects the need for a

6    disclosure of the proposed allocation, arguing that it is

7    neither necessary nor supported by precedent. (*Id.* at 23.)

8    Counsel also contends its fees should be paid upon the Court's

9    granting of the award because it is standard practice and

10   helps prevent meritless objections. (*Id.* at 24-25.)

11   Additionally, counsel adds that for four years they have

12   litigated the case without payment and that courts have

13   routinely rejected this objection. (*Id.* at 26-27.)

14        To conclude, plaintiffs' counsels reject that they

15   "misjudged" the case. (*Id.* at 27.) They argue that they are

16   "skilled lawyers" who after considering all factors determined

17   that $100 million dollars represented a fair value of the

18   case. (*Id.*) Counsel notes that Hedley seemingly conflates the

19   value of the case with the estimated damages of the case,

20   which they contend are two separate measures. (*Id.* at 28.)

21   Last, counsel states they did not engage in unnecessary

22   discovery and the lengthy discovery is in fact evidence of the

23   case's complexity. (*Id.* at 29-30.)

24        I am not going to repeat the arguments of the objectors

25   and the defense counsel.  I think you guys have articulated

1    that fairly clearly on the record today, so I'm not going to

2    repeat them.  I also believe very similar arguments, if not

3    almost verbatim, were placed in the written submissions to the

4    Court.  So for purposes of placing your arguments on the

5    record regarding attorneys' fees and costs, I will refer

6    simply to the written submissions to the Court and what you

7    have verbally provided to the Court today.

8           In reviewing an attorneys' fees award in a class action

9    settlement, the Third Circuit looks at a number factors known

10   as the *Gunter* factors" and the *"Prudential* factors."  *In re*

11   *AT&T Corp.*, 455 F.3d 160, 166(3d Cir. 2006).  The *Gunter*

12   factors include:

13          (1) the size of the fund created and the number of

14   persons benefited;

15          (2) the presence or absence of substantial objections

16   by members of the Class to the settlement terms and/or fees

17   requested by counsel;

18          (3) the skill and efficiency of the attorneys involved;

19          (4) the complexity and duration of the litigation;

20          (5) the risk of nonpayment;

21          (6) the amount of time devoted to the case by

22   plaintiffs' counsel; and

23          (7) the awards in similar cases.

24          The *Prudential* factors also include:

25          (1) the value of benefits accruing to the Class Members

1   attributable to the efforts of Class counsel as opposed to the

2   efforts of other groups, such as government agencies

3   conducting investigations,

4        (2) the percentage fee that would have been negotiated

5   had the case been subject to a private contingent fee

6   agreement at the time counsel was retained, and

7        (3) any "innovative" terms of settlement.

8        In cases involving extremely large settlement awards,

9   district courts may give some of these factors less weight in

10  evaluating a fee award.  *See In re Cendant Corp. Litig.*, 264

11  F.3d 201, 283(3d Cir. 2001); *In re Prudential Ins. Co. Am.*

12  *Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 339 (3d Cir.

13  1998).  What is important is that in all cases the district

14  court "engage in robust assessments of the fee award

15  reasonableness factors," *In re Rite Aid Corp. Sec. Litig.,* 396

16  F.3d 294, 302 (3d Cir. 2005), as amended (Feb. 25, 2005)

17  *Cendant PRIDES*, 243 F.3d at 730 (internal quotations omitted.)

18       The Court will address the objectors arguments in

19  order.  Mr. Hedley's first objection -- that the fee request

20  is unreasonably disproportionate to the overall settlement --

21  is unsupported.  The Court has not found any rules or

22  standards that demand or require that settlement awards be

23  exclusive of expenses.  Neither the text of Rule 23(h) nor the

24  Private Securities Litigation Reform Act ("PSLRA") makes it a

25  requirement that expenses be exclusive of the settlement

1    amount.  Moreover, several courts nationwide regularly affirm

2    districts courts' awards inclusive of expenses and fees as

3    opposed to exclusive of them.  *Kornell v. Haverhill Ret. Sys.*,

4    790 F. App'x 296, 298 (2d Cir. 2019) (affirming district

5    court's award of a percentage of the gross settlement fund,

6    rather than the settlement fund net of expenses, and finding

7    that the "text of Federal Rule of Civil Procedure 23(h) does

8    not bar one method or the other, as long as the award is

9    reasonable, and we decline to read a proscription into Rule

10   23(h) where there is none"); *Powers v. Eichen*, 229 F.3d 1249,

11   1258 (9th Cir. 2000) (rejecting argument that the "amount. . .

12   actually paid to the class" means only "the net amount

13   received after . . . expenses"); *In re Online DVD-Rental

14   Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir. 2015) ("The

15   district court did not abuse its discretion in calculating the

16   fee award as a percentage of the total settlement fund,

17   including notice and administrative costs, and litigation

18   expenses."); *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 172

19   n.8 (3d Cir. 2006) (rejecting objections that attorneys' fees

20   must be calculated based on net settlement amount and noting

21   "[e]xpenses are generally considered and reimbursed separately

22   from attorneys' fees").

23        Mr. Hedley's objection that plaintiffs' attorneys' fees

24   being 29 percent is unreasonable and extensive is not agreed

25   by the Court.  Though the Court recognizes that the fee of 29

1    percent is high, it is not unreasonable.  First, Mr. Hedley

2    has not presented any authority that makes it mandatory that

3    the fee percentage be 25 percent as he proposes.  The majority

4    of Mr. Hedley's supporting authority recommends 25 percent,

5    but those courts' calculations are based on a number of

6    factors, including the settlement amount, the complexity of

7    the case, quality of the results achieved, and overall efforts

8    of counsel in obtaining those results.  *Cendant PRIDES*, 243

9    F.3d at 722.  Second, counsel has provided evidence of the

10   efforts it undertook in obtaining this result in this case.

11   Here, as plaintiffs' counsel has argued, this case has

12   proceeded for more than four years, discovery was extensive

13   with over five million pages produced, dozens of depositions

14   conducted, and the issues were generally complex.  Third,

15   nationwide and within our district courts have awarded fee

16   percentages well within and above the 29% being requested in

17   this case.

18        Mr. Hedley's objection as it relates to the Plan of

19   Allocation is also denied.  Here, Mr. Hedley contends that the

20   Plan of Allocation is flawed because the loss amounts within

21   the plan are not reasonably related to the damages suffered by

22   the shareholders including him.  Mr. Hedley's objection is

23   flawed insofar as "courts 'generally consider plans of

24   allocation that reimburse Class members based on the type and

25   extent of their injuries to be reasonable,'" and "pro rata

1  distributions are consistently upheld." *In re Ocean Power*

2  *Techs.*, 2016 WL 6778218, at *23(D.N.J. Nov. 15, 2016)(internal

3  citation omitted.)  Adding "there is no requirement that a

4  Plan of Allocation differentiat[e] within a Class based on the

5  strength or weakness of the theories of recovery.'"

6  Additionally, the settlement notice informed all Class Members

7  that they may recover more or less than the estimated average

8  amount. (Notice of Settlement Notice ¶ 3, ECF No. 351-9.)

9       Mr. Hedley's second objection that the attorneys' fees

10  are not warranted because the case is not complex, risky, or

11  unique is also overruled.  As plaintiffs' counsel aptly noted

12  this case was complex and risky in various ways and the Court

13  agrees.  For example: (1) the issues in this case were complex

14  as they spanned across several pharmaceutical companies

15  touching on issues of fraud, market access, and pricing, (2)

16  the need for counsel to adapt to the pandemic with regards to

17  remote proceedings and marshalling evidence, (3) the case

18  surviving the motion to dismiss stage, (4) dozens of

19  depositions, and (5) over five million pages of discovery all

20  add to the complexity of the case.

21       Third, it is significant for the Court that out of the

22  378,728 copies of the settlement notices that were disbursed,

23  there was only one objector, Mr. Hedley.  Further, as

24  plaintiffs' counsel notes, the sole objector's issue is

25  neither with the settlement nor the Plan of Allocation as a

1  whole but rather with the attorneys' fees.  As courts have

2  stated, when the number of objectors is this low, the "vast

3  disparity between the number of potential Class Members who

4  received notice of the settlement and the number of objectors

5  creates a strong presumption . . . in favor of the settlement.

6  *Cendent PRIDES.,* 264 F.3d at 235.

7       Mr. Hedley's fourth objection -- that fee request fails

8  to disclose how the fees will be allocated and the fee

9  petition gives counsel unchecked authority on how to allocate

10  the fees -- is also overruled.  The Third Circuit *In re*

11  *Cendant Corp. Litig.,* which Mr. Hedley heavily relies,

12  concluded that the objector's pay-to-play concerns were

13  ultimately unfounded because the court explained that

14  "[a]llegations of impropriety are not proof of wrongdoing

15  [and] [i]f they were, then any class member (or lawyer seeking

16  to be appointed lead counsel) could disable any presumptive

17  lead plaintiff by making unsupported allegations of

18  impropriety." 264 F.3d at 270.  In essence, the court

19  explained that the objectors did not have any evidence of

20  wrongdoing to suggest that counsel would not properly allocate

21  the fees.  Likewise, Mr. Hedley's concerns are simply

22  unsupported by any evidence that counsel engaged or will

23  engage in any conduct that gives rise to pay-to-play concerns.

24  In sum, Mr. Hedley's concerns of impropriety are purely

25  speculative.

1    Mr. Hedley's objection that plaintiffs' counsel should

2  not be paid simultaneously with the award to the Class is also

3  overruled.  Mr. Hedley first contends the quick pay provision

4  violates the PSLRA.  However, Mr. Hedley cites no specific

5  provision that was violated.  Instead, the provision Mr.

6  Hedley cites mandates that fee percentages should not exceed

7  award of damages, but it states nothing on the timing of the

8  payments.  Also, in the case Mr. Hedley cites, *Hart v. BHH,*

9  *LLC*, 334 F.Rd. 74 (S.D.N.Y. 2020), the court's primary concern

10  was whether paying the attorneys first harms the Class.  Here,

11  Mr. Hedley has not presented any evidence or facts to suggest

12  that by paying the attorneys first this would somehow harm the

13  Class.  Further, in the *Eubank v. Pella Corp.* case, 753 F.3d

14  718 (7th Cir. 2014), which Mr. Hedley also relies on, the

15  court was only suspicious of the quick-pay provision because

16  the attorneys had a conflict of interest which was not fully

17  disclosed.  The Court cannot conclude that the quick-pay

18  provision should not be enforced.  The Court also finds

19  plaintiffs' counsels position that they have litigated the

20  case for over four years without pay is persuasive and favors

21  the enforcement of the quick-pay provision.

22    Mr. Hedley's final concern that counsels misjudged the

23  value of the case did not accurately predict the results of

24  the case is also overruled.  Plaintiffs' counsels are skilled

25  lawyers who at the outset predicted the case at a higher

1    amount and over the course of litigation, the case settled for

2    a lesser amount.  In agreeing to accept the $100 million

3    dollar settlement on behalf of the Class -- which the Class

4    overwhelmingly approves of -- counsel engaged in extensive

5    discovery, mediation, and litigation.  The Court does not find

6    any reason to believe counsel engaged in unnecessary discovery

7    to force a settlement amount.  As counsel states, and the

8    Court agrees, the lengthy discovery they engaged in is

9    evidence of the case's complexity.  In conclusion, Mr.

10   Hedley's objections are overruled, and the attorney' fees will

11   remain at $29 million dollars.

12        Accordingly, the Court approves the Class Settlement

13   Agreement and grants Class counsel's Motion for Attorneys'

14   Fees, Costs, and Service Awards.  An order consistent with

15   this opinion will be issued later today.

16        I do want to raise this issue.  I believe there are

17   three orders before me, and I want to make sure that I have it

18   on the record.

19        Mr. Cecchi, I don't know if you or Mr. Hollander are

20   going to affirm this, but I have an Order and Judgment

21   Approving Class Action Settlement that was proposed to the

22   court.  I have an Order Awarding Attorneys' Fees and

23   Litigation Expenses and Awards to Lead Plaintiffs.  That's a

24   proposed order before me.  I also have a third proposed order

25   which is an Order Approving Plan of Allocation.

1       Are you all tracking that those are the three proposed

2   orders that would be consistent with my ruling today?

3           MR. CECCHI:  Yes, Your Honor.

4           MR. HOLLANDER:  Yes, Your Honor.

5           THE COURT:  All right.  I intend to execute these

6   three records or proposed orders today and place them on the

7   docket.

8       Is there anything further from plaintiffs' counsel?

9           MR. CECCHI:  No, Your Honor.  Thank you for your time

10  and diligence today.

11          THE COURT:  Defense, I'm sorry.

12          MR. POTISCHMAN:  Nothing further.

13          THE COURT:  Mr. Hedley, I noted your objection and

14  it's on the record, but anything further from you before I

15  adjourn today's proceedings?

16          MR. HEDLEY:  Nothing, Your Honor.  Thank you.

17          THE COURT:  Thank you all for your time.  This matter

18  is now adjourned.  Be well.

19          (Court concludes at 11:58 a.m.)

20

21

22

23

24

25

1          FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

2          - - - - - - - - - - - - - - - - - - - - - -

3

4      I certify that the foregoing is a correct transcript from

5  the record of proceedings in the above-entitled matter.

6

7

8      I

9

10

11  **/S/ Megan McKay-Soule, RMR, CRR     August 18, 2022**

12           Court Reporter                         Date

13

14

15

16

17

18

19

20

21

22

23

24

25